Joseph J. Saltarelli (JS-1560)
HUNTON & WILLIAMS LLP
200 Park Avenue, 43rd Floor
New York, NY 10166
(212) 309-1000 (telephone)

   *-and-*

Edward J. Fuhr (admitted *pro hac vice*)
Terence J. Rasmussen (admitted *pro hac vice*)
HUNTON & WILLIAMS LLP
951 E. Byrd Street
Riverfront Plaza, East Tower
Richmond, Virginia 23219
804-788-8200 (telephone)

*Counsel for Defendants Dynex Capital, Inc.,*
*Merit Securities Corporation, Thomas H. Potts*
*and Stephen J. Benedetti*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____
                                 )
                                 )
                                 )
IN RE DYNEX CAPITAL, INC.       )     Master File No. 05-CV-1897 (HB)
SECURITIES LITIGATION         )
                                 )
                                 )
_____)


### DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS
### PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT


Dated:  July 15, 2005
       New York, New York

**TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ................................................................................1

II.     STATEMENT OF FACTS .....................................................................................2

        A.      Merit Issues the Series 13 Bonds ..............................................................3

        B.      Merit Discloses the Risks of Investing in the Bonds ................................5

        C.      The Collateral Performs Contrary to Expectations ...................................6

        D.      Despite the Performance of the Collateral, Plaintiff Purchases the Bonds............7

        E.      Following Plaintiff's Purchase, the Collateral Continues to Underperform...........7

        F.      Credit Agencies Downgrade the Credit Ratings of the Bonds ...............................8

        G.      Plaintiff Files This Lawsuit ......................................................................8

III.    ARGUMENT.........................................................................................................9

        A.      Plaintiff's Claims Are Time-Barred ..........................................................9

        B.      Plaintiff Fails To Plead Facts Giving Rise To a Strong Inference of Scienter ......12

                1.      Boilerplate Cannot Support a Strong Inference of Scienter ....................13

                2.      Plaintiff's Incoherent Theory of Motive Affirmatively Refutes Scienter .13

                3.      Plaintiff Fails To Plead Strong Circumstantial Evidence of Conscious Misconduct or Recklessness ...........................................15

        C.      Plaintiff Fails To Plead Fraud With the Particularity Required by the Reform Act and Rule 9(b) ...........................................17

        D.      Plaintiff Fails To Plead Loss Causation...................................................21

        E.      Statements Regarding Loss Reserves Were Forward-Looking .............................23

        F.      Plaintiff Lacks Standing to Pursue Many of the Claims Asserted........................24

IV.     CONCLUSION....................................................................................................25

## TABLE OF AUTHORITIES

### FEDERAL CASES

In re Advanta Corp. Sec. Litig., 180 F.3d 525 (3d Cir. 1999) ..........................................19

AIG Global Sec. Lending Group v. Banc of America Sec. LLC,
    254 F. Supp. 2d 373 (S.D.N.Y. 2003) ........................................................................19

In re American Bus. Fin. Servs., Inc. Sec. Litig., No. 04-0265,
    2005 WL 1324880 (E.D. Pa. June 2, 2005) ...............................................................20

America High-Income Trust v. AlliedSignal, 329 F. Supp. 2d 534
    (S.D.N.Y. 2004) ..........................................................................................................11

Basic, Inc. v. Levinson, 485 U.S. 224 (1985)....................................................................23

Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975) .......................................24

California Pub. Employees' Retirement Sys. v. Chubb Corp.,
    394 F.3d 126 (3d Cir. 2004) .......................................................................................20

Dodds v. Cigna Sec., Inc., 12 F.3d 346 (2d Cir. 1993) .....................................................10

Dura Pharms., Inc. v. Broudo, 125 S.Ct. 1627 (2005).......................................................21

Ennis v. Montemayor, 14 F. Supp. 2d 379 (S.D.N.Y. 1998)..............................................10

Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976).............................................................12

Faulkner v. Verizon Comm., Inc., 189 F.Supp.2d 161 (S.D.N.Y. 2002) ....................14, 16

Feasby v. Industri-Mathematik International Corp., No. 99-8761,
    2000 WL 977673 (S.D.N.Y. July 17, 2000) ..............................................................21

Feldman v. Hanley, 59 F.R.D. 299 (S.D.N.Y. 1973) ........................................................24

In re First Union Corp. Sec. Litig., 128 F. Supp. 2d 871 (W.D.N.C. 2001).....................14

In re Flag Telecom Holdings, Ltd. Sec. Litig., 308 F. Supp. 2d 249
    (S.D.N.Y. 2004)..........................................................................................................17

Funke v. Life Finance Corp., 237 F. Supp. 2d 458 (S.D.N.Y. 2002)..........................16, 23

Grace v. Rosenstock, 228 F.3d 40 (2d Cir. 2000) .............................................................24

In re Health Mgmt. Sys. Sec. Litig., No. 97-1865,
    1998 WL 283286 (S.D.N.Y. June 1, 1998) ..........................................................13, 17

Herbst v. Able, 45 F.R.D. 451 (S.D.N.Y. 1968) ..............................................................24

In re Initial Public Offering Sec. Litig., 227 F.R.D. 65 (S.D.N.Y. 2004) ........................22

In re Initial Public Offering Sec. Litig., 241 F. Supp. 2d 281 (S.D.N.Y. 2003) ...............23

In re Initial Public Offering Sec. Litig., 341 F. Supp. 2d 328 (S.D.N.Y. 2004) ...............25

In re Initial Public Offering Sec. Litig., No. MDL 1554, 2005 WL 743550
    (S.D.N.Y. Apr. 1, 2005).............................................................................................22

Kalnit v. Eichler, 264 F.3d 131 (2d Cir. 2001) ................................................12, 13, 14, 15

In re Kindred Healthcare, Inc. Sec. Litig., 299 F. Supp. 2d 724
    (W.D. Ky. 2004) ........................................................................................................23

Klein v. Bower, 421 F.2d 338 (2d Cir. 1970) ....................................................................11

LC Capital Partners, LP v. Frontier Ins. Group, Inc.,
    318 F.3d 148 (2d Cir. 2003) ................................................................................10, 11

Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir. 2005).........................................3, 21

In re Merrill Lynch & Co. Research Reports Sec. Litig., 272 F.Supp.2d 243
    (S.D.N.Y. 2003) ..........................................................................................................14

In re Merrill Lynch & Co. Research Reports Sec. Litig., 273 F.Supp.2d 351
    (S.D.N.Y. 2003) ......................................................................................................2, 12

Nolte v. Capital One Finance Corp., 390 F.3d 311 (4th Cir. 2004) .................................16

Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000) ..................................................2, 17, 18, 21

Oran v. Stafford, 226 F.3d 275 (3d Cir. 2002) ..................................................................22

Pfeiffer v. Goldman, Sachs & Co., No. 02-6912,
    2003 WL 21505876 (S.D.N.Y. July 1, 2003) ..............................................................2

Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004)..................................................15, 22, 25

Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124 (2d Cir. 1994) ..........................13, 14, 20

In re Sunterra Corp. Sec. Litig., 199 F. Supp. 2d 1308 (M.D. Fla. 1994) ........................17

<u>In re Ultrafem, Inc. Sec. Litig.</u>, 91 F. Supp. 2d 678 (S.D.N.Y. 2000) ...............................10

<u>Vervaecke v. Chiles Heider & Co., Inc.</u>, 578 F.2d 713 (8th Cir. 1978) ...........................24

<u>White v. H&R Block, Inc.</u>, No. 02-8965, 2004 WL 1698628
    (S.D.N.Y. July 28, 2004) .......................................................................................12

<u>In re WorldCom, Inc. ERISA Litig.</u>, 354 F. Supp. 2d 423 (S.D.N.Y. 2005) .....................6

## FEDERAL STATUTES

Section 10(b) of the Securities Exchange Act of 1934,
    15 U.S.C. § 78j(b) .................................................................................................1

Section 20(a) of the Securities Exchange Act of 1934,
    15 U.S.C. § 78t(a) ...............................................................................................25

Private Securities Litigation Reform Act of 1995,
    15 U.S.C. § 78u-4, 5 ...........................................................................2, 12, 17, 24

