**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------x
                             :

IN RE DYNEX CAPITAL, INC.      :
SECURITIES LITIGATION         :
                             :
                             :
-----------------------------------------------------x

Civ. No.: 05-1897 (HB)

SECOND AMENDED
CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

AUG 0 6 2008
U.S.D.C. S.D. N.Y.
CASHIERS

## I.   INTRODUCTION

1.    This securities class action is brought by Lead Plaintiff Teamsters Local 445 Freight Divisions Pension Fund on behalf of purchasers of Merit Securities Corporation's ("Merit") Collateralized Bonds Series 12 (the "Series 12 Bonds") and Series 13 Bonds (the "Series 13 Bonds") (the Series 12 and 13 Bonds, collectively the "Bonds") between February 7, 2000 and May 13, 2004 (the "Class Period"), alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). See 15 U.S.C. §§ 78j(b) and 78t(a). The Bonds were collateralized with mobile home loans ("MH Loans" or "bond collateral") originated and serviced by Dynex Capital Inc. ("Dynex" or the "Company"). The mortgage interest paid by the mobile home borrowers supported the interest paid to bondholders and thus the quality of the mortgages directly impacted the value and pricing of the Bonds. The action is brought against Defendants Merit, the issuer of the Bonds; Dynex, which wholly owned and controlled Merit and, as noted above, originated and serviced the mobile home loans collateral; Dynex's Chief Financial Officer ("CFO") as well as Merit's President Steven J. Benedetti ("Benedetti"), and Dynex's President and Chief Executive Officer ("CEO") Thomas H. Potts ("Potts").

2.    Defendants are alleged to have both concealed the true impaired quality of the bond collateral and issued materially false and misleading statements which artificially inflated

the value of the Bonds during the Class Period, including misrepresentations understating the amount of delinquencies and repossessions experienced by the bond collateral (¶¶ 89-93, 111-16, 123-24, 132, 142); that Merit maintained adequate controls and procedures to report delinquencies and repossessions in the bond collateral (¶¶ 8, 11, 54, 109, 129-131, 139-141, 149-150); false statements that the deteriorating performance of the bond collateral during the Class Period was due to "market conditions." (¶¶ 8, 57, 86, 106-07, 111-22, 147-48).

3.    Each Defendant had actual knowledge or, only as a result of severe recklessness disregarded, the impaired quality of the bond collateral and the falsity of the above material misrepresentations and omissions.    Dynex was a "later comer" to the mobile home loan origination business and thus was willing to fund less than creditworthy powers from suspect mobile home loan dealers in order to get the requisite volume of loans needed to securitize the loans and sell them as bonds to investors.  Dynex originated over 13,000 mobile home loans between 1996 and 1999.  This substantial quantity of mobile home loans was needed to consummate the $336,967,468 Series 12 bond offering on April 2, 1999 and the $303,975,556 Series 13 bond offering in September 2, 1999.  Dynex's loan origination program was effected through two principal systems:  an organization of five regional offices (located in North Carolina, Georgia, Texas, Ohio and Washington) and district sales offices within each region; and directly through Dynex management overseen by Potts and Benedetti in Virginia.

4.    While Dynex operated regional and district offices the underwriting process was highly centralized and controlled by the Company's management in Virginia headed by defendants Potts and Beneditti. Dynex collected data from the regional and district offices of all mobile home loan origination activities, including the number and dollar amount of total loan applications, the names and addresses of the mobile home dealers from whom these loan

2

applications were received, the number as well as the dollar amount of approved and rejected applications and funded loans. Dynex also assessed the creditworthiness of each loan from each mobile home dealer in a rating system of "A" (superior), "B" (good) and "C" (poor) based on borrower credit scores and other indicia of borrower creditworthiness. Dynex then incorporated all of this data in monthly reports which were circulated to all regional and district offices known as "**Manufactured Housing Dealer Performance Reports**" ("MHDP Reports"). (¶¶ 5-6, 8, 26-27, 53, 66). The MHDP Reports issued by Dynex management in Virginia showed the poor "C" rating assigned to substantial portions of the bond collateral. (¶¶ 5-6, 66).

5.     Dynex management also issued another monthly report to the Regional management known as the **Manufactured Housing Regional Performance Report** ("MHRP Reports"). The MHRP Report reflected the number and dollar amount of funded loans also rated by credit quality using the "A", "B" and "C" rating system in the MHDP Reports. This document, again, clearly provided Dynex management with actual knowledge of the substantially impaired quality of the bond collateral cumulatively and by region. For example, the MHRP Report issued on May 5, 1997 reflected that 64% of the loans funded by the Northeast Region were the lowest "C" quality loans. The MHDP Report for that same period and region identified the specific mobile home dealers responsible for the "C" quality loans as well as the dollar amount and number of "C" loans issued for that dealer.

6.     The MHDP and MHRP Reports were reviewed by Potts and Benedetti because they were used to evaluate the performance of regional management. Regional management was compensated in part based on the both the number of loans funded and the quality of the loans – the MHRP Report in particular was essential for determining that compensation. The MHDP and MHRP Reports were also used by Dynex management as a marketing tool. Since Dynex tracked

3

the exact number of poor quality "C" loans it funded, it would use that information to have Dynex representatives try and convince to give Dynex better quality loans since it had funded so many poor quality loans.

7. Defendants Potts and Benedetti also took a number of specific steps to accelerate the volume of loans originated so as to achieve sufficient volume to consummate the offerings -- even at the expense of originating poor quality loans. For example, Dynex issued written underwriting guidelines but then replaced it with a more aggressive computerized underwriting program. (¶¶ 52-53, 63-65). Dynex also shortly after its issuance in 1996 "amended" its underwriting guidelines to reduce the required financial documentation needed from dealers before funding borrower loans. (¶¶ 52-53, 68, 73, 98-99). Through its servicing center, operating out of Fort Worth, Texas, Dynex also regularly "audited" a certain percentage of its mobile home loan collateral in order to verify the bona fide value of the underlying loans. During the Class Period these audits were conducted by Cynthia Wasser who reported to Senior Vice President O. Douglas Burdette. (¶ 53). These audits, as well as the experience of its collectors, confirmed that a large percentage of the underlying loans were substantially defective, including, as a result of, for example, "Buy For MH Loans" where the borrower was not the home occupant or MH Loans and repeated instances where there was insufficient and/or inaccurate credit information supporting the loans. (¶¶ 26-27, 53, 58, 72-75).

8. By January 2000, just over a year after the issuance of the Bonds and prior to the commencement of the Class Period, Defendants -- specifically Defendant Benedetti in monthly reports issued by Merit on Dynex's website conveying recent delinquencies and repossession figures for the collateral -- reported that the delinquency and repossession rates for the Series 12 and 13 Series bonds increased dramatically by **170%** and **200%** respectively as a percentage of

4

current balance in the Merit 12 and Merit 13 portfolios (from 2.41% and 2.45%, respectively, at the time the Series 12 and Series 13 Prospectus' were issued, to 4.1% and 4.92%, respectively by December 2000). *See* Series 12 Prospectus and Series 13 Prospectus; *Cf.* Monthly Delinquency Reports. (¶¶ 22, 25-26, 53, 80-81, 132). Though Defendants already well knew that the poor credit quality of the bond collateral from, inter alia, the aggressive underwriting practices implemented by Defendants (¶¶ 63-65, 68, 85-94, 107-108, 125-126) and the identification and quantification  of the substantial percentage of poor quality loans quantified in Dynex management reports such as the MHDP and MHRP Reports -- the dramatic spike in delinquency and foreclosure rates just prior to the commencement of the Class Period was an unavoidable red flag to Defendants of the poor quality of the collateral which was only disregarded by way of the most severe form of recklessness. Indeed, Potts and Benedetti's severe recklessness persisted as they repeatedly stated throughout the class period that the increases in the losses attributable to the bond collateral was only the result of market conditions (¶¶ 8, 57, 86, 106-07, 111-22, 147-48) since as officers of Dynex and Merit, Defendants Potts and Benedetti were obligated to specifically review, analyze and quantify the impairment in the bond collateral in order to determine Merit's (¶¶ 11, 36,39, 54, 106-107), and Dynex's loan losses (¶¶ 11, 53-54, 78, 92, 100, 106, 110) and in order to report delinquency and repossession figures in the monthly Delinquency Reports issued by Merit and Benedetti. (¶¶ 11, 36,39, 54, 106-107). It was in connection with these independent reviews that defendant Benedetti also reviewed and discussed with Dynex management internal "**Basis Reports**" which further analyzed the deteriorating quality of the bond collateral. (¶¶ *Id.*) These repeated monthly, quarterly and year end reviews and internal reports reflecting the bond collateral's deterioration is also the backdrop for Defendants' scienter and recklessness in stating that the delinquency and repossession figures

were accurate and that Merit maintained sufficient in internal controls and procedures to accurately determine its loan losses as result of the bond collateral's deterioration. (¶¶ 63-65, 68, 85-94, 107-108, 125-126).

