accounting meetings were held at Dynex's headquarters in Glen Allen, Virginia to discuss the Basis Report. These Basis Report Meetings were approximately one hour in duration and were attended by Defendant Benedetti; Theresa Estep, Assistant Controller; Megan Rosenberg, Dynex's Accounting Manager, as well as senior accountants and staff accountants.

### N.   Defendants' Public Statements Conceal the True Impaired Quality of the Bond Collateral

86.     The Offering Documents issued in 1999 by Dynex in connection with the Series 12 and Series 13 Bonds belied the true facts concerning how the collateral was originated. These documents described delinquencies to be approximately 1.68% of the total loan balance (¶ 77) and were identical in assurances to investors that there were underwriting standards adhered to in the origination of this collateral, which included an evaluation of the Borrower's credit standing and repayment ability (e.g., mobile home loans are typically "made based upon a borrower's ability to make monthly payments" (¶ 95); based upon a review of specific supporting credit documentation (¶¶ 8, 53, 98)). The Offering Documents also described Dynex's role as "Master Servicer" of the loans including monitoring compliance with servicing guidelines which included reporting collateral performance to investors (¶¶ 21-22, 24, 26, 88-89, 94, 103, 108-09). As a result of these material assurances, the Bonds were assigned by Moody's and Fitch among their highest ratings (Aaa and AAA, respectively) and traded at par or above from the time of the Offering in 1999 through year end 2003. (¶¶10-11, 85, 93, 100, 134-35, 141-45).

87.     After the issuance of the Bonds in 1999 and throughout the Class Period beginning on February 7, 2000, Dynex never qualified or modified the descriptions regarding the origination of the Bond collateral contained in the Offering Documents. Instead, Dynex made numerous representations during the Class Period which reinforced the origination descriptions

by claiming that the Bond collateral's deteriorating performance was due to "market conditions" including for example:

(a)     In May 2001, that "manufacturing housing loans" were "currently experiencing higher loss severities than previously anticipated due to the depressed state of the manufactured housing sector" (¶ 110) and "as a result of the saturation in the market place with both new and used (repossessed) manufactured housing units" (¶¶ 112, 114, 118, 124, 146);

(b)     In April 2002, that high credit losses on its manufactured housing loan portfolio were "primarily related to the depressed market for repossessed manufactured homes, compounded by the exit from that market of several large lenders." (¶ 116); and

(c)     In April 2003, that "the weakness in the manufactured housing market as a major contributor to the net loss for 2002." (¶ 120);

88.     Dynex then claimed in April 2003 and April 2004 that it was only as a result of these recent "market events" and "new observable data" with respect to "performance and default activity" of the Bond collateral that it increased its loan loss reserves with respect to the mobile home loan collateral to include "all loans greater than 30 days delinquent" (¶ 92, 124) and then in April 2004 to include even "current" mobile home loans (¶ 131, 146-47).

89.     During the Class Period, Dynex also reiterated its role as "Master Servicer" of the mobile home loan collateral "monitoring" the compliance with "servicing guidelines" including reporting collateral performance (in terms of, inter alia, delinquencies and repossessions) to Bond investors on Dynex's website.

90.     In point of fact, all of Dynex's representations in the Offering Documents and during the Class Period regarding the mobile home loan collateral and Dynex's role as Master Servicer were materially false and misleading. Specifically, in underwriting and originating the

mobile home loan collateral, Dynex systematically disregarded "borrower creditworthiness" (¶¶ 26, 53, 59, 73, 80, 91, 99). Dynex salespeople were directed to tell mobile home dealers -- as a selling technique to gain business from established competitors like Green Point and Green Tree- - that Dynex would purchase their far from creditworthy paper in order to get the dealer's mobile home loan business (¶¶ 26, 53, 58, 59, 73, 80, 91, 99). Further, while underwriting standards existed, officers reporting to Potts and regional officers systematically waived "underwriting and borrower creditworthiness standards" (e.g., permitting loans to borrowers with FICO credit scores below 530) in order to amass the requisite mobile home loan volume to consummate the Bond offerings (¶ 3, 7, 27, 53, 67-73, 100, 104). Thus, it was not uncommon for corporate officers and regional managers to approve uncreditworthy borrowers whose loan application had already been rejected by field office or lower level underwriters (¶ 68). Dynex also directed its employees to understate reported delinquencies to be below 2% through the end of 1999. (¶ 69-73). Dynex's undisclosed reckless underwriting and origination practices resulted in 65% - 70% of its mobile home loan portfolios with undisclosed "Buy For" loans where the mobile home owner and the occupant was not the same as the "borrower" (¶¶ 26-27, 53, 58, 72-75). Buy For loans rendered the loan application facially defective since, inter alia, the application required an affirmation that the Borrower would be the principal occupant. These undisclosed Buy For loans also had significantly high delinquencies and high permanent default and repossession rates since the typical reason the occupant did not sign the loan application was because the occupant had no viable credit standing and because Federal lending statutes Fair Debt Collection Practice Act, 15 U.S.C. 1692(c) (Sept. 30, 1996), prohibited communication with an occupant who was not the borrower concerning the loan. Dynex also recklessly disregarded "red flags" of uncreditworthy paper by repeatedly purchasing loans from mobile home dealers known to regularly submit

falsified loan applications (i.e., doctoring W-2 forms to indicate a higher gross income; a more pronounced employment history; or a different social security number).

91.     Further, by 2000 Dynex had ample evidence from its collections operations of massive "First Payment Defaults" where the borrower refused to make even the first payment under the loan as a result of alleged misrepresentations in the sale of the mobile homes (¶ 77). These First Payment Defaults typically reflected predatory lending practices by the mobile home dealers who had promised a fully functional mobile home which when delivered was materially deficient or defective.  Given the reasons for the First Payment Defaults, these delinquencies also had a dramatically higher risk of permanent default and repossession.  Dynex, in originating these loans, also failed to obtain waivers from the mobile home landowners which ultimately precluded entirely or substantially Dynex's ability to collect in repossession because Dynex could not enter upon the land where the mobile home was located.

92.     Dynex thus knew, or recklessly disregarded, at or about the commencement of the Class Period in February 2000, these material defects and deficiencies in the underwriting and origination of the Bond collateral which undermined the quality of the Bond collateral itself.

93.     As a result of these undisclosed defects and deficiencies, Dynex knew, or recklessly disregarded, from the outset of the Class Period both that the Bond collateral would perform poorly (i.e., experience dramatically higher delinquency rates (well above the 1.3% described in the Offering Documents) and "loss severities" – i.e., losses from the inability to recover from repossessions) and that this poor performance would be sustained over time since it would not be due solely to "market conditions," but to the underlying impaired quality of the collateral itself.  It was thus materially false and misleading for Dynex to attribute throughout the Class Period the high delinquency, default and loss severity rates with respect to the mobile

home loan collateral to the "depressed housing market" (¶ 110); the "saturation of the market with repossessed homes" (¶¶ 112, 114, 118, 124, 146); or the "exit of large lenders" (¶ 116). It was also materially false and misleading to state that it was only as a result of "recent performance" and delinquency "data" (¶¶ 8, 57, 88. 107) that Dynex expanded its provision for losses on the mobile home loan collateral to include "all loans greater than 30 days delinquent' and then "current" mobile home loans. In fact, the high delinquencies and loss severities were due to factors known to defendants from the outset of the Class Period and stemmed fundamentally from Dynex's own reckless underwriting and origination practices. The reported loan loss provisions had thus been materially understated during the Class Period when greater than 30 day delinquent and "current" loans had not been included (¶¶ 120-22).

