Joseph J. Saltarelli
HUNTON & WILLIAMS LLP
200 Park Avenue, 43rd Floor
New York, NY 10166
(212) 309-1000 (telephone)

   -and-

Edward J. Fuhr (admitted *pro hac vice*)
Terence J. Rasmussen (admitted *pro hac vice*)
HUNTON & WILLIAMS LLP
951 E. Byrd Street
Riverfront Plaza, East Tower
Richmond, Virginia 23219
804-788-8200 (telephone)

*Counsel for Defendants Dynex Capital, Inc.,*
*Merit Securities Corporation, Thomas H. Potts*
*and Stephen J. Benedetti*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————

|  |  |
|---|---|
| ) | |
| ) | |
| ) | |
| IN RE DYNEX CAPITAL, INC.                    ) | Master File No. 05-CV-1897 (HB) |
| SECURITIES LITIGATION                          ) | |
| ) | |
| ) | |
| ) | |

———————————————————————

DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS
PLAINTIFF'S SECOND AMENDED CLASS ACTION COMPLAINT

Dated: September 11, 2008
         New York, New York

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................... iii

PRELIMINARY STATEMENT ....................................................................1

STATEMENT OF FACTS ...........................................................................3

    A.  Merit Issues the Bonds ...................................................................3

    B.  Dynex Sells DFI To a Third Party ................................................5

    C.  The Collateral Performs Contrary to Expectations .......................5

    D.  Despite the Performance of the Collateral, Plaintiff Purchases the Bonds ..................6

    E.  Credit Agencies Downgrade the Credit Ratings of the Bonds .......7

    F.  Plaintiff Files This Lawsuit ...........................................................7

    G.  On Interlocutory Appeal, The Second Circuit Vacates and Remands ..........................8

    H.  Plaintiff Files a Second Amended Complaint ...............................9

ARGUMENT ............................................................................................10

I.    Plaintiff Fails To Allege Specific Facts Giving Rise To A Strong Inference Of Scienter That Is Cogent And At Least As Compelling As Any Opposing Inference .........................................10

    A.  The Standard: the Reform Act and Tellabs ................................11

    B.  Plaintiff Fails To Plead Motive ..................................................12

    C.  Plaintiff Fails To Plead Conscious Misconduct or Recklessness in the Making of a Challenged Statement ....................................13

        1.  Anonymous Sources ..........................................................13

        2.  Internal Reports ................................................................18

        3.  Fraud By Hindsight ...........................................................19

    D.  Plaintiff's Own Allegations Affirmatively Refute Scienter .........20

        1.  Plaintiff's Own Confidential Witness Disagrees With Plaintiff ...........................20

        2.  Merit's Restatement Was in the Wrong Direction ..............22

        3.  Dynex Accurately Disclosed Total Bond Losses Every Month ..........................22

        4.  Dynex and Merit Were "Investor[s]" and Thus the Biggest Losers ....................23

II.    The Complaint Must Be Dismissed Because Plaintiff Fails To Plead Falsity ................25

    A.  Statements Concerning Market Conditions ................................26

    B.  Statements Concerning Loss Reserves ......................................27

    C.  Statements Concerning Underwriting .........................................28

**TABLE OF CONTENTS**
**(continued)**

**Page**

III.  The Complaint Must Be Dismissed Because Plaintiff Fails To Plead
Loss Causation ................................................................................................30

IV.  The Complaint Must Be Dismissed Because Plaintiff's Claims Are
Time-Barred ....................................................................................................31

V.  The Complaint Must Be Dismissed Because Plaintiff Lacks Standing
To Pursue Claims Based on Securities It Did Not Own ...................................33

VI.  Plaintiff's Claims Concerning Merit's Loss Reserves Must be Dismissed
on Causation and Materiality Grounds ...........................................................34

VII.  Plaintiff's Section 20(a) "Control Person" Claims Must Be Dismissed...........34

CONCLUSION...........................................................................................................34

# TABLE OF AUTHORITIES

**Page**

ATSI Commun., Inc. v. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007).............3, 10, 18, 19, 27, 34

Abbad v. Amman, 285 F. Supp. 2d 411 (S.D.N.Y. 2003),
    aff'd, 112 Fed. Appx. 97 (2d Cir. 2004)................................................................24

Acito v. IMCERA Group, Inc., 47 F.3d 47 (2d Cir. 1995)................................................12

Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975)................................................33

CALPERS v. Chubb Corp., 394 F.3d 126 (3d Cir. 2004) ........................................ 13-14

In re CIT Group, Inc. Sec. Litig., 349 F. Supp. 2d 685 (S.D.N.Y. 2004)......................................20

Chill v. G.E., 101 F.3d 263 (2d Cir. 1996) ................................................................12

City of Brockton Ret. Sys. v. Shaw Group, Inc., 540 F. Supp. 2d 464 (S.D.N.Y. 2008)..............19

In re Copley Pharm., Inc. Sec. Litig., No. 94-11897, 1995 WL 169215
    (D. Mass. Mar. 16, 1995).................................................................... 34-35

Davidoff v. Farina, 2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005) ................................................24

Denny v. Barber, 576 F.2d 465 (2d Cir. 1978) ................................................................19

Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005) ........................................30

In re Dynex Capital, Inc. Sec. Litig., 2006 WL 1517580 (S.D.N.Y. Jun. 12, 2006)......................8

In re Dynex Capital, Inc. Sec. Litig. ("Dynex I"), No. 05-1897, 2006 WL 314524
    (S.D.N.Y. Feb. 10, 2006)...................................................................... passim

Fadem v. Ford Motor Co., 352 F. Supp. 2d 501 (S.D.N.Y. 2005) ................................................14

In re GeoPharma, Inc. Sec. Litig., 411 F. Supp. 2d 434 (S.D.N.Y. 2006)................................22, 25

Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281 (2d Cir. 1973)................................................17, 18

Goldberg v. Household Bank, F.S.B., 890 F.2d 965 (7th Cir. 1989) ...................................... 19-20

In re Goodyear Tire & Rubber Co. Sec. Litig., 436 F. Supp. 2d 873 (N.D. Ohio 2006)...............20

Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753 (7th Cir. 2007) ................................................17

# TABLE OF AUTHORITIES

**Page**

Indiana Elec. Workers v. Shaw Group, Inc., -- F.3d --, 2008 WL 2894793
(5th Cir. 2008)..................................................................................................17

In re Initial Pub. Offering Sec. Litig., 399 F. Supp. 2d 261 (S.D.N.Y. 2005)..............................31

In re J.P. Morgan Chase Sec. Litig., 363 F. Supp. 2d 595 (S.D.N.Y. 2005) ................................24

Kalnit v. Eichler, 264 F.3d 131 (2d Cir. 2001).......................................................11, 12, 13, 24, 25

Klehr v. A.O. Smith Corp., 521 U.S. 179 (1997) .........................................................32

Lampf, Pleva v. Gilbertson, 501 U.S. 350 (1991) .........................................................32

Lapin v. Goldman Sachs Group, Inc., 506 F. Supp. 2d 221 (S.D.N.Y. 2006)..............................31

Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir. 2005)...........................................31

Maldonado v. Dominguez, 137 F.3d 1 (1st Cir. 1998)...................................................24

Malin v. XL Capital Ltd., 499 F. Supp. 2d 117 (D. Conn. 2007)......................................14, 15, 20

In re Merrill Lynch & Co. Research Reports Sec. Litig., 272 F. Supp. 2d 243
(S.D.N.Y. 2003)................................................................................................24

Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000) .......................................................19, 28

In re 2007 Novastar Fin., Inc. Sec. Litig., No. 07-0139, 2008 WL 2354367
(W.D. Mo. Jun. 4, 2008) ........................................................................ 16, 17-18

Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2 (2d Cir. 1996) ...........................................30

PR Diamonds, Inc. v. Chandler, 364 F.3d 671 (6th Cir. 2004) ...................................................28

Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004)...................................................28, 34

Ross v. A.H. Robins Co., 607 F.2d 545 (2d Cir. 1979)...................................................17

Santa Fe Indus. v. Green, 430 U.S. 462 (1977) ........................................................17

Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124 (2d Cir. 1994) .......................................19, 24, 28

Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., No. 05-1898, 2005
WL 2148919 (S.D.N.Y. Sept. 6, 2005)...................................................8, 25, 32

Teamsters Local 445 v. Bombardier, Inc., 2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006) ..............8

## TABLE OF AUTHORITIES

**Page**

Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.,
    531 F.3d 190 (2d Cir. 2008).......................................................................... passim

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499 (2007) ................................. passim

Vervaecke v. Chiles, Heider & Co., 578 F.2d 713 (8th Cir. 1978) ...............................................33

In re  Worlds of Wonder Sec. Litig., 35 F.3d 1407 (9th Cir. 1994) .............................................23

## FEDERAL STATUTES AND REGULATIONS

Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4, 5 (2008)................10, 11, 18, 20, 27

15 U.S.C. § 78j(b) (2008) ................................................................................................... passim

15 U.S.C. § 78t(a) (2008)..................................................................................................1, 34

17 C.F.R. § 240.10b-5(b) (2008) ..........................................................................................32

28 U.S.C. § 1658(b) (2008) ...........................................................................................31, 32

## FEDERAL RULES OF PROCEDURE

FED. R. CIV. P. 9(b)...........................................................................................................27

Defendants Dynex Capital, Inc. ("Dynex"), Merit Securities Corporation ("Merit"), Thomas H. Potts and Stephen J. Benedetti (collectively, "Defendants") submit this memorandum of law in support of their motion to dismiss the Second Amended Class Action Complaint ("Complaint") filed by Plaintiff Teamsters Local 445 Freight Division Pension Fund.  Plaintiff asserts claims under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), t(a), on behalf of a purported class of investors between February 7, 2000, and May 13, 2004 ("Class Period").

