*Exhibit 3, Part 1*
*to Declaration of Terence J. Rasmussen*
*In Support of Motion to Dismiss the*
<u>*Second Amended Class Action Complaint*</u>

You should rely only on the information contained or incorporated by reference in this prospectus supplement and the accompanying prospectus. We have not authorized anyone to provide you with different information.

We are not offering the Bonds in any state where the offer is not permitted.

We do not claim the accuracy of the information in this prospectus supplement and the accompanying prospectus as of any date other than the dates stated on the cover page of this prospectus supplement.

## TABLE OF CONTENTS

### Prospectus Supplement

| | Page |
|---|---|
| Terms of the Bonds and the Collateral | S-1 |
| Risk Factors | S-3 |
| Description of the Bonds | S-5 |
| Security for the Bonds | S-14 |
| Servicing of the Collateral | S-18 |
| Maturity and Prepayment Considerations | S-21 |
| Yield Considerations | S-26 |
| Certain Federal Income Tax Consequences | S-27 |
| Use of Proceeds | S-29 |
| Underwriting | S-29 |
| Legal Matters | S-30 |
| Ratings | S-30 |
| ERISA Considerations | S-31 |
| Legal Investment Considerations | S-31 |

### Prospectus

| | Page |
|---|---|
| Prospectus Summary | 1 |
| Risk Factors | 6 |
| Description of the Bonds | 15 |
| Maturity and Prepayment Considerations | 22 |
| Yield Considerations | 23 |
| Security for the Bonds | 23 |
| Origination of the Collateral | 33 |
| Servicing of the Collateral | 35 |
| The Indenture | 40 |
| Certain Legal Aspects of the Collateral | 43 |
| The Issuer | 54 |
| Certain Federal Income Tax Consequences | 54 |
| State Tax Considerations | 66 |
| ERISA Considerations | 66 |
| Legal Investment | 67 |
| Use of Proceeds | 67 |
| Plan of Distribution | 68 |
| Legal Matters | 68 |
| Financial Information | 68 |
| Additional Information | 68 |
| Incorporation of Certain Documents By Reference | 69 |
| Reports to Bondholders | 69 |
| Glossary | 70 |

Dealers will deliver a prospectus supplement and prospectus when acting as underwriters of the Bonds and with respect to their unsold allotments or subscriptions. In addition, all dealers selling the Bonds will deliver a prospectus supplement and prospectus until 90 days after the date of the prospectus supplement.

$341,250,000
(Approximate)

# MERIT Securities Corporation

Collateralized Bonds, Series 13

PROSPECTUS SUPPLEMENT
August 31, 1999

# LEHMAN BROTHERS

# GREENWICH CAPITAL

PROSPECTUS SUPPLEMENT
(To Prospectus dated August 11, 1999)

# $341,250,000
(Approximate)

# MERIT Securities Corporation
## Collateralized Bonds, Series 13

Principal and interest on your bonds are payable on or about the 28th day of each month, beginning September 1999.

The bonds will be non-recourse. The principal collateral for the bonds will be approximately $303,975,556 in aggregate unpaid principal balance (as of August 10, 1999) of manufactured housing installment sales contracts, having a weighted average remaining term to stated maturity of approximately 318 months, and $75,000,000 of funds intended to be used to acquire more manufactured housing installment sales contracts that will be pledged to secure the bonds.

The bonds offered by this prospectus are listed below.

MERIT will make one or more REMIC elections with respect to the contracts and certain other assets securing the bonds. See "CERTAIN FEDERAL INCOME TAX CONSEQUENCES" on page S-27.

**Consider carefully the risk factors beginning on page 6 of the Prospectus and on page S-3.**

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED THE BONDS OR DETERMINED THAT THIS PROSPECTUS SUPPLEMENT OR THE PROSPECTUS IS ACCURATE OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

|  | Original Principal Amount(1) | Class Interest Rate(2) | Weighted Average Life at Pricing Speed(3) | Ratings Moody's/Fitch(4) | Stated Maturity Date(5) | CUSIP Number |
|---|---|---|---|---|---|---|
| Class A1 | $ 75,000,000 | 7.04% | 0.9/0.9 years | Aaa/AAA | December 28, 2033 | 589962 CR8 |
| Class A2 | $ 35,000,000 | 7.39% | 2.2/2.2 years | Aaa/AAA | December 28, 2030 | 589962 CS6 |
| Class A3 | $ 47,000,000 | 7.63% | 3.2/3.2 years | Aaa/AAA | December 28, 2033 | 589962 CT4 |
| Class A4 | $116,000,000 | 7.88% | 4.8/7.9 years | Aaa/AAA | December 28, 2033 | 589962 CU1 |
| Class M1 | $ 41,364,000 | 7.88% | 5.0/9.0 years | Aa2/AA | December 28, 2033 | 589962 CV9 |
| Class M2 | $ 26,886,000 | 7.88% | 5.0/7.9 years | A2/A | December 28, 2033 | 589962 CW7 |

(1) Plus or minus 5% depending on the collateral actually pledged to secure the bonds. After the end of the funding period described herein, the class A1, class A2, class A3, class A4 and class M1 bonds will be "mortgage related securities" for SMMEA purposes. The class M2 bonds will not be "mortgage related securities" for SMMEA purposes. See "LEGAL INVESTMENT CONSIDERATIONS" on page S-31 and in the Prospectus. All classes of offered bonds are "ERISA eligible". See "ERISA CONSIDERATIONS" on page S-31.

(2) Subject to a cap described on page S-1 with respect to the class M-1 and class M-2 bonds. If MERIT does not exercise its option to redeem or effect a mandatory purchase of the bonds on the payment date after the first optional redemption date, the class interest rates will increase, subject to the cap, by the following amounts per annum: class A1, class A2, class A3 and class A4, 0.50%; class M1, 0.75%; and class M2, 1.00%.

(3) At the pricing speed to the first optional redemption date/maturity date. See "MATURITY AND PREPAYMENT CONSIDERATIONS" on page S-21.

(4) See "RATINGS" on page S-30.

(5) Determined as described under "MATURITY AND PREPAYMENT CONSIDERATIONS" on page S-21.

The underwriters for the offered bonds (other than $11,000,000 of the Class M2 bonds) will be Lehman Brothers Inc. and Greenwich Capital Markets, Inc. The underwriters will offer such bonds from time to time to the public in negotiated transactions or otherwise at varying prices to be determined at the time of sale. MERIT expects to deliver such bonds to the underwriters only in book-entry form through the book-entry facilities of The Depository Trust Company, CEDEL and Euroclear on or about September 2, 1999. An affiliate of MERIT will purchase the remainder of the Class M2 bonds and may offer such bonds from time to time in negotiated transactions or otherwise at varying prices to be determined at the time of sale.

**LEHMAN BROTHERS**                                                                                 **GREENWICH CAPITAL**

The date of this Prospectus Supplement is August 31, 1999

## TABLE OF CONTENTS

### Prospectus Supplement

| | PAGE |
|---|---|
| TERMS OF THE BONDS AND THE COLLATERAL | S-1 |
| RISK FACTORS | S-3 |
| DESCRIPTION OF THE BONDS | S-5 |
| General | S-5 |
| Book-Entry Bonds | S-6 |
| The Trustee | S-6 |
| Payments of Principal and Interest | S-6 |
| Collateralization Fund | S-8 |
| Pre-Funding Account and Capitalized Interest Account | S-8 |
| Definitions | S-8 |
| Events of Default | S-12 |
| Losses | S-13 |
| Stated Maturity Dates | S-13 |
| Optional Redemption | S-13 |
| SECURITY FOR THE BONDS | S-14 |
| The Collateral | S-14 |
| The Initial Contracts | S-14 |
| Selected Initial Contract Data | S-15 |
| Year 2000 Readiness Disclosure | S-17 |
| Additional Information | S-17 |
| Subsequent Contracts | S-18 |
| Substitution of Contracts | S-18 |
| SERVICING OF THE COLLATERAL | S-18 |
| General | S-18 |

| | PAGE |
|---|---|
| Advances | S-20 |
| Forbearance and Modification Agreements | S-20 |
| Events of Default | S-20 |
| Servicing and Other Compensation and Expenses | S-21 |
| Special Servicer | S-21 |
| MATURITY AND PREPAYMENT CONSIDERATIONS | S-21 |
| Weighted Average Life of the Bonds | S-21 |
| Factors Affecting Prepayments on the Contracts | S-22 |
| Mandatory Prepayment | S-22 |
| Modeling Assumptions | S-23 |
| YIELD CONSIDERATIONS | S-26 |
| General | S-26 |
| Subordination | S-27 |
| CERTAIN FEDERAL INCOME TAX CONSEQUENCES | S-27 |
| Credit Enhancement Provided by Collateralization Fund and Sale of Call Right | S-28 |
| USE OF PROCEEDS | S-29 |
| UNDERWRITING | S-29 |
| LEGAL MATTERS | S-30 |
| RATINGS | S-30 |
| ERISA CONSIDERATIONS | S-31 |
| LEGAL INVESTMENT CONSIDERATIONS | S-31 |

## SUMMARY

*The Issuer.* MERIT Securities Corporation is a limited purpose financing company.