28 U.S.C. § 1658(b) ...................................................................................................9, 10

## FEDERAL REGULATIONS

Rule 10b-5, 17 C.F.R. § 240.10b-5...............................................................................1

## FEDERAL RULES

Fed. R. Civ. P. 9(b) .....................................................................................2, 17, 18, 21

Fed. R. Civ. P. 12(b)(6) .................................................................................................2

## LEGISLATIVE HISTORY

H.R. Conf. Rep. No. 104-369 (1995) .............................................................................1

## MISCELLANEOUS

Alex Berenson, <u>A Boom Built Upon Sand, Gone Bust</u>,
    New York Times (Nov. 25, 2001) ......................................................................11, 12

Fitch Ratings, <u>Fitch Affirms 1 and Downgrades 3 RMBS Classes
of Merit Series 12-1</u>, Business Wire (Mar. 10, 2004) ............................................8, 22

Fitch IBCA, <u>Merit Securities Corp. Collat. Bonds Series 13 Rated by Fitch</u>,
Business Wire (Sept. 2, 1999) ....................................................................................4

Moody's Investors Service, <u>Moody's Reviews for Possible Downgrade Ratings
of Senior and Subordinated Certificates of Merit Series 13</u> (Oct. 2, 2003).................22

Moody's Investors Service, <u>Moody's Downgrades Senior and Subordinate
Certificates of Merit Securities Corp.'s Series 13 Manufactured Housing
Securitization</u>, (Feb. 24, 2004) .........................................................................8, 14, 22

Standard & Poor's, <u>U.S. Manufactured Housing ABS Hit Turbulent Times</u>,
(May 30, 2002) .........................................................................................................12

Defendants Dynex Capital, Inc. ("Dynex"), Merit Securities Corporation ("Merit"), Thomas H. Potts and Stephen J. Benedetti (collectively, "Defendants") submit this memorandum of law in support of their motion to dismiss with prejudice the Amended Class Action Complaint filed on May 31, 2005, by Teamsters Local 445 Freight Division Pension Fund ("Plaintiff"). Plaintiff asserts claims under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, on behalf of a purported class of purchasers of certain bonds between February 7, 2000, and May 13, 2004 ("Class Period").

## I.    PRELIMINARY STATEMENT

Gamblers do not bet on horses they know are going to lose. Nor do corporations purchase multi-million dollar interests in securities they know are doomed to fail. Doing so would defy economic reason.

In this case, Plaintiff's theory defies economic reason.

In 1999, Merit, a subsidiary of Dynex, issued two series of bonds. The collateral for the bonds consisted of pools of manufactured housing loans. Merit sold some of those bonds and used the proceeds primarily to purchase the collateral. As Plaintiff admits, however, Dynex and Merit also acquired an interest in the bonds that was valued in the tens of millions of dollars.

Beginning in 2000, two years before Plaintiff purchased any bonds, the performance of the loans underlying the bonds was increasingly disappointing. Despite this performance, Plaintiff purchased the bonds and purportedly lost money. Dynex lost even more money. Now Plaintiff, seeking to use this Court as investment insurance, argues that its investment losses were caused by fraud. But this fraud would have required Defendants to acquire a multi-million dollar interest in securities that, according to Plaintiff, Defendants themselves had doomed to failure.

In short, if there was a fraud, Dynex and Merit were its chief victims.

This outlandish claim fails to clear the "tall hurdle" that Congress created for plaintiffs seeking "to state a claim for securities fraud."  Pfeiffer v. Goldman, Sachs & Co., No. 02-6912(HB), 2003 WL 21505876, at *4 (S.D.N.Y. July 1, 2003).  This "hurdle" is the Private Securities Litigation Reform Act of 1995 ("Reform Act"), 15 U.S.C. § 78u-4, which was passed "to curtail the filing of meritless lawsuits" such as this.  Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000) (quoting H.R. Conf. Rep. No. 104-369, at 41 (1995)).

In addition to its disregard for economic reason, the Amended Complaint fails to satisfy the Reform Act, Rule 9(b), and Rule 12(b)(6) for the following reasons:

- Plaintiff's claims are time-barred, which is not surprising given that the bonds in question were issued in 1999;

- Plaintiff fails to plead facts giving rise to a strong inference of fraudulent intent;

- Plaintiff fails to plead with particularity that any statements are false;

- Plaintiff fails to plead that the alleged misstatements caused its losses;

- Plaintiff attacks forward-looking statements protected by a statutory safe harbor; and

- Plaintiff lacks standing to assert claims on behalf of purchasers of securities that Plaintiff never purchased, such as the Series 12 bonds.

For these reasons, the Amended Complaint must be dismissed with prejudice.

## II.    STATEMENT OF FACTS

Dynex is a financial services company that invests primarily in bonds secured by mortgage loans and manufactured housing loans.  Am. Compl. ¶ 22.[1]  Merit is a subsidiary of Issuer Holding Corporation ("IHC"), itself a subsidiary of Dynex (¶ 21).

---

[1] The following discussion is based on allegations in the Amended Complaint (referred to as "¶ __"), and other sources the Court may consider on this motion to dismiss.  See In re Merrill Lynch & Co. Research Reports Sec. Litig., 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003) (on motion to dismiss, courts consider documents "incorporated in[to] [the complaint] by reference," documents "'integral' to the complaint and relied upon in it, even if not . . . incorporated by reference," documents plaintiff "relied

(continued…)

This case arises out of two series of bonds (Series 12 and Series 13) issued by Merit in 1999 (¶ 54). The two series are virtually identical for purposes of this litigation. See ¶¶ 6 (the offering documents for each series "were identical in assurances to investors"); 1 (referring collectively to the two series as "the Bonds"); 53-116 (making no distinction between each series with regard to alleged misstatements). The following discussion focuses on Series 13, with references to Series 12 where appropriate.

## A.   Merit Issues the Series 13 Bonds

On August 31, 1999, Merit issued bonds ("Series 13 Bonds" or "Bonds") in the aggregate principal amount of $341,250,000 (¶ 54). The Bonds were issued pursuant to a Prospectus and a Prospectus Supplement ("Supplement") (collectively, the "Offering Documents") (¶¶ 6, 54, 67-71). See also Prospectus (Aug. 11, 1999), Ex. 2; Supplement (Aug. 31, 1999), Ex. 3.[2]

The Bonds were asset-backed securities. The asset that "backed" the Bonds was a pool of approximately 6,813 manufactured housing loans ("Collateral") that were originated by an affiliate of Dynex between 1997 and 1999 (¶¶ 35, 53-54). See also Ex. 3, at S-16. As homeowners made payments on these underlying loans, purchasers of the Bonds would receive monthly payments of interest and principal (¶ 37).

To decrease the credit risk associated with the Bonds, Merit added three forms of "credit enhancement" (Ex. 2, at 32) to the Bonds. First, Merit issued the Bonds in ten different classes, with holders of the more senior bonds entitled to priority in receiving payments of interest and

_____

on . . . in framing the complaint," documents filed with the SEC, and "facts of which judicial notice may . . . be taken"), aff'd sub nom. Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir. 2005). Relevant pages of such sources are attached hereto as Exhibits ("Ex. __").

[2] For the Series 12 Bonds, which were issued on March 29, 1999 (¶ 54), see Merit Form 424B4 (Apr. 2, 1999) (containing both the Series 12 Prospectus and the Series 12 Prospectus Supp.), Ex. 4, quoted in ¶¶ 67-70.

principal (¶¶ 36, 38-39).[3]  To the extent there were any losses on the Collateral, the subordinated

classes would absorb that loss before it was passed on to the senior classes (¶ 37).  See also Ex.

3, at S-2; Ex. 5, at 15.  Merit sold the seven most senior classes to underwriters, who sold them

to investors.  Dynex, however, retained the three most subordinated classes for its own account.