9.      Dynex was motivated to conceal the true impaired quality of the Bond collateral because by the time of the commencement of the Class Period Dynex was in the midst of a dramatic financial collapse.  Dynex's common stock price had collapsed **99%** -- from $48.75 per share on of May 12, 1998 to $0.47 per share on August 22, 2000.  The crisis was caused by Dynex's dramatic collapse in profitability and inability to obtain funding for mortgages needed for its securitization and other operations. (¶¶ 57, 150).  With its stock trading at $0.47 per share, Defendants well knew that they could not afford to disclose Dynex's aggressive underwriting and the true impaired quality of the substantial mobile home loan bond collateral. (¶ *Id.*). Defendants Potts and Benedetti were also motivated to conceal the impaired quality of the Bond collateral so as to preserve and protect their bonus compensation during the Class Period since disclosure of the true impaired nature of the collateral would have adversely impacted their bonus compensation. (¶¶ 24, 27).

10.      Beginning in October 2003, the material falsity of Defendants' statements and omissions began to be revealed, ultimately resulting in rating agency downgrades and substantial price declines.  On October 28, 2003, defendant Benedetti disclosed that delinquencies and repossessions had been falsely understated by **34%**, or $15.92 million.  This triggered action by the Ratings agencies covering the Bonds.  In November 2003, Moody's announced that five classes of Series 13 Bonds were "being reviewed for possible downgrade." (¶ 135).  On February 27, 2004, Fitch placed the Merit Series 13 Bonds on "Rating Watch Negative." (¶ 143). On March 9, 2004, Fitch downgraded the Series 13 Bonds, citing, among other reasons, "relaxed

credit standards" in loan origination.  (¶ 143).  Then on March 10, 2004, Fitch downgraded the Series 12 Bonds, also citing "relaxed credit standards."    (¶ 93).

11.    Finally, on April 15, 2004, defendant Benedetti disclosed that Merit's reported loan losses had been materially misstated and that Merit internal controls and procedures had been materially deficient during the Class Period.  (¶¶ 8, 11, 54, 109, 129-131, 139-141, 148-150).  Shortly thereafter, on April 19, 2004, Moody's announced that they were reviewing the Series 12 Bonds for possible downgrade. (¶¶ 93, 144).  On May 13, 2004, Moody's downgraded the Series 12 Bonds, citing, among other reasons, "relaxed underwriting." (¶ id.). The rating downgrades resulted in dramatic Bond price declines of as much as 72% as follows, see also (¶¶ 93, 145, 150):

| MESC 12 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Certificate | Class | Rating at Issuance (Moody's/Fitch) | 3/10/2004 | Fitch Downgrade 3/10/2004 | 3/12/2004 | % Decline | Moody's Downgrade 5/13/2004 | 5/17/2004 | Total % Decline |
| MESC 12 | 1M1 | Aa2/AA "very high credit quality" | $ 100.22 | A "high credit quality" | $ 100.16 | 0% | Ca "default probable" | $ 75.56 | -18% |
|  | 1M2 | A2/A "high credit quality" | $ 100.22 | BBB- "low investment grade" | $ 92.00 | -8% | C "imminent default" | $ 52.44 | -33% |
|  | 1B | BBB "low investment grade" | $ 100.13 | BB- "speculative" | $ 89.66 | -10% | C "imminent default" | $ 23.25 | -72% |

| MESC 13 | | | | | |
|---|---|---|---|---|---|
| Certificate | Class | Rating at Issuance (Moody's/Fitch) | Price on 2/24/04 | Rating Downgrade 2/24/04 | Next Trade (Trade Date) | % Decline |
| MESC 13 |  |  |  |  | 5/11/2004 |  |
|  | M1 | Aa2/AA "very high credit quality" | $ 101.875 | Ca "default probable" | $ 81.09 | 20% |
|  | M2 | A2/C "high credit quality" | $ 94.625 | C "imminent default" | $ 49.94 | 42% |
|  | B1 |  | $ 102.40 |  | 11/30/2004 |  |
|  |  |  |  |  | $ 15.38 | 85% |

12.    Plaintiff's allegations are based upon the investigation of plaintiff's counsel, including without limitation: (1) review of United States Securities and Exchange Commission ("SEC") filings by Merit and its parent, Dynex Capital, Inc. ("Dynex") (Merit and Dynex are herein collectively referred to as ("Dynex" or the "Company"); (2) securities analysts' and rating

agency reports and advisories regarding the Bonds, Merit, Dynex and the Manufactured Housing Asset-Backed Securities market ("MH-ABS Market"); (3) press releases and other public statements issued by the Company and Dynex concerning the Bonds and its reported financial results; (4) reports and studies about the manufactured housing market and underwriting practices in connection with the purchase of manufacturing housing; and (5) former employees of Dynex, its subsidiaries and affiliates, including Dynex Financial Services, engaged in the areas of sales, origination and underwriting of manufactured housing loans in branch offices in various locations in the United States, as well as former employees engaged in the mobile home loan collection and repossession activities at Dynex's former loan servicing offices in Fort Worth, Texas; and individuals knowledgeable about the mobile home loan market and underwriting and origination practices during the relevant period. (See Sources For Fraud Allegations, ¶ 53, infra.)

## II.    JURISDICTION AND VENUE

13.    The federal securities claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act of 1934 (15 U.S.C. Sections 78j(b) and 78t(a), Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. Section 240.10b-5]. The claims arising under Section 10(b) and Rule 10b-5 are based on fraud on the market.

14.    This Court has jurisdiction over the subject matter of the federal securities claims pursuant to 28 U.S.C. Sections 1331 and 1337, and Section 27 of the Exchange Act of 1934 [15 U.S.C. Section 78aa].

15.    Venue is proper in the Southern District of New York pursuant to Section 27 of the Exchange Act of 1934, and 28 U.S.C. Section 1391(b), given that many of the acts and practices complained of herein occurred in substantial part in this district and principal defendants reside within the district.

16.    In connection with the acts and omissions alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.    PARTIES

17.    Plaintiff, Teamsters Local 445 Freight Divisions Pension Fund, as set forth in the certification annexed hereto, purchased $450,000 par value Merit Series 13 bonds for a total investment of $442,922 during the Class Period. Teamsters 445's principal place of business is located within this Court's jurisdiction in Newburgh, New York.

18.    Defendant Merit was incorporated in Virginia on August 19, 1994, a wholly owned limited purpose finance subsidiary of Dynex Capital, Inc. Issuer Holding Corporation, Inc. ("IHC") another wholly owned subsidiary of Dynex, acquired Merit on September 4, 1996. Merit was organized for the purpose of facilitating the securitization of loans through the issuance and sale of collateralized bonds. After the payment of expenses incurred in connection with an offering, Merit would use the net proceeds to purchase collateral, such as mobile home loans, from IHC. From the date of inception through December 31, 1999, Merit issued fourteen (14) series of collateralized bonds, including Series 12 and 13, totaling approximately $10 billion.

19.    Defendant Dynex Capital Inc ("Dynex") is a financial services company which invested in a portfolio of securities and investments backed principally by mortgage loans, including manufactured housing installment loans. Dynex's principal place of business is located at 4551 Cox Road, Suite 300, Glen Allen, Virginia.