94.    Beginning in October 2003, Defendants'' misstatements began to be disclosed and integrated into the market.  Merit Securities Corporation issued a Delinquency Report which reflected that delinquencies had been understated by $15.92 million -- or 34%.  This disclosure caused immediate Rating agency actions.   In November 2003, Moody's announced that it was reviewing Merit Series 13 Bonds "for possible downgrade" due to "weaker-than-anticipated performance by the manufactured housing loans in the collateral pool." On February 24, 2004, Moody's completed the "review" initiated in September 2003 and dramatically downgraded the Series 13 Bonds from "very high" and "high" credit quality to "probable" and "imminent default." (see ¶¶ 10-11, 85, 93, 100, 134-35, 141-45, infra).  On February 27, 20004, Fitch put Merit Series 13 Bonds on "Rating Watch Negative."   On March 9, 2004, Fitch ultimately downgraded the Series 13 Bonds.  Then, on March 10, 2004, Fitch also downgraded the Series 12 Bonds. On March 29, 2004 Fitch again downgraded Merit manufactured housing contract Series 12, noting that due to, inter alia, "**relaxed credit standards**, overbuilding by

manufacturers, and the difficulties relating to servicing this unique asset have all contributed to poor performance of manufactured housing securities." On April 19, 2004, Moody's announced that they were reviewing the Series 12 Bonds for possible downgrade and subsequently on May 13, 2004, Moody's downgraded the Series 12 Bonds. These downgrades reflecting the true quality of bond collateral -- which Defendants knew of and recklessly disregarded from the outset of the Class Period -- resulted in dramatic Bond price declines as follows:

| MESC 12 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Certificate | Class | Rating at Issuance (Moody's/Fitch) | 3/10/2004 | Fitch Downgrade 3/10/2004 | 3/12/2004 | % Decline | Moody's Downgrade 5/13/2004 | 5/17/2004 | Total % Decline |
| MESC 12 | 1M1 | Aa2/AA "very high credit quality" | $ 100.22 | A "high credit quality" | $ 100.16 | 0% | Ca "default probable" | $ 75.56 | -18% |
| | 1M2 | A2/A "high credit quality" | $ 100.22 | BBB- "low investment grade" | $ 92.00 | -8% | C "imminent default" | $ 52.44 | -33% |
| | 1B | BBB "low investment grade" | $ 100.13 | BB- "speculative" | $ 89.66 | -10% | C "imminent default" | $ 23.25 | -72% |

| MESC 13 | | | | | | |
|---|---|---|---|---|---|---|
| Certificate | Class | Rating at Issuance (Moody's/Fitch) | Price on 2/24/04 | Rating Downgrade 2/24/04 | Next Trade (Trade Date) | % Decline |
| MESC 13 | | | | | 5/11/2004 | |
| | M1 | Aa2/AA "very high credit quality" | $ 101.875 | Ca "default probable" | $ 81.09 | 20% |
| | M2 | A2/A "high credit quality" | $ 94.625 | C "imminent default" | $ 49.94 | 42% |
| | | | | | 11/30/2004 | |
| | B1 | | $ 102.40 | | $ 15.38 | 85% |

95.    These downgrades and price declines were further fueled by disclosures in April and May 2004 that Merit had to restate its prior financial results due to "internal control deficiencies" with regard to recording loan loss allowances (¶¶ 141, 149). These same disclosures also revealed Dynex's failures to act as Master Servicer in reporting the performance of the Bond collateral.

48

**VIII.  DYNEX'S FALSE AND MISLEADING STATEMENTS**

**A.  Offering Document Statements**

96.    The Offering Documents stated that a manufactured home loan was typically

made based upon a determination of the "Borrower's ability to make monthly payments" and

upon an "investment analysis of the related manufactured home to determine the permissible

loan size," as follows:

> Under the underwriting standards applicable to the Manufactured Home Loans, the primary considerations in underwriting a Manufactured Home Loan other than the creditworthiness of the Borrower, are the results of an investment analysis of the Manufactured Home, which is used to determine the allowable Loan size, and the adequacy of such property as collateral in relation to the amount of the Manufactured Home Loan.
>
> *       *       *
>
> CONSUMER FINANCE LOANS.  A Consumer Finance loan typically is made based upon a determination of the Borrower's ability to make Monthly Payments on the Consumer Finance Loan and upon the purchase price of the related Facilities and the costs of installing the Facilities in a single family residential property.

(Series 12 Prospectus at p. 62 of 151; Series 13 Prospectus at p. 9) (Emphasis added).

97.    Specifically, the loan origination was to follow either Fannie Mae or Federal

Home Loan Mortgage Corporation ("FHLMC") standards on IHC's credit appraisal and

underwriting standards and guidelines or the "Participant's" guidelines.  The purpose of both was

purportedly to evaluate each prospective borrower's credit standing:

> Each Manufactured Home Loan will be originated by the Participant or acquired by the Participant from the originator.  In originating a Mortgage Loan or a Manufactured Home Loan, the loan originator (the *"Originator"*) will follow either (a) its own credit approval process, to the extent that such process conforms to underwriting standards generally acceptable to Fannie Mae or FHLMC, or (b) the Participant's various credit, appraisal and underwriting standards and guidelines.
>
> Both the Fannie Mae and FHLMC underwriting standards and the Participant's underwriting standards are applied in a manner intended to comply with applicable federal and state laws and regulations.  **The purpose of applying these**

**standards is to evaluate each prospective Borrower's credit standing and repayment ability and the value and adequacy of the related Mortgaged Premises as collateral.** The mortgage loans and manufactured housing installment sales contracts originated under the Participant's underwriting standards generally are based on loan application packages submitted by mortgage brokerage companies, manufactured home dealers or consumers for underwriting review, approval and funding by the Participant or an Affiliate of the Participant.

(Series 12 Prospectus at p. 89 of 151; Series 13 Prospectus at p. 34) (Emphasis added).

98.   The underwriting purportedly included obtaining credit data from the borrower and analyzing that data as follows:

In general, a prospective Borrower is required to complete a detailed application designed to provide pertinent credit information. The prospective Borrower generally is required to provide a statement of income as well as an authorization for a credit report that summarizes the Borrower's credit history with merchants and lenders as well as any suits, judgments or bankruptcies that are of public record. The Borrower may also be required to authorize verification of deposits at financial institutions where the Borrower has demand or savings accounts.

In determining the adequacy of the collateral for a Mortgage Loan, an appraisal is made of each Mortgaged Premises considered for financing by a qualified independent appraiser approved by Fannie Mae, FHLMC, the Participant or an Affiliate of the Participant. The appraiser is required to inspect the property and verify that it is in good repair and that construction, if new, has been completed. The appraisal is based on the market value of comparable homes and, if considered applicable by the appraiser, the estimated rental income of the property and a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or FHLMC appraisal standards then in effect.

In assessing a possible Manufactured Home Loan, the Participant determines the amount that it is willing to lend based not on an appraisal but on an investment analysis based on the invoice price of the Manufactured Home plus accessories, freight, taxes, insurance and other costs. The use of an investment analysis in the underwriting of manufactured housing installment sales contracts is customary in the financing of manufacturing housing. If the Manufactured Home Loan is also to be secured by Real Property, the Participant may have the Real Property appraised in the same manner as Mortgaged Premises are appraised.

Once all applicable employment, credit and property information is received, a determination generally is made as to whether the prospective Borrower has sufficient monthly income available (i) to meet the Borrower's monthly

obligations on the proposed mortgage loan or contract (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the Mortgaged Premises or Manufactured Home (such as property tax and hazard insurance) and (ii) to meet monthly housing expenses and other financial obligations and monthly living expenses. The underwriting standards applied, particularly with respect to the level of income and debt disclosure on the application and verification, may be varied in appropriate cases where factors such as low loan-to-value ratios or other favorable compensating factors exist.

(Series 12 Prospectus at p. 90 of 151; Series 13 Prospectus, p. 35) (Emphasis added).

99.    The Offering documents further provided that high loan-to-value ration loans

required a further "full documentation analysis" while lower loan-to-value ration loans could be

subjected to a "limited documentation program" as follows:

A prospective Borrower applying for a loan pursuant to the full documentation program is required to provide, in addition to the above, a statement of income, expenses and liabilities (existing or prior). An employment verification is obtained from an independent source (typically the prospective Borrower's employer), which verification generally reports the length of employment with that organization, the prospective Borrower's current salary and whether it is expected that the prospective Borrower will continue such employment in the future. If a prospective Borrower is self-employed, the Borrower may be required to submit copies of signed tax returns. For other than self-employed Borrowers, income verification may be accomplished by W-2 forms or pay stubs that indicate year to date earnings.

Under the limited documentation program, emphasis is placed both on the value and adequacy of the Mortgaged Premises or Manufactured Home as collateral and on credit underwriting, although certain credit underwriting documentation concerning income and employment verification is waived. The maximum permitted loan-to-value ratios for loans originated under such program are generally lower than those permitted for similar loans originated pursuant to the full documentation program.