## PRELIMINARY STATEMENT

Plaintiff has filed a second amended complaint that attempts, once again, to state a claim for securities fraud based not on intentionally false statements, but on allegedly improper loan underwriting, an attempt rejected previously by both this Court and the Second Circuit.  Section 10(b) of the Exchange Act, however, does not bar reckless underwriting anymore than it bars reckless driving.  Rather, it prohibits only false and misleading statements made with an intent to defraud investors.  Because the Complaint fails to plead such a statement, it must be dismissed.

Three years ago, Defendants moved to dismiss Plaintiff's first amended complaint.  That complaint accused Defendants of misleading investors about the quality of two series of asset-backed bonds.  This Court granted Defendants' motion with regard to Messrs. Potts and Benedetti, holding that Plaintiff had failed to plead intent, or scienter, as to them.  This Court denied Defendants' motion, however, as to Dynex and Merit, the two corporate defendants.

That decision led to an interlocutory appeal on the issue of whether a plaintiff can plead scienter as to a corporation without pleading scienter as to an individual corporate agent.

Conducting a de novo review, the Second Circuit ordered dismissal of Dynex and Merit, finding that Plaintiff had failed to plead scienter as to them.  Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc., 531 F.3d 190 (2d Cir. 2008).  The Second Circuit found that on the facts alleged, the more compelling inference was that any investment losses were

caused by "general weakness in the mobile homes market," not by fraud.  Id. at 197.  Indeed, the Second Circuit held that Plaintiff had "fail[ed] to allege the existence of information that would demonstrate that the statements made to investors were [even] misleading."  Id.

Now on remand, left with a dismissed complaint that alleged neither scienter nor a misleading statement, Plaintiff has filed another complaint that identifies the same statements. The primary difference is the addition of "details" concerning so-called "confidential witnesses."

But these "details" make Plaintiff's claims weaker, not stronger, because they confirm that Plaintiff's "confidential witnesses" were low-level employees not even of Dynex, but of a Dynex affiliate prior to the Class Period.  As such, they have no light to shed on the sole question posed by this securities fraud litigation; namely, whether the corporate defendants, controlled by Messrs. Potts and Benedetti, made intentionally false statements during the Class Period.

It gets worse for Plaintiff.  Not only do its confidential witnesses fail to support an inference that Defendants made a false statement with scienter, but one of those witnesses actually contradicts Plaintiff's key claim:  that Dynex "systematically disregarded [its] underwriting guidelines."  Compl. ¶ 104.  That rogue confidential witness states that:

> the underwriting process at Dynex [pertinent to the subject bonds] was very labor intensive.  CW #4 and other employees responsible for reviewing credit applications and supporting documentation would review the paperwork and render a decision based on guidelines that were set by the Company.

Compl. ¶ 53(d) (emphases added).

With confidential witnesses that contradict both each other and the core allegations of the Complaint, Plaintiff's favored inference is incoherent, certainly not cogent and compelling.  But a "cogent" and "compelling" inference of fraud is precisely what the Supreme Court requires from plaintiffs in suits under Section 10(b), 15 U.S.C. § 78j(b), on pain of dismissal.  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499 (2007); Teamsters, 531 F.3d at 197.

The Complaint must be dismissed for several additional reasons as well.  First, it fails to plead that the challenged statements were even false (as the Second Circuit noted of the prior complaint in <u>Teamsters</u>).  Plaintiff has made no effort to address this deficiency.  Second, the Complaint fails to plead that the revelation of the alleged falsehoods, rather than a normal downturn in business conditions, caused the alleged losses.  Finally, certain claims must also be dismissed on statute of limitations and standing grounds.

In sum, the bond performance that allegedly harmed Plaintiff (and that, as discussed below, harmed Dynex and Merit to a far greater extent) was the result of a business downturn, the kind that can and does happen in a free-market economy.  The Complaint, which seeks to transform this business downturn into a grossly implausible fraud, must be dismissed.

## STATEMENT OF FACTS

Dynex is a financial services company that invests primarily in bonds secured by mortgage loans and manufactured housing loans.  Compl. ¶ 19.[1]  Merit is a subsidiary of Issuer Holding Corporation ("IHC"), itself a subsidiary of Dynex (¶ 18).  This case arises out of two series of bonds ("Bonds"), Series 12 and Series 13, issued by Merit in 1999 (¶¶ 1, 3).

For the Court's convenience, a chart displaying the corporate structure of Dynex and its affiliates as alleged in the Complaint is attached hereto as Exhibit 1.

### A.    Merit Issues the Bonds

Between 1996 and 1999, Dynex Financial, Inc. ("DFI"), another subsidiary of IHC, made thousands of loans to people seeking to buy manufactured homes (¶¶ 3, 20).  In March and

---

[1] The following discussion is based on allegations in the Complaint (referred to as "¶ __"), and other sources the Court may consider on this motion to dismiss.  <u>See</u> <u>ATSI Commun., Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 98 (2d Cir. 2007) ("we may consider [on a motion to dismiss] . . . statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit").  Relevant pages of such sources are attached hereto as Exhibits ("Ex. __").

August of 1999, Merit purchased these loans, "pooled" them into two separate pools, and issued

two series of asset-backed securities using the separate loan pools as collateral (¶¶ 18-20); see

also Series 13 Prospectus (Aug. 11, 1999), Ex. 2; Series 13 Prospectus Supp. (Aug. 31, 1999),

Ex. 3; Merit Form 424B4 (Apr. 2, 1999) (containing both the Series 12 Prospectus and the Series

12 Prospectus Supp.), Ex. 4; Sales Agr. Between Merit and IHC, at 1 (Aug. 31, 1999), Ex. 5.

      The Bonds were issued in ten classes that were labeled, in descending order of seniority,

A1, A2, A3, A4, M1, M2, B1, B2, B3, and B-IO (¶ 35).  See Indenture Supp., at 2, 9-10 (Aug. 1,

1999), Ex. 6 (attached to Merit 8-K (Sept. 13, 1999), Ex. 7); Ex. 3, at 1.  As homeowners paid

off the underlying loans, purchasers of these classes would receive monthly payments of interest

and principal (¶ 36).  Pursuant to the offering documents, the bondholders would receive these

payments in a pre-set order reflecting their level of seniority in the bond structure.  That is, the

offering documents required "the payment of principal and interest to the senior [Bond] classes

(e.g., A-1, A-2) . . . before the subordinate classes (e.g., A-3, A-4 . . . M-2)" (¶ 35).[2]

      Merit, the owner of the loans backing the Bonds, hoped to make money like a bank, by

retaining the "spread" between the "typical yield (7%-9%) [it] paid to bondholders and the

interest (10%-14%) [it] received" from the homeowners (¶ 56).

      In addition to retaining this "spread," Merit retained — and the offering documents

contemplated that it would retain — a large interest in the Bonds it issued.  In other words, Merit

(and thus indirectly Dynex) became a Bond investor.  See ¶ 20 (describing Dynex's "principal

balance of net investment" in the Series 13 Bonds alone as "$44.16 million").  Merit's

investment was in the most junior, or subordinated, level of each Series.  As a result, to the

extent there were losses on the collateral, those losses would wipe out Merit before they would

---

[2] For the Court's convenience, a chart displaying the flow of monthly payments on the home loans comprising the Bond collateral is attached hereto as Exhibit 10.

harm investors like Plaintiff.  Plaintiff concedes as much.  See ¶ 36 ("losses were borne by Merit

(and Dynex) . . . and thereafter by the bonds") (emphasis added).[3]

###    B.    Dynex Sells DFI To a Third Party

After Merit issued the Bonds, the underlying loans were serviced initially by a division of

DFI (¶ 21); see also Ex. 3, at S-19 ("Dynex Services, a division of Dynex Financial, Inc.," was

retained as "[s]ervicer").  As servicer, DFI collected payments from the homeowners and

remitted those payments to Dynex, the "master servicer" (¶ 21).  Dynex, in turn, forwarded those

payments to the trustee for distribution to the bondholders (¶ 22); see also Ex. 3, at S-2.  As

master servicer, Dynex also issued to investors "detailed" monthly reports on the performance of

the Bonds.  Id.; Ex. 9 (monthly payment reports from Sept. 1999 to Dec. 2001).

In 1999, Dynex "sold [DFI,] its manufactured housing/servicing operation[,] to Origen

[Financial]" (¶ 21).  See also Dynex 10-K, at n.9 (Apr. 18, 2000), Ex. 11.  Dynex retained its

"master servicer" function after this sale (¶ 21), and thus continued issuing monthly reports.

###    C.    The Collateral Performs Contrary to Expectations

Following issuance of the Bonds, the delinquency rates of the underlying home loans —

and the cumulative losses on the Bonds — increased steadily.  Dynex reported this increase on a

monthly basis (¶¶ 8, 22).  See Ex. 9.  Indeed, far from concealing these delinquencies, Plaintiff

concedes that Dynex "reported" to investors at the outset of the Class Period "that the

delinquency . . . rates for the Series 12 and Series 13 bonds [had] increased dramatically by

**170%** and **200%** respectively."  ¶ 8 (emphases in original).

In addition to increasing delinquency rates, Dynex and Merit reported other issues

involving the Bond collateral.  For example, in 2001, Merit disclosed that because of its

---

[3] For the Court's convenience, a chart displaying the structure of the Series 13 Bonds as alleged in the Complaint is attached hereto as Exhibit 8.

investment in the Bonds, it had taken an impairment "charge of $13.3 million" due to the loans' "underperformance."  Merit 10-K, at 5 (Apr. 16, 2001), Ex. 12.  In the next eight months, Merit twice increased its loss reserves due "primarily . . . [to its] investment in manufactured housing loan pools."  Merit 10-Q, at 9 (Aug. 17, 2001), Ex. 13; Merit 10-Q, at 9 (Nov. 14, 2001), Ex. 14.

By the end of 2001, the Bond collateral had incurred cumulative losses of almost $25 million.  Ex. 15 (monthly payment report issued by Dynex to Bond investors on Dec. 28, 2001, disclosing on the final page "cumulative losses" of approximately $24.98 million).