*The Bonds.* The bonds are non-recourse obligations of MERIT payable only from payments received with respect to the collateral and do not represent the obligation of any other entity, nor has any other entity guaranteed payments on the bonds.

*Collateral.* The collateral consists principally of manufactured housing installment sales contracts which MERIT acquired from an affiliate.

*Trustee and Custodian.* Chase Bank of Texas, National Association, will act as trustee and custodian.

*Interest payments.* The trustee will pay interest on the bonds monthly, in order of seniority.

*Principal Payments.* The trustee will make principal payments on the bonds monthly, generally in order of seniority.

*Surplus.* The trustee will release any amounts remaining in the collateral proceeds account after monthly payments on the bonds to MERIT.

*Losses.* MERIT will incur losses on the collateral if there are defaults and resulting losses upon disposition of the manufactured homes. Losses will be borne initially by MERIT to the extent that the collateral value exceeds the principal balance of the bonds and thereafter by the bonds in reverse order of seniority.

---

This summary provides a very broad overview of the bonds; it does not, however, contain the specific information you will need to consider in making a decision whether to invest in the bonds.

If you are considering an investment in the bonds, you should next review the section "Terms of the Bonds and the Collateral" on page S-1. Before making a final investment decision, you should review:

- this prospectus supplement — for more detailed information on the bonds and the collateral.
- the prospectus — for general information, some of which may not apply to the collateral.

MERIT has included "forward-looking statements" in this Prospectus Supplement. Section 27A of the Securities Act of 1933 defines "forward looking statements" to include statements containing projections of various financial items. Such statements are qualified by important factors discussed in connection therewith that could cause actual results to differ materially from those in the forward-looking statements.



## TERMS OF THE BONDS AND THE COLLATERAL

This term sheet provides an overview. It does not contain all the information that you need to consider in making your investment decision. To understand the terms of the bonds and the characteristics of the manufactured housing installment sales contracts and the additional security for the bonds, read carefully the entire prospectus supplement and the accompanying prospectus.

### THE BONDS

The bonds consist of the offered bonds listed on the cover page and the class B1 bonds, which are not offered hereby.

### Payment Dates

The 28th day of each month (or, if not a business day, then the next business day).

### Interest

*Class Interest Rates.* The class interest rates per annum for the offered bonds are set forth on the cover page, except that on any payment date the class interest rates on the class A2, class A3, class A4, class M1 and class M2 bonds will be capped at the weighted average net interest rate on the contracts.

*Computation.* Interest will be computed on the basis of a 360-day year consisting of twelve 30-day months.

*Accrual Period.* Interest is payable on each payment date for the period commencing on the 1st day of the preceding month through the last day of such month.

### Principal

On each payment date, the trustee will apply the *principal payment amount*, derived generally from principal payments on the manufactured housing installment sales contracts, to pay principal to the bonds.

See "DESCRIPTION OF THE BONDS — Payments of Principal and Interest" on page S-6.

### Redemption

MERIT may, at its option, redeem the bonds in whole, but not in part, or an affiliate of MERIT may effect a mandatory purchase of any class of the bonds in whole, but not in part, on any payment date on or after the earlier of (1) the payment date in August 2004 and (2) the payment date on which, after taking into account payments of principal to be made on such payment date, the aggregate outstanding principal balance of the bonds is less than 35% of the initial aggregate principal balance of the bonds.

The redemption price will be 100% of the aggregate outstanding principal balance of the bonds redeemed, plus accrued and unpaid interest.

See "DESCRIPTION OF THE BONDS — Optional Redemption" on page S-13 and "DESCRIPTION OF THE BONDS — Redemption" in the Prospectus.

### Denominations

MERIT will issue the bonds in book-entry form in minimum denominations of $100,000 and in integral multiples of $1,000 in excess thereof. See "DESCRIPTION OF THE BONDS — Book-Entry Bonds" on page S-6 and "DESCRIPTION OF THE BONDS — Book-Entry Procedures" in the Prospectus.

### THE COLLATERAL

The collateral for the bonds is approximately $303,975,556 principal amount of initial manufactured housing installment sales contracts (as of August 10, 1999) and $75,000,000 of funds which are intended to be used to acquire up to approximately $85,714,000 of manufactured housing installment sales contracts before November 26, 1999. The contracts will consist of the initial contracts and any subsequent contracts purchased by MERIT. The purchase of subsequent contracts will increase the aggregate principal balance of the contracts and decrease the amount in the pre-funding account by an offsetting amount.

To the extent MERIT does not use the entire $75,000,000 to purchase additional contracts, the remaining amount will be applied to pay down principal of the bonds not later than the November 1999 payment date.

### A. Initial Contracts

*Whenever there is a reference in this Prospectus Supplement to a percentage of, or to the characteristics of, the initial contracts, the calculations are approximate and are based on the unpaid principal balances of the initial contracts as of August 10, 1999, when the aggregate unpaid principal balance of the intial contracts was expected to be $303,975,556. However, the contracts on which those calculations are based do not include initial contracts pledged to secure the bonds and acquired by MERIT prior to the closing date but after those calculations were made. In addition, certain contracts on which those calculations are based may be included among the initial contracts pledged to secure the bonds as of the closing date. The initial contracts are now expected to have an aggregate unpaid principal balance of approximately $322,453,213 as of August 10, 1999. See "SECURITY FOR THE BONDS" — Additional Information" on page S-17.*

*The initial contracts will have the characteristics set forth below.*

| | |
|---|---|
| Aggregate unpaid principal balances: | $303,975,556 |
| Average unpaid principal balance: | $44,617 |
| Range of unpaid principal balances: | $773 to $165,506 |
| Weighted average loan-to-value ratio: | 87.27% |
| Range of interest rates: | 5.75 % to 14.25% |
| Weighted average interest rate: | 8.88% |
| Weighted average remaining amortization term: | 318 months |
| Range of remaining amortization terms: | 23 to 360 months |
| Administrative cost rate (including the servicing fee): | 1.02% |
| Administrative cost rate (excluding the servicing fee): | 0.02% |

*Administrative Cost Rate*

The administrative cost rate per annum with respect to each contract equals the sum of (1) the servicing fee rate (if Dynex Services is no longer the Servicer) (2) master servicing fee rate, (3) the rate used to calculate certain administrative expenses applicable to such contract and (4) the fees of any special servicer.

### B. Collateral Proceeds Account

The servicer of the contracts must remit collections and advances on the contracts monthly to the master servicer, who in turn must remit collections and advances to the collateral proceeds account held by the trustee. The trustee will apply collections and advances to the payment of interest and principal due on the bonds and certain administrative fees and expenses. After making required payments on each payment date, the trustee will release any remaining amounts to MERIT. See "SECURITY FOR THE BONDS — Collateral Proceeds Account" in the Prospectus.

### C. Credit Enhancement; Subordination

Credit enhancement for the class A1, class A2, class A3 and class A4 bonds will be provided through (1) limited overcollateralization, *i.e.*, the pledge of collateral having a principal amount in excess of the original principal balance of the bonds and the deposit of other assets in the collateralization fund as described below, (2) the excess of interest received on the collateral over interest paid on the bonds on any payment date and (3) the subordination of the class B1, class M2 and class M1 bonds. Credit enhancement for the class M1 and class M2 bonds will be provided through (1) the limited overcollateralization and excess interest described above and (2) in the case of the class M1 bonds, the subordination of the class B1 and class M2 bonds and (3) in the case of the class M2 bonds, the subordination of the class B1 bonds. Losses borne by the bonds will be borne in reverse order of seniority.