See Initial Compl. ¶ 8 (Dynex "was an 'investor' in [the] bonds").[4]

  Second, Merit retained a substantial interest in the Bonds in the form of "over-

collateralization."  See ¶¶ 40 (Merit "agreed to an 'overcollateralization' commitment [that] . . .

was approximately 3% to 5% of the loan balance"); 23 (quantifying Merit's retained interest in

the Bonds as "$44.16 million"); see also Ex. 3, at S-2, S-11.  The over-collateralization was the

amount by which the principal balance of the Collateral exceeded, or went "over," the principal

balance of the Bonds (¶ 37).  This amount provided additional security for investors, as any loss

on the Collateral would have to exhaust the over-collateralization before investors — even those

holding the most subordinated bond classes — felt its impact.  See ¶ 37 ("losses were borne by

Merit (and Dynex) . . . to the extent [of the over-collateralization] and thereafter by the [B]onds

in reverse order of seniority") (emphasis added).

  Finally, Merit established a "collateralization fund."  Ex. 3, at S-2, S-8; Ex. 5, at 15; Ex.

8.  Merit deposited into this fund loans with a principal balance of $15 million as additional

security for the Bonds.  Ex. 3, at S-2.

---

  [3] The ten classes were labeled, in descending order of seniority, A1, A2, A3, A4, M1, M2, B1, B2, B3, and B-IO.  See Indenture Supp., at 2, 9-10 (Aug. 1, 1999), Ex. 5 (attached to Merit 8-K (Sept. 13, 1999), Ex. 6); Sales Agreement Between Merit and IHC, at 1 (Aug. 31, 1999), Ex. 7 (referenced in Ex. 6).

  [4] See also Ex. 7, at 1 (in exchange for receipt of the Collateral from IHC, Merit agreed to give IHC not only the proceeds from the sale of the Class A1 through B1 Bonds, but also the Class B2, B3 and B-IO Bonds themselves, which are referred to as the "Retained Bonds"); Fitch IBCA, Merit Securities Corp. Collat. Bonds Series 13 Rated by Fitch, Business Wire (Sept. 2, 1999) (referring to the "unoffered B1, B2 and B3" classes), Ex. 8; Am. Compl. ¶¶ 22; 53.

After Merit issued the Bonds, the underlying loans were serviced initially by an affiliate of Dynex and subsequently by Origen Financial, Inc. (¶ 24). Among other duties, servicers collected monthly payments from the owners of the manufactured homes and remitted those payments to Dynex, the "master servicer" (¶¶ 24-25). <u>See also</u> Ex. 3, at S-2, S-18 to 19. Dynex, in turn, forwarded those payments to the trustee for distribution to the bondholders (¶ 25).[5]

**B.      <u>Merit Discloses the Risks of Investing in the Bonds</u>**

The Offering Documents disclosed the risks of investing in the Bonds. In particular, these documents disclosed the risks associated with, among other things:

- <u>The underwriting of the loans</u>. <u>See, e.g.</u>, Ex. 2, at 9 ("Manufactured Home Loans are originated in accordance with credit underwriting standards that . . . generally are <u>more lenient</u> than those applied to borrowers under many conventional . . . mortgage loans.") (emphasis added); 33 (Dynex's "underwriting guidelines for Mortgage Loans are <u>less stringent</u> than those applied by [government agencies] Fannie Mae or FHLMC") (emphasis added).

- <u>Future defaults on the loans</u>. <u>See, e.g.</u>, Ex. 2, at 9 ("the Manufactured Home Loans are likely to experience rates of Delinquency and Foreclosure that are higher, <u>and may be substantially higher</u>, than mortgage loans originated in accordance with [stricter] underwriting standards.") (emphasis added).

- <u>Future losses upon repossession and resale</u>. <u>See, e.g.</u>, Ex. 2, at 8 ("Manufactured Homes generally decline in value over time . . . , and so the Losses incurred upon repossession and resale of . . . Manufactured Homes . . . generally may be expected to be more severe than the Losses that would be incurred upon Foreclosure on Mortgaged Premises.").

- <u>Future losses on the Bonds</u>. <u>See, e.g.</u>, Ex. 3, at S-3 ("**You may have losses on your bonds if the losses and delinquencies on contracts exceed certain levels.**") (emphasis in original); Ex. 2, at 4 ("in extreme cases, [Bondholders may] fail to recoup fully their initial investments.").

- <u>Lack of Market for the Bonds</u>. <u>See, e.g.</u>, Ex. 3, at S-5 ("There is no assurance that any [secondary] market, if established, will continue or that any investor will be able to sell any of the bonds at a price equal to or greater than the [purchase] price.").

---

[5] For the convenience of the Court, attached as Exhibits 9 and 10 are charts displaying the structure of the Bonds and total payments and losses to date on the Bonds, respectively.

- <u>Economic Downturn</u>.  <u>See, e.g.</u>, Ex. 2, at 8 ("if economic conditions decline . . . , Losses . . . are likely to increase, perhaps substantially"); <u>id.</u> (a borrower's "ability . . . to make Monthly Payments will be dependent on the availability of jobs and general economic conditions.").[6]

## C.    <u>The Collateral Performs Contrary to Expectations</u>

Following issuance of the Bonds, the delinquency rates of the underlying home loans increased steadily.  Dynex reported this increase on a monthly basis.  <u>See</u> ¶¶ 24-25 (in its role as master servicer, Dynex issued monthly payment reports); Monthly Payment Reports (Sept. 1999 - Dec. 2001), Ex. 11.  In the first two years following issuance of the Bonds, Dynex reported an increase in delinquency rates of <u>more than three hundred percent</u>.  <u>See</u> Ex. 11.

In addition to increasing delinquency rates, Dynex and Merit reported numerous other problems with the Collateral.  For example, in 2001, Merit disclosed that it had taken an impairment "charge of $13.3 million in the fourth quarter of 2000 <u>due to the underperformance of the Company's securitized manufactured housing loan portfolio</u>."  Merit 10-K, at 5 (Apr. 16, 2001) (emphasis added), Ex. 12.  Merit had "seen the loss severity on manufactured housing loans increase dramatically since the end of the third quarter of 2000" and  had also seen "some increase in overall default rates."  <u>Id.</u>[7]  Merit believed that "market conditions for manufactured housing loans w[ould] remain unfavorable through 2001."  <u>Id.</u>

---

[6] In addition to these risk disclosures, the Supplement disclosed in great detail the characteristics of the Collateral.  <u>See</u> Ex. 3, at S-15 to 17.  This allowed potential investors to draw their own conclusions.  <u>See</u> Ex. 2, at 23 ("prospective investors are urged to consider their own estimates as to the anticipated rate of future payments of principal on the Collateral").  The warning regarding economic conditions, <u>see</u> Ex. 2, at 8, was especially pertinent as the economy entered a recession not long after Merit issued the Bonds.  <u>See, e.g.</u>, <u>In re WorldCom, Inc. ERISA Litig.</u>, 354 F. Supp. 2d 423, 437 (S.D.N.Y. 2005) ("By March 2001, the economy had entered a downturn that . . . became more severe following the events of September 11, 2001.").

[7] The term "loss severity" refers to the severity of "losses from the inability to recover [the remaining loan balance] from repossession[]" and resale of the underlying mobile home (¶ 13).  It is distinct from the terms "delinquency rate" or "default rate," which refer to the percentage of homeowners that fail to make payments on their loans.

Four months later, in August 2001, Merit announced another increase in loss reserves due "primarily . . . [to] the Company's investment in manufactured housing loan pools." Merit 10-Q, at 9 (Aug. 17, 2001), Ex. 13. Four months later, Merit increased reserves yet again for the same reason. Merit 10-Q, at 9 (Nov. 14, 2001), Ex. 14. By the end of 2001, as a result of this subpar performance, the Collateral had incurred cumulative losses of almost $25 million. See Ex. 15.