20.    In connection with the Bonds, Dynex was the parent company of Merit, which "issued" the Bonds; Dynex was also parent of IHC, which through one of its subsidiaries,

originated the Series 12 and Series 13 mobile home loan collateral. Dynex also retained a financial interest in the collateral which secured the Bonds. As a public company, Dynex had to report in its filings with the SEC the "impairments" of that investment in terms of loan loss provisions. Dynex's Form 10-K for the year ended December 31, 2001 described Dynex's principal balance of net investment in the Series 13 Bonds as $44.16 million. The reporting of such impairments adversely impacted Dynex's reported profits during the Class Period. Thus, as an "investor" Dynex was disincentivized to accurately report the true adverse performance of the collateral.

21.     Fortunately for Dynex, though not for public investors however, Dynex could control the public disclosures regarding the performance of the collateral since it was also the "Master Servicer" of the Bonds. (In 1999, Dynex sold its manufactured housing/servicing operation to Origen, however Dynex retained its "Master Servicer function" with respect to the Series 13 collateral to date).

22.     As Master Servicer, Dynex purportedly monitored the servicer's compliance with servicing guidelines, monitored and reconciled the loan payments remitted by the servicers of the loans, determined the payments due on the securities, and determined that the funds are correctly sent to a trustee or investor for each series of securities. As Master Servicer, Dynex also provided on its website throughout the Class Period detailed "Monthly Delinquency Reports" on the collateral it serviced, including the Series 13 Bond Collateral. As Master Servicer, Dynex was paid a monthly fee based on the outstanding principal balance of each such loan serviced by the Company as of the last day of each month. Despite the fact that Dynex erroneously reported the true performance of the bond collateral repossession, it continued to receive payment for its Master Service functions.

23.     Defendant Merit is a wholly owned limited purpose subsidiary of Dynex.   Merit had no physical properties and listed in its public filings the same business address and telephone number as Dynex.  In 2003 and 2004, Merit's principal executive officer and director was at all relevant times defendant Benedetti.  Issuer Holding Corporation ("IHC"), the originator of a substantial portion of the Series 12 and 13 Bond Collateral, was a wholly owned subsidiary of Merit.  Merit issued the Series 12 and 13 Bonds and sold them to the Underwriters receiving approximately $605 million in proceeds.  Merit also purchased a portion of the Class M2 bonds through an affiliate and then sold these bonds to the investing public during the Class Period.

24.     Defendant Benedetti was at all relevant times the President and Chief Executive Officer of Merit.  Benedetti signed the SEC filings issued by Merit which described in detail the quality Manufactured Home Loan Portfolio and the Company's role as Master Servicer.  See Dynex Capital 2000 Annual Report (¶¶ 110, 112); see also, Dynex Capital 2000 Form 10-K (¶¶ 109-10, 112); Merit 2000 Form 10-K (¶ 114); Merit 2001 Form 10-K (¶ 118); Dynex Capital 2001 Form 10-K (¶ 20, 109); Merit 2002 Form 10-K (¶ 124); Merit 2003 Form 10-K (¶¶127, 130, 146, 148).

25.     In addition, Benedetti issued specific Monthly Delinquency Reports to investors including information on the bond collateral delinquencies, foreclosures and repossessions. Benedetti's monthly reports, made publicly available when posted on the Dynex's website showed 170% and 200% increases in total delinquencies, repossessions and foreclosures as a percentage of current balance in the Merit 12 and Merit 13 portfolios, respectively – from 2.41% and 2.45%, respectively, at the time the Series 12 and Series 13 Prospectus' were issued, to 4.1% and 4.92%, respectively by December 2000. See Series 12 Prospectus and Series 13 Prospectus; Cf. Monthly Delinquency Reports.

26.     From September 1997 through December 1998, Benedetti was Vice President and Controller of Dynex.  Benedetti had served as Vice President and Treasurer of Dynex since October 1997; and from September 1994 until December 1998, Benedetti served as Vice President and Controller of Dynex.  In May 2000, Benedetti assumed the responsibilities of Lynn K. Geurin who resigned as Chief Financial Officer and Secretary of the Dynex.  Benedetti was also a member of Dynex's Board of Directors.  From 2003 through the end of the Class Period, defendant Benedetti was also both the Principal Executive Officer and Chief Financial Officer of Dynex.  During the Class Period, defendant Benedetti, in addition to his salary compensation, received bonus compensation of $150,000, $60,000, $120,000 and $102,000 for fiscal years 2000-2003, respectively.  Benedetti, as a result of his various senior positions, was well aware of the poor quality of the bond collateral as reflected in the MHDP and MHRP Reports (¶¶ 5-6, 8, 26-27, 53, 66); Dynex's implementation of aggressive underwriting practices and policies (¶¶ 63-65, 68, 85-94, 107-108, 125-126); audit reports originated by the Fort Worth, Texas servicing center (¶ 53); Basis Reports issued monthly regarding the deteriorating bond collateral during the Class Period (¶¶ 11, 36,39, 54, 106-107) and data derived from the collections operations with respect to the Bond collateral both before the Class Period (when Dynex itself serviced the Bond collateral) and during the Class Period (when Dynex acted as Master Servicer with respect to the Bond collateral) which reflected the high percentage of Buy For Loans, First Payment Default delinquencies and failed or impaired repossessions as a result of the failure to obtain requisite releases and as alleged herein waivers. (¶¶ 53, 59, 73, 80, 90-91, 99).  Defendant Benedetti knew or with severe recklessness disregarded these reports and adverse information during the Class Period while he conducted intense examinations of losses from bond collateral as President and CEO of Merit and CFO of Dynex and as issuer of the Monthly Delinquency Reports.  As a result,

Benedetti knew, or recklessly disregarded, that the true undisclosed reason for the poor performance of the Bond collateral was due, in material part, to the manner in which the collateral was originated.

27.     Defendant Thomas H. Potts ("Potts") was at all relevant times a member of Board of Directors of the Company.  From 1997 to June 2002, Potts served as Dynex's President and Principal Executive Officer.  During the Class Period, defendant Potts, in addition to his salary compensation, received bonus compensation of 94,500 stock options in lieu of a cash bonus in for fiscal year 2000 and a cash bonus of $200,000 for fiscal year 2002.  Potts was well aware of the impaired quality of the bond collateral as a result of Defendants' aggressive underwriting practices since Potts authorized and implemented these practices review the MHDP and MHRP Reports quantifying poor loan quality during the underwriting period (¶¶ 5-6, 8, 26-27, 53, 66); knew or recklessly disregarded audit reports reflecting borrower uncreditworthiness regarding the bond collateral (¶¶ 26-27, 53, 58, 72-75 ); knew or recklessly disregarded the dramatic increase in delinquency and repossessions shortly after the Bond issuances (¶¶ 22, 25-26, 53, 80-81, 132); reviewed and quantified the deteriorating performance of the Bond collateral throughout the Class Period on a monthly and quarterly basis in quantifying the loan loss reserve to be recorded by Dynex (¶¶ 80-81), and also had access before and during the Class Period to collection data indicating a high percentage of Buy For loans (¶¶ 74-75) and First Payment Default delinquencies (¶ 76) and failed or impaired repossessions due to the failure to obtain the requisite releases and waivers as alleged herein (¶¶ 53, 59, 73, 80, 90-91, 99).  Potts knew, or recklessly disregarded, that he and the senior officers reporting to him at the corporate headquarters were directly involved in the approval of mobile home loans collateral which failed to satisfy internal underwriting standards and guidelines and were approved only in order to be

able to consummate or meet loan volume quota and/or the offerings as alleged herein.  Potts also well knew that a material, but undisclosed reason, for the sale of Dynex's mobile home loan origination operations in 1999 included the poor quality of the mobile home loans originated.