(Series 12 Prospectus at id.; Series 13 Prospectus at id.) (Emphasis added).

100.    The statements contained in ¶¶ 95-98 were materially false and misleading

because the creditworthiness of the borrower as well as deficiencies in borrower documentation

was systematically disregarded by Dynex in order to reach loan volume quotas and/or loan

volume amounts necessary to consummate the Bond Offerings. The sources for these allegations are contained in ¶¶ 52-53, supra.

101.   The above misrepresentations and omissions concerning the mobile home loan underwriting and origination of the Bonds resulted, in material part, in "high quality" credit ratings by ratings agencies, such as Fitch and Moody's as follows:

| Series | Class | Principal Amount | Coupon | Fitch Rating | Moody's Rating |
|--------|-------|------------------|--------|--------------|----------------|
| 12 | A1 | $73,650,000 | 6.16% | Aaa | AAA |
|  | A2 | $42,500,000 | 6.19% | Aaa | AAA |
|  | A3 | $132,523,000 | 6.95% | Aaa | AAA |
|  | M1 | $32,000,000 | 7.63% | Aa2 | AA |
|  | M2 | $24,889,000 | 8.35% | A2 | A |
| 13 | A1 | $75,000,000 | 7.04% | Aaa | AAA |
|  | A2 | $35,000,000 | 7.39% | Aaa | AAA |
|  | A3 | $47,000,000 | 7.63% | Aaa | AAA |
|  | A4 | $116,000,000 | 7.88% | Aaa | AAA |
|  | M1 | $41,364,000 | 7.88% | Aa2 | AA |
|  | M2 | $26,886,000 | 7.88% | A2 | A |

These superlative credit ratings, as well as the alleged misrepresentations during the Class Period alleged herein, in turn caused, in material part, the Bonds to trade at par or above during a substantial portion of the Class Period through early 2004.

**B.    False and Misleading Statements During the Class Period**

102.   During the Class Period defendants' made disclosures concerning the Bonds and its collateral through three sources of information:  Dynex Capital's SEC filings; Merit's SEC filings; and the monthly reports on the performance of the Bond collateral reported on Dynex website. The disclosures from each of these sources were materially false and misleading.

103.   On or about April 18, 2000, Dynex Capital filed it s Form 10-K for the year ended December 31, 1999. The Form 10-K touted under the heading "Prior Lending Operations" that

its was a "vertically integrated lender" that utilized "internally generated guidelines" to originate

loans and then listed mobile home loans production in 1997, 1998 and 1999 as follows:

> <u>The Company generally has been a vertically integrated lender by performing the
> sourcing, underwriting, funding and servicing of loans to maximize efficiency and
> provide superior customer service.</u> The Company generally has focused on loan
> products that maximize the advantages of the REIT tax election and has
> emphasized direct relationships with the borrower and minimized, to the extent
> practical, the use of origination intermediaries. <u>**The Company has historically
> utilized internally generated guidelines to underwrite loans for all product
> types and maintained centralized loan pricing, and performed the servicing
> function for loans on which the Company has credit exposure.**</u>

Dynex Capital Form 10-K for year ended Dec. 31, 1999, p. 4 (Emphasis added).

104.    The statements set forth in the preceding paragraph were materially false and

misleading because Dynex's senior management systematically disregarded the underwriting

guidelines to achieve loan volume and Dynex recklessly disregarded its servicing duties as

Master Servicer with respect to the loan collateral.    The sources for these allegations are

contained in ¶¶ 52-53, <u>supra</u>.

105.    Defendant Potts signed a Letter to Shareholders dated April 28, 2000 which gave

an "explanation" for its sale of the mobile home loan business that based the decision entirely on

"market" factors failing to disclose that the defective quality of its mobile home loans was due to

its reckless underwriting practices:

> As a result of that environment, it became apparent in the second quarter of 1999
> that our production activities were not going to be economic – it is difficult to
> make money as a lender without a competitive source of funding.  Our sources of
> funding , be it interim lenders such as commercial banks and Wall Street firms, or
> long term investors in our securitization were generally changing specialty
> finance companies, including Dynex, higher rates or were unwilling to renew
> credit lines under reasonable terms.  <u>**This led to our decision to sell**</u> during 1999
> our model home purchase/leaseback business ("Dynex Residential, Inc." or
> "DRI") and <u>**our manufactured housing lending business**</u> ("Dynex Financial,
> Inc." or "DFI").

Dynex 1999 Annual Report, p. 1. (Emphasis added.)

106.   The statements contained in the preceding were materially false and misleading because Dynex failed to disclose the poor underwriting and origination practices engaged in which produced materially defective mobile home loan portfolios.

107.   Dynex monitored the performance of the Bond collateral because it had the potential to directly impact Dynex's reported profits. Dynex's earning were derived largely from the payments received from its mortgage portfolio (net of payments to bondholders) however, these earnings would have to be offset by increased loan loss reserves. Thus, in its SEC filings Dynex purported to monitor risk of default on borrowers on collateral and purportedly established reserves based on this risk. However, the description of risk was materially false and misleading because again it referred only to "potential market conditions" and the reserves were materially understated as follows:

> Credit Risk.  Credit risk is the risk of loss to the Company from the failure by a borrower (or the proceeds from the liquidation of the underlying collateral) to fully repay the principal balance and interest due on a loan.  A borrower's ability to repay, or the value of the <u>underlying collateral, could be negatively influenced by economic and market conditions.  These conditions could be global, national, regional or local in nature.</u>  When a loan is funded and becomes part of the Company's investment portfolio, the Company has all of the credit risk on the loan should it default.  Upon securitization of the pool of loans, the credit risk retained by the Company is generally limited to the net investment in collateralized bonds and subordinated securities.  <u>The Company provides for reserves for expected losses based on the current performance of the respective pool of loans; however, if losses are experienced more rapidly due to **market conditions** than the Company has provided for in its reserves, the Company may be required to provide for additional reserves for these losses.</u>

> The Company began to retain a portion of the credit risk on securitized mortgage loans in 1994 as mortgage pool insurance became less available in the market and as the Company diversified into other products.  <u>The Company evaluates and monitors its exposure to credit losses and has established reserves and discounts for probable credit losses based upon anticipated future losses on the loans, general economic conditions and historical trends in the portfolio.</u>

Dynex 1999 Form 10-K p.7 (Emphasis added).

108.   The statements contained in the preceding paragraph were materially false and misleading because it failed to disclose that a material cause for the increased loan loss reserves was the impaired mobile home loan collateral and undisclosed aggressive underwriting practices. The sources for these allegations are contained in ¶¶ 52-53, supra.

109.   Dynex also falsely reported its "masters servicers function" with respect to the Bond collateral:

> The Company   performs the function of master servicer for certain of the securities it has issued.   The master servicer's function typically includes monitoring and reconciling the loan payments remitted by the servicers of the loans, determining the payments due on the securities and determining that the funds are correctly sent to a trustee or investors for each series of securities. <u>Master servicing responsibilities also include monitoring the servicers' compliance with its servicing guidelines.</u>   As master servicer, the Company is paid a monthly fee based on the outstanding principal balance of each such loan master serviced or serviced by the Company as of the last day of each month. As of December 31, 1999, the Company master serviced $3.0 billion in securities.

Dynex 1999 Form 10-K, p. 5 (Emphasis added).

110.   The statements contained in the preceding paragraph were contained in Dynex's subsequent Form 10-Ks issued in years 2001 through 2004.  Each of these statements were materially false and misleading because Dynex recklessly disregarded its Master Servicer functions and duties as reflected in the disclosure of the material understatement of cumulative repossessions and absence of sufficient internal controls to assess loan loss provisions including with respect to mobile home loan collateral. The sources for these allegations are contained in ¶¶ 52-53, supra.

111.   On May 4, 2001, Dynex reported its 2000 results, which included significantly higher credit losses from "underperformance" of mobile home loans.  Defendant Potts Letter to Shareholders dated May 4, 2001 was misleading in that it falsely conveyed surprise in the mobile home loans performance and also attributed the poor performance to market conditions:

54

> Further, today the Company has *unrealized losses* on its securitized assets of nearly $120 million. <u>These unrealized losses are due in large part to projected credit losses on both the Company's manufactured housing loans and commercial mortgage loans</u>. While credit losses to date on the commercial mortgage loans have been consistent with our expectations, <u>the manufactured housing loans are currently experiencing higher loss severities than previously anticipated due to the depressed state of the manufactured housing section.</u>

Dynex 2000 Annual Report, p. 1-2 (Emphasis added).