**D.**      **Despite the Performance of the Collateral, Plaintiff Purchases the Bonds**

In early 2002, despite disclosure by Dynex that Plaintiff now characterizes as "an unavoidable red flag . . . of the poor quality of the collateral" (¶ 8), Plaintiff bought class M1 and M2 bonds in Series 13 with a principal balance of $442,922 (¶ 17).  See also Plaintiff's Certification, attached to Complaint.

Following Plaintiff's purchase of the Bonds, the Collateral continued to experience performance issues, which issues Dynex disclosed to Bond investors.  See Ex. 16 (monthly payment reports from January 2002 to April 2005); see also Dynex 10-K, at 23-24 (Mar. 28, 2002) (referring to "continued underperformance of the . . . manufactured housing loan portfolio" that was expected to continue "through 2002"), Ex. 17.

In April 2003, Merit disclosed that generally accepted accounting principles ("GAAP") required it to establish loss reserves for a greater percentage of loans in its private investment portfolio.  Merit 10-K, at 6, Ex. 18; ¶ 125.  Merit disclosed further that "[s]hould these trends continue, [it would] likely need to increase [further] the provision for loan losses" (¶ 125).

As noted above, Dynex had been providing to Bond investors detailed monthly payment reports.  In October 2003, Dynex discovered and corrected an error in one of the many figures it had been reporting:  cumulative repossessions (¶ 133-34).  See Ex. 19 (monthly payment report

for Sept. 2003, noting on final page that "Cumulative REPO figure has been corrected for erroneous reporting in previous payment reports"). Notably, the myriad other information contained in these reports was <u>not</u> erroneous, and Plaintiff does not allege otherwise. In particular, Dynex accurately reported "cumulative losses" on the Series 13 Bonds, which by September 2003 had risen to approximately $47.76 million. Ex. 19.

In April 2004, after yet another year of subpar loan performance and as forewarned in its 2003 10-K, Merit increased the loss reserves for its private investment portfolio to include even more loans; namely, a percentage of loans that were still "current as to payment but which the Company has determined to be impaired . . . under [GAAP]" (¶ 147); Merit 10-K, at 8, Ex. 20.

**E.    Credit Agencies Downgrade the Credit Ratings of the Bonds**

On February 24, 2004, Moody's downgraded the credit ratings of the class M1 and M2 bonds in Series 13 (¶¶ 10-11, 143-44). According to Moody's, this downgrade was "prompted by the weaker-than-anticipated performance of the [underlying] manufactured housing loans." Moody's Release (Feb. 24, 2004), Ex. 21. The Series 12 Bonds were later downgraded for similar reasons (¶¶ 144, 151). <u>See</u> Fitch Ratings, <u>Fitch Affirms 1 and Downgrades 3 RMBS Classes</u>, BUSINESS WIRE (Mar. 10, 2004) ("[t]he rating actions reflect the poor performance of the collateral pool"), Ex. 22. Several months later, during the week that marks the end of the Class Period in May 2004, the Bonds allegedly traded at "reduced values" (¶ 146).[4]

**F.    Plaintiff Files This Lawsuit**

In February 2005, Plaintiff initiated this action. In May 2005, Plaintiff filed an Amended Complaint. Plaintiff claimed Defendants had "misrepresented the cause of the bond collateral's poor performance; misrepresented the reasons for restating [Merit's] loss reserves; and concealed

---

[4] For the convenience of the Court, attached as Exhibit 23 is a chart displaying total payments and losses on the Bonds as of 2005, when this action was filed.

the loans' faulty underwriting." Teamsters, 531 F.3d at 193 (quoting In re Dynex Capital, Inc.
Sec. Litig. ("Dynex I"), No. 05-1897, 2006 WL 314524, at *1 (S.D.N.Y. Feb. 10, 2006), Ex. 24).

On February 10, 2006, this Court granted in part Defendants' motion to dismiss. Dynex
I. The Court dismissed the claims against Messrs. Potts and Benedetti, holding that Plaintiff had
"failed to adequately plead scienter." Id. at *9. The Court, however, denied the motion as to
Dynex and Merit, finding scienter adequately pleaded as to those corporate entities. Id. at *9-10.

On June 2, 2006, at Defendants' request, this Court certified its order for interlocutory
appeal. In re Dynex Capital Inc. Sec. Litig., 2006 WL 1517580 (S.D.N.Y. Jun. 12, 2006), Ex.
25.[5]

### G.     On Interlocutory Appeal, The Second Circuit Vacates and Remands

On June 26, 2008, the Second Circuit vacated Dynex I. Teamsters, 531 F.3d 190. The
court held that to plead scienter with respect to a corporation, a complaint "must create a strong
inference that someone whose intent could be imputed to the corporation acted with the requisite
scienter." Id. at 195. After analyzing the complaint, the court held that Plaintiff had failed to
meet this standard and thus had failed to allege scienter as to Dynex and Merit. Id. at 197.

Indeed, the Second Circuit concluded that Plaintiff had "fail[ed] to allege the existence of
information that would demonstrate that the statements made to investors were [even]
misleading, e.g., information showing that the primary cause of the bonds' poor performance
was not the general weakness in the mobile homes market." Id. (emphasis in original).

---

[5] As the Court may recall, in 2005 the Plaintiff in this action, represented by the same counsel,
filed a securities fraud action against Bombardier, Inc. and others on the same day it filed this action. See
Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., No. 05-1898, 2005 WL 2148919
(S.D.N.Y. Sept. 6, 2005), Ex. 26; see also Dynex I (relying on Bombardier). The Bombardier action also
involved bonds backed by manufactured housing loans. On August 1, 2006, Judge Scheindlin denied the
Plaintiff's motion to certify a class in Bombardier on the grounds that the bonds did not trade in an
efficient market, effectively bringing that action to an end. Teamsters Local 445 v. Bombardier, Inc.,
2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006), Ex. 27. Plaintiff has appealed that decision.

Applying the rule of <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 127 S. Ct. 2499 (2007),

the Second Circuit held that the complaint gave rise to a "number of competing inferences":

> One might infer that no one at Dynex or Merit found the
> statements misleading because they identified the cause of the
> bonds' performance as accurately as possible, or that no one
> responsible for the statements made to investors had reason to
> believe that Dynex employees were systematically flouting its
> underwriting guidelines or giving them false information about the
> cause of the bonds' poor performance.  Teamsters would have us
> infer that <u>someone</u> whose scienter is imputable to the corporate
> defendants and who was responsible for the statements made was
> at least reckless toward the alleged falsity of those statements.  We
> cannot say, based on the allegations in the complaint, that this
> inference is 'at least as compelling' as the competing inference;
> i.e., that the statements either were not misleading or 'were the
> result of merely careless mistakes at the management level based
> on false information fed it from below.'

<u>Id.</u> at 197 (emphasis in original) (internal quotations omitted).

Based on this analysis, the Second Circuit vacated the order in <u>Dynex I</u> and remanded

with instructions to dismiss the suit and allow Plaintiffs leave to amend.  <u>Id.</u>

**H.    <u>Plaintiff Files a Second Amended Complaint</u>**

On August 6, 2008, Plaintiff filed the Complaint.  This pleading differs from Plaintiff's

two previous efforts in one major respect:  it relies on nine "confidential witnesses" who either

left Dynex prior to the Class Period or never worked at Dynex in the first instance (¶ 53).

Like its predecessors, the Complaint alleges five general categories of misstatements:

- <u>Market Conditions</u>:  Defendants stated that "the deteriorating performance of the bond
  collateral during the Class Period was due to 'market conditions,'" when it was actually
  due to faulty underwriting prior to the Class Period (¶¶ 2, 111-122, 125-26; 147-50);

- <u>Loss Reserves</u>:  Dynex and Merit understated their loan loss reserves at all times during
  the Class Period by failing to include losses from "current mobile home loans" (¶¶ 119-
  22; 127-28; 132; 137-39; 149-50);

- <u>Underwriting</u>:  Defendants misrepresented in the Offering Documents the quality of the
  collateral and the manner in which the collateral was underwritten (¶¶ 96-100).

- <u>Internal Controls</u>:  Defendants misrepresented "that Merit maintained adequate controls and procedures to report . . . repossessions in the bond collateral" (¶¶ 2; 130-31; 140-41);

- <u>Repossessions</u>:  Defendants misrepresented the amount of "repossessions experienced by the bond collateral" (¶¶ 2; 123-24; 133-34).

## <u>ARGUMENT</u>

To state a claim for securities fraud under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), a "plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." <u>ATSI Commun., Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 105 (2d Cir. 2007).  A plaintiff must also overcome the "exacting pleading requirements," <u>Tellabs</u>, 127 S. Ct. at 2504, of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, 5, which Congress passed "as a check against abusive litigation by private parties." <u>Tellabs</u>, 127 S. Ct. at 2504.

In this case, the Complaint fails to satisfy the first, second, and final elements of a claim under Section 10(b) (falsity, scienter, and causation).  In addition, portions of the Complaint must be dismissed on statute of limitations and standing grounds.

## I.    <u>Plaintiff Fails To Allege Specific Facts Giving Rise To A Strong Inference Of Scienter That Is Cogent And At Least As Compelling As Any Opposing Inference</u>

The Complaint must be dismissed because — just like the Second Circuit found of its predecessor — it does not allege facts giving rise to a strong inference that Potts, Benedetti, or "someone" else "who was responsible for the statements made" by the corporate Defendants, <u>Teamsters</u>, 531 F.3d at 197, acted with scienter.  Rather, the far more "compelling" inference on the facts alleged, <u>Tellabs</u>, 127 S. Ct. at 2404, is that Merit issued <u>and invested in</u> the Bonds believing that they would perform according to expectations, but that an unanticipated "general weakness in the mobile homes market," <u>Teamsters</u>, 531 F.3d at 197, derailed these plans.