On the closing date, MERIT expects to deposit in the collateralization fund (which will not be part of the REMIC), as additional security for the bonds, manufactured housing installment sales contracts with an unpaid principal balance as of August 10, 1999, equal to approximately $15,104,304 (of which approximately $5,064,894 are nonperforming). For purposes of calculating the value of the fund, the contracts initially deposited will be deemed to have a balance equal to 34.97% of their principal balances. On that basis, the initial balance in this fund is deemed to be approximately $5,281,975. MERIT may substitute eligible investments (as defined in the indenture) for the assets initially deposited in the collateralization fund. MERIT will not have any other obligation to make deposits to the collateralization fund.

The collateralization fund balance and actual percentages may be lower or higher depending on the final requirements of the rating agencies. See "DESCRIPTION OF THE BONDS — Collateralization Fund" on page S-8.

### SERVICERS AND MASTER SERVICER

Dynex Financial, Inc., doing business as Dynex Services, an affiliate of MERIT, services all the contracts; GreenPoint Credit Corp. is the stand-by servicer for the contracts.

Dynex Capital, Inc., an affiliate of MERIT, serves as master servicer and Norwest Bank Minnesota, National Association, serves as stand-by master servicer.

The servicer (and the stand-by servicer) will be entitled to a servicing fee and the master servicer (and the stand-by master servicer) will be entitled to a master servicing fee from interest collected on the contracts.

### Advances

On or before each payment date, the servicer must (subject to the limitations provided in its servicing agreement) make a cash advance with respect to any delinquent contract in an amount equal to the sum of (1) the scheduled payment (the interest portion only in the case of simple interest contracts and, in any case, without deduction for the servicing fee so long as Dynex Services is the servicer of the contracts), (2) amounts for the payment of assessments, insurance premiums and property protection expenses and (3) amounts to cover expenses relating to foreclosure and liquidation. The master servicer and the trustee (in that order) must make any required advance if it has not otherwise been made. Norwest, as stand-by master servicer, will not be obligated to pay any advances. In addition, neither the master servicer nor the trustee must make any advance if it has determined in its good faith business judgment that such advance would not be recoverable from proceeds of the collateral. See "SERVICING OF THE COLLATERAL" in the Prospectus.

## RISK FACTORS

Prospective bondholders should consider the following factors (as well as the factors set forth under "RISK FACTORS" in the Prospectus) in connection with a purchase of the bonds.

**You may have losses on your bonds if the losses and delinquencies on contracts exceed certain levels**

Manufactured housing generally depreciates in value. If it does, the market values of the manufactured homes could be less than the principal balances of the contracts that they secure. This may cause more defaults and may increase the amount of loss following default. In such event, MERIT may not be able to recover the full amount owed, which may result in a loss on your bonds. See "RISK FACTORS — Manufactured Housing Loans" in the Prospectus for a discussion of other risk factors relating to manufactured housing contracts.

**Subordination mechanics place risk of loss on the class M1 and class M2**

Under the cash flow mechanics of the indenture:
- the class M1 bonds will receive payments only after required payments are made to the class A1, class A2, class A3 and class A4 bonds; and
- the class M2 bonds will receive payments only after required payments are made to the class A1, class A2, class A3, class A4 and the class M1 bonds.

If the trustee does not have sufficient funds to pay interest to all classes of bonds, the shortfall will be borne by the bonds in reverse order of seniority (beginning with the class B1 bonds).

If the servicer disposes of a contract at a loss, the aggregate principal balances of the bonds may exceed the aggregate unpaid principal balances of the contracts.

You should fully consider the subordination risks associated with an investment in the class M1 or class M2 bonds, including the possibility that you may not fully recover your initial investment if losses on the contracts exceed the principal balances of subordinated classes of bonds that are not offered hereby.

**Uncertain timing of principal payments may result in reinvestment risk**

Unlike standard corporate bonds, principal payments on the bonds are not fixed and will be determined by, among other things:
- the timing and amount of principal payments (including prepayments, defaults, liquidations and repurchases) on the contracts, which are subject to a variety of economic, geographic, legal, tax, and social factors primarily because the contracts are generally prepayable by the borrowers at any time; and
- the principal payment structure (including redemption provisions) of the bonds.

Faster prepayment rates, which are generally associated with a declining interest rate environment, will reduce the weighted average life of the bonds. If there is a significant decline in prevailing interest rates, the price of a bond that is trading at or above par will not increase to the same extent as the price of a standard corporate bond with a comparable interest rate. Furthermore, bondholders will be unable to achieve comparable yields on the available investment alternatives in such a reduced interest rate environment. Conversely, slower prepayment rates, which are generally associated with an increasing interest rate environment, will increase the weighted average life of the bonds and decrease the funds available to a bondholder to reinvest in higher yielding investment alternatives.

Furthermore, MERIT will apply any funds remaining in the pre-funding account at the end of the funding period which it does not use to purchase subsequent contracts to pay down the principal of the bonds.

See "MATURITY AND PREPAYMENT CONSIDERATIONS" on page S-21 and "YIELD CONSIDERATIONS" on page S-26. See also "YIELD CONSIDERATIONS" and "RISK FACTORS — Average Life and Yield Considerations" in the Prospectus.

| | |
|---|---|
| **Termination of Servicer and Master Servicer** | The initial term of the servicing agreement with Dynex Services and the master servicing agreement with Dynex expires December 31, 1999. Those agreements may be renewed for subsequent quarterly terms by the trustee, but only if the trustee receives a letter from Fitch IBCA, Inc., in its capacity as one of the rating agencies, confirming that such renewal will not result in a downgrading of its rating of any of the bonds. In addition, the servicing agreement includes triggers that may result in termination if Dynex Services' servicing performance does not meet required standards. If either agreement is not renewed or is terminated, there may be disruptions in the administration of the contracts. In particular, it is likely that delinquencies on the contracts will increase temporarily, possibly resulting in increased losses, until the stand-by servicer has completed the logistical processes necessary to render it fully capable of servicing the contracts effectively. See "SERVICING OF THE COLLATERAL — General — *Terms of Servicing and Master Servicing Arrangements*" on page S-20. Furthermore, if the stand-by servicer becomes the servicer, the cap on the class interest rate on the class M1 and class M2 bonds would be reduced by 1% because the weighted average net rate on the contracts would thereafter be calculated after deducting the servicing fee. |
| **Maturity of important Dynex credit facilities** | Dynex, the master servicer and MERIT's and IHC's parent corporation, currently has recourse credit facilities aggregating in excess of $1 billion. Dynex has not obtained replacement financing for a $100 million credit facility secured by loans serviced by AutoBond Acceptance Corp., that expires in September 1999. |
| | Dynex has obtained a temporary injunction to compel AutoBond and its affiliates to release to Dynex the related loan files and servicing rights. Nevertheless, Dynex can give no assurance as to when it will actually obtain the related loan files and servicing rights. Dynex believes that, if AutoBond and its affiliates do not release the servicing files, it will be difficult for Dynex to secure replacement financing for its credit facility that expires in September 1999. Moreover, regardless of the location of the servicing files, it may be difficult for Dynex to secure such replacement financing. |
| | Dynex's credit facilities contain "cross-default" provisions that cause a default on any one credit facility to be a default on each. If Dynex does not secure new sources of credit or obtain an extension of existing facilities, it may default on one or more of its facilities, including the credit facility that expires in September 1999. If a default occurs, Dynex may not be able to master service the contracts and payments to bondholders may be delayed or challenged. |
| **Dynex is proposing to sell Dynex Financial, Inc.** | Dynex announced during the second quarter of 1999 that it had retained Lehman Brothers Inc., one of the underwriters of the offered bonds, as an advisor to assist in the sale of Dynex Financial, Inc. (which includes the servicer of the contracts, Dynex Services). Dynex has not yet identified a purchaser for Dynex Financial, Inc. Dynex can give no assurances as to when or if Dynex Financial, Inc. will be sold or what the effect of a sale would be on the servicing of the contracts securing the bonds. |
| **Bonds are non-recourse** | The bonds will be non-recourse obligations of MERIT. The bondholders will have no rights or claims against MERIT directly for the payment of principal of and interest on the bonds and may look only to the collateral pledged to the trustee as security for the bonds to satisfy MERIT's obligations to make interest and principal payments on the bonds. No other person has guaranteed or insured the bonds. The bonds will be particularly sensitive to the loss experience of the collateral. |
| | Each bondholder will be deemed, by acceptance of its bond, to have agreed not to file or cause a filing against MERIT of an involuntary petition under any bankruptcy or receivership law for a period of one year and one day following the payment in full of the bonds and any other bonds of MERIT. |
| | See "YIELD CONSIDERATIONS — Subordination" on page S-27. |