**D.    Despite the Performance of the Collateral, Plaintiff Purchases the Bonds**

In January and March of 2002, after a parade of Forms 10-K, Forms 10-Q, and monthly reports disclosed the underperformance of the Collateral, Plaintiff purchased class M1 and M2 Bonds with a principal balance of $442,922 (¶ 20). See also Pl.'s Certification. The Class M1 and M2 Bonds were described in the Offering Documents as riskier than the four more senior classes because they were "more sensitive to the rate of delinquencies and defaults." Ex. 3, at S-29. Indeed, the Supplement warned investors in the Class M1 and M2 Bonds that they "may not fully recover [their] initial investment." Id. at S-3.[8]

**E.    Following Plaintiff's Purchase, the Collateral Continues to Underperform**

Following Plaintiff's purchase of the Bonds, the Collateral continued to experience high default rates and loss severities. See Dynex 10-K, at 23-24 (Mar. 28, 2002) (referring to "continued underperformance of the Company's manufactured housing loan portfolio" that was expected to continue "through 2002"), Ex. 16. In late 2002, Dynex and Merit concluded that generally accepted accounting principles ("GAAP") required them to establish loss reserves for a percentage of loans that were delinquent by only 30 days. Accordingly, Dynex and Merit began

---

[8] See also id. ("**Subordination mechanics place risk of loss on the class M1 and class M2 [bonds].**") (emphasis in original); Ex. 2, at 14 ("the [credit] ratings assigned to Subordinated Classes of Bonds may be more subject to change than the ratings assigned to other kinds of securities").

taking reserves for "a percentage of all [such] loans."  Merit 10-K, at 6, Ex. 17; ¶¶ 2, 100.[9]

In late 2003, after yet another year of subpar loan performance, Dynex and Merit began including in their reserves a percentage of loans that were still "current as to payment but which the [companies had] determined to be impaired . . . under [GAAP]" (¶ 110).

**F.     Credit Agencies Downgrade the Credit Ratings of the Bonds**

On February 24, 2004, Moody's Investors Service ("Moody's") downgraded the class M1 and M2 Bonds in Series 13 from ratings of Aa2 and A2, respectively, to Ca and C (¶¶ 13, 107).  See also Moody's Press Release (Feb. 24, 2004), Ex. 18.  According to Moody's, this downgrade was "prompted by the weaker-than-anticipated performance of the [underlying] manufactured housing loans."  Id.  Several months later, on May 11, 2004, the Bonds traded at "dramatically reduced values" (¶ 108).[10]

**G.     Plaintiff Files This Lawsuit**

On February 7, 2005, Plaintiff initiated this action.  On May 31, 2005, Plaintiff filed an Amended Complaint.  Plaintiff alleges two primary misrepresentations:

1.      That Defendants misrepresented in the Offering Documents in 1999 the quality of the Collateral and the manner in which the Collateral was originated and underwritten (¶¶ 2, 5-6, 10-13, 15, 67-72, 102).

---

[9] Significantly, Dynex had already disclosed to investors the exact number of loans that were delinquent by 30 days.  See Ex. 11 (third page of each report disclosed 30, 60, and 90 day delinquencies).  The change effected by Dynex's new accounting policy was not the disclosure that these loans were delinquent.  Rather, it was the creation of an accounting reserve for loans that had already been disclosed as delinquent by 30 days.

[10] Plaintiff makes similar allegations regarding the Series 12 Bonds (¶¶ 13, 109, 114), which were downgraded for similar reasons.  See Fitch Ratings, Fitch Affirms 1 and Downgrades 3 RMBS Classes of Merit Series 12-1, Business Wire (Mar. 10, 2004) ("[t]he rating actions reflect the poor performance of the collateral pool"), Ex. 19, quoted in ¶ 109.

2.      That Dynex and Merit understated their loan loss reserves at all times during the Class Period by failing to include losses from loans that were not delinquent and loans that were only 30 days delinquent (¶¶ 2, 13, 78-79, 82-83, 86-91, 94-97).[11]

## III.    ARGUMENT

### A.    Plaintiff's Claims Are Time-Barred

Plaintiff's claims must be dismissed with prejudice because they are barred by the statute of limitations.  An action for securities fraud "may be brought not later than the earlier of . . . 2 years after the discovery of the facts constituting the violation; or . . . 5 years after such violation."  28 U.S.C. § 1658(b).  The Complaint runs afoul of these periods.

First, many (if not most) of Plaintiff's claims are based on statements made in the Offering Documents in 1999.  See, e.g., ¶¶ 6 ("The Offering Documents issued in 1999 by Dynex . . . belied the true facts concerning how the collateral was originated"); 64 (Dynex "directed that . . . reported delinquencies be falsified . . . in the Series 12 and Series 13 Offering Documents.").  Indeed, an entire section of the Complaint is devoted solely to alleged misstatements in the Offering Documents (¶¶ 67-72).  See also ¶¶ 56-66 (describing alleged "deficiencies" in loan origination concealed by the Offering Documents).  As Plaintiff filed its Complaint on February 7, 2005 — almost six years after the Offering Documents were issued —

---

[11] Plaintiff also alleges that Defendants: (i) misrepresented that increasing loss severities on the Collateral were due in part to conditions in the manufactured housing market (¶¶ 84-89, 92-97, 100-101, 110-111, 112-13); (ii) failed to disclose that Dynex neglected its duties as master servicer (¶ 80-81); and (iii) failed to disclose that "a material factor in [Dynex's] decision to sell [its] mobile home lending business [in 1999] was [its alleged] poor underwriting and origination practices" (¶ 76-77).

these claims fall outside the five-year limitations period.  28 U.S.C. § 1658(b).  Accordingly, Plaintiff's attack on the Offering Documents must be dismissed with prejudice.[12]

Second, the remainder of Plaintiff's claims are time-barred because "[a]ll of the salient facts upon which [Plaintiff] base[s] [its] Complaint were within [Plaintiff's] grasp" at least two years before Plaintiff filed.  Ennis v. Montemayor, 14 F. Supp. 2d 379, 386 (S.D.N.Y. 1998).  Accordingly, Plaintiff failed to bring suit within two years of "discovery of the facts constituting the [alleged] violation[s]."  28 U.S.C. § 1658(b).

A securities plaintiff "will be deemed to have discovered fraud for purposes of triggering the statute of limitations when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud."  Dodds v. Cigna Sec., Inc., 12 F.3d 346, 350 (2d Cir. 1993).  Courts dismiss claims based on "inquiry" notice "when the facts from which knowledge may be imputed [to the plaintiff] are clear from the pleadings and the public disclosures themselves."  LC Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d 148, 156 (2d Cir. 2003) (quoting In re Ultrafem, Inc. Sec. Litig., 91 F. Supp. 2d 678, 692 (S.D.N.Y. 2000)).

In this case, the facts purportedly giving rise to Plaintiff's action are: (i) Dynex's allegedly poor underwriting between 1997 and 1999, (ii) resulting poor loan performance, and (iii) increasing loan loss reserves.  But there were "storm warnings," LC Capital, at 154, of these conditions prior to February 2003, when Plaintiff knew (or is charged with knowledge) that:

- delinquency rates had increased by more than three hundred percent between 1999 and 2001, see above, at 6, and remained at that high level thereafter, see Ex. 20;

---

[12]  In addition to the paragraphs quoted above, the following paragraphs of the Amended Complaint expressly allege misstatements and omissions in the Offering Documents: ¶¶ 2; 10; 35; 119.  Moreover, to the extent Plaintiff alleges misstatements prior to February 7, 2000, in documents other than the Offering Documents, those claims must also be dismissed.  See, e.g., ¶¶ 10 (Dynex "directed its employees to understate reported delinquencies to be below 2% through the end of 1999.") (emphasis added); 73; 115(b).

- loss severities had "increase[d] <u>dramatically</u>" (Ex. 12, at 5);

- Dynex's loss reserve "more than doubl[ed] to $34.6 million in 2000" (¶ 86);

- Dynex and Merit took additional loss reserves on an almost-quarterly basis in 2001, <u>see</u> <u>above</u>, at 7;

- total losses on the Collateral had risen by <u>two thousand percent</u> from $2 million in December 1999 to almost $40 million in December 2002 (see Monthly Payment Reports (Jan. 2000, Jan. 2003), Exs. 21, 22).

These facts alone were enough "storm warning" to put Plaintiff on inquiry notice of what Plaintiff characterizes as fraud.  <u>See</u> <u>LC Capital</u>, 318 F.3d at 155 (three charges "within four years should alert any reasonable investor that something is seriously wrong"); <u>Am. High-</u> <u>Income Trust v. AlliedSignal</u>, 329 F. Supp. 2d 534, 550 (S.D.N.Y. 2004) (two charges "triggered the duty of a reasonable investor to inquire as to the possibility of fraud").  Indeed, the three hundred percent increase in delinquencies in less than two years was itself a sufficiently threatening storm cloud, even for an unsophisticated investor.  Yet Plaintiff, a sophisticated pension fund, waited more than <u>three years</u> after this tremendous increase to act.  <u>Cf.</u> <u>Klein v.</u> <u>Bower</u>, 421 F.2d 338, 343 (2d Cir. 1970) (statute of limitations will "not await [plaintiff's] leisurely discovery of the full details of the alleged scheme").