28.     Defendants Benedetti and Potts, are collectively referred to herein as the Individual Defendants.  Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its underwriting and origination of Bond collateral, the investment quality of the Bonds, the performance of the Bond collateral, and the underwriting of the Bonds and caused, allowed and permitted the false and misleading statements in the Registration Statements and Prospectuses and thereafter in public filings, press release and reports.

29.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the above officers of the Company, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.  Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company and the Bonds, and approved or ratified these statements, in violation of the federal securities laws.

30.     As officers and controlling persons of a publicly-held company whose debt securities were, and are, registered with the SEC pursuant to the Exchange Act, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's Bonds and Bond collateral, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's Bonds would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

31.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions there from, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Merit and or Dynex, each of the Individual Defendants had access to the adverse undisclosed information about the underwriting practices used to originate the Series 12 and 13 Bond Collateral and the true adverse performance of that collateral during the Class Period as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by Merit and/or Dynex about the Bonds materially false and misleading.

32.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Bonds during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to

15

prevent their issuance or cause them to be corrected.   Accordingly, each of the Individual Defendants are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

33.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of the Bonds by disseminating materially false and misleading statements and/or concealing material adverse facts.   The scheme: (i) deceived the investing public regarding the underwriting practices used to originate the Bond Collateral, including manufactured housing loans and the performance of that collateral during the Class Period; and (ii) caused plaintiff and other members of the Class to purchase the Bonds at artificially inflated prices.

IV.     **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

34.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the Merit Series 12 and Series 13 Bonds in the open market purchasers of the Series 12 and 13 Bonds between February 7, 2000 and May 13, 2004, inclusive (the "Class Period") and who were damaged thereby.   Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.   The collateral for the Bonds was composed of entirely mobile home loans and was originated by Dynex between 1997 and 1999.   The prices of the Bonds were artificially inflated by the identical materially false and misleading descriptions of the underwriting and origination of the mobile home loan collateral contained in the Merit Offering Documents; and

by Dynex and Merit's subsequent false and misleading statements regarding the Bond collateral as set forth below.

35.     The Bonds also all shared the same fundamental structure. As noted, each Series was divided into a hierarchy of classes (e.g., A-1, A-2, A-3, A-4, M-1, M-2, B-1). Each class was assigned a specific amount of collateral by term. The A-1 class, for example, had to mobile home loans of shorter durations and the Bonds would be fully repaid within a shorter duration than all other classes within that series.  It was for that reason that the higher classes were deemed to have less risk. This "class structure" also provided that the payment of principal and interest to the senior classes (e.g., A-1 and A-2) occurred before the subordinate classes (e.g., A-3, A-4, . . . M-2).

36.     Under the terms of the Bonds as set forth in the prospectus, bondholders were to be paid monthly interest and principal from payments from principal and interest payments made by the borrowers under the manufactured housing contracts.  Merit and Dynex would incur "losses" on the collateral if there were defaults on payments under the loan agreement such that subsequent foreclosures upon the mobile home yielded less than the loan amount.  Such losses were borne by Merit (and Dynex) only to the extent that the collateral value exceeded the bond balance and thereafter by the bonds in reverse order of seniority.

37.     On each payment date the holders of the higher ranking classes of bonds had preferential rights to receive payment.  Payment of interest and principal from manufactured home contracts were paid first to the higher class of bonds before payment was made to any subordinate class.

38.     Classes M would not receive any principal until the senior classes had been reduced to zero. Class B would not receive any principal until the senior and classes M principal had been reduced to zero.

39.     In addition, the issuer agreed to an "overcollateralization" commitment which in each Series was approximately 3% to 5% of the loan balance. If the overcollateralization amount as exhausted due to, for example, losses on the mobile home loans in repossessions, the issuer could provide supplemental support for the Bonds through loans and lines of credit. However, Merit had no obligation to make any further deposits to the collateralization fund. The interest on the collateralization fund was to be drawn upon to the extent available if funds from the interest on the underlying collateral was insufficient to pay the interest and principal due on the Bonds.

40.     All purchasers of Bonds relied on the identical false statements describing the underwriting and origination of the collateral as set forth herein (e.g., ¶¶ 8, 11, 54, 89-93, 109, 111-16, 123-24, 129-131, 132, 139-142, 149-150).

41.     The Bonds trading prices reacted efficiently to market information (¶¶ 145, 150).

42.     The Company and the Bonds were followed closely by securities and manufactured housing industry analysts, as well as credit rating agencies (including Fitch and Moody's). (¶¶ 10-11, 85, 93, 100, 134-35, 141-45).

43.     A liquid market for the Bonds existed at all times during the Class Period. There were approximately at least twelve broker-dealers (including Lehman Brothers, Inc. and Credit Suisse First Boston) that made a market for the Bonds. On any given trading day, approximately four or more broker-dealers would post a bid and ask quote for the Bonds, creating an available market for investors to transact in the Certificates (¶¶ 145, 150).

44.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Merit or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

45.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

46.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

47.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     Whether defendants participated in and pursued the common course of conduct complained of herein;

(c)     Whether documents filed with the SEC and other documents, press releases and statements disseminated to the investing public and Merit's bondholders during the Class Period misrepresented material facts about the Bonds and the collateral securing the Bonds;

19

(d)     Whether the market price of Merit's Series 12 and Series 13 Bonds during the Class Period was artificially inflated due to the material misrepresentations and failure to correct the material misrepresentations complained of herein; and

(e)     To what extent the members of the Class have sustained damages and the proper measure of damages.

48.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

49.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a)     defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b)     the omissions and misrepresentations were material;

c)     the Bonds traded in an efficient market;

d)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Bonds; and

e)     Plaintiff and members of the Class purchased the Bonds between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

50.     Based upon the following, plaintiff and members of the Class are entitled to the presumption of reliance upon the integrity of the market.

51.     In addition, plaintiff will rely, in part, upon the presumption of reliance established by the fraud-created-the-market doctrine in that: had the defendants' common scheme and plan to fraudulently originate and service manufactured housing mortgage loans, for the purpose of providing the collateral for the Bonds, been fully disclosed to investors the Bonds could not have been marketed.

## V.     SOURCES FOR FRAUD ALLEGATIONS

52.     The sources for the allegations regarding Dynex's recklessness and fraudulent practices were derived from the investigation of counsel, which included interviews with former Dynex employees who worked at Dynex's headquarters in Glen Allen, Virginia; Dynex's centralized loan servicing center Forth Worth, Texas; and Dynex's regional and district sales offices located through the United States during the Class Period and/or during the time immediately preceding the Class Period when the mobile home loans that served as the collateral for the Bonds were originated.

53.     As alleged herein, the detailed information regarding the misrepresentations and omissions relating to the undisclosed impaired quality of the mobile home loans that served as collateral for the Bonds was derived from interviews with:

a)     CW #1, employed as a District Sales Manager at Dynex between February 1996 and May 1997. CW#1 routinely encountered mortgage dealers who would submit applications for loans to Dynex without the proper documentation to support the income level claims on the application, and have those applications approved. CW#1 stated that Dynex was "taking the bad paper" from the dealers because they were a new company in the industry in the mid-1990's and sought to get the business of the dealers in established markets. CW#1 stated that Dynex's internal infrastructure for repossessions and collections was not sufficient to serve

the needs of the Company, and rather, the Company continuously stressed the need to achieve volume in sales and underwriting and compensated accordingly. CW#1 received the monthly MHDP and MHRP Reports from Dynex management in Virginia and was aware of its uses as a means for Potts and Benedetti to evaluate and compensate performance of regional management and as a marketing tool (¶¶ 5-6, 8, 26-27, 53, 66).

   b)   CW #2, employed as a District Sales Manager and then promoted to District Manager at between June 1996 and January 2000. CW#2 reported directly to the Regional Supervisor for the Georgia region, J.V. Smith. CW#2 observed much of the same conditions at Dynex that CW#1 had encountered while employed at Dynex. CW#2 stated that dealers would routinely submit falsified manufactured home loan application documents to Dynex, and because regional offices were given wide latitude to waive underwriting standards throughout the period in which CW#2 was employed, such falsified documentation would result in approval of the loan application. In addition, similar to CW#1, CW#2 stated that both salary and bonus at the regional and district offices were based largely on volume. CW#2 received and understood use of the NHDP and NHRP Reports by Dynex's management in Virginia.