112. The statements in the preceding paragraph were materially false and misleading because as known to defendants, but undisclosed, the material cause for the mobile home loan loss severities was the reckless underwriting and origination practices engaged in by defendants resulting in, <u>inter alia</u>, high percentages of First Payment Defaults and Buy For delinquencies. The sources for these allegations are contained in ¶¶ 52-53, <u>supra</u>.

113. The Form 10-K filed on that same date was similarly misleading describing the more than doubling of the loan loss provision to $34.6 million in 2000 due largely to mobile home loans as a result of market condition as follows:

> Provision for losses increased to $34.6 million in 2000, or 0.93% of average interest earning assets, from $16.1 million or 0.35% during 1999. The provision for losses increased as a result of an overall increase in credit risk retained from securities issued by the Company (<u>principally for securities issued in the latter portion of 1999), and a charge of $13.3 million in the fourth quarter of 2000 due to the underperformance of the Company's securitized manufactured housing loan portfolio. **The Company has seen the loss severity on manufactured housing loans increase dramatically since the end of the third quarter of 2000 as a result of the saturation in the *market place* with both new and used (repossessed) manufactured housing units. In addition, the Company has seen some increase in overall default rates on its manufactured housing loans.** The Company anticipates that market conditions for manufactured housing loans will remain unfavorable through 2001.</u>

Dynex 2000 Form 10-K at p 22 of 73. (Emphasis added).

114. The statements in the preceding paragraph were materially false and misleading because as known to defendants, but undisclosed, the material cause for the mobile home loan

loss severities was the reckless underwriting and origination practices engaged in by defendants resulting in, inter alia, high percentages of First Payment Defaults and Buy For delinquencies. The sources for these allegations are contained in ¶¶ 52-53, supra.

115.   The Merit Form 10-K dated April 16, 2001 contained a similar explanation for the loan loss provisions from $13.6 million in 1999 to $34.1 million in 2000, as follows:

> Provision for losses increased to $34.1 million in 2000 from $13.6 million in 1999 as a result of an overall increase in credit risk retained from securities issued by the Company (principally for securities issued in the latter portion of 1999), and a charge of $13.3 million in the fourth quarter of 2000 due to the underperformance of the Company's securitized manufactured housing loan portfolio. The Company has seen the loss severity on manufactured housing loans increase dramatically since the end of the third quarter of 2000 as a result of the saturation in the market place with both new and used (repossessed) manufactured housing units. In addition, the Company has seen some increase in overall default rates on its manufactured housing loans. The Company anticipates that market conditions for manufactured housing loans will remain unfavorable through 2001. Provision for losses increased to $13.6 million in 1999 from $6.2 million in 1998 primarily due to the addition of three series of collateralized bonds during 1999.

Merit 2000 Form 10-K at p. 7 of 30. (Emphasis added).

116.   The statements in the preceding paragraph were materially false and misleading because as known to defendants, but undisclosed, the material cause for the mobile home loan loss severities was the reckless underwriting and origination practices engaged in by defendants resulting in, inter alia, high percentages of First Payment Defaults and Buy For delinquencies. The sources for these allegations are contained in ¶¶ 52-53, supra.

117.   On April 8, 2002, Defendant Potts issued another Letter to Shareholders which again falsely attributed continued poor performance of mobile home loans to "market" conditions as follows:

> As referenced above, we are experiencing a high level of credit losses on the manufactured housing loan portfolio. These losses are primarily related to the depressed market for repossessed manufactured homes, compounded by the exit from that market of several large lenders. We will continue to try to minimize

these losses; however shareholders' equity already reflects that these credit losses remain high. The remaining exposure of shareholders' equity to the performance of the manufactured housing loan portfolio is quite low.

Merit 2001 Annual Report, p. 1. (Emphasis added).

118.    The statements in the preceding paragraph were materially false and misleading because as known to defendants, but undisclosed, the material case for the losses in the mobile home loan portfolio was Dynex's reckless underwriting and origination practices as alleged herein. The sources for these allegations are contained in ¶¶ 52-53, supra.

119.    The Merit 2001 Form 10-K filed on May 28, 2002 also attributed the high provision for loan losses due to mobile home loans and particularly to "market conditions":

> Provision for losses increased to $34.5 million in 2001 from $34.1 million in 2000. **The Company has seen the loss severity on manufactured housing loans increase dramatically since the third quarter of 2000 as a result of the saturation in the market place with both new and used (repossessed) manufactured housing units.** In addition, the Company has seen some increase in overall default rates on its manufactured housing loans. The Company anticipates that market conditions for manufactured housing loans will remain unfavorable through 2002. Provision for losses increased to $34.1 million in 2000 from $13.6 million in 1999 as a result of an overall increase in credit risk retained from securities issued by the Company (principally for securities issued in the latter portion of 1999), and a charge of $13.3 million in the fourth quarter of 2000 due to the under-performance of the Company's securitized manufactured housing loan portfolio.

Merit 2001 Form 10-K at p. 9-10 of 34. (Emphasis added).

120.    The statements in the preceding paragraph were materially false and misleading because as known to defendants, but undisclosed, the material cause for the losses in the mobile home loan portfolio was defendants' reckless underwriting and origination practices. The statements were additionally false and misleading for materially understating the loan loss amount for failing to include current mobile home loans. The sources for these allegations are contained in ¶¶ 52-53, supra.

121.    Defendant Potts issued a Letter to Shareholders dated April 18, 2003, which again attributed net losses to market conditions in the mobile home loan "market":

> **The weakness in the manufactured housing markets was a major contributor to the net loss for 2002.** The Company provided reserves for losses on manufactured housing loans of $29.9 million, and recorded impairment charges of $15.5 million on securities back by manufactured housing loans. These charges were necessary because the Company has exposure to credit losses on these assets. Unfortunately, the manufactured housing market continues to underperform, and 2003 will likely include significant charges to earnings.

Dynex 2002 Annual Report, p. 1. (Emphasis added).

122.    The statements in the preceding paragraph were materially false and misleading because as known to defendants, but undisclosed, the material cause for the losses in the mobile home loan portfolio was defendants' reckless underwriting and origination practices.    The statements were additionally false and misleading for materially understating the loan loss amount for failing to include current mobile home loans.    The sources for these allegations are contained in ¶¶ 52-53, supra.

123.    The Dynex Form 10-K filed on that same date also contained a table as part of a section on "Credit Exposure" which purported to reflect delinquencies including from mobile home loans as follows:

> The following table summarizes single family mortgage loan, manufactured housing loan and commercial mortgage loan delinquencies as a percentage of the outstanding collateral balance for those structures in which Dynex has retained a portion of the direct credit risk included in the table above. The delinquencies as a percentage of the outstanding collateral increased to 2.71% at December 31, 2002, from 1.78% at December 31, 2001, primarily from increasing delinquencies in the Company's manufactured housing loan and commercial mortgage loan portfolios and a declining overall outstanding collateral balance as a result of prepayments. The Company monitors and evaluates its exposure to credit losses and has established reserves based upon anticipated losses, general economic conditions and trends in the investment portfolio. As of December 31, 2002, management believes the level of credit reserves is sufficient to cover any losses that may occur as a result of current delinquencies presented in the table below.

Delinquency Statistics

| December 31, | 60 to 89 days delinquent | 90 days and over delinquent (1) | Total |
|---|---|---|---|
| 2000 | 0.37% | 1.59% | 1.96% |
| 2001 | 0.28% | 1.50% | 1.78% |
| 2002 | 0.64% | 2.07% | 2.71% |

(1) Includes foreclosures, repossessions and REO.

Dynex 2002 Form 10-K at p. 23 (Emphasis added).

124.    The statements contained in the preceding paragraph were materially false and misleading because Dynex materially underreported cumulative delinquency and repossession statistics for mobile home loans.  The sources for these allegations are contained in ¶¶ 52-53, supra.