### A.   The Standard: the Reform Act and Tellabs

As the Supreme Court recently observed, the PSLRA requires securities plaintiffs to plead not just that a statement is false, but to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" in making the false statement. Tellabs, 127 S. Ct. at 2504 (quoting 15 U.S.C. § 78u-4(b)(2)). This "required" state of mind is an "intent to deceive, manipulate, or defraud." Tellabs, 127 S. Ct. at 2507. To plead this intent, a plaintiff must allege: (i) "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness," or (ii) "facts to show that defendants had . . . motive . . . to commit fraud." Kalnit v. Eichler, 264 F.3d 131, 138-39 (2d Cir. 2001). If a plaintiff fails in this task, Congress has declared that the complaint "shall" be dismissed. 15 U.S.C. § 78u-4(b)(3)(A).

Since this Court issued its opinion in Dynex I, the legal standard governing the pleading of intent in a securities case has shifted dramatically. See Tellabs, 127 S. Ct. 2499. No longer can a securities fraud complaint survive a motion to dismiss simply because "a reasonable fact finder plausibly could infer from the complaint's allegations the requisite state of mind." Tellabs, 127 S. Ct. at 2504 (emphasis added). Rather, to qualify as "strong," an "inference of scienter must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id. at 2504-05.

To make this determination, a court "must engage in a comparative evaluation." Id. at 2504. That is, "a court must take into account plausible opposing inferences," not just "inferences favoring the plaintiff." Id. at 2510. In performing this comparative analysis, "omissions and ambiguities [in the complaint] count against inferring scienter." Id. at 2511.

Finally, as the Second Circuit made clear in Teamsters, in all but the most extreme circumstances (and this action is not one) a plaintiff cannot plead scienter against a corporation without pleading scienter against a "specific individual defendant." Teamsters, 531 F.3d at 195.

And even in extreme cases — such as when General Motors sells no SUVs before announcing that it has sold one million, see id. at 195-96 — the complaint must support a strong inference that "someone . . . who was responsible for the statements made" acted with scienter.  Id. at 197 (second emphasis added).

###    B.    Plaintiff Fails To Plead Motive

Under some circumstances, a plaintiff may support an inference of scienter by pleading a sufficient motive to defraud.  Kalnit, 264 F.3d at 138.  But the Complaint, like its predecessors, see Dynex I, at *9, relies on two theories of motive that courts have repeatedly rejected.

Plaintiff claims first that Potts and Benedetti defrauded investors to "protect their bonus compensation" (¶ 152(c); ¶¶ 26-27).  But the Second Circuit has repeatedly rejected this theory. See, e.g., Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995) ("[I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated.").

Plaintiff next claims that Dynex was "motivated to conceal the true impaired quality of the Bond collateral" because it was "in the midst of a dramatic financial collapse" (¶ 9).  With its stock price having fallen substantially, the company allegedly needed to maintain the appearance of profitability and boost its stock price.  Id.; see also id. at ¶¶ 57, 152(c).

But the Second Circuit has rejected this theory of motive as well.  If courts "accept as [a viable] motive" that companies "desire[] [their] stock to be priced highly by the market," then "the motive requirement becomes meaningless."  Chill v. G.E., 101 F.3d 263, 268 n.5 (2d Cir. 1996).  Indeed, "if scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."  Id. at 268.  As the Second Circuit stated in this very action, the Teamster's

"proffered motive is the same desire to maintain the appearance of profitability that we have consistently rejected as insufficient." Teamsters, 531 F.3d at 196.[6]

### C.    Plaintiff Fails To Plead Conscious Misconduct or Recklessness in the Making of a Challenged Statement

Because Plaintiff fails "to demonstrate that [D]efendants had a motive to defraud . . . [it] must produce a stronger inference of recklessness." Kalnit, 264 F.3d at 143; see also Dynex I, at *9 (recognizing this principle). Plaintiff attempts to produce this inference in three ways: (i) by relying on anonymous "sources"; (ii) by relying on purported internal reports; and (iii) by relying on fraud-by-hindsight. Each attempt fails.

### 1.    Anonymous Sources

The primary difference between the Complaint and Plaintiff's previous efforts is the addition of details concerning so-called "confidential witnesses" ("CWs"). But these "details" simply confirm what Defendants have always suspected; namely, that Plaintiff's CWs were low-level employees not of Dynex, but of a Dynex affiliate prior to the Class Period. As such, they have no light to shed on the challenged statements or the intent with which they were made.

First, out of the nine confidential witnesses cited in the Complaint, only two are alleged to have been employed during the Class Period (¶¶ 53(e), (g)). And these two were not even employed at Dynex, but at Origen Financial, Inc., the unaffiliated third party to which Dynex sold its manufactured housing operations in 1999 (¶ 21). See above, at 5.

Courts have held that witnesses like these, who leave the defendant company prior to the start of the class period, add nothing to the scienter analysis. See, e.g., CALPERS v. Chubb Corp., 394 F.3d 126, 154 (3d Cir. 2004) ("Plaintiffs do not allege that this former vice president

---

[6] Plaintiff also fails to tie Dynex's alleged corporate motive to any individual. This runs afoul of the holding in Teamsters that "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." Id. at 195 (emphasis added).

[and confidential witness] was employed at the appropriate time.  Indeed, it appears that he was

not . . . ."); <u>Malin v. XL Capital Ltd.</u>, 499 F. Supp. 2d 117, 141 (D. Conn. 2007) ("the bulk of the

information relayed by the CWs relates to the time period prior to the start of the [c]lass

[p]eriod," and "[p]laintiffs . . . produce no evidence to show that the . . . problems described

continue through the class period"); <u>Fadem v. Ford Motor Co.</u>, 352 F. Supp. 2d 501, 523

(S.D.N.Y. 2005) ("It is doubtful, at best, that such a former employee is in a position to predict

(he cannot know) what was said or unsaid by whom and to whom [at the pertinent time]").

     None of Plaintiff's so-called "witnesses" — whether the seven who left Dynex prior to

the Class Period or the two who never worked at Dynex — could have known what was in the

minds of Potts and Benedetti (or anyone else) as those two individuals crafted the statements

made in February 2001, 2002, 2003 and 2004, the statements that are the subject of this lawsuit.

Nor could these witnesses have known whether Potts and Benedetti "had access to specific

reports or statements" during the Class Period that "contradicted their public statements," as this

Court held was required in <u>Dynex I</u>.  <u>Id.</u> at *9 ("Plaintiff has not alleged that Potts or Benedetti

saw or had access to specific reports or statements . . . that contradicted their public statements

. . . .  <u>Therefore</u>, plaintiff has failed to adequately plead scienter . . . .") (emphases added).

     Indeed, Potts and Benedetti could have received data during the Class Period suggesting

that, in the words of the Second Circuit, the "primary cause of the bonds' poor performance" was

in fact "the general weakness in the mobile homes market."  <u>Teamsters</u>, 531 F.3d at 197; <u>see also</u>

<u>id.</u> (noting that any misstatements during the Class Period could have been the result of "merely

careless mistakes at the management level based on false information fed it from below").  The

"witnesses" here are simply in no position to know, and Plaintiff does not allege otherwise.

Second, even if the CWs had been employed during the Class Period, out of the nine confidential witnesses cited in the Complaint, <u>none</u> are alleged to have had any contact with Potts and only <u>one</u> is alleged to have had any contact with Benedetti (¶ 53(h)).  Indeed, these other eight CWs are not even alleged to have <u>reported</u> to anyone who had contact with Potts or Benedetti (¶ 53).[7]  As such, they have nothing to say about the controlling intent for purposes of this action; that is, the intent of Potts and Benedetti.  <u>See</u> ¶¶ 29, 32 ("The Individual Defendants . . . control[led] the content of the various SEC filings, press releases and other public statements pertaining to the Bonds during the Class Period."); <u>Malin</u>, 499 F. Supp. 2d at 141 ("none of the CWs present any evidence that they communicated . . . the alleged problems . . . to any of the Individual Defendants or that the Individual Defendants otherwise knew about these issues"); <u>see also</u> <u>Teamsters</u>, 531 F.3d at 197 (complaint must plead that "<u>someone</u> . . . who was responsible for the statements made" acted with scienter).

Moreover, the one CW who purportedly had contact with Benedetti (but only prior to the Class Period), <u>see</u> ¶ 53(h), says nothing supporting an inference that any statement was made with an intent to defraud investors.  Rather, he simply states that each month he "would attend a meeting" also "attended by Benedetti" at which "the monthly portfolio analyses that were performed and depicted in [certain] [r]eports were discussed."  <u>Id.</u>

---

[7] This is not surprising, as Plaintiff's CWs were generally low level and short-term employees of DFI.  <u>See</u> Ex. 1 (chart of Dynex corporate structure).  For example, several were "District Sales Managers" of DFI (<u>e.g.</u>, Compl. ¶ 53(a)).  By Plaintiff's own admission, these "Managers" were at the bottom of the corporate totem pole.  Dynex was headquartered in Virginia, and its manufactured housing affiliate DFI had "five regional offices" around the country that were run by "Regional Supervisors" (¶¶ 60, 62).  These "Regional Supervisors" had at least three levels of corporate hierarchy beneath them (¶ 62).  Only then does one get to the "District" level, where the "District Sales Managers" that populate the ranks of the CWs were not even at the top position.  ¶ 53(b) (CW2 was "employed as a District Sales Manager" but then "promoted to District Manager").

There is nothing sinister about this allegation.  As one court stated recently in dismissing a similar action, conduct such as attending meetings is "normal and expected, and does not indicate fraudulent intent."  In re 2007 Novastar Fin., Inc. Sec. Litig., No. 07-0139, 2008 WL 2354367, at *4 (W.D. Mo. Jun. 4, 2008), Ex. 28.  Indeed, "[m]anagement is supposed to review results and search for ways to improve operations."  Id.  Nowhere does Plaintiff explain how these meetings alerted Benedetti that a Class Period statement was false or misleading.