| | |
|---|---|
| **Insolvency of the seller could cause payment delays** | MERIT believes that the transfer of the collateral by Issuer Holding Corp., an affiliate of MERIT, to MERIT constitutes an absolute and unconditional sale. Nevertheless, in the event of the bankruptcy of Issuer Holding Corp., a trustee in bankruptcy, or Issuer Holding Corp. itself as debtor-in-possession, could attempt to recharacterize the sale as a borrowing secured by a pledge of that collateral. Such an attempt, even if unsuccessful, could result in delays in payments on the bonds. Furthermore, if such an attempt were successful, the trustee in bankruptcy, or Issuer Holding Corp. itself as debtor-in-possession, could elect to accelerate payment of the bonds and liquidate the collateral, with the holders of the bonds entitled to no more than the then outstanding principal balance, if any, of such bonds together with interest at the applicable class interest rate to the date of payment. In the event of an acceleration of the bonds, the holders of the bonds would lose the right to future distributions of interest and might suffer reinvestment risk in a lower interest rate environment. |
| **Delinquencies may indicate risk of future losses** | Approximately 1.36% of the initial contracts were delinquent by one or more scheduled payments as of August 10, 1999. The inclusion of delinquent contracts may affect the rate of defaults on the collateral for the bonds and result in increased losses on the collateral. Defaults may result in principal prepayments on the bonds, may result in losses on the bonds and may affect the yield on the bonds. See "SECURITY FOR THE BONDS —The Initial Contracts" on page S-14. |
| **Geographic concentration may increase risk of loss** | The initial contracts are secured by properties located in Texas (19%), North Carolina (13%), Georgia (10%), South Carolina (8%) and Michigan (7%). Consequently, prepayments and losses on the contracts and resulting payments and potential losses on the bonds may be affected significantly by changes in the housing markets and the regional economy of, and by the occurrence of natural disasters in, those states. |
| **No secondary market may develop for the bonds** | There is currently no secondary market for the bonds. The underwriters intend to establish a market in the bonds but are not obligated to do so. There is no assurance that any such market, if established, will continue or that any investor will be able to sell any of the bonds at a price equal to or greater than the price at which they were purchased. |
| **Computer risks associated with Year 2000** | The master servicer and the servicer have each taken action intended to assure that their computer systems are "year 2000 compliant". See "SECURITY FOR THE BONDS — Year 2000 Readiness Disclosure" on page S-17. Nevertheless, if its computer systems or the computer systems of other financial intermediaries are not "year 2000 compliant" MERIT could experience disruptions in collecting payments on the contracts and in making payments on the bonds. See "DESCRIPTION OF THE BONDS — Book-Entry Bonds — *DTC Year 2000 Compliance*" on page S-6. |
| **New Legislation Could Cause Delays in Payments to You** | In July 1999, the President signed into law the Year 2000 Act, which generally limits legal liability for losses caused by year 2000 computer-related errors. Among other things, the legislation provides a grace period from foreclosures for delinquent obligors whose monthly payments are not processed in an accurate or timely manner because of an actual year 2000 computer failure. |
| | The Year 2000 Act does not extinguish an obligor's payment obligations but only delays their enforcement. The Year 2000 Act could delay the servicer's ability to repossess or foreclose upon some manufactured homes during the first quarter of the year 2000. These delays, in turn, could delay payment to you. |

## DESCRIPTION OF THE BONDS

### General

The following summary of the provisions of the Bonds and the Indenture does not purport to be complete and is subject to, and qualified in its entirety by reference to, the provisions of the Prospectus and the Indenture. Reference is made to the Prospectus for important information in addition to that set forth herein regarding the terms and conditions of the Bonds.

The Bonds will be non-recourse obligations of MERIT. See "RISK FACTORS — Bonds are non-recourse" on page S-4.

The majority of the capitalized terms used in the balance of this Prospectus Supplement are defined under "— Definitions", on page S-8 and "— SECURITY FOR THE BONDS — The Collateral" on page S-14.

### Book-Entry Bonds

*General.* The Bonds will be Book-Entry Bonds, which will be represented by one or more certificates registered in the name of a nominee of The Depository Trust Company ("DTC"), and beneficial interests therein will be held by investors through the book-entry facilities of DTC, as described herein, in minimum denominations of $100,000 and integral multiples of $1,000 in excess thereof, except that, for each Class of Bonds, one Bond may be issued in a different denomination. MERIT has been informed by DTC that its nominee will be Cede & Co. ("Cede"). Accordingly, Cede is expected to be the holder of record of the Book-Entry Bonds. No person acquiring a Book-Entry Bond (each, a "beneficial owner") will be entitled to receive a physical certificate representing such Bond. A beneficial owner's interest in a Bond will be evidenced by appropriate entries on the books and records of one or more financial intermediaries (including a DTC Participant). Payments on Book-Entry Bonds will be effected by credits to accounts maintained on the books and records of such financial intermediaries for the benefit of the beneficial owners. See "DESCRIPTION OF THE BONDS — Book-Entry Procedures" in the Prospectus.

*DTC Year 2000 Compliance.* DTC management is aware that some computer applications, systems, and the like for processing data ("Systems") that are dependent upon calendar dates, including dates before, on, and after January 1, 2000, may encounter "Year 2000 problems". DTC has informed its Participants and other members of the financial community (the "Industry") that it has developed and is implementing a program so that its Systems, as the same relate to the timely payment of distributions (including principal and income payments) to securityholders, book-entry deliveries, and settlement of trades within DTC ("DTC Services"), continue to function appropriately. This program includes a technical assessment and a remediation plan, each of which is complete. Additionally, DTC's plan includes a testing phase, which is expected to be completed within appropriate time frames.

However, DTC's ability to perform properly its services is also dependent upon other parties, including, but not limited to, issuers and their agents, as well as third party vendors from whom DTC licenses software and hardware, and third party vendors on whom DTC relies for information or the provision of services, including telecommunication and electrical utility service providers, among others. DTC has informed the Industry that it is contacting (and will continue to contact) third party vendors from whom DTC acquires services to: (i) impress upon them the importance of such services being Year 2000 compliant; and (ii) determine the extent of their efforts for Year 2000 remediation (and, as appropriate, testing) of their services. In addition, DTC is in the process of developing such contingency plans as it deems appropriate.

### The Trustee

Chase Bank of Texas, National Association, will act as Trustee for the Bonds. As of the date of this Prospectus Supplement, the mailing address of the Trustee's corporate trust office is 600 Travis, 10th Floor, Houston, Texas 77002, and its telephone number is (713) 216-4181.

### Payments of Principal and Interest

*Payment Dates*

The Payment Dates for the Bonds will be the 28th day of each month (or, if such day is not a Business Day, then the next succeeding Business Day), commencing September 1999. For accounting purposes, the Payment Date will be deemed to occur on the 28th day of the month without regard to whether such day is a Business Day.

*Interest Payments*

Interest on each Class of Bonds will be determined based on a 360-day year of twelve 30-day months. The interest payable on any Class on any Payment Date will be the interest accrued on the respective outstanding principal balance at the respective Class Interest Rate during the applicable Accrual Period.

Interest payments allocated to a Class of Bonds on any Payment Date will be paid to the Holders of the Bonds of such Class *pro rata* in the proportion that the outstanding principal balance of each Bond of such Class bears to the aggregate outstanding principal balance of all Bonds of such Class.