There is more.  As Plaintiff admitted in its initial complaint, "disclosures emerged in 2001 and 2002 concerning the improper practices of [manufactured housing] lenders."  Initial Compl. ¶ 58.[13]  As an example of these "disclosures," Plaintiff cited a New York Times article from 2001 that accused underwriters in the manufactured housing industry of "cut[ting] loan standards," "accept[ing] buyers with spotty credit histories," and engaging in "underwriting

---

[13] Perhaps realizing that it was hoist by its own petard with regard to inquiry notice, Plaintiff omitted this admission from the Amended Complaint.

schemes" that produced loans that "would inevitably become delinquent."  Id. ¶¶ 59-60 (citing

Alex Berenson, A Boom Built Upon Sand, Gone Bust, N.Y. Times (Nov. 25, 2001), Ex. 23).

These are the same practices of which Plaintiff accuses Dynex.  See Am. Compl. ¶¶ 5, 13.[14]

   Because the facts that motivated Plaintiff's filing in February 2005 were available to

Plaintiff prior to February 2003, the Amended Complaint is time-barred.

**B.      Plaintiff Fails To Plead Facts Giving Rise To a Strong Inference of Scienter**

   Plaintiff's claims must also be dismissed because Plaintiff fails to plead that the

Defendants acted with scienter.[15]  To survive a motion to dismiss under the Reform Act, a

complaint must, "with respect to each . . . [alleged] omission . . . , state with particularity facts

giving rise to a strong inference that the defendant acted with the required state of mind."  15

U.S.C. § 78u-4(b)(2) (emphases added).  The required state of mind is the "intent to deceive,

manipulate, or defraud."  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976).

   To plead a strong inference of scienter, a plaintiff must allege: (1) "facts that constitute

strong circumstantial evidence of conscious misbehavior or recklessness," or (2) "facts to show

that defendants had both motive and opportunity to commit fraud."  Kalnit v. Eichler, 264 F.3d

---

[14] In addition to the New York Times article, in 2002 Standard & Poor's reported an "across-the-board weakening of industry delinquency statistics . . . consistent with the looser underwriting standards that were prevalent throughout the industry."  Standard & Poor's, U.S. Manufactured Housing ABS Hit Turbulent Times, at 7 (May 30, 2002) (emphasis added), Ex. 24.  This report also noted the "effort [in the mid-1990s] to increase volumes in a highly competitive environment."  Id. at 33; cf. ¶ 56 (Dynex "purchased bad loans . . . since that was the means to enter a highly competitive market").  Numerous other articles prior to February 2003 reported similar facts.  This Court may consider articles and ratings agency reports on this motion to dismiss because, among other reasons, Plaintiff relied on them in drafting the Amended Complaint (¶ 3), and Plaintiff relies on them to support its allegations of market efficiency (¶ 43).  See Merrill Lynch, 273 F. Supp. 2d at 356-57; see also White v. H&R Block, Inc., No. 02-8965, 2004 WL 1698628, at *6 n.2 (S.D.N.Y. July 28, 2004) ("While the court cannot take judicial notice of these articles for the truth of the reports, the court can — and does — take judicial notice that the reports were made, which is all that is necessary to trigger inquiry notice."), Ex. 25.

[15] Plaintiff's scienter allegations are located primarily in ¶ 115 (labeled "Scienter"), but are also scattered throughout the Amended Complaint.  See, e.g., ¶¶ 12-13, 27-30.

131, 138 (2d Cir. 2001).  Recklessness in the securities context involves "highly unreasonable" conduct that is an "extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  Id. at 142.  In this case, Plaintiff fails to plead scienter for three reasons.

**1.    Boilerplate Cannot Support a Strong Inference of Scienter**

First, Plaintiff relies primarily on the same boilerplate that the Second Circuit has disparaged as "so broad and conclusory as to be meaningless."  Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir. 1994).  For example, Plaintiff claims that Defendants "knew [that] the true cause[] for the poor performance of the collateral was . . . reckless underwriting" (¶ 115(e)), and that Defendants "knew, or recklessly disregarded, that 65% -70% of [Dynex's] . . . loan collateral [consisted of] Buy For loans" (¶ 115(c)).  These allegations fail.  See Shields, 25 F.3d at 1129 (rejecting allegation that "defendants 'knew or were reckless in not knowing' that the loan loss reserve was inadequate").

Plaintiff's attempt to plead scienter as to the Individual Defendants suffers from similar defects:  reliance on either boilerplate or allegations so generic that they apply to every single executive in America.  See ¶¶ 27 ("as a result of [Benedetti's] various senior positions," he was "well aware" of undisclosed data); 29 ("Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information"); 28; 30; 32-33.  Courts "have routinely rejected" similar allegations.  See In re Health Mgmt. Sys. Sec. Litig., No. 97-1865(HB), 1998 WL 283286, at *6 (S.D.N.Y. June 1, 1998), Ex. 26.

**2.    Plaintiff's Incoherent Theory of Motive Affirmatively Refutes Scienter**

Second, Plaintiff's theory of fraud negates scienter.  According to Plaintiff, Defendants misled investors about the quality of the Collateral to ease Dynex's entry into the lending market and to ensure a large profit upon sale of the Bonds to the unsuspecting public (¶ 55).

The fatal flaw with this theory is that Dynex and Merit acquired a greater interest in the Bonds than any member of the "unsuspecting" public.  According to Plaintiff, Dynex invested more than $44.16 million in the Series 13 Bonds alone, more than <u>one hundred times</u> the amount Plaintiff invested.  <u>See</u> ¶ 23 (describing "Dynex's principal balance of net investment in the Series 13 Bonds as $44.16 million").  This "net investment" includes the "overcollateralization" (i.e., the most subordinated layer of the Bond structure) described in the Supplement.  <u>See</u> <u>above</u>, at 4; ¶ 40.  Because Dynex retained this subordinated layer, it was the first to feel the impact of any defaults or losses on the Collateral.  <u>See</u> ¶ 37 ("losses were borne by Merit (and Dynex) . . . <u>and thereafter</u> by the [B]onds") (emphasis added); <u>see also</u> Exs. 9, 10.[16]

In short, if a fraud was perpetrated, Dynex and Merit were its chief victims.

The Second Circuit has held that where a plaintiff's "view of the facts defies economic reason, . . . [i]t does not yield a reasonable inference of fraudulent intent." <u>Kalnit</u>, at 140-41 (quoting <u>Shields</u>, at 1130); <u>see also</u> <u>Faulkner v. Verizon Comm.</u>, 189 F. Supp. 2d 161, 171 (S.D.N.Y. 2002) (dismissing complaint because it "defie[d] logic to believe that Verizon sought to bring about NorthPoint's bankruptcy by giving it $150 million in cash").  Indeed, when a plaintiff's allegations "contradict[] the assumption that [defendants] were acting in their own economic self-interest," those allegations "<u>affirmatively refute scienter</u>." <u>In re Merrill Lynch Sec. Litig.</u>, 272 F. Supp. 2d 243, 263 (S.D.N.Y. 2003) (citing <u>Shields</u>) (emphasis added).