   c)   CW #3, employed as a District Sales Manager at a Dynex district office between 1998 and 2000. CW#3 stated that Dynex's management and Regional Supervisors in both the Virginia headquarters and the regional office routinely stressed the importance of higher volumes of loan origination at the expense of the Company's stated underwriting guidelines. CW#3 received the MHDP and MHRP Reports prepared by Dynex's management in Virginia.

   d)   CW #4, employed as a Credit Underwriter at a Dynex regional office between July 1998 and February 2000. CW#4 stated that prior to 1999, the underwriting process at Dynex was very labor intensive. CW#4 and other employees responsible for reviewing credit

22

applications and supporting documentation would review the paperwork and render a decision based on guidelines that were set by the Company. Beginning in 1999, Dynex instituted a fully automated computer system, known as the "Portal System", which required the manager or underwriter to enter certain information into the computer, and an instantaneous decision was made. CW#4 stated that the computerized decisions were illogical at many times, and would regularly approve loans for individuals who would not have been approved for loans under the pre-1999 system, or would deny those who would have been approved under the old system. In addition, CW#4 stated that the Portal System had a preference to approve more loans to people for multi-unit manufactured homes as opposed to single-unit – in other words, a potential borrower may be denied a single-unit manufactured housing loans, yet be approved for a loan on a more expensive multi-unit manufactured home using the same credit information and documents.

    e)  CW #5, employed as a Loan Service manager at Dynex's Fort Worth, Texas centralized loan servicing center between September 2000 and May 2001. CW#5 routinely encountered falsified loan documentation for manufactured home loans, specifically, documentation which dealers filled out with social security numbers and personal information of minors with no income or credit history. Moreover, CW#5 discovered that in several instances loans had been approved by the underwriters and originators at Dynex for individuals who had no income or employment.

    f)  CW #6, employed in management of collections at Dynex's Fort Worth, Texas centralized loan servicing center between April 1996 and December 1998. CW#6 routinely reviewed loan origination documents in the course of being employed as in the Collections department at Dynex. According to CW#6, Dynex's underwriters and sales

managers routinely ignored the Company's stated guidelines in order to achieve "volume" in the organization of manufactured mobile home loans. CW#6 would routinely be assigned collection duties for "Buy-For" loans which were the potential borrower did not have income or any creditworthiness and the loan would be originated in the name of an elderly family member who would satisfy the credit requirements. Dynex was originating 30-year "Buy-For" loans for 65 to70 year old borrowers, who had little or no chance to repay the loans, when the actual resident, or uncreditworthy relative, of the borrower defaulted on the loan.

g)     CW #7, employed as a Supervisor in the areas of REO, Foreclosure and Bankruptcy at Dynex's Fort Worth, Texas centralized loan servicing center between May 1998 and October 2000. CW#7 stated that it was common for Dynex to continue to accrue interest after a mortgaged property had been foreclosed upon. CW#7 stated that the correct practice would be to remove the foreclosed loan from the books and cease accruing interest on it since there was no longer any chance of repayment by the borrower. CW#7 reported this practice of improper interest accrual to Cynthia Wasser, the Vice President of Collections who oversaw many of the operations at the Fort Worth servicing center. CW#7 stated that management in Virginia was aware of increases in delinquency rates, repossessions and foreclosures throughout 1998 to 2000 due to the fact that the Company put in place a high-technology imaging system on which all documentation was scanned and sent to Virginia for review. CW#7 was involved in the preparation of foreclosure reports which were sent to Darryl Ake in Virginia, who at that time was the assistant to the then President, Robinson.

h)     CW #8, employed as a senior accountant at Dynex's headquarters in Glen Allen, Virginia between 1997 and 1999. Each month CW#8 would prepare Basis Reports, which summarized the value of the company based on the assets it held (of which the collateralized

bonds were the largest), that was distributed to Dynex Executives such as Defendant Benedetti, and member of Dynex's management who reported to him, such as Teresa Estep, Dynex's Controller, and Meg Rosenberg, Dynex's Accounting Manager in Glen Allen, VA. Each month, either prior to or just after the close of the month, CW#8 would attend a meeting also attended by Benedetti, Estep and Rosenberg, at which the monthly portfolio analyses that were performed and depicted in the Basis Reports were discussed. These reports served as the basis for Benedetti's preparation and review of the Monthly Delinquency Reports setting forth collections, delinquencies, foreclosures and repossessions relating to the manufactured housing loan portfolios.

        i)    CW#9 was responsible for mobile home loan securitization at Dynex's Fort Worth servicing center. CW#9 reported directly to Senior Vice President Doug Burdette and Vice President Cynthia Wasser. CW#9 routinely performed quality control audits of sample sets of the mobile home loan portfolio. CW#9 stated that the quality control audits revealed true rates of first payment defaults and dealer fraud. In connection with the quality control audits, CW#9 reviewed loan files where borrower had experienced first-payment default or received fraudulent promises from the dealer, and uncovered that borrower's creditworthiness was not consistent with underwriting guidelines.

      54.    As alleged herein, the Defendants misrepresented in and/or omitted from Merit's public filings with the SEC that Merit maintained sufficient and proper internal controls with respect to its accounting for losses to be borne by investors, as opposed to Merit. The source for these allegations is Merit's financial restatement for the second and third quarters of fiscal year 2003, in which Merit disclosed on April 15, 2004 and May 18, 2004 that Merit lacked proper internal controls for its accounting for deficiencies.

55.    In addition, the investigation of counsel included interviews with former employees of Dynex's competitors during the Class Period who were familiar with Dynex's sales and/or underwriting practices, as well as other persons with knowledge of the underwriting and origination practices in the mobile home loan industry during the Class Period and all other relevant periods.

## VI.    SUBSTANTIVE ALLEGATIONS

56.    Dynex was a financial services company that was principally engaged in the business of "pooling" or packaging commercial mortgages, residential mortgage and MH Loan so that they could be "securitized" as collateral for bonds issued to public investors. These public bond issuances provided Dynex with the opportunity for not only the immediate influx of hundreds of millions of dollars to fund purchases of the mortgages used as collateral, but also the potential for further profit from the differential between what the typical yield (7% to 9%) paid to the bondholders and the interest (10% to 14%) received from the mortgages. Mobile home loan contracts or mortgages were not the predominant "vehicle" for Dynex's debt securities issuances. The more typical collateral for Dynex's public debt securities were commercial or residential mortgages. Indeed, of the fourteen bond issuances totaling approximately $10 billion Dynex originated between 1994 and 2000 only two issues (totaling $736.2 million or 7.3%) were composed entirely of mobile home loan collateral -- the Series 12 and Series 13 Bonds. Further, all of these offerings were consummated by year 1999 and by that same time -- year end 1999 -- Dynex had sold its mobile home origination business.