**In 2003, Dynex Expanded Criteria For Calculating Loan Loss To Include The Percentage of 30-Day Delinquent Mobile Home Loans**

125.    Merit's 2002 Form 10-K, filed on April 15, 2003, described increases in loan loss provisions due to "under performance," of the portfolio and adverse "trends"  and also the need to include a portion of all loans greater than 30 days delinquent:

> The Company provides for losses on its loans where it has retained credit risk. The Company provides for losses on its loans through a provision for loan losses. Provision for loan losses increased to $28.6 million in 2002 from $18.7 million in 2001. **The continuing under-performance of the Company's manufactured housing loan and securities portfolio prompted the company to revise its estimate of losses to include a percentage of all loans with delinquencies greater than 30 days.** Defaults in 2002 averaged 4.3% versus 4.2% in 2001, and loss severity remained at 77% during the year. *"Loss Severity"* is the cumulative loss incurred on a loan, or sub-set of loans, divided by the unpaid principal balance of such loan(s). **Should these trends continue, the Company will likely need to increase the provision for loan losses and will likely have increased other-than-temporary impairment charges on its manufactured housing debt securities portfolio.** Provision for losses for loans decreased to $18.7 million in 2001 from $28.5 million in 2000 and impairment charges increased to $15.8

million in 2001 from $5.5 million in 2000. Provision for losses and other-than-temporary impairment losses remained high in 2001 due to the under-performance of the Company's manufactured housing loan portfolio. **The increase in severe loan losses is a result of the saturation in the market place with both new and used (repossessed) manufactured housing units. In addition, the Company has seen some increase in overall default rates on its manufactured housing loans. Defaults in 2001 averaged 4.2% versus 3.4% in 2000, and loss severity increased from 70% to 77% during the year.**

Merit 2002 Form 10-K at p. 15-16 of 61. (Emphasis added).

126.    The statements contained in the preceding paragraph were materially false and misleading because it failed to disclose that a material cause for the increased loan loss reserves was the impaired mobile home loan collateral and undisclosed aggressive underwriting practices. The sources for these allegations are contained in ¶¶ 52-53, supra.

**Merit's False and Misleading Form 10-Q For The Period Ending June 30, 2003**

127.    On or about August 14, 2003, Merit filed its form 10-Q with the SEC for the period ended June 30, 2003 ("2Q 2003 Form 10-Q") which was signed by Defendant Benedetti. In the 2Q 2003 Form 10-Q, Merit stated that the Company maintained the proper loan loss reserves for its mortgage pools and thus accurately reported Merit's loan loss related balance sheet and income statement line items as follows:

The following table summarizes the types of collateral for collateralized bonds as of June 30, 2003 and December 31, 2002:

|  | June 30, 2003 | December 31, 2002 |
|---|---|---|
| Loans, at amortized cost .. | $ 914,528 | $ 1,038,146 |
| Allowance for loan losses .. | (33,300) | (20,700) |
|  | 881,228 | 1,017,446 |
| Debt Securities, at fair value ... | 289,724 | 323,791 |
|  | $ 1,170,952 | $ 1,341,237 |

128.    The statements in the above paragraph including the reported financial result were materially false and misleading and had to be made with scienter because Defendants, with

knowledge, disregarded facts undisclosed to investors regarding the insufficiency of the loan loss reserves as of June 30, 2003 as was evident when the Company was forced to restate its collateralization and loss reserves for the quarter ending June 30, 2003 in the Company's 2003 Form 10-K, filed with the SEC on April 15, 2004, as follows:

## Consolidated Balance Sheets Data
### (amounts in thousands)

|  | (As Previously Reported) | (As Restated) |
|---|---|---|
|  | September 30, 2003 | September 30, 2003 |
| Securitized finance receivables - loans | $  825,220 | $  836,012 |
| Total assets | 1,137,875 | 1,148,667 |
| **Accumulated deficit** | **(12,599)** | **(1,807)** |
| **Total stockholders' equity** | **56,452** | **67,244** |
| Total liabilities and stockholder's equity | 1,137,875 | 1,148,667 |
|  | June 30, 2003 | June 30, 2003 |
| Securitized finance receivables - loans | $  881,228 | $  888,490 |
| Total assets | 1,205,478 | 1,212,740 |
| **Accumulated deficit** | **(14,724)** | **(7,462)** |
| **Total stockholders' equity** | **56,271** | **63,533** |
| Total liabilities and stockholder's equity | 1,205,478 | 1,212,740 |

Consolidated Statements of Operations Data
(amounts in thousands)

|  | Three Months Ended September 30, 2003 | | Nine Months Ended September 30, 2003 | |
|---|---|---|---|---|
|  | (As Previously Reported) | (As Restated) | (As Previously Reported) | (As Restated) |
| Provision for loan losses | $ (5,003) | $ (1,473) | $ (27,298) | $ (16,506) |
| Net interest margin | 2,142 | 5,672 | (4,390) | 6,402 |
| Net income (loss) | 2,125 | 5,655 | (5,829) | 4,963 |
| Comprehensive income (loss) | $ 4,068 | $ 7,598 | $ (6,330) | $ 4,462 |

|  | Three Months Ended June 30, 2003 | | Six Months Ended June 30, 2003 | |
|---|---|---|---|---|
|  | (As Previously Reported) | (As Restated) | (As Previously Reported) | (As Restated) |
| Provision for loan losses | $ (17,292) | $ (10,030) | $ (22,295) | $ (15,033) |
| Net interest margin | (10,232) | (2,970) | (6,532) | 730 |
| Net (loss) income | (10,272) | (3,010) | (7,953) | (691) |
| Comprehensive income (loss) | (8,425) | (1,163) | (5,508) | 1,754 |

Merit Securities, 2003 Form 10-K, p. 3-4.

129.    Thereafter, on May 15, 2004, Merit filed its Second Quarter Form 10-Q/A for the quarter ended June 30, 2003, which substantially reiterated the same information set forth in the Form 10-K for year-end December 31, 2003, see ¶ 128, supra.

130.    In addition, Merit's Second Quarter 2003 Form 10-Q filed on August 14 ,2003, also contained a Sarbanes-Oxley Certification signed by Defendant Benedetti, in which Benedetti certifies that the quarterly report for the quarter ended June 30, 2003 "does not contain

any omission of material fact" and that the Company maintained sufficient disclosure controls

and procedures throughout the reporting period as of June 30, 2003, stating:

CERTIFICATION
PURSUANT TO 17 CFR 240.13a-14
PROMULGATED UNDER
SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Stephen J. Benedetti, certify that:

1.      I have reviewed this quarterly report on Form 10-Q of Merit Securities Corporation;

2.      Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.      Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4.      The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a)     Designed such disclosure controls and procedures or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

(b)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonable likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting,

to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: August 14, 2003      By: /s/ Stephen J. Benedetti
                            ------------------------------------
                            Stephen J. Benedetti
                            Principal Executive Officer

Merit Securities, June 30, 2003 Form 10-Q, Exhibit 31.1. (Emphasis added).

131.    The statements in the Sarbanes Oxley Certification of Defendant Benedetti are false and misleading because, in fact, Merit was forced to restate its financial results for the period ended September 30, 2003, and disclosed in its 2003 Form 10-K that Merit's internal control deficiencies required restatements precisely in the area of recording loan losses in excess of loan obligations Merit Securities.  Merit Securities 2003 Form 10-K, p. 30.

**Dynex Disclosed 34% Understatement of Previously Reported Cumulative Repossessions**

132.    Throughout the Class Period, Dynex issued Monthly Delinquency Reports concerning the performance of the Series 12 and Series 13 Bond collateral, which appeared on its corporate web site.  These reports, upon which rating agencies relied and upon which, in turn the bonds were priced, purported to contain detailed information concerning delinquencies and foreclosure of loans collateralizing the Bonds.  However, each of these reports was materially false and misleading since none disclosed the true facts concerning the "origination of collateral"; the improper underwriting practices used to secure the collateral or that even "current" non-delinquent loans were in fact likely to be impaired given these underwriting practices.

133.    Specifically, in the September 2003 Monthly Delinquency Report, Dynex reported to the investing public on its website that the cumulative repossessions for the Series 13 Bond collateral was no more than $47.08 million.

134.    However, on or about October 28, 2003, in the October 2003 Monthly Delinquency Report, Dynex disclosed that the previously reported "cumulative Repo/REO" figure had been <u>understated</u> by approximately 34% -- actual cumulative repossessions were actually $63 million as of September 2003.