Third, even if Teamsters' confidential witnesses had been employed during the Class Period, employed by Dynex, and had worked directly with Potts and Benedetti, their statements would still be insufficient because they do not support Plaintiff's claims that Defendants knowingly or recklessly made false statements during the Class Period.  Rather, they support an inference, at most, that while one DFI underwriter thought the company's underwriting was vigorous and "labor intensive" (¶ 53(d)), a handful of low-level employees purportedly witnessed "several instances" (¶ 53(e)) of the underwriting of individual home loans in which DFI, in the CW's opinion, did not insist on "proper documentation" (¶ 53(a)).

But allegations of "several instances" of allegedly bad underwriting do not give rise to a "compelling" inference, see Tellabs, 127 S. Ct at 2505, that Dynex or Merit as a whole made misstatements in connection with the purchase or sale of the Bonds during the Class Period.  And they certainly do not support a compelling inference that Potts or Benedetti intentionally caused Dynex or Merit to make such a misstatement.[8]

---

[8] Plaintiff's other CW allegations are a study in careful (and clever) ambiguity that underscores their lack of reliability.  For example, CW9 states that his quality control audits "revealed true rates of first payment defaults and dealer fraud" (¶ 53(i)) (emphasis added).  He does not state, however, what those rates were, whether they were inconsistent with any public statements, or even whether they were unusually high for the company or the industry.  If CW9 had anything incriminating to say, it would have shown up in the Complaint.  Cf. Tellabs, 127 S. Ct at 2511 ("omissions and ambiguities [in the complaint] count against inferring scienter").

16

Finally, following <u>Tellabs</u>, two Courts of Appeals have held that claims attributed to confidential witnesses should be "discounted." <u>Higginbotham v. Baxter Int'l, Inc.</u>, 495 F.3d 753, 756-57 (7th Cir. 2007) ("allegations from 'confidential witnesses' must be 'discounted' rather than ignored [but] [u]sually that discount will be steep"); <u>Indiana Elec. Workers v. Shaw Group, Inc.</u>, -- F.3d --, 2008 WL 2894793, at *4 (5th Cir. 2008) ("That these allegations derive from confidential sources further detracts from their weight in the scienter analysis.") (citing <u>Tellabs</u>).

At bottom, the CW allegations — and the Complaint as a whole — represent an effort to shift this Court's attention from the challenged statements and the intent with which they were made to <u>other acts</u> Plaintiff clams were done with bad intent. For example, the Complaint refers to "reckless underwriting and origination practices" (¶¶ 90, 93), as if "reckless underwriting" were a cause of action under Section 10(b) of the Exchange Act. <u>See also</u> ¶¶ 8, 27 ("aggressive underwriting practices"); ¶ 79 ("improper underwriting practices").

This effort is misguided. Section 10(b) does not bar "reckless underwriting" (¶ 90), any more than it bars reckless driving. What it bars is the knowing or reckless making of a false or misleading statement. <u>See, e.g.</u>, <u>Ross v. A.H. Robins Co.</u>, 607 F.2d 545, 555-56 (2d Cir. 1979) ("To establish a § 10(b) violation, the plaintiff must plead . . . that the defendant acted with scienter <u>in making a material misstatement or omission</u>") (emphasis added); <u>Gerstle v. Gamble-Skogmo, Inc.</u>, 478 F.2d 1281, 1301 n.20 (2d Cir. 1973) ("the scienter issue would revolve around <u>the intent with which the . . . statement is prepared</u>") (Friendly, J.) (emphasis added).

Instances of "improper" underwriting do not amount to securities fraud, no matter how bad an idea they are alleged to have been. <u>See, e.g.</u>, <u>Santa Fe Indus. v. Green</u>, 430 U.S. 462, 479 (1977) ("Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement."); <u>see also</u> <u>Novastar</u>, 2008 WL 2354367, at *3 ("[T]he

17

Company may have changed or even weakened its internal controls or underwriting standards," thereby "increas[ing] risks faced by the Company," but "[p]laintiff has not explained how these reports demonstrate the falsity of any particular public statement.").  Rather, securities fraud involves false statements made to investors with intent to defraud.  ATSI, 493 F.3d at 105.

Having failed to plead that those who "prepared" the challenged public statements did so with scienter, see Gerstle, 478 F.2d at 1301 n.20, Plaintiff has failed to satisfy the PSLRA.

### 2.      Internal Reports

In addition to the CWs, Plaintiff relies on purported "internal reports" (¶¶ 4, 5, 8).  But as with the CWs, the Complaint fails to deliver the goods.  Indeed, the Complaint fails to allege that Potts or Benedetti received any of the alleged reports during the Class Period.

Stripped of hyperbole, the Complaint cites exactly one particular report.  ¶¶ 5, 66 (citing an "MHRP Report").  That report was issued in 1997, was restricted to only four months of results, and related to only one of the five regions into which DFI, Dynex's manufactured housing affiliate, was organized (¶¶ 5, 66).  This is thin gruel on which to base the broad allegation that internal reports "showed the poor 'C' rating assigned to substantial portions of the bond collateral" on a Company-wide basis from 1996 to 1999 (¶ 4) (emphasis added).  Nor does this solitary report — or the broad allegation based upon it — demonstrate that any particular challenged statement during the Class Period was even false or misleading.

Plaintiff also refers to monthly "Basis Reports" contained in "Microsoft Excel spreadsheet[s]" as if they were a smoking gun (¶¶ 8, 53(h), 85).  But these reports simply "summarized the value of the company based on the assets it held" (¶ 53(h)).  Defendants have attached hereto an example of such a report.  See Ex. 29.  This exhibit confirms the falsity not of any statement by Defendants, but of the claim by Plaintiff that these Basis Reports "analyzed the

deteriorating quality of the bond collateral" (¶ 8).  As the exhibit confirms, these reports had nothing to do with collateral.  Rather, they simply listed Dynex's investments by category.[9]

One of the "important limitations on the scope of liability for securities fraud based on reckless conduct" is that "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."  Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000); see also Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir. 1994) (affirming dismissal of securities class action where plaintiff failed to allege "that the company's disclosures were inconsistent with current [internal] data" and "current reserve reports") (emphasis added).  Plaintiff fails to overcome this limitation.

### 3.   Fraud By Hindsight

Finally, Plaintiff attempts to plead scienter by hindsight, arguing that because Dynex and Merit corrected certain financial data towards the end of the Class Period, the Defendants "had to" have acted with scienter in releasing the previously reported data earlier in the Class Period (¶ 128).  This effort fails.  See Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978) (affirming dismissal of securities complaint that alleged "fraud by hindsight") (Friendly, J.).

For example, Plaintiff seizes on Dynex's announcement in October 2003 that it had discovered a mistake in its reporting of cumulative repossessions on the loans backing the Bonds (¶¶ 133-34).  According to Plaintiff, this discovery and subsequent public correction, or restatement, supports an inference that the initial reporting was intentionally false (¶ 152(f)).

But "it is well settled that the mere fact of a restatement of earnings does not support a strong, or even a weak, inference of scienter."  City of Brockton Ret. Sys. v. Shaw Group, Inc., 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008).  Indeed, "[r]estatements of earnings are common."

---

[9] This Court may consider this report without converting this motion into one for summary judgment, as Plaintiff relies heavily on these Basis Reports in its Complaint.  See ATSI, 493 F.3d at 98.

Goldberg v. Household Bank, F.S.B., 890 F.2d 965, 967 (7th Cir. 1989).  While a restatement demonstrates that the prior statements were mistaken, it does not demonstrate that they were intentionally mistaken.  See, e.g., In re Goodyear Tire & Rubber Co. Sec. Litig., 436 F. Supp. 2d 873, 903 (N.D. Ohio 2006) ("it is clear that the statements . . . were not true, but the Court's duty is to determine whether the pleadings sufficiently allege scienter.").

The same is true of Merit's decision to restate its loan loss reserves in April 2004.  The decision "to revise the amount of loan loss reserves that [Merit] deemed adequate provides absolutely no reasonable basis for concluding that defendants did not think reserves were adequate at the time."  In re CIT Group, Inc. Sec. Litig., 349 F. Supp. 2d 685, 690-91 (S.D.N.Y. 2004).  Indeed, "the process of estimating loss reserves is a difficult one, and even following . . . accounting policies might not result in adequate loss reserves."  Malin, 499 F. Supp. 2d at 146; see also id. at 148 ( "Plaintiffs must do more than allege that Defendants could not have actually believed that loan loss reserves were adequate because they later increased reserves."); cf. ¶ 128 (statements "had to be made with scienter because Defendants . . . disregarded facts . . . as was evident when the Company was forced to restate its . . . loss reserves") (emphases added).

### D.   Plaintiff's Own Allegations Affirmatively Refute Scienter

As discussed above, the new Complaint, like its predecessors, fails to plead scienter.  This alone requires dismissal.  15 U.S.C. § 78u-4(b)(3)(A).  The new Complaint, however, goes one step further by alleging facts that affirmatively refute an inference of scienter.

### 1.   Plaintiff's Own Confidential Witness Disagrees With Plaintiff

First, Plaintiff's own confidential witness disagrees with Plaintiff's core theory of fraud.  Central to Plaintiff's theory is the claim that between 1996 and early 1999, before the Bonds were issued, DFI originated loans pursuant to inappropriately lax underwriting standards.

Indeed, Plaintiff claims that DFI employees "systematically disregarded the underwriting guidelines to achieve loan volume" (¶ 104); <u>see also</u> <u>Dynex I</u>, at *10 (same claim).

But CW4, who was employed as a "Credit Underwriter" at Dynex (¶ 53(d)), disagrees. He states that "prior to 1999" when the Bond collateral was originated, the "underwriting process at Dynex was very labor intensive." <u>Id.</u> Indeed, he and "the other employees responsible for reviewing credit applications and supporting documentation would review the paperwork and render a decision <u>based on guidelines that were set by the Company</u>." <u>Id.</u> (emphasis added); <u>cf.</u> ¶ 103 (Plaintiff claiming Dynex misled investors when Dynex said, in accord with the testimony of CW4, that DFI used "internally generated guidelines to underwrite loans").