On each Payment Date, the Interest Payment Amount will be applied in the following order of priority:

> First, to pay Current Interest with respect to the Class A1, Class A2, Class A3 and Class A4 Bonds *pro rata* (based on the amounts of Current Interest then due on the Class A1, Class A2, Class A3 and Class A4 Bonds, respectively);
>
> Second, to pay Current Interest with respect to the Class M1 Bonds;
>
> Third, to pay Current Interest with respect to the Class M2 Bonds;
>
> Fourth, to pay Current Interest with respect to the Class B1 Bonds;
>
> Fifth, so long as Dynex Services is the Servicer, to pay the Servicing Fees with respect to the Contracts;
>
> Sixth, to be included in the Principal Payment Amount to the extent required by the definition thereof; and
>
> Seventh, any remainder to be applied in accordance with the Indenture, after which it will no longer serve as security for the Bonds.

### *Principal Payments*

Principal payments allocated to a Class of Bonds on any Payment Date will be paid to the Holders of the Bonds of such Class *pro rata* in the proportion that the outstanding principal balance of each Bond of such Class bears to the aggregate outstanding principal balance of all Bonds of such Class.

On each Payment Date prior to September 2004, the Principal Payment Amount will be applied in the following order of priority:

> First, to pay the Class A1, Class A2, Class A3 and Class A4 Bonds until paid in full, the Principal Payment Amount to be paid sequentially in that order so that no such payment will be made to the Class A2, Class A3 and Class A4 Bonds until the Class A1 Bonds are paid in full, no such payment will be made to the Class A3 and Class A4 Bonds until the Class A2 Bonds are paid in full and no such payment will be made to the Class A4 Bonds until the Class A3 Bonds are paid in full; *provided, however,* that, on any Payment Date on which the aggregate principal balance of the Class A1, Class A2, Class A3 and Class A4 Bonds is equal to or greater than the aggregate Unpaid Principal Balance of the Contracts, the Principal Payment Amount will be paid *pro rata* to the Class A1, Class A2, Class A3 and Class A4 Bonds (based on principal balances);
>
> Second, to pay the Class M1 Bonds until paid in full;
>
> Third, to pay the Class M2 Bonds until paid in full;
>
> Fourth, to pay the Class B1 Bonds until paid in full; and
>
> Fifth, any remainder to be applied in accordance with the Indenture, after which it will no longer serve as security for the Bonds.

On each Payment Date on and after the September 2004 Payment Date, the Principal Payment Amount will be applied in the following order of priority:

> First, to pay the Senior Principal Payment Amount to the Class A1, Class A2, Class A3 and Class A4 Bonds until paid in full, the Senior Principal Payment Amount to be paid sequentially in that order so that no such payment will be made to the Class A2, Class A3 and Class A4 Bonds until the Class A1 Bonds are paid in full, no such payment will be made to the Class A3 and Class A4 Bonds until the Class A2 Bonds are paid in full and no such payment will be made to the Class A4 Bonds until the Class A3 Bonds are paid in full; *provided, however,* that, on any Payment Date on which the aggregate principal balance of the Class A1, Class A2, Class A3 and Class A4 Bonds is equal to or greater than the aggregate Unpaid Principal Balance of the Contracts, the Senior Principal Payment Amount will be paid *pro rata* to the Class A1, Class A2, Class A3 and Class A4 Bonds (based on principal balances);
>
> Second, to pay the Class M1 Principal Payment Amount to the Class M1 Bonds until paid in full;
>
> Third, to pay the Class M2 Principal Payment Amount to the Class M2 Bonds until paid in full;
>
> Fourth, to pay the Class B1 Principal Payment Amount to the Class B1 Bonds until paid in full;

Fifth, to pay the Overcollateralization Principal Payment Amount as follows: (a) first, to pay principal of the Class B1 Bonds until paid in full; (b) second, to pay principal of the Class M2 Bonds until paid in full; (c) third, to pay principal of the Class M1 Bonds until paid in full; (d) fourth, to pay principal of the Class A1, Class A2, Class A3 and Class A4 Bonds, sequentially in that order, in each case until paid in full; and

Sixth, any remainder to be applied in accordance with the Indenture, after which it will no longer serve as security for the Bonds.

### Collateralization Fund

On the Closing Date, MERIT will establish a fund (the "Collateralization Fund"), which will not be part of the REMIC, with the Trustee and deposit therein, as additional security for the Bonds, manufactured housing installment sales contracts with an unpaid principal balance as of August 10, 1999, equal to approximately $15,104,304 (of which approximately $5,064,894 are nonperforming). For purposes of calculating the balance on deposit in the Collateralization Fund, the balance of the contracts initially deposited is deemed to be 34.97% of their outstanding principal balance. On that basis, the balance initially deposited in the Collateralization Fund is deemed to be approximately $5,281,975. MERIT may substitute Eligible Investments for the assets initially deposited in the Collateralization Fund and invest all payments received with respect to such assets in Eligible Investments. MERIT will not have any other obligation to make deposits to the Collateralization Fund. The actual percentage and Collateralization Fund balance may be higher or lower depending on the final requirements of the Rating Agencies.

On each Payment Date, the Trustee is required, based on written information provided to the Trustee by the Master Servicer prior to each Payment Date: (a) to apply interest earnings on assets in the Collateralization Fund (i) first, to pay interest on the Bonds if the portion of Available Funds attributable to interest is less than Current Interest on all Classes of the Bonds and (ii) second, to increase the Principal Payment Amount to the extent required by the definition thereof; (b) to apply any amounts attributable to principal payments received with respect to the assets on deposit to the Collateralization Fund to increase the Principal Payment Amount to the extent required by the definition thereof; and (c) to release from the Collateralization Fund any interest earnings on assets on deposit in the Collateralization Fund not required to be applied as set forth in clause (a) above. Once released from the Collateralization Fund, such amount will not be available to make payments on the Bonds.

### Pre-Funding Account and Capitalized Interest Account

On the Closing Date, MERIT will establish with the Trustee two funds (the "Pre-Funding Account" and the "Capitalized Interest Account"). The Pre-Funding Account and the Capitalized Interest Account will not be part of the REMIC.

MERIT will deposit $75,000,000 in the Pre-Funding Account on the Closing Date. During the Funding Period, MERIT may use money in the Pre-Funding Account to purchase manufactured housing installment sales contracts ("Subsequent Contracts") at a purchase price equal to 87.50% of the Unpaid Principal Balance of such Subsequent Contracts. Any balance remaining in the Pre-Funding Account at the end of the Funding Period will be added to the Principal Payment Amount on the next Payment Date resulting in an additional prepayment of the principal balance of the Bonds.

MERIT will deposit approximately $1,430,625 in the Capitalized Interest Account. On each Payment Date during the Funding Period the Trustee will withdraw an amount equal to 1/12 of 7.63% of the Pre-Funded Amount from the Capitalized Interest Account and deposit such amount in the Collateral Proceeds Account. Any balance in the Capitalized Interest Account at the end of the Funding Period will be paid to MERIT.

### Definitions

"Administrative Cost Rate": The administrative cost rate per annum with respect to each Contract equals the sum of (1) if the appointment of Dynex Services as Servicer is not renewed, the Servicing Fee Rate (see "SERVICING OF THE COLLATERAL — General — *Terms of Servicing and Master Servicing Arrangements*" on page S-20), (2) the Master Servicing Fee Rate, (3) the rate used to calculate certain administrative expenses applicable to such Contract and (4) the fees of any special servicer.

"Available Funds": On each Payment Date, (a) payments of the principal and interest (at the Net Rate) received in respect of the Contracts during the related Due Period and deposited in the Collateral Proceeds Account less (b) any

reimbursement for Advances made by the Servicer, the Master Servicer and the Trustee and, from and after the occurrence of an Event of Default, all sums due under the Indenture to the Trustee.

"Bonds": The Offered Bonds shown on the cover page and $20,682,000 principal amount of the Class B1 Bonds, which are not offered hereby.

"Class B1 Percentage" With respect to any Payment Date: (a) zero, if the Senior Principal Balance, the Class M1 Principal Balance and the Class M2 Principal Balance have not yet been reduced to zero after application of principal on the current Payment Date and the Class B1 Principal Payment Test is not satisfied or (b) otherwise, a fraction, expressed as a percentage, the numerator of which is the Class B1 Principal Balance as of such Payment Date, and the denominator of which is the sum of: (i) the Senior Principal Balance, (ii) the Class M1 Principal Balance, (iii) the Class M2 Principal Balance, (iv) the Class B1 Principal Balance and (v) if the Overcollateralization Test is satisfied, the Overcollateralization Amount, otherwise zero.