Dynex's retention of a multi-million dollar interest in the Bonds is a "sign that [it] believed [the Bonds] w[ere] undervalued, not 'artificially inflated.'" <u>In re First Union Corp. Sec. Litig.</u>, 128 F. Supp. 2d 871, 899 (W.D.N.C. 2001) (defendant company's purchase of its own

---

[16] On February 24, 2004, when Moody's downgraded the Bonds, it confirmed that the "over-collateralization" — the amount retained by Dynex (¶ 40) — had "eroded completely." <u>See</u> Ex. 18, <u>quoted in</u> ¶ 107.

stock contradicted scienter allegations).  Because Plaintiff's allegations "def[y] economic reason," they cannot "yield a reasonable inference of fraudulent intent."  Kalnit, at 140-41.[17]

Even if Plaintiff's theory of fraud were coherent, Plaintiff fails to allege a cognizable motive based on its claim that Dynex sought to enter the lending market (¶ 55).  Dynex entered this market in 1996 (¶¶ 5, 55-56).  Dynex exited this market by the end of 1999.  See ¶¶ 4 ("by . . . year-end 1999 Dynex had sold its mobile home origination business"); 24; 76.  Any motive to enter the lending market would necessarily have dissipated upon Dynex's satisfaction of that motive through entry into (and exit from) the market.  Because this alleged motive was extinguished by 1999 at the latest (¶ 4), it could have "motivated" only those misstatements that were uttered prior to year-end 1999.  As Plaintiff's claims based on alleged misstatements prior to year-end 1999 are time-barred, see above at 9-10, this motive is irrelevant.

In addition to this failure to plead a corporate motive, Plaintiff fails to plead that the Individual Defendants received any benefit whatsoever as a result of their alleged misconduct.  See Rombach v. Chang, 355 F.3d 164, 177 (2d Cir. 2004) (affirming dismissal where plaintiffs "nowhere allege[d] that defendants engaged in . . . transactions to secure personal gain").

### 3. Plaintiff Fails To Plead Strong Circumstantial Evidence of Conscious Misconduct or Recklessness

Because Plaintiff fails "to demonstrate that [D]efendants had a motive to defraud . . . [it] must produce a stronger inference of recklessness."  Kalnit, at 143 (emphasis added).  This

---

[17] Dynex's multi-million dollar loss on the Bonds is further confirmed by: (i) Dynex's retention of the three most subordinated bond classes, see above at 4, yet another action utterly inconsistent with knowledge that the Bonds were doomed to fail; and (ii) Plaintiff's claim that Dynex underreported its loss reserves.  As to the latter, Plaintiff claims that Dynex's reserve of $29.9 million in 2002 for losses on the Collateral was "understat[ed]" (¶¶ 96-97).  By claiming this figure was understated, Plaintiff admits that Dynex lost in excess of $29.9 million in connection with the Collateral.  By claiming that Dynex knew from the outset that the Collateral would incur these losses (¶ 13), Plaintiff is reduced once again to arguing that Dynex knowingly purchased worthless bonds.

stringent "test is not easily met."  Funke v. Life Fin. Corp., 237 F. Supp. 2d 458, 467 (S.D.N.Y.

2002).  Plaintiff attempts to satisfy this test by relying on unnamed "sources" (¶ 15).  See also

¶ 115 (relying on data purportedly obtained from unnamed sources).  This attempt fails.

First, the alleged sources were low-level employees of branch offices at a subsidiary of

Dynex prior to the Class Period (¶ 15).[18]  Accordingly, these sources are irrelevant to Plaintiff's

allegations of fraud during the Class Period.

Second, Plaintiff fails to explain how a former employee's purported knowledge of

certain loan practices supports a strong inference that the Defendants intended to defraud

investors.  Nowhere does Plaintiff allege even generally that any of its sources informed the

Individual Defendants (or some other executive who actually made a public statement) of the

source's alleged opinion.  Nor does Plaintiff allege that the Individual Defendants or any other

executive "adopted [such] opinion" but then "publicly declared" the opposite.  Nolte v. Capital

One Fin. Corp., 390 F.3d 311, 316 (4th Cir. 2004).  These omissions are fatal.  See Faulkner, 189

F. Supp. 2d at 171 (dismissing complaint where "[p]laintiffs plead[ed] no . . . facts to suggest

that [one employee's] opinion was shared, or even seriously considered, by other Verizon

executives"); Nolte, 390 F.3d at 313-14, 316 (4th Cir. 2004).

Finally, Plaintiff's alleged sources are not "described . . . with sufficient particularity to

support the probability that a person in the position occupied by the source would possess the

---

[18] Plaintiff attempts to disguise these facts, but they are clear from the Amended Complaint.
First, in paragraphs 24, 76 and 77, Plaintiff admits that Dynex sold its "manufactured housing lending"
and "servicing operation," known as "Dynex Financial, Inc.," to a third party in 1999.  Second, Plaintiff's
sources allegedly worked in "branch offices" (¶ 3) in the areas of servicing ("collection[s]"), "origination
and underwriting" (¶¶ 3, 15), the exact areas controlled by Dynex Financial (¶¶ 3, 24, 76-77).
Accordingly, having sold Dynex Financial in 1999 (¶ 24, 76-77), Dynex would not have employed people
in the collection and origination fields — the fields in which Plaintiff's "sources" purportedly worked —
subsequent to 1999.

information alleged." Novak, 216 F. 3d at 314. For example, Plaintiff's sources purportedly knew of the "massive First Payment Defaults" Dynex allegedly experienced on a company-wide basis (¶ 15). But the description of these sources as former employees who worked "in the areas of collection and repossession" (¶ 15), fails to "support the probability" that they knew of fatal problems materially affecting the entire universe of Dynex's manufactured housing loans. See In re Flag Telecom Holdings, Ltd. Sec. Litig., 308 F. Supp. 2d 249, 262 (S.D.N.Y. 2004) ("while it would not be impossible for the [informant] to possess this information, it is not apparent from the informant's title that he or she would probably possess such information") (emphasis added).

The only other sources to which Plaintiff points to "support" its flawed scienter allegations are events that occurred towards the very end of the Class Period. See, e.g., ¶ 115(e) - (g) (referring to "internal control" issues and adjusted reporting of repossessions). These "[a]llegations of fraud by hindsight are not actionable under the securities laws," and fail to show that earlier statements were false "at the time they were made." Health Mgmt., at *5.[19]

## C.   Plaintiff Fails To Plead Fraud With the Particularity Required by the Reform Act and Rule 9(b)

The Amended Complaint must also be dismissed because it fails to plead fraud with particularity. The Reform Act requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, [to] state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1) (emphases added). Similarly, Rule

---

[19] See also In re Sunterra Corp. Sec. Litig., 199 F. Supp. 2d 1308, 1326 (M.D. Fla. 2002) (allegations regarding a "breakdown in . . . internal controls" established, at worst, negligence, not "severe recklessness"); cf. ¶ 115(g).

9(b) requires plaintiffs to "explain why the statements were fraudulent."  Novak, 216 F.3d at

306.  Plaintiff fails to do so for three reasons.

First, as a threshold matter, Plaintiff fails to allege that many statements were false.  For

example, Plaintiff claims that Dynex violated its underwriting guidelines between 1997 and 1999

(¶¶ 55-66).  These violations allegedly rendered misleading both the Offering Documents (¶¶ 67-

71), and Defendants' subsequent public statements, each of which hid the alleged violations.

The problem with this theory is that Dynex never claimed to adhere to the rigid

guidelines that Plaintiff says it did.  Plaintiff alleges that Dynex "systematically waived

'underwriting and borrower creditworthiness standards'" by "permitting loans to borrowers with

FICO credit scores below 530" (¶ 10).  Nowhere, however, does Plaintiff allege that Dynex

informed investors that it rejected loan applicants with a FICO score below 530.  Nor does

Plaintiff allege that Dynex's internal guidelines required rejection of such applicants.  Similarly,

Plaintiff alleges that Dynex purchased "Buy For" loans (¶¶ 61-62).  Nowhere, however, does

Plaintiff allege that Dynex informed investors that it rejected such loans, or that Dynex's internal

underwriting guidelines barred such purchases.  Without such allegations, the alleged failure to

disclose purchases of "Buy For" loans is in no way false or misleading.