57.    By April 1999, Dynex was in the midst of a financial crisis. As reflected in the following chart, Dynex's common stock price had collapsed from $50 per share in 1998 to $0.47 by August  22, 2000:

26



Dynex's 99% decline in its stock price at the time of the commencement of the Class Period was the result of significant declines in net income, which after consideration of dividends on preferred stock resulted in net losses, and an inability to obtain funding for its origination of mortgages needed for securitizations and other operations. For example, Dynex net income figures between the second quarter of 1998 and third quarter of 1999 (after the Bond offerings were completed) had dropped precipitously from $15.5 million in the second quarter of 1998 to $320,000 in the third quarter of 1999. On October 7, 1998, in response to "recent volatile market conditions that will likely have negative implications on earnings and future financial flexibility" Fitch IBCA, credit rating service, downgraded Dynex's senior unsecured debt to "BB-". Fitch noted that "capital access to continue to fund growth may also be limited going forward." Fitch further downgraded Dynex's senior unsecured debt to "B" from "BB-" on February 5, 1999 noting that the downgrade "reflects the difficulty [Dynex] has had replenishing its liquidity position … and the importance of future securitizations to replenish funding." Dynex's cash crunch finally most dramatically reared its head on February 8, 1999, when Dynex was sued by

AutoBond Acceptance Corporation for refusal to fund AutoBond's retail automobile installment contracts pursuant to a strategic alliance agreement entered into with AutoBond on or about June 10, 1998. Dynex was unable to fund these loans because its $100 million credit facility from Diawa Finance Corporation had been entirely exhausted and was not going to be renewed or extended. See Agility Capital Inc., Form 8-K filing dated February 8, 1999. On March 9, 2000, AutoBond obtained a jury verdict and judgment against Dynex in the amount of $68.7 million and as a result Dynex's common stock price plummeted to $.47 per share by August 22, 2000. In Dynex's annual report for year-ended 1999, filed on April 18, 2000, Dynex auditor Deloitte & Touche LLP issued a "going concern letter" stating that "litigation, the difficulty the company is experiencing in accessing new funding sources and the default of certain debt covenants which permit the lenders to accelerate the maturity of the debt raise substantial doubt about its ability to continue as a going concern." See Dynex 1999 Form 10-K at p. 41 of 68. It is in the context of this financial crisis and near total collapse that Dynex withheld disclosure of the true impaired quality of its substantial mobile home loan portfolio collateral.

A.      **Dynex Aggressively Entered the Mobile Home Lending Market**

58.      Dynex originated a massive quantity of mobile home loans (approximately 13,000) in a relatively short period of time (between 1996 and 1999); this quantity was needed to consummate the Bond Offerings. This rapid and massive origination of mobile home loans was achieved in the face of enormous market obstacles. By the late 1990s the mobile home loan market had become dominated by well established companies, such as Green Tree Financial Corporation ("Green Tree") and Green Point Financial Corporation ("Green Point"), with field offices throughout the United States. These companies had long standing relationships with mobile home dealers that posed a significant barrier to entry to any "late comer" to the market.

In fact, the Bond collateral was principally originated in Texas, North Carolina, Georgia, South Carolina and Michigan, which were all geographic areas Green Tree and Green Point had a well established presence. Moreover, the mobile home loan market was also plagued in the late 1990s with oversupply of mobile home product and the interrelated pervasive fraudulent practices of mobile home dealers seeking to "push through" financing for uncreditworthy purchasers in order to record sales and earn commissions. Dynex only overcame these obstacles, as set forth below, by the undisclosed practice of overtly marketing to mobile home dealers Dynex's willingness to buy "bad paper" or uncreditworthy loans; purchasing these highly defective and impaired loans; and then using them as the Bond collateral.

**B.     Dynex's Virginia-Based Management Established
         Centralized Mobile Home Loan Underwriting**

59.     Dynex Financial had two means of generating mobile home loans during the period 1997 through 1999. The first was through a network of regional and district offices; the second was direct mobile home loan origination from Dynex headquarters in Virginia overseen by Defendants Potts and Benedetti. Dynex Financial, during the period 1997 through 1999, set up field offices throughout the country with regional headquarters in Charlotte, North Carolina; Atlanta, Georgia; Cincinnati, Ohio; and Dallas, Texas. The largest source of mobile home loan collateral was Texas. The regions generated between $60 and $90 million annually. In each region there was a regional Vice President and in each branch or field office there were branch managers. The branch managers and Vice Presidents had the power to waive underwriting guidelines for loans up to $85,000. Loans in excess of $85,000 were approved by Dynex's corporate headquarters.

60.     The Corporate officers of Dynex and upper management of Merit were located at the Dynex's headquarters in Glen Allen, Virginia. Dynex was lead by Defendant Potts who at all

relevant times as Dynex's President and CEO. Defendant Benedetti served as the President and CEO of Merit and also served as Dynex's Controller from September 1994 to December 1998 and then as CFO from May 2000 through the end of the Class Period. During the Class Period, reporting directly to Defendant Benedetti was the Controller of Dynex Teresa Estep. Ms. Estep had previously served as assistant controller to Benedetti when Benedetti served in the role of Controller of the Company. Reporting directly to Teresa Estep was the Vice President of Accounting of the Company's accounting, Megan Rosenberg, during the relevant period. Reporting to Megan Rosenberg were two Vice Presidents in the accounting group at Dynex – a Vice President of General Ledger Accounting and a Vice President of Finance and Portfolio Accounting. Also located at Dynex's headquarters was Darryl Ake, Vice President of Collections. Mr. Ake regularly visited Dynex's Fort Worth, Texas centralized loan servicing center and oversaw Dynex's regional and district office loan servicing operations.

61.    Dynex controlled its servicing operations based in the Fort Worth, Texas servicing center the from its Virginia headquarters. Dynex's Fort Worth, Texas servicing center was lead by Vice Presidents of Collections, Repossessions and Foreclosures Jeff Izingia and Cynthia Wasser. Under the Vice Presidents of Collections were Collections Supervisors who oversaw Collections Managers and other collections employees.

62.    Dynex's origination, underwriting, repossession, remarketing and foreclosure functions operations were based out of five regional offices located in Seattle, Washington; Cincinnati, Ohio; Woodlands, Texas; Charlotte, North Carolina; and, Atlanta, Georgia. The organizational structure of each regional office was as follows: a Regional Supervisor; who oversaw the Regional Operations Manager; and reporting to the Regional Operations Manager were three managers – a Funding Manager, an Underwriting Manager and a Repossession

Manager. Underwriting Managers were responsible for departments of 4-6 individual credit underwriters, responsible for dealing with credit loan applications and the approval process. Once a prospective borrower was approved for a manufactured housing loan, the paperwork was handed over to the funding department, overseen by the Regional Funding Manager.   The Repossession Managers were responsible for the regional repossession departments which were made up of subgroups, headed by managers, of Collections, Repossession and Remarketing.

      **C.**      **Dynex's Underwriting Process Was Controlled From Virginia By Underwriting Guidelines and A Subsequently Implemented And More Aggressive Computer Based Loan Approval System**

      63.      Dynex's Virginia-based management developed and implemented underwriting guidelines to be followed in the evaluation and analysis of a borrower's ability and willingness to repay the loan in accordance with the terms of the loan.  The underwriting guidelines were issued by the Director of Operations on January 1, 1996 and later revised on April 18, 1996.  These written underwriting guidelines were to be used during a manual underwriting process whereby a Dynex mobile home loan underwriter would analyze a potential borrowers credit criteria and make a quantitative and qualitative assessment of creditworthiness and ultimately whether or not to approve the loan.

      64.      In 1999, Dynex Financial Inc., in an effort to exhibit centralized and automated control over the mobile home loan underwriting process, designed, developed and implemented a computerized loan approval system -- named "Portal."   Portal was a mainframe computer program based at Dynex's Virginia office. Dynex's mobile home loan underwriters were able to access Portal from their regional offices and input a potential borrower's credit criteria into Portal.   Portal replaced the evaluation and analysis previously performed by Dynex's underwriters.

65.     According to confidential witnesses, Portal was a more aggressive underwriting process than the previous practice of manual underwriting. The discrepancy between manual underwriting and Portal was readily apparent to Dynex's mobile home loan underwriters who were entering a potential borrower's credit information from a loan application into Portal. Often loans approved by Portal conflicted with the written underwriting guidelines and would have been denied had Dynex still employed its prior manual underwriting process.