135.    Following the disclosure of this massive understatement of cumulative repossessions, in November 2003 Moody's initiated a Ratings Review of the Series 13 Bonds.

136.    As reported in the November 2003 <u>Mortgage Servicing News</u> the five classes of the Series 13 Bonds were being reviewed by Moody's for "possible downgrade" because of "high cumulative loss and insufficient spread overcollateralization has dropped from 10% to 5% of the original pool balance."

**Merit's False and Misleading Form 10-Q For The Period Ending September 30, 2003**

137.    On or about November 13, 2003, Merit filed its form 10-Q with the SEC for the period ended September 30, 2003 ("3Q 2003 Form 10-Q") which was signed by Defendant Benedetti. In the 3Q 2003 Form 10-Q, Merit stated that the Company maintained the proper loan loss reserves for its mortgage pools and thus accurately reported Merit's loan loss related balance sheet and income statement line items as follows:

The following table summarizes the types of collateral for collateralized bonds as of September 30, 2003 and December 31, 2002:

| | September 30, 2003 | December 31, 2002 |
|---|---|---|
| Loans, at amortized cost | $    858,974 | $    1,038,146 |
| Allowance for loan losses | (33,754) | (20,700) |

|  |  |  |
|---|---|---|
| Debt Securities, at fair value | 825,220 | 1,017,446 |
|  | 270,287 | 323,791 |
| ------------------------------ | -------------------------- | ------------------------ |
|  | $ 1,095,507 | $ 1,341,237 |
| ------------------------------ | -------------------------- | ------------------------ |

Merit Securities, September 30, 2003 Form 10-Q, p. 8 of 30.

138.    The statements in the above paragraph were materially false and misleading and made with scienter because Defendants, with knowledge, disregarded facts undisclosed to investors regarding the insufficiency of the loan loss reserves as of September 30, 2003 as was evident when the Company was forced to restate its collateralization and loss reserves for the quarter ending September 30, 2003 in the Company's 2003 Form 10-K, filed with the SEC on April 15, 2004, as follows:

Consolidated Balance Sheets Data
(amounts in thousands)

|  | (As Previously Reported) | (As Restated) |
|---|---|---|
|  | September 30, 2003 | September 30, 2003 |
| Securitized finance receivables - loans | $ 825,220 | $ 836,012 |
| Total assets | 1,137,875 | 1,148,667 |
| **Accumulated deficit** | **(12,599)** | **(1,807)** |
| **Total stockholders' equity** | **56,452** | **67,244** |
| Total liabilities and stockholder's equity | 1,137,875 | 1,148,667 |
|  | June 30, 2003 | June 30, 2003 |
| Securitized finance receivables - loans | $ 881,228 | $ 888,490 |
| Total assets | 1,205,478 | 1,212,740 |
| **Accumulated deficit** | **(14,724)** | **(7,462)** |
| **Total stockholders' equity** | **56,271** | **63,533** |
| Total liabilities and stockholder's equity | 1,205,478 | 1,212,740 |

Consolidated Statements of Operations Data
(amounts in thousands)

| | Three Months Ended September 30, 2003 | | Nine Months Ended September 30, 2003 | |
|---|---|---|---|---|
| | (As Previously Reported) | (As Restated) | (As Previously Reported) | (As Restated) |
| Provision for loan losses | $ (5,003) | $ (1,473) | $ (27,298) | $ (16,506) |
| Net interest margin | 2,142 | 5,672 | (4,390) | 6,402 |
| Net income (loss) | 2,125 | 5,655 | (5,829) | 4,963 |
| Comprehensive income (loss) | $ 4,068 | $ 7,598 | $ (6,330) | $ 4,462 |

| | Three Months Ended June 30, 2003 | | Six Months Ended June 30, 2003 | |
|---|---|---|---|---|
| | (As Previously Reported) | (As Restated) | (As Previously Reported) | (As Restated) |
| Provision for loan losses | $ (17,292) | $ (10,030) | $ (22,295) | $ (15,033) |
| Net interest margin | (10,232) | (2,970) | (6,532) | 730 |
| Net (loss) income | (10,272) | (3,010) | (7,953) | (691) |
| Comprehensive income (loss) | (8,425) | (1,163) | (5,508) | 1,754 |

Merit Securities, 2003 Form 10-K, filed April 15, 2004. (Emphasis added.)

139.    Thereafter, on May 15, 2004, Merit filed its Second Quarter Form 10-Q/A for the quarter ended September 30, 2003, which substantially reiterated the same information set forth in the Form 10-K for year-end December 31, 2003, see ¶¶ 127, 130, supra.

140.    In addition, Merit's 2003 3Q Form 10-Q, also contained a Sarbanes-Oxley Certification signed by Defendant Benedetti, in which Benedetti certifies that the quarterly report for the quarter ended September 30, 2003 "does not contain any omission of material fact" and

that the Company maintained sufficient disclosure controls and procedures throughout the

reporting period as of September 30, 2003, stating:

CERTIFICATION
PURSUANT TO 17 CFR 240.13a-14
PROMULGATED UNDER
SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Stephen J. Benedetti, certify that:

1.      I have reviewed this quarterly report on Form 10-Q of Merit Securities Corporation;

2.      Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3.      Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4.      The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   (a)      Designed such disclosure controls and procedures or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

   (b)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (c)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonable likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting,

68

to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: November 14, 2003 By: /s/ Stephen J. Benedetti

-------------------------------------

Stephen J. Benedetti
Principal Executive Officer

Merit Securities, September 30, 2003 Form 10-Q, Exhibit 31.1.

141.    The statements in the Sarbanes-Oxley Certification of Defendant Benedetti are false and misleading because, in fact, Merit was forced to restate its financial results for the period ended September 30, 2003, and disclosed in its 2003 Form 10-K that Merit's internal control deficiencies required restatements precisely in the area of recording loan losses in excess of loan obligations Merit Securities.  See Merit Securities 2003 Form 10-K, p. 30.  (Emphasis added).

## C.    Truth Regarding Material Misstatements And Artificial Inflation of Bond Prices Begins To Be Disclosed In October 2003 Resulting In Bond Downgrades And Price Declines

142.    Beginning in October 2003, Defendants' misstatements began to be disclosed and integrated into the market.  Merit Securities Corporation issued a Delinquency Report which reflected that delinquencies had been understated by $15.92 million -- or 34%.  This disclosure caused immediate rating agency actions.  In November 2003, Moody's announced that it was reviewing Merit Series 13 Bonds "for possible downgrade" due to "weaker-than-anticipated performance by the manufactured housing loans in the collateral pool."  On February 24, 2004, Moody's completed the "review" initiated in September 2003 and dramatically downgraded the

Series 13 Bonds from "very high" and "high" credit quality to "probable" and "imminent default." (see ¶¶ 10-11, 85, 93, 100, 134-35, 141-45, supra).

143.    On February 24, 2004, Moody's issued massive downgrades of the Series 13 Bonds noting, inter alia, that worsening "cumulative repossession rates."  The cumulative possession rates were the figures Dynex only began to report in October 2003.  The Class M1 bonds were downgraded from Aa2 ("high quality bonds by all standards") to Ca ("speculative," "a high degree of which are often in default or have other market shortcomings")  and Class M2 bonds were downgraded from A2 (bonds "having many favorable attributes" considered "upper medium grade obligations") to C (the "lowest rated class of bonds having extremely poor prospects of ever attaining any real investment standing"), representing an enormous descent in credit worthiness under the Moody's rating system.

144.    Shortly thereafter on February 27, 2004, Fitch put Merit Series 13 Bonds "on Rating Watch Negative."  On March 9, 2004, Fitch ultimately downgraded the Series 13 Bonds. And the following day, on March 10, 2004, Fitch downgraded the Series 12 Bonds.  On March 29, 2004 Fitch again downgraded Merit manufactured housing contract Series 12, noting that due to, inter alia, "**relaxed credit standard**, overbuilding by manufacturers, and the difficulties relating to servicing this unique asset have all contributed to poor performance of manufactured housing securities."

145. On April 19, 2004, Moody's announced that they were reviewing the Series 12 Bonds for possible downgrade, and subsequently, on May 13, 2004, downgraded the Series 12 Bonds.