This theme is repeated elsewhere in the Complaint, with Plaintiff alleging that "Portal," the automated underwriting system adopted in late 1999, "was a more aggressive underwriting process than the previous practice of manual underwriting" used for the Bond collateral (¶ 65). "Often loans approved by Portal conflicted with the written underwriting guidelines <u>and would have been denied</u> had Dynex still employed its prior manual underwriting process." <u>Id.</u>

In short, Plaintiff claims generally that underwriting standards were "systematically disregarded" (¶ 104), while citing a witness with alleged personal knowledge that the DFI "employees responsible for reviewing credit applications" would "render a decision based on guidelines that were set by the Company" (¶ 53(d)). This does not give rise to a "compelling" inference that Defendants lied about underwriting. Rather, it supports an inference that DFI's underwriting adhered to internal guidelines but that an unanticipated "general weakness in the mobile homes market," <u>Teamsters</u>, 531 F.3d at 197 — i.e., a standard business downturn — led to poor collateral performance and ultimately losses for Dynex, Merit, and the other investors.

### 2.    Merit's Restatement Was in the Wrong Direction

Second, the restatement to which Plaintiff points with such gusto as evidencing scienter (¶ 128), actually contradicts Plaintiff's claims.  Plaintiff alleges repeatedly that Merit <u>understated</u> its loan loss reserves at all times during the Class Period (¶¶ 119-22; 127-28; 132; 137-39; 149-50).  This allegation is central to Plaintiff's theory that Defendants sought to conceal from investors the problems with the collateral by understating various measures of poor performance.

But in April 2004, Merit disclosed that due to an internal control deficiency it had actually been <u>overstating</u> its loan loss reserves.  ¶ 149 (Merit had "record[ed] [an] allowance for loan losses <u>in excess of loan obligations</u>") (emphasis added); ¶ 138.  Put differently, Merit had been <u>overstating</u> the anticipated losses on the Bond collateral.

But it is inconceivable that someone trying to cast the collateral in a rosy light — as Plaintiff claims Defendants were doing — would <u>overstate</u> the anticipated losses on the collateral.  Indeed, that is the last thing such a person would do.  Plaintiff's theory is "internally inconsistent" and thus insufficient under <u>Tellabs</u>.  See <u>In re GeoPharma, Inc. Sec. Litig.</u>, 411 F. Supp. 2d 434, 446-47 n.83 (S.D.N.Y. 2006) (courts "<u>often</u> refuse to infer scienter, even on a recklessness theory, when confronted with illogical allegations") (citing cases) (emphasis added).

### 3.    Dynex Accurately Disclosed Total Bond Losses Every Month

Third, Plaintiff claims that Defendants sought to conceal the increasingly poor performance of the collateral (<u>e.g.</u>, ¶ 2).  But each month Dynex disclosed the total amount of losses to date on the loans.  See Exs. 9, 16 (each monthly report disclosed "cumulative losses").  Plaintiff does not allege that these loss reports were false.[10]

---

[10] In terms of reported financial numbers, the Complaint challenges only the accuracy of: (i) Merit's loss reserves (<u>e.g.</u>, ¶¶ 119-22); and (ii) the Series 13 collateral's repossession rate (¶¶ 133-34).

A company seeking desperately to conceal from investors the poor performance of the collateral would not distribute a monthly report trumpeting that poor performance. Cf. In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1424 (9th Cir. 1994) ("If WOW's officers were bent on committing fraud, it is not likely that they would have provided such detailed risk disclosure in the prospectuses."). As Plaintiff itself concedes, these monthly reports were "an unavoidable red flag . . . of the poor quality of the collateral" (¶ 8), a red flag that Defendants waved in investors' faces every month. This theory is simply not "compelling." Tellabs.

### 4.    Dynex and Merit Were "Investor[s]" and Thus the Biggest Losers

Finally, Merit's investment in the Bonds refutes scienter. Merit, like Plaintiff, was an "investor." See ¶ 20 ("Dynex [through Merit] also retained a financial interest in the collateral which secured the Bonds"); see also above, at 4-5. Indeed, it invested more than $44.16 million in the Series 13 Bonds alone, more than one hundred times the amount Plaintiff invested (¶¶ 17, 20). Because this investment was in the most junior layer, any "losses were borne by Merit (and Dynex) . . . and thereafter by the [B]onds" (¶ 36) (emphasis added).

Moreover, in addition to its investment in the Bonds, Merit sought to profit from the "spread" between the interest paid by homeowners and the interest paid out to bondholders (¶ 56). Accordingly, if the homeowners did not make their monthly payments, Merit (and thus Dynex) did not get paid.[11]

In short, by engaging in the alleged "fraud" Plaintiff posits, Dynex was literally shooting itself in the foot; that is, originating worthless loans and issuing worthless bonds in which it then

---

[11] See also Ex. 3, at S-2 (describing the process of Merit's anticipated payments as follows: "[t]he servicer . . . must remit collections [from homeowners]. . . monthly to the master servicer, who in turn must remit collections . . . to the . . . trustee. The trustee will apply collections . . . to the payment [to the bondholders] of interest and principal due on the bonds . . . . After making the required payments [to the bondholders] on each payment date, the trustee will release any remaining amounts to Merit.").

became the chief investor.  The theory that a sophisticated corporation made such an irrational

decision is simply not "compelling."  Tellabs; see Kalnit, 264 F.3d at 140-41 ("where plaintiff's

view of the facts defies economic reason, . . . [it] does not yield a reasonable inference of

fraudulent intent") (quoting Shields, 25 F.3d at 1130); Maldonado v. Dominguez, 137 F.3d 1, at

12 n.9 (1st Cir. 1998) (plaintiffs conceded "that [defendants] invested and lost one and a half

million dollars of their own money in PRIBANK, which undermines . . . scienter").[12]

   In Dynex I, this Court questioned whether — regardless of the long-term investment

losses Dynex would incur on the Bonds under Plaintiff's theory — Dynex might have "sought to

make [much larger] short term profits at the expense of unsuspecting investors," such that

Plaintiff's theory of fraud might still make sense.  Id. at *10.

   But the structure of the Bonds as alleged in the new Complaint forecloses this possibility.

See Ex. 8.  The Complaint also alleges that Dynex and Merit were long-term investors that made

no money off of the initial sale of the Bonds.  See ¶ 56 (Merit used "the immediate influx of

hundreds of millions of dollars" not to pad its pockets, but "to fund purchases of the mortgages

used as collateral") (emphasis added); ¶ 18; Ex. 3, at S-29 ("The proceeds from the sale of the

Bonds will be used by MERIT to purchase the collateral from [IHC].").  Rather, Merit hoped to

---

[12] Courts in this District are no strangers to this argument.  See, e.g., In re J.P. Morgan Chase Sec.
Litig., 363 F. Supp. 2d 595, 621 (S.D.N.Y. 2005) (no scienter when "[p]laintiffs also fail to allege facts
explaining why, if it was aware of Enron's problems, [defendant] . . . len[t] Enron billions of dollars");
Davidoff v. Farina, 2005 WL 2030501, at *11 n.19 (S.D.N.Y. Aug. 22, 2005), Ex. 30 (allegations
"compel[led] the conclusion that defendants did not act with . . . scienter"; "it would have made no
economic sense for defendants to invest . . . in a venture that they knew would fail"); In re Merrill Lynch
& Co. Research Reports Sec. Litig., 272 F. Supp. 2d 243, 263 (S.D.N.Y. 2003) ("Because courts assume
that defendants act in their 'informed self-interest,' the allegations . . . affirmatively refute scienter")
(quoting Shields, 25 F.3d at 1130); Abbad v. Amman, 285 F. Supp. 2d 411, 418 n.5 (S.D.N.Y. 2003),
aff'd, 112 Fed. Appx. 97 (2d Cir. 2004) ("Amman actually purchased 270,000 shares . . . after the time
defendants . . . allegedly . . . determined that the company could not survive. . . .  That fact defeats any
inference that Amman knew that GTS would become nothing but an empty shell with worthless stock.").

profit from the spread in interest payments between homeowners and bondholders (¶ 56), a hope that depended on the homeowners continuing to make monthly payments.[13]

In light of the Supreme Court's landmark decision in <u>Tellabs</u> — issued subsequent to this Court's decision in <u>Dynex I</u> — it is now clear that given Merit's substantial investment in both the collateral and the Bonds themselves, Plaintiff cannot survive the requisite "comparative analysis" of competing inferences at the dismissal stage.  <u>Tellabs</u>, at 2504.

In sum, Plaintiff's "theory of the case" is "internally inconsistent," <u>see</u> <u>GeoPharma</u>, 411 F. Supp. 2d at 446-47, "makes no sense," <u>see</u> <u>Kalnit</u>, 264 F.3d at 140, and "defies economic reason."  <u>Id.</u>  In a "comparative evaluation," <u>Tellabs</u>, 127 S. Ct. at 2504, of these allegations with the "plausible opposing inference," <u>id.</u> at 2510, that Defendants' woes were the result of a normal business downturn, the latter theory is most compelling.

## II.   <u>The Complaint Must Be Dismissed Because Plaintiff Fails To Plead Falsity</u>

Even apart from the element of scienter, the Complaint fails because it does not plead that statements concerning market conditions, loss reserves or underwriting were false.  The Second Circuit found that Plaintiff's previous complaint "fail[ed] to allege the existence of information that would demonstrate that the statements made to investors were misleading."  <u>Teamsters</u>, 531 F.3d at 197.  As the new Complaint adds no such "information," it too must be dismissed.