"Class B1 Principal Payment Amount": The product of the Principal Payment Amount and the Class B1 Percentage.

"Class B1 Principal Payment Test": With respect to any Payment Date, the Class B1 Principal Payment Test will be satisfied if each of the following tests is satisfied: (i) a Trigger Event is not in effect, (ii) the sum of the Class B1 Principal Balance, the Overcollateralization Amount and the Collateralization Fund Balance divided by the sum of the Contract Balance and the Collateralization Fund Balance as of the immediately preceding Payment Date must be equal to or greater than 30.625% and (iii) the Class M2 Principal Payment Test is satisfied.

"Class M1 Percentage": With respect to any Payment Date: (a) zero, if the Senior Principal Balance has not yet been reduced to zero after application of principal on the current Payment Date and the Class M1 Principal Payment Test is not satisfied or (b) otherwise, a fraction, expressed as a percentage, the numerator of which is the Class M1 Principal Balance and the denominator of which is the sum of: (i) the Senior Principal Balance, (ii) the Class M1 Principal Balance, (iii) if the Class M2 Principal Payment Test is satisfied, the Class M2 Principal Balance, otherwise zero (iv) if the Class B1 Principal Payment Test is satisfied, the Class B1 Principal Balance, otherwise zero and (v) if the Overcollateralization Test is satisfied, the Overcollateralization Amount, otherwise zero.

"Class M1 Principal Payment Amount": The product of the Principal Payment Amount and the Class M1 Percentage.

"Class M1 Principal Payment Test": With respect to any Payment Date, the Class M1 Principal Payment Test will be satisfied if each of the following tests is satisfied: (i) a Trigger Event is not in effect and (ii) the sum of the Class M1 Principal Balance, the Class M2 Principal Balance, the Class B1 Principal Balance, the Overcollateralization Amount and the Collateralization Fund Balance divided by the sum of the Contract Balance and the Collateralization Fund Balance as of the immediately preceding Payment Date must be equal to or greater than 59.50%.

"Class M2 Percentage": With respect to any Payment Date: (a) zero, if the Senior Principal Balance and the Class M1 Principal Balance have not yet been reduced to zero after application of principal on the current Payment Date and the Class M2 Principal Payment Test is not satisfied or (b) otherwise, a fraction, expressed as a percentage, the numerator of which is the Class M2 Principal Balance and the denominator of which is the sum of: (i) the Senior Principal Balance, (ii) the Class M1 Principal Balance, (iii) the Class M2 Principal Balance, (iv) if the Class B1 Principal Payment Test is satisfied, the Class B1 Principal Balance, otherwise zero and (v) if the Overcollateralization Test is satisfied, the Overcollateralization Amount, otherwise zero.

"Class M2 Principal Payment Amount": The product of the Principal Payment Amount and the Class M2 Percentage.

"Class M2 Principal Payment Test": With respect to any Payment Date, the Class M2 Principal Payment Test will be satisfied if each of the following tests is satisfied: (i) a Trigger Event is not in effect, (ii) the sum of the Class M2 Principal Balance, the Class B1 Principal Balance, the Overcollateralization Amount and the Collateralization Fund Balance divided by the sum of the Contract Balance and the Collateralization Fund Balance as of the immediately preceding Payment Date must be equal to or greater than 42.00% and (iii) the Class M1 Principal Payment Test is satisfied.

"Class Interest Rate": With respect to each Payment Date and the Class A1 Bonds, the Class Interest Rate initially will equal the per annum rate shown in the table on the cover page and, if MERIT or its affiliate does not exercise its option to redeem or effect a mandatory purchase of the Class A1 Bonds on the Payment Date after the First

Optional Redemption Date, such per annum rate will be increased on the Payment Date after the First Optional Redemption Date as set forth in note 2 on the cover page. With respect to each Payment Date and the Class A2, Class A3, Class A4, Class M1 or Class M2 Bonds, the Class Interest Rate will equal the lesser of: (i) the per annum rate shown in the table on the cover page and, if MERIT or its affiliate does not exercise its option to redeem or effect a mandatory purchase of the Class A1, Class A2, Class A3, Class A4, Class M1 or Class M2 Bonds on the Payment Date after the First Optional Redemption Date, such per annum rate will be increased on the Payment Date after the First Optional Redemption Date as set forth in note 2 on the cover page; and (ii) the Weighted Average Net Rate. With respect to each Payment Date and the Class B1 Bonds, the Class Interest Rate will equal the lesser of: (i) 7.88% and, if MERIT or its affiliate does not exercise its option to redeem or effect a mandatory purchase of the Class B1 Bonds on the Payment Date following the First Optional Redemption Date, such per annum rate will be increased on such Payment Date by 1.00%; and (ii) the Weighted Average Net Rate.

"Closing Date": On or about September 2, 1999.

"Collateralization Fund Balance": With respect to each Payment Date, the sum of (a) 34.97% of the unpaid principal balance of the assets in the Collateralization Fund other than Eligible Investments and (b) the principal balance of Eligible Investments held in the Collateralization Fund.

"Contracts": The Initial Contracts and the Subsequent Contracts.

"Contract Balance": With respect to each Payment Date, the sum of (i) the aggregate Unpaid Principal Balances of the Contracts and (ii) the Pre-Funded Amount.

"Cumulative Losses": With respect to any Payment Date, the sum of the Losses for that Payment Date and each preceding Payment Date since August 10, 1999.

"Cumulative Losses Test": With respect to any Payment Date, the Cumulative Losses Test will be satisfied:

 (i) if such Payment Date occurs between September 1, 2004, and August 31, 2005, the Cumulative Losses as of such Payment Date are less than or equal to 8.00% of the Initial Contract Balance; and

 (ii) if such Payment Date occurs on or after September 1, 2005, the Cumulative Losses as of such Payment Date are less than or equal to 9.00% of the Initial Contract Balance.

"Current Interest": With respect to each Class of Bonds and each Payment Date, the interest accrued at the applicable Class Interest Rate for the applicable Accrual Period on the outstanding principal balance of such Class.

"Current Losses Test": With respect to any Payment Date, the aggregate Losses with respect to such Payment Date and the two preceding Payment Dates are less than or equal to 2.75% of the arithmetic average of the Contract Balance for the second preceding Payment Date and the current Payment Date.

"First Optional Redemption Date": The earlier of (i) the Payment Date in August 2004 or (ii) the first Payment Date on which, after taking into account payments of principal to be made on such Payment Date, the aggregate outstanding principal balance of the Bonds is less than 35% of the aggregate principal balance of the Bonds on the Closing Date.

"Funding Period": The period commencing on the date the Bonds are issued and ending on the earlier of (i) the date on which the Pre-Funded Amount is less than $100,000 or (ii) the day before the Master Servicer Remittance Date preceding the Payment Date in November 1999.

"Indenture": The Indenture dated as of November 1, 1994, between MERIT and the Trustee, as amended by a First Supplemental Indenture dated as of November 1, 1994, and as supplemented by the Series 13 Supplement dated as of August 1, 1999.

"Initial Collateralization Fund Balance": The Collateralization Fund Balance as of the Closing Date.

"Initial Contracts": The Contracts pledged to the Trust Estate on the Closing Date.

"Initial Contract Balance": The sum of (i) the Unpaid Principal Balance of the Contracts on the Closing Date and (ii) the Original Pre-Funded Amount.

"Interest Payment Amount": On each Payment Date, the sum of (i) the portion of Available Funds attributable to interest on the Contracts, (ii) the amount withdrawn from the Capitalized Interest Account and deposited in the

Collateral Proceeds Account and (iii) any interest earnings on the Collateralization Fund to the extent required to be used to pay Current Interest on the Bonds.

"Master Servicing Fee Rate": 0.02% per annum.

"Net Rate": The interest rate on a Contract less the Administrative Cost Rate.

"Original Pre-Funded Amount": $75,000,000.

"Overcollateralization Amount": With respect to each Payment Date, the excess of (a) the Contract Balance over (b) the sum of the Senior Principal Balance, the Class M1 Principal Balance, the Class M2 Principal Balance and the Class B1 Principal Balance.