Moreover, Plaintiff ignores what Dynex actually told investors about its underwriting

guidelines.  Rather than describing inflexible rules tied to specific FICO scores (¶¶ 10, 56-58),

Dynex stated only that "a Manufactured Home Loan typically is made based upon a

determination of the Borrower's ability to make Monthly Payments on the . . . Loan and upon an

investment analysis of the related Manufactured Home."  Ex. 2, at 8; see also id. at 33-35

(describing "Origination of the Collateral"); ¶¶ 67-70 (quoting Prospectus).  This statement is not

rendered false by Dynex's alleged lending to borrowers who posed more of a credit risk than

Plaintiff may have tolerated if Plaintiff were making that business decision.  See In re Advanta Corp. Sec. Litig., 180 F.3d 525, 538-40 (3d Cir. 1999) (court rejected plaintiff's attempt to plead scienter by pointing to the defendant credit card company's "relax[ation] [of] its underwriting and monitoring procedures"; "[a]t most," these allegations demonstrated that defendant "embarked on a business strategy of aggressively recruiting new customers without adequately accounting for the increased risk this endeavor posed") (emphasis added).  This is especially true given Dynex's repeated disclosure in the Offering Documents that its underwriting standards were "more lenient," Ex. 2 at 9, and "less stringent" than others, id. at 33.[20]

Second, even if Plaintiff had pleaded generally that Defendants' statements were false, it fails to do so with the requisite particularity.  For example, Plaintiff accuses Dynex of failing to disclose purchases of "bad loans" (¶ 56), but fails to allege how many bad loans Dynex purchased, or even if that quantity was a material percentage of the Collateral.  Courts have repeatedly rejected similar allegations.  See AIG Global Sec. Lending Group v. Banc of Am. Sec. LLC, 254 F. Supp. 2d 373, 385 (S.D.N.Y. 2003) ("Although the plaintiffs . . . claimed in conclusory terms that the loss figures [for a pool of loans] were materially false, they . . . provided no indication of the amount by which the figures were supposedly under or overstated.").[21]

---

[20]   See also Ex. 2, Cover Page (loans "may be underwritten in accordance with underwriting standards for 'non-conforming credits,' which include borrowers whose creditworthiness and repayment ability do not satisfy Fannie Mae of FHLMC underwriting guidelines"); id. at 34 (underwriting standards "may be varied in appropriate cases . . . , particularly with respect to the level of income and debt disclosure [required] on the [loan] application and verification"); above, at 5.

[21]   See also ¶¶ 10 (claiming that Dynex "systematically waived" underwriting standards but failing to allege specifically what those standards were, how often they were waived, or whether that amount was material); 63 (claiming that Dynex "saw significant 'First Payment Defaults'" but failing to allege even generally how many defaults Dynex "saw" or whether that amount was material); 65 (claiming that Dynex "failed to obtain releases from the land owner who owned the property where the mobile home was placed" but failing to allege even generally how often this occurred, whether that

(continued…)

In one recent case, the plaintiffs accused defendant of "fraudulently alter[ing] [its] loan delinquency ratio."  In re Am. Bus. Fin. Servs., Inc. Sec. Litig., No. 04-0265, 2005 WL 1324880, at *2 (E.D. Pa. June 2, 2005), Ex. 27.  The plaintiffs claimed further that defendant's "employees knowingly accepted bad checks to satisfy [the company's] months delinquency goals."  Id.; cf. ¶¶ 56, 59 (accusing Dynex's "sales force" of "knowingly purchas[ing] bad loans" and "'miraculously' achiev[ing] . . . monthly [loan volume] quotas").  The court dismissed the complaint because plaintiffs failed to include "specific allegations as to the frequency with which re-aging techniques were used to avoid delinquent loans or specific allegations as to the amount by which the reported delinquency rate was understated at any point in time."  Am. Bus., at *3 (emphases added).

Finally, in addition to its attack on loan underwriting, Plaintiff accuses Dynex and Merit of understating loan loss reserves for almost the entire class period (¶¶ 78-79, 82-83, 88-91, 94-97, 100-101).  According to Plaintiff, these reserves were "materially understated for failing to include 'current' and 'greater than 30 days delinquent' mobile home loans" (¶ 87).  Plaintiff fails to allege even generally, however, the amount by which these reserves were understated in each challenged SEC filing.  See California Pub. Employees' Retirement Sys. v. Chubb Corp., 394 F.3d 126, 153 (3d Cir. 2004) (affirming dismissal where plaintiffs failed to "provide any particulars regarding the amount by which reserves were distorted").  Nor does Plaintiff allege that Dynex's statements of reserves were "incompatible with what the most current [internal] reserve reports showed at the time the disclosures were made."  Shields, 25 F.3d at 1129; see

---

amount was material, or whether the alleged failure to obtain releases actually had any impact on the Collateral by, for example, preventing successful repossession of a mobile home); 66 (similar defects); 115(a) (claiming that "[u]nderwriting [g]uidelines were typically waived on the regional branch and corporate levels," but failing to allege how often these guidelines were waived, what percentage of that amount was waived at the "corporate" level, or even what particular guidelines were waived).

also Novak, 216 F.3d at 309 ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports . . . containing this information.").

In essence, Plaintiff asks this Court to find fraud in every public statement by two companies over a period of almost five years based on the conclusory allegation that Defendants' reserves were "materially understated" by some unspecified amount (¶ 87) and the assertion that Dynex violated underwriting guidelines to which it never purported to adhere.  The Reform Act and Rule 9(b) require more.  See Feasby v. Industri-Mathematik Int'l Corp., No. 99-8761(HB), 2000 WL 977673 (S.D.N.Y. July 17, 2000), Ex. 28.

## D.    Plaintiff Fails To Plead Loss Causation

To survive this motion to dismiss, Plaintiff must allege that "the subject of the fraudulent statement or omission was the cause of the actual loss suffered."  Lentell, 396 F.3d at 173 (emphasis in original).  Put differently, Plaintiff must allege that "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  Id.; see also Dura Pharms., Inc. v. Broudo, 125 S. Ct. 1627 (2005).  The alleged misstatements in this case relate to Collateral quality and loss reserves.  Accordingly, to plead loss causation Plaintiff must allege that its loss was caused by disclosure of the true quality of either the Collateral or the loss reserves.  Lentell, at 173.  This Plaintiff fails to do.

Indeed, Plaintiff claims its loss was caused by credit downgrades, not by any disclosure of previously withheld information that "negatively affected the value of the security."  Id.; see ¶¶ 2 (referring to "substantial[] downgrade[s] by Moody's on February 24, 2004 (Series 13) and May 13, 2004 (Series 12) which caused dramatic Bond price declines") (emphasis added); 13 ("These downgrades . . . resulted in dramatic Bond price declines . . . .") (emphasis added); 108;

114.  Nowhere does Plaintiff allege that its loss was caused by disclosures regarding either

Collateral quality or loss reserves.[22]

Even assuming that the credit downgrades disclosed previously withheld information,

Plaintiff admits that it took "three months" for that new information to impact Bond prices

(¶ 108).  This contradicts Plaintiff's claim that the Bonds traded in an efficient market (¶ 50-51).

Cf. Oran v. Stafford, 226 F.3d 275, 282 (3d Cir. 2002) ("in an efficient market," material

information is "immediately incorporated into the stock price") (emphasis added).  Accordingly,

either the alleged disclosure did not cause the price drop, in which case Plaintiff fails to allege

loss causation, or the market for the Bonds was grossly inefficient, in which case Plaintiff fails to

plead reliance.  See ¶ 50 ("Plaintiff will rely . . . upon the presumption of reliance established by

the fraud-on-the-market doctrine in that . . . the Bonds traded in an efficient market).[23]

---

[22]  Plaintiff may portray the Amended Complaint as alleging not a single causal link between the downgrades and the price drop, but a two-step causal chain:  (i) the disclosure of previously withheld information caused credit downgrades; and (ii) credit downgrades caused Bond prices to fall.  Even under this reading of the Amended Complaint, however, it fails to plead loss causation because any facts "disclosed" in connection with the credit downgrades had already been disclosed.  According to Plaintiff, the press releases announcing the credit downgrades referred to "cumulative repossession rates" (¶ 107) and "relaxed credit standard[s]" (¶ 109).  See also Press Releases, Exs. 18, 19.  But the alleged "truth" regarding these facts had been disclosed months and even years earlier.  See, e.g., above at 5-8, 11-12; ¶ 104 (cumulative repossession rates were disclosed by October 28, 2003); Moody's Press Release, Moody's Reviews for Possible Downgrade Ratings of Senior and Subordinate Certificates of Merit Series 13 (Oct. 2, 2003) ("[t]he review is prompted by weaker-than-anticipated performance of the . . . loans that make up the collateral pool"; also referring to "high cumulative losses and insufficient excess spread"), Ex. 29.  The only new information disclosed by the credit downgrades was the fact of the downgrades.  According to the Amended Complaint, this fact — not any revelations about Collateral quality or loss reserves — was the cause of Plaintiff's losses (¶¶ 2, 13, 108, 114).