### D.      Dynex Headquarters In Virginia Generated MHDP and MHRP Reports Which Quantified Poor Credit Quality MH Loans

66.     Dynex's management in Virginia generated specific reports documenting the poor quality of the mobile home loans used as collateral for the Bonds. Dynex Financial Inc. generated monthly "Manufactured Housing Dealer Performance Reports." These MHDP Reports contained a separate page for each mobile home dealer in each region throughout the United States. The MHDP Report quantified in number and dollar amount and percentage of mobile home loan applications "Received," "Approved," "Denied," "Suspended," "Expired," and "Funded" for each dealer. The MHDP Report would then have a page reflecting cumulative figures. Further, the MHDP Report rated the quality of the loan application "A" (highest quality), "B" (medium quality), and "C" (lowest quality) based on FICO scores and borrower credit worthiness. Dynex also generated a "Manufactured Housing Regional Performance Report" (the "MHRP Report") on a monthly basis. The MHRP Report would have the cumulative numbers of MH Loan applications "Received," "Approved," "Denied," "Suspended," "Expired," and "Funded" rated by categories "A", "B" and "C". Thus, for example, according to the MHRP Report generated by Dynex for the Northeast Regional Office, 64% of the $8.3 million loans funded by the Northeast Region between January 1, 1997 and April 30, 1997 were assigned the lowest "C Rated Loans" rating. Defendants Potts and Benedetti were fully familiar with both the

MHDP and MHRP Reports.  The Regional Managers were compensated based on factors including the number of funded loans and the quality of the loans.  Defendants Potts and Benedetti assessed regional performance having reviewed these Reports.

### E.   Dynex Reduced Required Mobile Home Dealer Financial Review In Order to Accelerate Dealer Base and MH Loan Volume

67.   Dynex Financial Inc. implemented "Dealer Credit Review" guidelines on January 1, 1996 and later revised those guidelines on April 18, 1996.  The April 18th guidelines provided as follows:

I.   GENERAL
Effective administration and control of dealer credit requires individual manager acceptance or responsibilities and accountability for delegated lines of credit authority.

II.   CREDIT FILES
The original credit file on each dealer for whom credit has been established will be maintained at the Headquarters and the corresponding regional office will maintain a copy file. Dealer files should contain the following:

A.   Properly approved and current Dealer Review establishing necessary Retail Credit Line.
B.   Properly completed and executed Non-Recourse Dealer Agreement.
C.   An approved Dealer Initial Credit Line Request.
D.   Completed and signed Dealer Application with signed Notice of Investigation for all principals.
E.   Executed Corporate Resolution and/or Signature Authorization with copy of Articles of Incorporation.
F.   Executed Wire Instruction Form
G.   Filed UCC-1 Financing Statement for dealer entity and all d/b/a's
H.   Additional Lot Locations Form.
I.   Copy of current Business and Insurance Licenses.
J.   Annual Financial Statements (Balance sheet and operating statements signed and dated by the dealer and personal financial statements, if necessary, to support credit line. In addition, completed Financial Analysis Form.
K.   TRW Business Profile and Principal Credit Reports. After the initial review, updated TRW Report should be ordered annually. "Continuous reports" should not be ordered.
L.   Current Bank, Retail Financing and Warehouse Financing References.
M.   Informative Management Cover Letter.
N.   Pertinent correspondence (obsolete and irrelevant data should be periodically destroyed).

III.   DEALER REVIEWS

A.   The dealer review is the key ingredient to analyzing and evaluating dealers to ensure proper extension of credit lines. The review provides a clear picture of the dealer's experience, financial condition, current sales, financing plans and agreements.

B.   Initial dealer approval will require that a Full Dealer Review be completed. A Limited Dealer Review will be conducted within six months of initial approval. Annually, thereafter, an objective appraisal of DFI experience and investment with each dealer will be conducted using a Limited Dealer Review. These reviews will consist of an evaluation of the dealers financial condition, application activity, credit line, DFI experience and a limited reference and license review.

C.   Approximately sixty days before a review is due, Regions should request financial statements to ensure that information will be available on the scheduled due date. If the review date cannot be met, the manager must submit a Request for Extension of Dealer Review Date to the appropriate approval authority (extensions can be granted to a maximum of 90 days). If dealer review or extension request is not completed, the Region must discontinue purchasing loans from the Dealer until such time the review or extension request is completed and immediately advise the Dealer of the circumstances.

D.   On those dealers served by more than one region, the region office located in the dealer's headquarters area would normally be delegated liaison responsibility and will maintain consolidated control data on outstandings and approved credit lines.

E.   Investment exceeding approved credit line is not authorized unless documented and approved within delegated lines.  Authority to make further investment in time sales expires on the established review date unless written extension by required level of management is obtained.  Timely preparation and submission of reviews are therefore, extremely important.

68.   However, a mere three weeks later on May 8, 1996, Dynex Financial Inc. issued "Operation Letter OP #96-5 Re: Dealer Review Streamline Program" which "effectively immediately" implemented the "225 Program" which streamlined the dealer review process "in order to expedite growth of our dealer base."   Pursuant to the 225 Program, "Regional Managers will have the authority to approve initial credit lines (up to $200M with limited documentation." This limited documentation only required a dealer to submit an executed Non-Recourse Dealer Agreement and a signed Dealer Application.

**F.      Dynex Sales People Were Directed to Tell Mobile
          Home Dealers That Dynex Would "Buy Deep"**

69.      The sales force was directed to tell mobile home dealers that Dynex was willing
to "buy deep" – meaning Dynex would purchase the dealer's less than creditworthy loans if
Dynex would be able to purchase the other "good paper."  Dynex thus knowingly purchased bad
loans from the outset since that was the means to enter a highly competitive market.  Bad loans
consisted of applicants who either had <u>no</u> credit or had bad credit.  Bad credit included a FICO
score under 550; unstable employment history; history of unpaid accounts and bills.  Dynex also
<u>paid</u> mobile home dealers between 1.5% and 3% of the loan to obtain the loan business.

70.      The FICO system is a scoring system that converts over 30 different variables of
an individual's credit profile into a number score.  The most important variables include
mortgage history, derogatory credit history, liens or judgments, length of credit history, depth of
credit history, proportion of debt to credit balances and amounts of available credit.  The
approximate credit score correlates to grades as follows:

<u>Credit Score Correlated to Letter Grades</u>
          720 and up: AA
          700 to 719: A
          680 to 699: A/B+
          660 to 679: B+/B
          640 to 659: B
          620 to 639: B-/C+/C
          600 to 619: C/D
          580 to 599: D/F
          579 and below: F

(Source: AtVantage.Com).

71.      Freddie Mac, for example, provides that unless there are extenuating
circumstances a credit score less than 620 "should be viewed as a strong indication that the

borrower does not have an acceptable credit reputation."  See Freddie Mac, Determining Underwriting Scores and Indicator Scores (August 2004).

72.    The internal corporate culture of Dynex was also completely focused on achieving high loan volume.  The Company set monthly quotas from the highest levels to the field offices.  Management and employee compensation derived from meeting quotas constituted a substantial portion of total annual compensation.  Many regions, particularly the Texas region, led by Regional Vice President, John Whitehead, "miraculously" achieved enormous loan volume quotas on the last few days of each quarter.

73.    The Company established underwriting guidelines, but then gave the branch managers and regional managers, such as John Whitehead, Walter McGee, Brad Nole, and Greg Usher, wide latitude to waive those guidelines.  Such waivers were reportedly used to achieve the volume loan quota.  Indeed, mobile dealers would often circumvent the underwriters and go directly to branch and regional Vice Presidents to have the underwriting guidelines waived or have the guidelines waived by senior management after it was rejected by lower level underwriters following the guidelines.  This was achieved by agreeing to purchase "bad paper" – where there was no requisite documentation of borrower employment income or assets or with facially fraudulent documentation of the same; the borrower was a minor, elderly or deceased; the borrower was not to be the occupant and so the loan was a "Buy For" loan.

### G.     Dynex Financial, Inc.'s Underwriting Guidelines Sanctioned 25-Year Term Loans to Elderly Borrowers

74.    On or about April 18, 1996, Dynex Financial issued a directive to its underwriting and origination staff – i.e., "Operation Letter OL#96-2 Re: Maximum Term Limits" – which authorized mobile home loan underwriters to approve loans to senior citizens that would far

surpass normal life-expectancy statistics.   For example, Dynex permitted loans to be issued to senior citizens ages 60 to 65 with a 25-year principal repayment term.