146.    This series of Ratings actions – both the Credit Watch alerts and Downgrades – resulted in an immediate disinterest by investors for the Series 13 Bonds.  During the three

months -- February 24, 2004 through May 11, 2004 -- the Series 13 M1 and M2 Bonds were not priced on the Bloomberg Trading system.   Once the Series 13 Bonds did resume trading it was only at dramatically reduced values.   These downgrades reflecting the true quality of bond collateral -- which Defendants knew of and recklessly disregarded from the outset of the Class Period -- resulted in dramatic Bond price declines as follows:

| MESC 12 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Certificate | Class | Rating at Issuance (Moody's/Fitch) | 3/10/2004 | Fitch Downgrade 3/10/2004 | 3/12/2004 | % Decline | Moody's Downgrade 5/13/2004 | 6/17/2004 | Total % Decline |
| MESC 12 | 1M1 | Aa2/AA "very high credit quality" | $ 100.22 | A "high credit quality" | $ 100.16 | 0% | Ca "default probable" | $ 75.56 | -18% |
| | 1M2 | A2/A "high credit quality" | $ 100.22 | BBB- "low investment grade" | $ 92.00 | -8% | C "imminent default" | $ 52.44 | -33% |
| | 1B | BBB "low investment grade" | $ 100.13 | BB- "speculative" | $ 89.66 | -10% | C "imminent default" | $ 23.25 | -72% |

| MESC 13 | | | | | |
|---|---|---|---|---|---|
| Certificate | Class | Rating at Issuance (Moody's/Fitch) | Price on 2/24/04 | Rating Downgrade 2/24/04 | % Decline |
| MESC 13 | | | | | 5/11/2004 |
| | M1 | Aa2/AA "very high credit quality" | $ 101.875 | Ca "default probable" | Next Trade (Trade Date) $ 81.09 | 20% |
| | M2 | A2/A "high credit quality" | $ 94.625 | C "imminent default" | $ 49.94 | 42% |
| | | | | | 11/30/2004 |
| | B1 | | $ 102.40 | | $ 15.38 | 85% |

## 2004 Merit Further Expands Loan Loss Calculation
## to Include Percentage of "Current" Mobile Home Loans

147.   Merit continued the façade of being supported by the performance of mobile home loans in its 2003 Form 10-K filed on April 15, 2004 when it claimed it was expanding the criteria for determining its loan loss provision to include even "current" mobile home loans based on "new observable data":

> Provision for loan losses decreased to $18.6 million in 2003 from $28.6 million in 2002.   Included in provision for loan losses is $6.1 million recorded in 2003 specifically for currently existing credit losses within outstanding manufactured housing loans that are current as to payment but which the Company has determined to be impaired.   Previously, the Company had not considered current loans to be impaired under generally accepted accounting principles and therefore

71

had not previously provided for the impairment of these loans. Continued worsening trends in both the industry as a whole and the Company's pools of manufactured housing loans prompted the Company to prepare extensive analysis on these pools of loans. <u>The Company has not originated any new manufactured housing loans since 1999</u>, and has extensive empirical data on the historical performance of this static pool of loans. <u>The Company analyzed performance and default activity for loans that were current at various points in time over the last 36 months, and based on that analysis, identified default trends on these loans. The Company also considered current market conditions in this analysis, with the expectation that these market conditions would continue for the foreseeable future. Given this new observable data, the Company now believes the inclusion of amounts in the provision for loan losses for loans which are current as to payment is an appropriate application of the definition of impairment within generally accepted accounting principles, and has accounted for this provision as a change in accounting estimate and, accordingly, recorded the amount as additional provision for loan losses.</u> The Company continues to experience unfavorable results in its manufactured housing loan portfolio in terms of elevated delinquencies and loss severity. Within each non-recourse securitization financing, a group of loans are held within the securitization structure as additional support for potential credit losses and to provide additional cash flow to cover such credit losses. Once the cumulative level of losses surpassed the cash flow available from the credit reserve and losses have depleted the over-collateralization, future losses are passed to the holders of the lowest classes of bonds within the structure. In one of the securitization structures of the Company, total cumulative losses have surpassed the level of the cash flow available from the credit reserve and have completely depleted the over-collateralization. During the three months ended December 31, 2003, losses on this securitization began to pass to the subordinate class bondholders. As the over-collateralization has been depleted in the current year, the Company's provision for loan losses correspondingly declined.

Merit 2003 Form 10-K, p. 8 (Emphasis added).

Provision for loan losses increased to $28.6 million in 2002 from $18.7 million in 2001. Provision for losses increased by $9.9 million as a result of additions for manufactured housing loans. The continuing under-performance of these loans prompted the Company to revise its estimate of losses to include a percentage of all loans with delinquencies greater than 30 days. This revision, which was instituted during the fourth quarter of 2002, resulted in an increase in provision for losses of $7.4 million during the quarter. <u>Loss severity on the manufactured housing loans continued to remain high during 2002 as a result of the saturation in the market place with both new and used (repossessed) manufactured housing units.</u> Defaults in 2002 on manufactured housing loans averaged 4.5%, versus 4.2% in 2001, and loss severity continued at 77% during the year.

Id. pp. 8-9. (Emphasis added).

148.   The statements in preceding paragraph were materially false and misleading since the material causes for the additional provision including the defective collateral quality arising from reckless underwriting and origination practices was known, or recklessly disregarded, by Defendants since the time of origination and/or the commencement of the Class Period.  The sources for these allegations are contained in ¶¶ 52-53, supra.

**Defendant Benedetti Admitted The Falsity of Statements**
**Regarding Dynex's Internal Controls And Procedures**

149.   Merit's 2003 Form 10-K filed on April 15, 2004 also disclosed internal control deficiencies requiring restatements precisely in the area of recording loan losses in excess of loan obligations as follows:

Item 9A. Controls and Procedures

(a)   Evaluation of disclosure controls and procedures.

Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed in the Company's reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms.  Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed in the Company's reports filed under the Exchange Act is accumulated and communicated to management, including the Company's management, as appropriate, to allow timely decisions regarding required disclosures.

As of the end of the period covered by this annual report, the Company carried out an evaluation of the effectiveness of the design and operation of the Company's disclosure controls and procedures pursuant to Rule 13a-15 under the Exchange Act. This evaluation was carried out under the supervision and with the participation of the Company's management. Based upon that evaluation, the Company's management concluded that the Company's disclosure controls and procedures are effective, except as described below.

The Company identified an internal control deficiency related to the recording of allowance for loan losses in excess of loss obligations. The Company will restate the interim periods of June 30, 2003 and September 30, 2003 as a result of the deficiency. Management believes that it has performed the appropriate procedures to ensure that the information included herein for the year ended December 31, 2003 is materially accurate in all reasonable aspects. This internal control deficiency did not impact the consolidated financial statements of the Company's parent.

In conducting its review of disclosure controls, management concluded that sufficient disclosure controls and procedures, other than this deficiency, did exist to ensure that information required to be disclosed in the Company's reports filed or submitted under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms.

(b)     Changes in internal controls.

The Company's management is also responsible for establishing and maintaining adequate internal control over financial reporting. There were no changes in the Company's internal control over financial reporting identified in connection with the evaluation of it that occurred during the Company's last fiscal quarter that materially effected, or are reasonably likely to materially affect internal control over financial reporting.

Merit Securities, 2003 Form 10-K, p. 30.

150.    The statements in the preceding paragraph were materially false and misleading because the basis for the change of the criteria for loan loss allocation was known to defendants throughout the Class Period, which included, inter alia, defendants' reckless underwriting and origination practices. The sources for these allegations are contained in paragraphs ¶¶ 52-53, supra.