---

[13] This is the crucial distinction between this action and the <u>Bombardier</u> action, <u>see</u> <u>Bombardier</u>, 2005 WL 2148919, on which this Court relied in <u>Dynex I</u>.  In <u>Bombardier</u>, the defendant company pooled the collateral, sold the asset-backed bonds (thereby unloading all the long-term risk on third parties), and recognized an immediate "gain on sale."  <u>Id.</u> at *2 ("Bombardier was drawn to this market by the 'financial allure of "gain on sale" accounting,'" which allowed it … "to book future expected profits on those securities as current income").  This created an incentive to book large short-term profits.  In contrast, Dynex and Merit did <u>not</u> use gain on sale accounting, and Plaintiff does not claim otherwise.

### A.   __Statements Concerning Market Conditions__

Plaintiff claims that Defendants misrepresented that "the deteriorating performance of the bond collateral during the Class Period" was due solely "to 'market conditions.'" (¶¶ 2, 8, 111-122, 125-26; 147-50).  Plaintiff fails to plead that this statement was misleading for two reasons.

First, this is the same claim contained in Plaintiff's previous complaint and the same claim that the Second Circuit has already considered and rejected.  See Teamsters, 531 F.3d at 197 ("Teamsters fails to allege the existence of information that would demonstrate that the statements made to investors were misleading, e.g., information showing that the primary cause of the bonds' poor performance was not the general weakness in the mobile homes market.").

Second, and more fundamentally, Defendants never made the statement Plaintiff attacks. Merit never said that the "performance of the bond collateral" was "only the result of market conditions" (¶ 2).  Nor is there any such quotation in the Complaint.  Rather, Merit said this:

> The Company has seen the loss severity on manufactured housing loans increase dramatically . . . as a result of the saturation in the market place with both new and used (repossessed) manufactured housing units.  In addition, the Company has seen some increase in overall default rates on its manufactured housing loans.  The Company anticipates that market conditions for manufactured housing loans will remain unfavorable through 2001.

Ex. 12, at 5; ¶ 115.

To plead that these sentences are false, Plaintiff would have to plead that despite Merit's statement to the contrary: (i) Merit had not seen loss severities increase as a result of marketplace saturation; (ii) Merit had not seen an increase in default rates; or (iii) Merit did not anticipate unfavorable market conditions through 2001.  But Plaintiff pleads none of these facts.

With regard to assessing the falsity of the Merit's statement concerning loss severities and marketplace saturation in particular, it is crucial to understand the term "loss severity."  Loan performance has two ingredients: (i) default rates; and (ii) loss severities.  Once a loan becomes

delinquent and ultimately defaults, the lender repossesses and sells the home, thereby incurring a loss severity to the extent the sale price is less than the outstanding loan balance.  <u>Teamsters</u>, 531 F.3d at 192-93.  Loss severity is thus a direct function of resale price.  And if there is a glut of used homes on the market, the prices for those homes will drop.

This explains why Dynex stated that it had "seen the <u>loss severity</u> on manufactured housing loans" — <u>not</u> losses in general — "increase dramatically . . . as a result of the saturation in the marketplace with both new and used (repossessed) manufactured housing units"; i.e., as a result of market conditions.  Ex. 12, at 5 (emphasis added); <u>see also</u> ¶¶ 113, 115, 119 (quoting this precise language); <u>cf.</u> ¶ 8 (without citing any particular statement, claiming that Dynex stated that "increases in the losses attributable to the bond collateral was [sic] <u>only</u> the result of market conditions") (emphasis added).

Plaintiff has not pleaded "why" the statement Dynex actually made — that market place saturation impacted <u>loss severities</u> — was false.  <u>See</u> <u>ATSI</u>, 493 F.3d at 99 (complaint must "specify the statements that the plaintiff contends were fraudulent" and "explain why the statements were fraudulent").  If Defendants are to be held liable for securities fraud, it ought to be for something they actually said, not something <u>the Complaint</u> says.

> **B.      Statements Concerning Loss Reserves**

Plaintiff next claims that Merit understated its loan loss reserves at all times during the Class Period by failing to include losses from "current mobile home loans" (¶¶ 119-22; 127-28; 132; 137-39; 149-50).  This claim also fails for failure to plead falsity.

Under the Reform Act and Rule 9(b), Plaintiff cannot plead falsity simply by pointing to a statement and saying "this is false."  <u>See, e.g.</u>, <u>ATSI</u>, 493 F.3d at 99 ("[a]llegations that are conclusory or unsupported by factual assertions are insufficient").  Rather, Plaintiff has to explain <u>why</u> the statement was false <u>when made</u>.  <u>Id.</u>  Plaintiff, however, points to no documents

suggesting that Merit's public reserve statements were "incompatible with what the most current [internal] reserve reports showed at the time the disclosures were made." <u>Shields</u>, 25 F.3d at 1129 (affirming dismissal of securities action); <u>see also</u> <u>PR Diamonds, Inc. v. Chandler</u>, 364 F.3d 671, 692 (6th Cir. 2004) (affirming dismissal where there were "no specific allegations of a divergence between internal reports and external statements on the same subject").

Plaintiff does point to the decisions of Merit to increase its loss reserves as conditions worsened (¶¶ 125, 147). Plaintiff claims that those decisions should have been made earlier in the Class Period. <u>E.g.</u>, ¶ 120 (reserves "[w]ere false and misleading for . . . failing to include [a percentage of] current mobile home loans," as Merit did later). But mere "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." <u>Novak</u>, 216 F.3d at 309; <u>see also</u> <u>Rombach v. Chang</u>, 355 F.3d 164, 172 (2d Cir. 2004) (complaint "fail[ed] the tests of Rule 9(b) and the PSLRA" where it did not "state with particularity the specific facts in support of [plaintiffs'] belief that [defendants'] statements were <u>false when made</u>") (emphasis added).[14]

### C.    Statements Concerning Underwriting

Plaintiff next claims that Dynex, through DFI, violated its underwriting guidelines between 1996 and 1999 (e.g., ¶¶ 79, 90). These violations allegedly rendered misleading both the offering documents (¶¶ 96-100) and Defendants' subsequent public statements, each of which hid the alleged violations (e.g., ¶ 2). For example, Plaintiff claims that the statement

---

[14] Defendants note that Plaintiff does allege that <u>two</u> statements of loss reserves were false. These are the statements by Merit on August 14, 2003, and November 13, 2003, which statements were restated on April 15, 2004 (¶¶ 127-28, 137-38). As discussed above, however, while a restatement establishes falsity, it does not establish scienter. <u>See</u> <u>above</u>, at 19-20. Indeed, the restatement of loss reserves revealed that Merit had been <u>overstating</u> its anticipated losses on the collateral, which is directly contrary to the Complaint's theory of fraud. <u>See</u> <u>above</u>, at 21-22.

"[t]he Company has historically utilized internally generated guidelines to underwrite loans" was false because DFI "systematically disregarded the underwriting guidelines" (¶¶ 103-04).

These claims fail to plead falsity for three reasons. First, Plaintiff's own CW4 believes that Dynex's statements concerning underwriting were accurate (¶ 53(d)). See above, 20-21.

Second, Plaintiff states in conclusory terms that DFI "systematically disregarded" its internal guidelines (¶ 104). But the "particular[] . . . facts" Plaintiff cites to support that claim, see 15 U.S.C. § 78u-4(b)(1), are insufficient. Plaintiff cites to only one particular internal report for one DFI region for four months in 1997 (¶ 5). See above, at 18. This cannot support the broad claim that DFI "systematically disregarded" its underwriting guidelines, and thus that Dynex misspoke when it said that it "historically utilized internally generated guidelines."

Similarly, Plaintiff cites to a confidential witness that refers to "several instances" in which "loans had been approved . . . for individuals who had no income or employment" (¶ 53(e)). But "several instances" witnessed by one low-level employee do not a "systematic disregard" make. Put differently, the fact that some of the CWs reached different opinions about the quality of the underwriting that they observed in their particular offices does not mean that Defendants' statements about company-wide underwriting standards were false. And significantly, the only source for Plaintiff's claim about "systematic disregard" of underwriting standards is the CWs. See ¶ 99 (the offering documents were misleading because "the creditworthiness of the borrower" was "systematically disregarded by Dynex"; the "sources for these allegations are contained in ¶¶ 52-53," which paragraphs relate solely to the CWs).

Finally, and more fundamentally, Dynex never claimed to adhere to the underwriting standards that Plaintiff says it did. Plaintiff alleges that DFI "systematically waived . . . creditworthiness standards" by "permitting loans to borrowers with FICO credit scores below

530" (¶ 90).  Nowhere, however, does Plaintiff allege that Dynex's internal guidelines required

rejection of such applications.  This is because <u>Dynex did not tell investors that the loans were</u>

<u>restricted to FICO scores above 530</u>, as would be required to make the challenged statement a

lie.  Rather, it disclosed that the loans were "originated in accordance with credit underwriting

standards that . . . generally are <u>more lenient</u> than those applied . . . under many conventional . . .

mortgage loans."  Ex.2, at 9 (emphasis added).

Plaintiff alleges further that DFI disregarded internal guidelines prior to the Class Period

by accepting loans with "limited documentation" such that there was no "requisite

documentation of borrower employment [or] income" (¶ 73).  But Dynex told investors expressly

that it used a "limited documentation program" under which "certain credit underwriting

documentation concerning income and employment verification is waived."  Ex. 2, at 34.

Similarly, Plaintiff alleges that DFI disregarded internal guidelines prior to the Class

Period by giving various employees the authority to waive those guidelines.  But once again,

Dynex disclosed in the Offering Documents that "[t]he underwriting standards applied,

particularly with respect to the level of income and debt disclosure on the application and

verification, <u>may be varied</u> in appropriate cases."  Ex. 2, at 34 (emphasis added); <u>cf. Olkey v.</u>

<u>Hyperion 1999 Term Trust, Inc.</u>, 98 F.3d 2, 5 (2d Cir. 1996) ("[t]he prospectuses warn investors

of exactly the risk[s] the plaintiffs claim w[ere] not disclosed").  Because Plaintiff fails to plead a

false statement concerning underwriting, its claims must be dismissed.