"Overcollateralization Percentage": With respect to any Payment Date, (a) zero, if the Senior Principal Balance, the Class M1 Principal Balance, the Class M2 Principal Balance and the Class B1 Principal Balance have not yet been reduced to zero after application of principal on the Current Payment Date and the Overcollateralization Test is not satisfied or (b) otherwise, a fraction, expressed as a percentage, the numerator of which is the Overcollateralization Amount as of such Payment Date and the denominator of which is the sum of: (i) the Senior Principal Balance, (ii) the Class M1 Principal Balance, (iii) the Class M2 Principal Balance, (iv) the Class B1 Principal Balance and (v) the Overcollateralization Amount.

"Overcollateralization Principal Payment Amount": The product of the Principal Payment Amount and the Overcollateralization Percentage.

"Overcollateralization Test": With respect to any Payment Date, the Overcollateralization Test will be satisfied if each of the following tests is satisfied: (i) the Payment Date occurs during or after September 2004, (ii) a Trigger Event is not in effect, (iii) the sum of the Overcollateralization Amount and the Collateralization Fund Balance divided by the sum of the Contract Balance and the Collateralization Fund Balance as of the immediately preceding Payment Date must be equal to or greater than 21.875%, (iv) the Overcollateralization Amount is not less than 2.00% of the Initial Contract Balance and (v) the Class B1 Principal Payment Test is satisfied.

"Payment Date": The 28th day of each month or, if such day is not a business day, then on the next succeeding business day, commencing on September 28, 1999.

"Pre-Funding Account": The account into which the Original Pre-Funded Amount will be deposited on the Closing Date.

"Pre-Funded Amount": With respect to each Payment Date, the Original Pre-Funded Amount less the amount theretofore applied to purchase Subsequent Contracts.

"Prepayment Period": With respect to each Payment Date, the period commencing on the twenty-first day of the month preceding the month in which the Payment Date is deemed to occur and ending on the twentieth day of the month in which the Payment Date is deemed to occur, except that the first Prepayment Period shall begin on the August 10, 1999, and end on September 20, 1999.

"Principal Balance": With respect to any Payment Date and any Class of Bonds or the Senior Bonds, the outstanding principal balance of such Class or the Senior Bonds, as the case may be.

"Principal Payment Amount": On each Payment Date, the sum of (i) the Available Funds (less the portion thereof attributable to interest) received with respect to the Contracts, (ii) on the Payment Date immediately following the end of the Funding Period any Pre-Funded Amount, (iii) an amount equal to any Losses incurred with respect to the Contracts during the related Prepayment Period to the extent any of the following amounts are available, to be drawn in the following order: (A) cash and cash equivalents in the Collateralization Fund attributable to principal ("Reserve Principal"), (B) the balance of the Interest Payment Amount (after providing for interest then due on the Bonds and the Servicing Fee) ("Excess Interest") and (C) any interest earnings on assets in the Collateralization Fund ("Reserve Interest") and (iv) the amount necessary to be paid as principal on the Bonds in order to ensure that the Subordination Balance will be at least equal to the Target Subordination Balance after payment of current Losses pursuant to clause (iii) above, to the extent any Excess Interest remains.

"Senior Bonds": The Class A1, Class A2, Class A3 and Class A4 Bonds.

"Senior Percentage": With respect to any Payment Date: a fraction, expressed as a percentage, the numerator of which is the Senior Principal Balance and the denominator of which is the sum of: (i) the Senior Principal Balance,

(ii) if the Class M1 Principal Payment Test is satisfied, the Class M1 Principal Balance, otherwise zero, (iii) if the Class M2 Principal Payment Test is satisfied, the Class M2 Principal Balance, otherwise zero, (iv) if the Class B1 Principal Payment Test is satisfied, the Class B1 Principal Balance, otherwise zero and (v) if the Overcollateralization Test is satisfied, the Overcollateralization Amount, otherwise zero.

"Senior Principal Payment Amount": The product of the Principal Payment Amount and the Senior Percentage.

"Servicing Fee Rate": The lesser of (i) 1% per annum and (ii) the amount specified in a servicing agreement as the rate to be used in determining the fee payable to a servicer.

"Sixty-Day Delinquency Ratio": With respect to any Payment Date, a fraction, expressed as a percentage, the numerator of which is the aggregate of the outstanding balances of all Contracts that were 60 days or more delinquent as of the end of the related Due Period (including Contracts in respect of which the related Manufactured Homes have been repossessed but are still in inventory) and the denominator of which is the Contract Balance.

"Subordination Balance": The sum of (A) the Overcollateralization Amount and (B) the Collateralization Fund Balance.

"Subsequent Contracts": The Contracts pledged to the Trust Estate after the Bonds are issued.

"Target Subordination Balance": For any Payment Date prior to the Payment Date occurring in September 2004, 12.50% of the sum of (A) the Initial Contract Balance and (B) the Initial Collateralization Fund Balance. For any Payment Date on or after the Payment Date occurring in September 2004, the lesser of (i) 12.50% of the sum of (A) the Initial Contract Balance and (B) the Initial Collateralization Fund Balance and (ii) 21.875% of the sum of (A) the Contract Balance and (B) the Collateralization Fund Balance.

"Thirty-Day Delinquency Ratio": With respect to any Payment Date, a fraction, expressed as a percentage, the numerator of which is the aggregate of the outstanding balances of all Contracts that were 30 days or more delinquent as of the end of the related Due Period (including Contracts in respect of which the related Manufactured Homes have been repossessed but are still in inventory) and the denominator of which is the Contract Balance.

"Trigger Event": With respect to any Payment Date during or after September 2004, a Trigger Event exists if (i) the Cumulative Losses Test is not satisfied, (ii) the Current Losses Test is not satisfied, (iii) the Thirty-Day Delinquency Ratio exceeds 7.00% or (iv) the Sixty-Day Delinquency Ratio exceeds 5.00%.

"Weighted Average Net Rate": With respect to any Payment Date, the weighted average (by principal balance) of the Net Rates on the Contracts.

The actual percentages in the definitions may be higher or lower depending on the final requirements of the Rating Agencies.

## Events of Default

An Event of Default means any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(i) on any Payment Date, default in the payment of Current Interest on any Senior Bond when the same shall become due and payable (or, after the Senior Bonds have been paid in full, the Class of Bonds then outstanding with the highest seniority), which Default shall continue for a period of five days; or

(ii) on the Stated Maturity Date of any Class of Bonds, default in the payment in full of the outstanding principal balance of any such Class of Bonds; or

(iii) default in the performance, or breach, of any other covenant or warranty of MERIT in the Indenture and continuance of such default or breach for a period of 60 days after there shall have been given, by registered or certified mail, to MERIT by the Trustee or by the Holders of at least 66 2/3% in then outstanding principal balance of the Senior Bonds (or, after the Senior Bonds have been paid in full, the Class of Bonds then outstanding with the highest seniority), a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "Notice of Default" under the Indenture; or

(iv) the entry of a decree or order by a court having jurisdiction in the premises adjudging MERIT bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of MERIT under the federal Bankruptcy Code or any other applicable federal or state law, or appointing a receiver, liquidator, assignee, or sequestrator (or other similar official) of MERIT or of any substantial part of its property, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of 90 consecutive days; or

(v) the institution by MERIT of proceedings to be adjudicated as bankrupt or insolvent, or the consent by it to the institution of bankruptcy or insolvency proceedings against it, or the filing by it of a petition or answer or consent seeking reorganization or relief under the federal Bankruptcy Code or any other similar applicable federal or state law, or the consent by it to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee or sequestrator (or other similar official) of MERIT or of any substantial part of its property, or the making by it of an assignment for the benefit of creditors, or the admission by it in writing of its inability to pay its debts generally as they become due, or the taking of corporate action by MERIT in furtherance of any such action.

Upon the occurrence of a default with respect to any Class of Bonds (without regard to the passage of time or giving of notice, or both) and the continuance of such default for 60 days, the Trustee is required to resign as trustee for any Class of Bonds which is subordinate to the outstanding Class of Bonds with the highest seniority. MERIT is required in such circumstances to appoint one or more separate trustees for the Holders of such Classes of Bonds; *provided, however*, that, if MERIT fails to appoint such separate trustees within 15 days thereafter, the Trustee immediately petition a court of competent jurisdiction to appoint such separate trustees.