[23]  In other words, if this Court accepts Plaintiff's claim that a credit downgrade in February moved Bond prices in May, then the market for the Bonds was inefficient by definition.  See, e.g., In re IPO Sec. Litig., No. MDL 1554, 2005 WL 743550, at *7 (S.D.N.Y. Apr. 1, 2005) (in an efficient market, "information about a security is immediately incorporated into share prices") (emphasis added), Ex. 30.  If the market was inefficient, then Plaintiff may not rely on the fraud-on-the-market presumption of reliance.  See In re IPO Sec. Litig., 227 F.R.D. 65, 106-07 (S.D.N.Y. 2004) ("presumption only applies if the market . . . quickly incorporates material information into the price of the security").  Accordingly, the Complaint must be dismissed for failure to plead either loss causation or reliance, both essential elements of a claim for securities fraud.  See Rombach, 355 F.3d at 169 n.4.  (Plaintiff also purports to rely on the

(continued…)

Finally, Dynex's reserves, even if misstated, could not have caused a loss to the Bonds because Dynex's reserves were immaterial to bondholders. Dynex's reserves impacted Dynex's earnings. But the performance of the Bonds depended only on the "earnings" of the Collateral, for which Dynex and Merit were mere conduits, as well as interest rates and similar factors unrelated to the corporate performance of Dynex and Merit. See ¶ 53 (Bonds were "non-recourse" to Dynex and Merit); Ex. 3, at S-4 (bondholders "may look only to the collateral pledged" for "interest and principal payments"). Because corporate loss reserves were irrelevant to the prices of the Bonds, they could not have caused a drop in those prices.[24]

**E.      Statements Regarding Loss Reserves Were Forward-Looking**

Plaintiff's attack on Defendants' loss reserves fails for the additional reason that statements regarding reserves are forward-looking. See Funke, 237 F. Supp. 2d at 470 (determining likelihood of payment on pool of collateral was a "predictive exercise" that could not trigger liability "even if the predictions [were] unreasonable"); In re Kindred Healthcare Sec. Litig., 299 F. Supp. 2d 724, 733-34 (W.D. Ky. 2004) (loss reserves, "[b]y their very nature," are "projections of future events and results"). Because Defendants identified these statements as

---

"fraud created the market" theory to plead and prove reliance (¶ 52), but this theory has not been endorsed by any court in this Circuit, see In re IPO Sec. Litig., 241 F. Supp. 2d 281, 377 (S.D.N.Y. 2003)).

[24] Apart from this causation argument, Plaintiff's attack on Defendants' loss reserves must be dismissed for failure to plead materiality. Plaintiff attacks Defendants' reserves for failing to include losses from current and 30-day delinquent loans (¶ 87). But Dynex's monthly bond reports disclosed as line items the exact number and dollar value of current and 30-day delinquent loans. See Ex. 11. In contrast, Dynex's corporate reserve figure included all of Dynex's projected losses, not just those related to the Bonds. See, e.g., ¶ 98 (Dynex's reserves were impacted by delinquencies in its "manufactured housing" and "commercial mortgage" portfolios). Accordingly, everything germane to the bondholders (with respect to current and 30-day delinquent loans) was included in the monthly bond reports. Because those reports disclosed the exact information Plaintiff claims bondholders were seeking, a "reasonable" bondholder would not have viewed an increase in Dynex's reserves "as having significantly altered the 'total mix' of information made available." Basic v. Levinson, 485 U.S. 224, 231-32 (1985).

forward-looking and included meaningful cautionary language, see above at 5-8 and Ex. 16, at

35-37, these statements are protected by the statutory safe harbor.[25]  See 15 U.S.C. § 78u-5(c)(1).

## F.   Plaintiff Lacks Standing to Pursue Many of the Claims Asserted

Finally, the Amended Complaint must be dismissed to the extent it asserts claims based

on securities that Plaintiff never purchased.  To have standing, a plaintiff must have purchased or

sold "the relevant securities"; i.e., the securities the price of which was allegedly impacted by the

fraud.  Grace v. Rosenstock, 228 F.3d 40, 46 (2d Cir. 2000).  Accordingly, purchasers of one

class of securities lack standing to file suit on behalf of purchasers of a different class.  See

Feldman v. Hanley, 59 F.R.D. 299, 301 (S.D.N.Y. 1973) (rejecting plaintiffs' attempt to bring

suit on "behalf of Common and Class A shareholders" where "no named plaintiff [was] a Class

A shareholder"); Herbst v. Able, 45 F.R.D. 451, 455 (S.D.N.Y. 1968) (purchasers of debentures

could not bring suit on behalf of purchasers of issuer's other securities).

The decision in  Vervaecke v. Chiles Heider & Co., Inc., 578 F.2d 713, 719 (8th Cir.

1978), is directly on point.  The court in Vervaecke affirmed dismissal of claims based on the

second of two series of bonds because plaintiff had purchased only the first series.  The court

relied on the "rigid rule of standing" set forth in Blue Chip Stamps v. Manor Drug Stores, 421

U.S. 723 (1975).  Vervaecke, at 719.

In this case, Plaintiff asserts claims on behalf of purchasers of all classes of the Series 12

and Series 13 bonds (¶¶ 1, 35).  But Plaintiff purchased only class M1 and M2 Bonds in Series

13 (¶ 20).  Because Plaintiff could not bring an individual suit based on the Series 12 bonds,

---

[25] Significantly, even if Defendants' reserve statements had not been accompanied by meaningful
cautionary language, Plaintiff's attack would still fail because Plaintiff pleads no facts indicating that
Defendants' possessed "actual knowledge" that their reserve statements were false when made.  See 15
U.S.C. 78u-5(c)(1)(B).

Plaintiff cannot do so "as a representative of a class." <u>In re IPO Sec. Litig.</u>, 341 F. Supp. 2d 328, 344 (S.D.N.Y 2004).  Similar reasoning requires dismissal of Plaintiff's claims to the extent they are based on classes of the Series 13 Bonds other than M1 and M2.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that this Court dismiss the Amended Complaint in its entirety without leave to amend further.[26]

Dated: July 15, 2005
       New York, New York                         HUNTON & WILLIAMS LLP

                                          By:  <u>/s/ Joseph J. Saltarelli</u>
                                               Joseph J. Saltarelli (JS-1560)
                                               200 Park Avenue, 43rd Floor
                                               New York, NY 10166
                                               (212) 309-1000

                                               Edward J. Fuhr
                                               (admitted *pro hac vice*)
                                               Terence J. Rasmussen
                                               (admitted *pro hac vice*)
                                               951 E. Byrd Street
                                               Riverfront Plaza, East Tower
                                               Richmond, Virginia 23219
                                               (804) 788-8200

                                               *Counsel for Defendants Dynex*
                                               *Capital, Inc., Merit Securities*
                                               *Corporation, Thomas H. Potts*
                                               *and Stephen J. Benedetti*

---

[26] As Plaintiff fails to state a claim for a primary securities fraud violation, its claims for derivative liability under Section 20(a), 15 U.S.C. § 78t(a), must also be dismissed.  <u>See</u> <u>Rombach</u>, 355 F.3d at 177-78.

## **CERTIFICATE OF SERVICE**

I certify that on the 15th day of July, 2005, a true and accurate copy of the foregoing was sent via first-class mail to:

> Joel P. Laitman
> Christopher Lometti
> Frank R. Schirripa
> SCHOENGOLD SPORN
>  LAITMAN & LOMETTI, P.C.
> 19 Fulton Street, Suite 406
> New York, NY  10038
> (212) 964-0046
>
> *Counsel for Lead Plaintiff Teamsters Local 445*
> *Freight Divisions Pension Fund*

_____/s/ Joseph J. Saltarelli_____
Joseph J. Saltarelli