### H.   Dynex Mobile Home Loans Were Significantly Impaired With Uncollectible "Buy-For" Loans

75.   By 2000, Dynex knew approximately 65% - 70% of the delinquent mobile home loans were "Buy For" loans. These loans were inherently uncreditworthy and had little prospect for collection and high likelihood for repossession for several reasons. Buy For loans were loans where the actual occupant of the mobile home had no viable credit standing, and thus, could not even submit a loan application. A more creditworthy relative or friend would fill out the loan application, even though that person did not sign the contract for the mobile home. Indeed, in many instances the borrower on the Buy For loan application was an elderly person (i.e., in their late seventies or senior) who was approved for mobile home loan with a thirty year term, and in some instances even deceased. In addition, Dynex was aware of "red flags" with regard to uncreditworthy loans since it repeatedly purchased loans for mobile home dealers who were known to regularly submit falsified loan applications (i.e., doctoring W-2 forms to indicate higher gross income; a more pronounced employment history; or a different social security number).

76.   Dynex knew, or recklessly disregarded, that it bought Buy For loans because the Dynex loan files contained both the loan application and the mobile home contract, and thus, it was apparent in the case of a Buy For loan the name and signature on the loan application was different from the name and signature on the mobile home contract. Dynex also knew of its Buy For loans because collectors at its Texas offices reported this condition. The Buy For loan became largely uncollectible because, when the occupant of the mobile home was contacted by telephone or by an in-person visit that they were delinquent on their payments, they would

disregard Dynex, stating that they did not sign any loan agreement with Dynex. Further, the loan application became defective on its face since it stated the signatory would be the occupant and that was false for a Buy For loan. In addition, not only was the signatory on the loan application reluctant to make payments for the delinquent occupant and payor, but the Dynex collectors were forbidden by the Fair Debt Collection Practice Act, 15 U.S.C. 1692(c) (Sept. 30, 1996), to even contact the occupant without the permission of the person who signed the loan application. This created yet another known but undisclosed material impediment to any expectation of collateral.

I.  **Dynex's Mobile Home Loans Were Significantly
    Impaired By "First Payment Default" Deficiencies**

77.    By 1999, Dynex collectors also saw significant "First Payment Defaults." These were loans which became delinquent in the very first month because the mobile home loan dealer failed to either provide the mobile home contracted or represented it would provide the buyer; the mobile home was defective in terms of functionally (including functionality of appliances or other facilities); or the mobile home was improperly situated on the property as the dealer had represented. The underwriters at the regional sales offices knew that a majority of the manufactured home dealers were selling inferior product and practiced shoddy workmanship in the installing process. Despite internal "red flags" on applications sent to Dynex by these non-reputable dealers, the underwriters knowingly approved the loan where a first payment default was eminent. By 1999, it was also overwhelmingly clear to Dynex that these deficiencies were generally not corrected and the property would ultimately default into foreclosure and repossession.

38

**J.      Dynex Collectors Were Directed to Falsify Reported Delinquency**
**Percentages To Keep Under 2% of Outstanding Loan Balance**

78.      By 1999, Dynex had been for over two years pressuring its collectors to limit
delinquencies (in any form: 30 days, 60 days, 90 days or repossession) to <u>less</u> than two percent
(2%) of the outstanding mobile home loan balance. By the end of 1998, this was becoming
impossible due to increased delinquencies. Dynex thus directed that the reported delinquencies
be falsified. Indeed, the delinquency percentage reported in the Series 12 and Series 13 Offering
Documents were 1.68% and 1.36%, respectively. (<u>See</u> Series 12 Prospectus at p. 31 of 151[1];
Series 13 Prospectus at p. S-17).

**K.      Dynex's Additional Undisclosed Reckless Business**
**Practices In The Origination of Collateral**

79.      In addition to the above improper underwriting practices, Dynex engaged in other
practices, which were so reckless that they largely doomed any hope of collection from
foreclosure in the event of delinquency – or in other words ensured astronomically high "loss
severities" (losses from foreclosure and repossession). Dynex failed to obtain releases from the
land owner who owned the property where the mobile home was placed. The effect of this
failure was to preclude Dynex from entering into the property to reclaim the mobile home or to
have to negotiate with the landowner -- who was also typically owed money by the defaulting
borrower -- to get only a portion of the asset value upon resale. The failure to obtain the release
from the landowner thus had the effect of either precluding Dynex from repossessing the mobile
home <u>at all</u> or at best obtaining only a portion of the proceeds from repossession with the balance
going to the landowner who was typically owed rent monies from the mobile homeowner.

---

[1]      Many of Dynex's and Merit's filings with the SEC do not contain internal page numbering. Therefore, in
order to provide the Court with the precise location of the alleged false and misleading statement, whenever a filing
was devoid of internal page numbering we referenced the specific page using the page numbering provided by
www.SECInfo.com, a free website which publishes SEC filings.

80.     Finally, Dynex also failed to obtain waivers from litigating in Native American courts when a mobile home was sold to occupants of Native American land.  This origination failure again also reduced the likelihood of recovery from repossessions -- thereby increasing future "loss severities" -- in these geographic areas.

**L.     Dynex and Merit Officers Potts And Benedetti Repeatedly Assess
And Quantify The Impaired Quality of Bond Collateral As A Result
of Reporting Obligations In Monthly Delinquency Reports, Merit Quarterly
And Annual Report And Dynex Quarterly And Annual Reports**

81.     In connection with the Series 12 and Series 13 Bonds, Dynex prepared and disseminated on a monthly basis "Delinquency Reports" to investors. The Monthly Delinquency Reports were publicly available to investors on Dynex's corporate website.   The Monthly Delinquency Reports depicted 30-, 60- and 90-day delinquencies, repossessions and foreclosures as a percentage and a dollar amount of total collateral for the Series 12 and Series 13 Bonds.

82.     The Monthly Delinquency Reports were generated from loan servicing data entered into and tracked on Dynex's loan servicing computer system named Polaris.  Polaris tracked each mobile home loan that served as the collateral for the Bonds.  All loan servicing and collection operations were based in the Forth Worth, Texas Servicing Center.  Monthly payments were received by Dynex at the Fort Worth Servicing Center and entered into Polaris.   Through Polaris Dynex management was also able to track payment defaults and delinquencies.   Polaris data was accessed and reviewed by Benedetti when preparing and disseminating Dynex's Monthly Delinquency Reports to investors.

**M.     Defendant Benedetti Had Actual Knowledge of Bond Collateral
Impaired Quality Through Monthly Review of Basis Reports**

83.     Dynex's management at headquarters in Virginia closed monitored mobile home loan repossessions and foreclosures.  A repossession or foreclosure would incur a substantial loss

value of the collateral purportedly supporting the Bonds – a mobile home loan that served as the basis for Bond collateral following a repossession/sale and foreclosure generally would be sold for only pennies on the dollar.  Dynex's corporate valuation and credit rating was based largely on the value of its assets -- i.e., portfolio of collateralized debt obligations, including, inter alia, the Bonds.  Accordingly, Dynex had a vested interest in maintaining the original valuation of its portfolio and thus, to minimize the occurrences and magnitude of loss as a result of repossessions or foreclosures.

84.    Following the repossession or foreclosure on an account that was post 90-days delinquent, all loan documentation – including all underwriting documents, verification of income, bank statements, credit reports – as well as the repossession or foreclosure documents were imaged and entered into the Polaris System.  All foreclosures or repossessions were reported and a complete set of all documentation was forwarded to Vice President Darryl Axe located at Dynex headquarters in Virginia.

85.    In addition, another report entitled the "**Basis Report**" was generated by the Senior Accountant located at Dynex Capital's headquarters in Virginia.    The Basis Report contained a summary of Dynex's value as sum of the value of its assets – i.e., portfolio of collateralized debt obligations, including, inter alia, the Bonds.   The Basis Report was a quantitative report generated on a monthly basis, contained in Microsoft Excel spreadsheet and stored on the corporate mainframe computer system accessible internally to Dynex management in Virginia.  The Basis Report should depict an anticipated and steady decrease in portfolio valuation on a month-by-month basis as loan principal is repaid during the normal life of a loan. However, repossessions and foreclosures expedite the diminution of collateral value since a substantial portion of the loan principal is lost forever -- and not simply repaid.    Monthly