## May 17, 2004 Series 12 Bond Prices Collapse Following Substantial Rating Downgrade

151.    Following Fitch's massive downgrade of the Series 12 Bonds on May 10, 2004, the trading price of the Series 12 Bonds declined precipitously on average by 41% as follows:

| MESC 12 |
| --- |

| Certificate | Class | Rating at Issuance (Moody's/Fitch) | 3/10/2004 | Fitch Downgrade 3/10/2004 | 3/12/2004 | % Decline | Moody's Downgrade 5/13/2004 | 5/17/2004 | % Decline |
|---|---|---|---|---|---|---|---|---|---|
| MESC 12 | 1M1 | Aa2/AA | $ 100.22 | A | $ 100.16 | 0% | Ca | $ 75.56 | -18% |
| | 1M2 | A2/A | $ 100.22 | BBB- | $ 92.00 | -8% | C | $ 52.44 | -33% |
| | 1B | BBB | $ 100.13 | BB- | $ 89.66 | -10% | C | $ 23.25 | -72% |

## Scienter

152.    Defendants' recklessness and/or actual knowledge of the true adverse information concerning the collateral for Series 12 and Series 13 Bonds is reflected in the following facts alleged herein:

(a)    Defendants Potts and Benedetti implemented specific aggressive underwriting practices in connection with the origination of the Bond collateral which adversely impacted the performance of the Bonds during the Class Period, including cutting back the required supporting mobile home dealer financial documentation to rapidly increase the volume of mobile home dealer loans originated (¶¶ 52-53, 68, 73, 98-99); and implementation of a more aggressive computerized mobile home loan underwriting program (¶¶ 52-53, 63-65).  Further, the systematic disregard for creditworthiness of the borrower was a "top down" policy since: (i) the Underwriting Guidelines were typically waived on the regional branch and corporate levels (¶¶ 53, 59, 73, 80, 90-91, 99); and (ii) the sales approach used to convince mobile home dealers to refer contracts also was implemented across many offices and regions (¶¶ 53, 63-65, 68, 85-94, 107-108, 125-126).  Defendants Potts and Benedetti knew or with sever recklessness disregarded the poor loan quality of the Bond collateral as reflected in Dynex's own internal reports, including the MHDP and MHRP Reports (¶¶ 5-6, 8, 26-27, 53, 66) and Basis Reports (¶¶11, 36,39, 54, 106-107);

(b)     Merit and Defendant Benedetti artificially understated reported delinquencies and repossessions prior to October 2003 (¶¶ 89-93, 111-16, 123-24, 132, 142);

(c)     Defendants Potts and Benedetti were motivated to conceal the true impaired quality of Dynex's mobile home loan portfolio since by early in the Class Period Dynex was on the verge of total financial collapse (with its common stock price depreciating 99% from $48.75 per share on May 12, 1998 to $0.47 per share in August 22, 2000) (¶¶ 9, 57).  During the Class Period, Defendants Potts and Benedetti were also motivated to conceal the impaired quality of the Bond collateral so as to preserve and protect their bonus compensation, which was materially linked to operating performance and the total return of the Company's common stock and directly tied to the achievement of pre-established target earnings per share goals (See Dynex Capital Proxy Statement, filed April 28, 2000),  since disclosure of the true impaired nature of the collateral would have adversely impacted their bonus compensation.  (¶¶ 24, 27);

(d)     Defendant Benedetti falsely stated that, as President of Merit, he created and monitored sufficient internal controls and practices to accurately report Merit and investor losses from the deteriorating performance of Bond collateral (¶¶ 8, 11, 54, 109, 129-131, 139-141, 149-150);

(e)     The statements in April 2003 and April 2004 that purported to expand, based on recent events and performance data, the collateral loans included in the loan loss provision to "30 day delinquent" and then "current" loans was materially false and misleading because defendants knew the true

76

causes for the poor performance of the collateral was, in material part, not merely "recent events," but Dynex's aggressive underwriting and origination practices (¶¶ 53, 63-65, 68, 85-94, 107-108, 125-126);

(f)     The admitted "erroneous" reporting of cumulative repossessions in October 2003, resulting in approximately 34% understatement of the amount of cumulative repossessions is indicative of defendants' intentional and/or reckless disregard of "Master Servicers" duties and responsibilities described to investors (¶¶ 21-22, 24, 26, 88-89, 94, 103, 108-09); and

(g)     The admitted "deficiencies in internal controls" assessing and determining the loan loss provision with respect to Bond collateral (which in turn resulted in the restatement of 2003 interim financial statements) reflect defendants intentional and/or reckless disregard of Master Servicer functions as described to investors. (¶¶ 141, 149).

## No Safe Harbor

153.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for purportedly those false forward-looking statements because at the time each of those purportedly forward-looking statements was made, the particular speaker knew that

the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Merit who knew that those statements were false when made.

## COUNT I

### (Against The Company and the Individual Defendants For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 of the Securities and Exchange Commission)

154.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

155.    This Count is asserted against all defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

156.    During the Class Period, defendants, singularly and in concert, directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon plaintiff and the other members of the Class, and made various deceptive and untrue statements of material facts and omitted to state material in order to make the statements made, in light of the circumstances under which they were made, not misleading to plaintiff and the other members of the Class, including statements in the Prospectus concerning "origination collateral" and monthly reports regarding performance of collateral and delinquencies and repossessions.  The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce plaintiff and the other members of the Class to purchase Merit Series 12 and Series 13 Bonds during the Class Period at artificially inflated prices.

157.    During the Class Period, defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and/or recklessly issued, caused to be issued, participated in the

issuance of, the preparation and issuance of deceptive and materially false and misleading statements to the investing public as particularized above.

158.    Throughout the Class Period, the Company acted through the Individual Defendants, whom it portrayed and represented to the financial press and public as its valid representative. The knowledge and/or recklessness of the Individual Defendants are therefore imputed to Merit, which is primarily liable for the securities law violations while acting in their official capacities as Company representatives, or, in the alternative, which is liable for the acts of the Individual Defendants under the doctrine of respondent superior.

159.    As a result of the dissemination of the false and misleading statements set forth above, the market price of the Series 12 and Series 13 Bonds was artificially inflated during the Class Period. In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by said defendants, plaintiff and the other members of the Class relied, to their detriment, on the integrity of the market price of the bonds in purchasing Merit Series 12 and Series 13 Bonds. Had plaintiff and the other members of the Class known the truth, they would not have purchased said shares or would not have purchased them at the inflated prices that were paid.

160.    Plaintiff and the other members of the Class have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

161.    By reason of the foregoing, defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon plaintiff and the other members of the Class in connection with its purchases of Merit Series 12 and 13 Bonds during the Class Period.

## COUNT II

### (Against The Individual Defendants For
### Violation of Section 20(a) of the Exchange Act)

162.    Plaintiff repeats and realleges each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

163.    The Individual Defendants, by virtue of their positions, stock ownership and/or specific acts described above, were, at the time of the wrongs alleged herein, controlling persons within the meaning of Section 20(a) of the Exchange Act.

164.    The Individual Defendants had the power and influence and exercised the same to cause the Company to engage in the illegal conduct and practices complained of herein.

165.    By reason of the conduct alleged in Count 1 of the Complaint, the Individual Defendants are liable for the aforesaid wrongful conduct, and are liable to plaintiff and to the other members of the Class for the substantial damages which they suffered in connection with its purchases of the Series 12 and 13 Bonds during the Class Period.

WHEREFORE, plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

80

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  August 6, 2008

**SCHOENGOLD SPORN LAITMAN & LOMETTI, P.C.**

By:  _____

Joel P. Laitman (JL-8177)
Christopher Lometti (CL-9124)
Frank R. Schirripa (FS-1960)
Daniel B. Rehns (DR-5506)
19 Fulton Street, Suite 406
New York, NY 10038
Tel:    (212) 964-0046

*Lead Counsel for the Class and Attorneys*
*for Lead Plaintiff Teamsters Local 445*

## CERTIFICATE OF SERVICE

I, Frank R. Schirripa, one of the attorneys for Lead Plaintiff, Teamsters Local 445 Freight

Division Pension Fund, hereby certify that on August 6, 2008, Lead Plaintiff's Amended Class

Action Complaint was filed with the Clerk of the Court and served by overnight mail on the

following:

Edward J. Fuhr, Esq.
Hunton & Williams, LLP
Riverfront Plaza
951 East Byrd Street
Richmond, Virginia 23219

Joseph J. Saltarelli, Esq.
Hunton & Williams, LLP
200 Park Avenue, 43rd Floor
New York, New York 10166

*Counsel for Defendants Dynex Capital, Inc.,*
*Merit Securities Corporation, Stephen J.*
*Benedetti, and Thomas H. Potts*

James E. Brandt, Esq.
Jeff. G. Hammel, Esq.
Latham & Watkins, LLP
885 Third Avenue
New York, New York 10022

*Counsel for Lehman Brothers, Inc and*
*Greenwich Capital Markets, Inc.*

Frank R. Schirripa