## III.   <u>The Complaint Must Be Dismissed Because Plaintiff Fails To Plead Loss Causation</u>

Another element of a securities fraud claim is loss causation.  <u>Dura Pharmaceuticals, Inc.</u>

<u>v. Broudo</u>, 544 U.S. 336 (2005).  To plead loss causation, Plaintiff must plead that the price of

the Bonds dropped as a proximate result of the "truth" regarding the alleged misrepresentations

being revealed to the market.  <u>Id.</u> at 346-47.  As the Court held in <u>Dura</u>, this element ensures that

while Section 10(b) protects investors from "economic losses that misrepresentations actually cause," it does not provide "broad insurance against market losses."  Id. at 345.

Plaintiff's new Complaint, however, fails to make the required showing.  The rating reports that mark the end of the Class Period and that "caused" the drop in Bond prices (¶ 11), did not disclose that any statements issued during (or even before) the Class Period concerning underwriting, loss reserves or anything else were inaccurate, would need to be restated, or were in any way tainted by misconduct (¶ 144).  See also Exs. 21, 22 (releases by ratings agencies).  In the terminology of the loss causation doctrine, although these ratings downgrades "ha[d] a negative effect on [bond] prices," they did not have "a corrective effect."  In re Initial Pub. Offering Sec. Litig., 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) (emphasis in original).

Plaintiff simply has not alleged the "corrective disclosure" that is essential to pleading loss causation; i.e., a disclosure that demonstrates to the market not just that the subject securities were overvalued, but that the defendants' prior statements were false.  Lentell v. Merrill Lynch & Co., 396 F.3d 161, 175 n.4 (2d Cir. 2005) ("These allegations do not amount to a corrective disclosure, however, because they do not reveal to the market the falsity of the prior recommendations.") (emphasis added); Lapin v. Goldman Sachs Group, Inc., 506 F. Supp. 2d 221, 243 (S.D.N.Y. 2006) ("It is the exposure of the fraudulent representation that is the critical component of loss causation.").  Accordingly, the Complaint must be dismissed in its entirety.

## IV.    The Complaint Must Be Dismissed Because Plaintiff's Claims Are Time-Barred

Certain of Plaintiff's claims must also be dismissed because they are barred by the statute of limitations.  An action for securities fraud "may be brought not later than the earlier of . . . 2 years after the discovery of the facts constituting the violation; or . . . 5 years after such violation."  28 U.S.C. § 1658(b).  The "violation" to which this provision refers is, in the context

of Section 10(b) and Rule 10b-5(b), a misleading statement or omission.  See 17 C.F.R. §

240.10b-5(b) (prohibiting "any untrue statement").

Plaintiff attacks statements made in the Offering Documents in 1999 (¶¶ 96-100).  As

Plaintiff filed its initial complaint on February 7, 2005 — almost six years after the Offering

Documents were issued — these claims are time-barred.  28 U.S.C. § 1658(b).

This Court, relying on Bombardier, 2005 WL 2148919, reached the opposite conclusion

in Dynex I.  See id. at *5 ("[t]he period of repose begins when the last alleged misrepresentation

was made") (quoting Bombardier, at *5).  But in doing so, it provided an analysis that was not

offered by Plaintiff and that flatly contradicts the holding of the Supreme Court in Klehr v. A.O.

Smith Corp., 521 U.S. 179 (1997).

In Klehr, a civil RICO case, the Court expressly rejected the theory that a period of

repose begins when the last alleged misrepresentation was made.  It held that:

> the last predicate act rule creates a limitations period that is longer
> than Congress could have contemplated.  Because a series of
> predicate acts . . . can continue indefinitely, such an interpretation,
> in principle, lengthens the limitations period dramatically.   It
> thereby conflicts with a basic objective — repose — that underlies
> limitations periods.

Id. at 187.[15]

If corporate defendants can make a misstatement in 2007 and remain liable to purchasers

in 2017, the statute has not served as the "cutoff," Lampf, Pleva v. Gilbertson, 501 U.S. 350

(1991), it is intended to be.  See id. at 363 ("Because the purpose of the [formerly] 3-year

limitation is clearly to serve as a cutoff, . . . tolling principles do not apply to that period.").

Plaintiff's claims based on pre-Class Period statements (e.g., ¶¶ 96-101), must be dismissed.

---

[15] The Klehr decision was not cited to this Court in Dynex I or, to Defendants' knowledge, to the
court in Bombardier.

**V.    The Complaint Must Be Dismissed Because Plaintiff Lacks Standing To Pursue Claims Based on Securities It Did Not Own**

The Complaint must also be dismissed to the extent it asserts claims based on the Series 12 Bonds, securities for which, as the Second Circuit pointedly noted, "[t]here is no allegation . . . that Teamsters purchased [them]." Teamsters, 531 F.3d at 193.

To sue under Section 10(b), a plaintiff must have dealt in the securities at issue. See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 742 (1975) (no Section 10(b) claims for "plaintiffs who were not themselves purchasers or sellers of the stock in question"). Indeed, Blue Chip "limits the class of plaintiffs [in a Section 10(b) action] to those who have at least dealt in the security to which the prospectus, representation, or omission relates." Id. at 747.

Accordingly, as the Eighth Circuit held in Vervaecke v. Chiles, Heider & Co., 578 F.2d 713 (8th Cir. 1978), a plaintiff who trades in only one of two series of bonds lacks standing to assert Section 10(b) claims based on the series in which he did not trade. See id. at 719 (relying on Blue Chips's "rigid rule of standing"). This is true even when there are "similarities between the two stock offerings and the nature of the alleged fraud." Id.

Although the Second Circuit declined to reach this issue in the Teamsters appeal, the opinion is clearly skeptical of Plaintiff's claims of standing:

> Teamsters brought the putative class action "on behalf of all open market purchasers of Series 12 and 13 bonds [within] . . . the class period." There is no allegation, however, that Teamsters purchased the Series 12 bonds.

Id. at 193 (emphasis added). As Plaintiff did not "deal[] in the security to which the [Series 12] prospectus . . . relates," Blue Chip, 421 U.S. at 747, its Series 12 claims must be dismissed.

**VI.**     **Plaintiff's Claims Concerning Merit's Loss Reserves Must be Dismissed on Causation and Materiality Grounds**

As noted above, Plaintiff challenges Merit's statements of loss reserves during the Class Period.  See above, at 9.  But Merit's reserves, even if misstated, could not have caused a loss to the bondholders because Merit's reserves were immaterial to bondholders.  Merit's reserves impacted Merit's (and thus ultimately Dynex's) earnings, which earnings were material to the shareholders of Dynex.  In contrast, bondholders looked solely to the performance of the Bonds for their investment returns (¶ 36).  See also Ex. 31 (chart of corporate structure).

It is true that Merit's "loss reserves were based, in part, on the performance of the bond collateral," Dynex I, at *12, given that Merit was an investor in the Bonds.  Indeed, Bond performance presumably impacted the earnings of every bondholder, including Plaintiff.  This does not mean, however, that the corporate performance of each bondholder (of which Merit was one) impacted the Bonds or induced people to purchase Bonds.  It did not.  Nor does Plaintiff allege otherwise.  Accordingly, the claims based on Merit's loss reserves must be dismissed.

**VII.**     **Plaintiff's Section 20(a) "Control Person" Claims Must Be Dismissed**

As discussed above, Plaintiff fails to state a claim for a primary violation under Section 10(b), 15 U.S.C. § 78j(b).  Accordingly, its claims for derivative "control person" liability against Potts and Benedetti under Section 20(a), 15 U.S.C. § 78t(a), must also be dismissed.  See Rombach, 355 F.3d at 177-78.  Moreover, even if the Complaint did plead a primary violation, it fails to plead that Potts or Benedetti were culpable participants therein.  ATSI, 493 F.3d at 108.

**CONCLUSION**

As one court explained, "[s]ecurites law is not about fostering [general] senses; it is about actual statements, whether or not they are true or false, and, if false, whether or not the utterer knew at the time the statements were made that they were false."  In re Copley Pharm., Inc. Sec.

Litig., No. 94-11897, 1995 WL 169215, at *6 n.5 (D. Mass. Mar. 16, 1995), Ex. 32.  Although

the Complaint in this case strives to foster a general "sense" of bad business practices, it fails to

plead that Potts, Benedetti, or anyone else responsible for statements by Dynex or Merit made a

particular public statement with an intent to defraud investors.  Indeed, if the Complaint gives

rise to a "compelling" inference of anything, Tellabs, 127 S. Ct. at 2504, it is an inference of a

normal business downturn, the kind that happens everyday and has nothing to do with fraud.

        For the foregoing reasons, Defendants respectfully request that this Court dismiss the

Complaint in its entirety without leave to amend yet again.


Dated: September 11, 2008
      New York, New York                HUNTON & WILLIAMS LLP


                               By:   /s/ Terence J. Rasmussen    
                                    Edward J. Fuhr
                                    (admitted *pro hac vice*)
                                    Terence J. Rasmussen
                                    (admitted *pro hac vice*)
                                    951 E. Byrd Street
                                    Riverfront Plaza, East Tower
                                    Richmond, Virginia 23219
                                    (804) 788-8200

                                    Joseph J. Saltarelli
                                    200 Park Avenue
                                    New York, NY 10166
                                    (212) 309-1000

                                      *Counsel for Defendants Dynex*
                                      *Capital, Inc. and Merit Securities*
                                      *Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 11th day of September, 2008, a true and accurate copy of the

foregoing was served via the Court's ECF Filing System on:

> Joel P. Laitman, Esq.
> Frank R. Schirripa, Esq.
> SCHOENGOLD SPORN
>   LAITMAN & LOMETTI, P.C.
> 19 Fulton Street, Suite 406
> New York, NY  10038
> (212) 964-0046
>
> *Counsel for Lead Plaintiff Teamsters Local 445*
> *Freight Division Pension Fund*

> /s/ Terence J. Rasmussen
> Terence J. Rasmussen