Each Bondholder shall be deemed to have agreed, by its acceptance of its Bond, not to file, or join in filing, any petition in bankruptcy or commence any similar proceeding in respect of MERIT for a period of one year and one day following the payment in full of the Bonds and any other bonds of MERIT.

Upon certain Events of Default, the Holders of the Bonds shall have the remedies described in the Indenture. See "THE INDENTURE — Default" in the Prospectus with respect to the rights of the Bondholders. Funds collected by the Trustee following an Event of Default will be applied in the order specified above under "— Payments of Principal and Interest" on page S-6.

**So long as the Senior Bonds (and after the Senior Bonds have been paid in full, the Class M1 Bonds; and after the Class M1 Bonds have been paid in full, the Class M2 Bonds) are outstanding, the failure to pay interest on or principal of all Classes of Bonds subordinate thereto prior to the Stated Maturity Date will not constitute an Event of Default.**

### Losses

Losses with respect to the Contracts will be borne, by virtue of the payment priorities described herein, first, by the cash and cash equivalents on deposit in the Collateralization Fund attributable to principal, second, by any interest received on the Contracts in excess of interest required to be paid on the Bonds on any Payment Date, third, by any interest earnings on assets on deposit in the Collateralization Fund, fourth, by the limited overcollateralization of the Bonds and, fifth, by the Class B1, Class M2 and Class M1 Bonds (in that order) before any losses will be borne by the Class A1, Class A2, Class A3 and Class A4 Bonds. Losses will be borne by the Class A1, Class A2, Class A3 and Class A4 Bonds *pro rata* based on their outstanding principal balance.

### Stated Maturity Dates

The Stated Maturity Dates for the Bonds are set forth on the cover page hereof and represent the dates on which the Bonds are payable in full. The Stated Maturity Dates for the Bonds have been calculated in accordance with the assumptions set forth under "MATURITY AND PREPAYMENT CONSIDERATIONS" on page S-21.

### Optional Redemption

On any Payment Date on or after the earlier of (i) the Payment Date in August 2004 and (ii) the first Payment Date on which, after taking into account payments of principal to be made on such Payment Date, the aggregate outstanding principal balance of the Bonds is less than 35% of the aggregate principal balance of the Bonds on the Closing Date (the "First Optional Redemption Date"), MERIT may redeem the Bonds in whole, but not in part, or

an affiliate of MERIT may effect a mandatory purchase of a Class of Bonds in whole, but not in part, without retiring such Bonds so that a designee of the Issuer has the ability to own or resell such Bonds.

Any such redemption or mandatory purchase will be paid in cash at a price equal to 100% of the aggregate outstanding principal balance of the Class of Bonds so redeemed, plus accrued and unpaid interest for the applicable Accrual Period. See "DESCRIPTION OF THE BONDS — Redemption" in the Prospectus.

Any redemption of a Class of Bonds may have an adverse effect on the yield of such Class, because such redemption would have the same effect on such Class as a prepayment in full of the Contracts. See "YIELD CONSIDERATIONS" on page S-26.

## SECURITY FOR THE BONDS

### The Collateral

The collateral for the Bonds initially will consist of (i) manufactured housing installment sales contracts pledged by MERIT (the "Initial Contracts") and the Original Pre-Funded Amount and (ii) initial deposits by MERIT in the Collateralization Fund and the Capitalized Interest Account.

### The Initial Contracts

The Initial Contracts include both Adjustable Rate Contracts, which provide for adjustments in their interest rates as described below, and Level Payment Contracts, which have fixed annual percentage rates and provide for level monthly payments over their term sufficient to amortize the principal balance in full. 13.65% of the Initial Contracts provide for allocation of payments according to the "actuarial" method (each, an "Actuarial Contract") and the balance provide for allocation of payments according to the simple interest method (each, a "Simple Interest Contract").

The portion of each monthly payment for any Actuarial Contract allocable to principal will be equal to the total amount thereof less the portion allocable to interest. In each month, the portion allocable to interest is a precomputed amount equal to one month's interest on the principal balance determined by reducing the initial principal balance by the principal portion of all monthly payments that were due in prior months (whether or not timely made) and all prior partial principal prepayments. Thus, each payment allocated to a scheduled monthly payment of an Actuarial Contract will be applied to interest and principal in accordance with such allocation whether such monthly payment is received in advance of or subsequent to the date it is due. All payments received on an Actuarial Contract (other than prepayments in full or in part) will be applied when received to current and any previously unpaid monthly payments in the order they were due.

Payments on a Simple Interest Contract will be applied first to interest accrued through the date immediately preceding the date of receipt of payment and then to unpaid principal. Accordingly, if an obligor pays an installment less than one month after the previous payment, the portion of the payment allocable to interest will be less than if the payment had been made when due, the portion of the payment applied to reduce the principal balance will be correspondingly greater, and the principal balance will be amortized more rapidly than scheduled. Conversely, if an obligor pays an installment more than one month after the previous payment, the portion of the payment allocable to interest for the payment period will be greater than if the payment had been made when due, the portion of the payment applied to reduce the principal balance will be correspondingly less, and the principal balance will be amortized more slowly than scheduled, in which case a larger portion of the principal balance may be due on the final scheduled payment date.

Whenever reference is made herein to a percentage of the Initial Contracts or to the characteristics of the Initial Contracts, the calculation is approximate and is based on the Unpaid Principal Balances of the Initial Contracts as of August 10, 1999.

All the Initial Contracts have an original term to maturity of not more than 30 years. The weighted average remaining term to stated maturity of the Initial Contracts was 318 months. 1.69% of the Initial Contracts were Adjustable Rate Contracts and 98.31% were Level Payment Contracts.

As specified in the related Contract, the interest rate on each Adjustable Rate Contract will adjust on each Interest Adjustment Date applicable thereto to a rate that is calculated in accordance with the average of LIBOR for six-month Eurodollar deposits in the London market based on quotations of major banks as published either by Fannie Mae or *The Wall Street Journal* (the "Six-Month LIBOR Index") and a fixed percentage (the "Gross Margin"), subject to, in most

cases, (i) a maximum periodic increase or decrease of 1% per annum (a "Periodic Rate Cap") and (ii) any minimum and maximum lifetime interest rate. Adjustments are subject to Periodic Rate Caps, and minimum and maximum lifetime interest rates, and, accordingly, the interest rate on any such Adjustable Rate Contract, as adjusted on any Interest Adjustment Date, may not equal the sum of the Six-Month LIBOR Index and the applicable Gross Margin.

With respect to the Initial Contracts, (i) the interest rates range from 5.75% to 14.25%, with a weighted average interest rate of 8.88% . For the Adjustable Rate Contracts, (i) the weighted average Gross Margin is 5.80%, (ii) the maximum lifetime interest rates range from 11.25% to 16.25%, with a weighted average maximum lifetime interest rate of 14.26%, and (iii) the minimum lifetime interest rates range from 6.25% to 11.25%, with a weighted average minimum lifetime interest rate of 9.26%. In no case will the minimum lifetime interest rate of an Adjustable Rate Contract be less than the Gross Margin of such Contract.

***Delinquencies.*** Delinquencies with respect to the Initial Contracts are as follows:

| 31 to 60 days | 61 days and greater | Total |
|---|---|---|
| 1.36% | 0.0% | 1.36% |

Nonperforming manufacturing housing installment sales contracts having an aggregate unpaid principal balance of $5,064,894 have been deposited in the Collateralization Fund. If those contracts had been included in the Initial Contracts, the delinquency percentages set forth above would have been higher.

## Selected Initial Contract Data

The Initial Contracts and related properties securing the Initial Contracts have the characteristics set forth in the following tables as of August 10, 1999. The characteristics of the Initial Contracts actually pledged to secure the Bonds may vary from information set forth herein due to a number of factors, including prepayments, delinquencies and losses with respect to the Initial Contracts from August 10, 1999 to the Closing Date and the acquisition of additional Contracts by MERIT before the Closing Date. Asterisks (*) in the following tables indicate values between 0.0% and 0.5%. Whenever reference is made in the tables to a percentage of the Initial Contracts, such percentage is based on the aggregate Unpaid Principal Balance of the Initial Contracts as of August 10, 1999. Percentages may not sum to 100% due to rounding.