*Exhibit 3, Part 2*
*to Declaration of Terence J. Rasmussen*
*In Support of Motion to Dismiss the*
<u>*Second Amended Class Action Complaint*</u>

## Selected Data for Initial Contracts

### 1) Current Unpaid Principal Balance

| Current Unpaid Principal Balance ($) | Number of Loans | Unpaid Principal Balance ($) | Unpaid Principal Balance (%) |
|---|---|---|---|
| 1 - 10,000 | 42 | 320,757 | * |
| 10,001 - 20,000 | 371 | 5,976,386 | 2 |
| 20,001 - 30,000 | 1,192 | 30,680,571 | 10 |
| 30,001 - 40,000 | 1,624 | 56,723,964 | 19 |
| 40,001 - 50,000 | 1,281 | 57,455,345 | 19 |
| 50,001 - 60,000 | 1,030 | 56,362,513 | 19 |
| 60,001 - 70,000 | 620 | 40,006,346 | 13 |
| 70,001 - 80,000 | 276 | 20,571,042 | 7 |
| 80,001 - 90,000 | 176 | 14,902,195 | 5 |
| 90,001 - 100,000 | 105 | 9,917,317 | 3 |
| 100,001 - 110,000 | 43 | 4,498,417 | 1 |
| 110,001 - 120,000 | 27 | 3,077,043 | 1 |
| 120,001 - 130,000 | 12 | 1,502,560 | * |
| 130,001 - 170,000 | 14 | 1,981,099 | 1 |
| Totals: | 6,813 | 303,975,556 | 100 |

The average Unpaid Principal Balance is $44,617, the maximum Unpaid Principal Balance is $165,506 and the minimum Unpaid Principal Balance is $773.

### 2) Remaining Term to Stated Maturity

| Remaining Term (Months) | Number of Loans | Unpaid Principal Balance ($) | Unpaid Principal Balance (%) |
|---|---|---|---|
| 1 - 150 | 364 | 7,617,374 | 3 |
| 151 - 210 | 638 | 18,496,195 | 6 |
| 211 - 250 | 943 | 32,578,389 | 11 |
| 251 - 290 | 307 | 10,944,932 | 4 |
| 291 - 330 | 313 | 11,252,570 | 4 |
| 331 - 340 | 1,152 | 54,102,890 | 18 |
| 341 - 350 | 29 | 1,519,853 | * |
| 351 - 355 | 100 | 5,840,873 | 2 |
| 356 - 360 | 2,967 | 161,622,480 | 53 |
| Totals: | 6,813 | 303,975,556 | 100 |

The weighted average remaining term to stated maturity is 318 months.

### 3) Original Loan-to-Value Ratio[1]

| Original LTV Ratio(%) | Number of Loans | Unpaid Principal Balance ($) | Unpaid Principal Balance (%) |
|---|---|---|---|
| 50.00 and below | 100 | 2,394,193 | 1 |
| 50.01 - 55.00 | 47 | 1,348,687 | * |
| 55.01 - 60.00 | 59 | 2,087,418 | 1 |
| 60.01 - 65.00 | 77 | 2,928,879 | 1 |
| 65.01 - 70.00 | 119 | 5,632,169 | 2 |
| 70.01 - 75.00 | 187 | 9,220,325 | 3 |
| 75.01 - 80.00 | 567 | 27,120,170 | 9 |
| 80.01 - 85.00 | 936 | 44,454,166 | 15 |
| 85.01 - 90.00 | 2,376 | 107,262,851 | 35 |
| 90.01 - 95.00 | 2,185 | 95,182,421 | 31 |
| 95.01 - 100.00 | 160 | 6,344,277 | 2 |
| Totals: | 6,813 | 303,975,556 | 100 |

(1) The Loan-to-Value Ratio of a Contract is equal to the ratio (expressed as a percentage) of the original amount financed and the fair market value of the property at the time of origination. The fair market value of the manufactured homes is the total amount of the related contract plus any cash downpayment and the value of any trade-in and in the case of a land-secured Contract, the value of the land securing the Contract as appraised at origination. The weighted average original loan-to-value ratio is 87.27%.

### 4) Current Interest

| Current Interest Rates (%) | Number of Loans | Unpaid Principal Balance ($) | Unpaid Principal Balance (%) |
|---|---|---|---|
| 5.750 - 5.999 | 36 | 3,064,086 | 1 |
| 6.250 - 6.499 | 42 | 3,206,816 | 1 |
| 6.500 - 6.749 | 77 | 5,960,790 | 2 |
| 6.750 - 6.999 | 352 | 22,024,556 | 7 |
| 7.000 - 7.249 | 42 | 2,779,984 | 1 |
| 7.250 - 7.499 | 222 | 13,585,872 | 4 |
| 7.500 - 7.749 | 396 | 21,260,731 | 7 |
| 7.750 - 7.999 | 566 | 28,564,431 | 9 |
| 8.000 - 8.249 | 154 | 8,007,648 | 3 |
| 8.250 - 8.499 | 346 | 18,156,718 | 6 |
| 8.500 - 8.749 | 438 | 21,682,709 | 7 |
| 8.750 - 8.999 | 527 | 22,802,875 | 8 |
| 9.000 - 9.249 | 195 | 8,938,277 | 3 |
| 9.250 - 9.499 | 363 | 13,782,444 | 5 |
| 9.500 - 9.749 | 462 | 19,055,218 | 6 |
| 9.750 - 9.999 | 645 | 25,009,662 | 8 |
| 10.000 - 10.249 | 93 | 3,868,033 | 1 |
| 10.250 - 10.499 | 289 | 10,391,319 | 3 |
| 10.500 - 10.749 | 361 | 12,939,062 | 4 |
| 10.750 - 10.999 | 336 | 12,100,451 | 4 |
| 11.000 - 11.249 | 88 | 3,358,816 | 1 |
| 11.250 - 11.499 | 136 | 4,381,626 | 1 |
| 11.500 - 11.749 | 235 | 7,506,391 | 2 |
| 11.750 - 11.999 | 148 | 4,344,173 | 1 |
| 12.000 - 12.249 | 43 | 1,232,446 | * |
| 12.250 - 12.499 | 85 | 2,251,901 | 1 |
| 12.500 - 12.749 | 43 | 1,324,724 | * |
| 12.750 - 12.999 | 42 | 1,144,613 | * |
| 13.000 - 13.249 | 5 | 141,465 | * |
| 13.250 - 13.499 | 32 | 821,845 | * |
| 13.500 - 13.749 | 5 | 89,650 | * |
| 13.750 - 13.999 | 8 | 188,569 | * |
| 14.000 - 14.250 | 1 | 7,654 | * |
| Totals: | 6,813 | 303,975,556 | 100 |

The weighted average current interest rate per annum is 8.88%.

### 5) State Distribution of Properties

| State | Number of Loans | Unpaid Principal Balance ($) | Unpaid Principal Balance (%) |
|---|---|---|---|
| Texas | 1,400 | 57,296,309 | 19 |
| North Carolina | 742 | 38,483,485 | 13 |
| Georgia | 669 | 29,131,048 | 10 |
| South Carolina | 542 | 25,036,353 | 8 |
| Michigan | 486 | 20,182,848 | 7 |
| Kentucky | 387 | 15,211,316 | 5 |
| Tennessee | 313 | 13,604,243 | 4 |
| Oregon | 189 | 10,685,643 | 4 |
| Florida | 215 | 9,910,951 | 3 |
| Ohio | 250 | 9,799,521 | 3 |
| Virginia | 199 | 9,403,564 | 3 |
| Washington | 150 | 8,801,737 | 3 |
| West Virginia | 187 | 7,613,055 | 3 |
| Arkansas | 149 | 6,810,466 | 2 |
| Mississippi | 145 | 6,424,954 | 2 |
| Arizona | 117 | 5,649,211 | 2 |
| Alabama | 113 | 5,099,737 | 2 |
| California | 98 | 4,538,013 | 1 |
| Oklahoma | 90 | 4,009,292 | 1 |
| Idaho | 76 | 3,833,641 | 1 |
| Indiana | 90 | 3,659,933 | 1 |
| New York | 62 | 2,315,651 | 1 |
| Others | 144 | 6,474,586 | 2 |
| Totals: | 6,813 | 303,975,556 | 100 |

Others include: Colorado, Delaware, Illinois, Kansas, Louisiana, Maryland, Missouri, Nevada, New Mexico, Pennsylvania, Utah and Vermont.

6) New or Used

|  | Number of Loans | Unpaid Principal Balance ($) | Unpaid Principal Balance (%) |
|---|---|---|---|
| New | 5,946 | 276,825,069 | 91 |
| Used | 867 | 27,150,488 | 9 |
| Totals | 6,813 | 303,975,556 | 100 |

7) Single or Multi-Wide

|  | Number of Loans | Unpaid Principal Balance ($) | Unpaid Principal Balance (%) |
|---|---|---|---|
| Single Wide | 2,542 | 75,503,310 | 25 |
| Multi-Wide | 4,271 | 228,472,246 | 75 |
| Totals | 6,813 | 303,975,556 | 100 |

8) Year of Loan Origination

| Year | Number of Loans | Unpaid Principal Balance ($) | Unpaid Principal Balance (%) |
|---|---|---|---|
| 1999 | 4,447 | 212,336,184 | 70 |
| 1998 | 40 | 3,580,441 | 1 |
| 1997 | 2,314 | 87,607,825 | 29 |
| 1996 | 12 | 451,107 | * |
| Totals | 6,813 | 303,975,556 | 100 |

## Year 2000 Readiness Disclosure

The Master Servicer and the Servicer are preparing their computer systems and computer-driven equipment and devices for the year 2000. Virtually every computer operation could be affected in some way by the rollover of the two-digit year value from 99 to 00. Systems that do not properly recognize date-sensitive information when the year changes to 2000 could fail or generate erroneous data. The year 2000 problem could affect traditional information systems and embedded systems. It could also affect software or computer applications that use, store, transmit or receive information involving dates.

The objective of the Master Servicer and the Servicer is to be year 2000 compliant. "Year 2000 compliant" means that critical systems, devices, applications and business relationships have been evaluated and are expected to be suitable for continued use into and beyond the year 2000. To that end, they have evaluated their critical systems, devices, applications and business relationships to determine the extent to which they are in fact "year 2000 compliant.

The Master Servicer and the Servicer expect to have systems and applications capable of processing, before January 1, 2000, date and date-related data consistent with the functionality of such systems and applications and without a material adverse effect upon its performance of services.

## Additional Information

The description in this Prospectus Supplement of the Initial Contracts is calculated as of the close of business on August 10, 1999, when the aggregate unpaid principal balance of the Initial Contracts was expected to be $303,975,556. However, the Contracts on which those calculations are based do not include Initial Contracts pledged to secure the Bonds and acquired by MERIT prior to the Closing Date but after those calculations were made. Further, certain Contracts on which those calculations are based may not be included among the Initial Contracts pledged to secure the Bonds as of the Closing Date. The Initial Contracts are now expected to have an aggregate unpaid principal balance of approximately $322,453,213 as of August 10, 1999. Nevertheless, MERIT may acquire additional Contracts before the Closing Date and some of the Initial Contracts may be removed prior to closing as a result of incomplete documentation or non-compliance with representations and warranties, if MERIT deems such removal necessary or appropriate, and MERIT may substitute other contracts subject to certain terms and conditions. Neither the removal or substitution of contracts nor the addition of contracts not included originally are expected to cause material variances from the information set forth herein.

A current report on Form 8-K will be available to purchasers of the Bonds and will be filed with the Securities and Exchange Commission, together with the Indenture, within fifteen days after the initial issuance of the Bonds and will provide additional information with respect to the Contracts actually pledged to the Bonds on the Closing Date. A current report on Form 8-K will also be filed within 15 days of the ending of the Funding Period with respect to the Pre-Funded Amount reflecting the purchase of any other Subsequent Contracts (see " — SUBSEQUENT CONTRACTS" below). Also, MERIT intends to file certain additional yield tables and other computational materials with the Commission in a report on Form 8-K. Such tables and materials were prepared by the Underwriters at the request of certain prospective investors. Such tables and assumptions may be based on assumptions that differ from

the Modeling Assumptions; see "MATURITY AND PREPAYMENT CONSIDERATIONS" on page S-21. Accordingly, such tables and other materials may not be relevant to or appropriate for investors other than those specifically requesting them.

The Master Servicer will make available on an ongoing basis current information relating to the Collateral, including (i) Contract delinquencies of 30 days, 60 days and 90 days or over, (ii) Contracts in foreclosure, (iii) REO, (iv) Losses on the Contracts, (v) the remaining Overcollateralization Amount, and (vi) modifications made to Contracts.

### Subsequent Contracts

The application of the Pre-Funded Amount to the purchase of Subsequent Contract is subject to certain conditions including, but not limited to the following: (a) each Subsequent Contract must satisfy the same representations and warranties as the Initial Contracts; (b) Subsequent Contracts may not be selected in a manner that is reasonably believed to be adverse to the interests of the Bondholders; (c) each Subsequent Contract must satisfy the following criteria: (i) such Subsequent Contract may not be 30 or more days delinquent; (ii) the lien securing such Subsequent Contract must be a first lien; (iii) such Contract may not have a loan-to-value ratio greater than 100%; (iv) such Contract may not have an interest rate less than 6.50% per annum (or, in the case of an Adjustable Rate Contract, a minimum interest rate less than 6.25% per annum); (v) such Contract may not have a principal balance greater than $125,000 ($175,000 in the case of a Contract secured by a mortgage); and (vi) such Contract may not have an initial term of more than 30 years; and (d) following the purchase of such Contracts, (i) the weighted average interest rate of the Contracts may not be less than 8.78% per annum, (ii) at least 85% of the Subsequent Contracts will have a minimum interest rate of 7.00% per annum, (iii) the weighted average loan-to-value ratio of the Contracts may not exceed 92%, (iv) the weighted average remaining term to maturity will be no more than 332 months, (v) the percentage of the Contracts (by unpaid principal balance) in any State in which more than 5% of the Initial Contracts (by unpaid principal balance) were located will not be greater than the sum of such percentage of the Initial Contracts plus 2%, (vi) the percentage (by unpaid principal balance) of the Contracts with respect to which the borrower is not the original owner of the related Manufactured Home will not exceed 10% and (vii) no more than 2% of the Contracts may be Adjustable Rate Contracts.

### Substitution of Contracts

In certain circumstances within two years of the Closing Date, MERIT may pledge to the Trustee a Contract in substitution for a Contract initially pledged (an "Original Contract") to secure the Bonds in the event of a breach of a representation or warranty with respect to such Original Contract or in the case of defective or incomplete documentation with respect to such Original Contract which materially and adversely affects the value of such Original Contract. It is anticipated that any substitution for an Original Contract will not materially change the characteristics of the Contracts as set forth above.

## SERVICING OF THE COLLATERAL

### General

*Master Servicer — Dynex.* Dynex has been engaged to act as Master Servicer and will initially be performing all master servicing and bond administration duties. As of June 30, 1999, Dynex acted as master servicer for approximately 29,000 loans, including single family mortgage loans, manufactured housing installment sales contracts, multifamily mortgage loans and commercial mortgage loans, with an aggregate principal balance of approximately $3.9 billion. See "THE ISSUER" in the Prospectus.

Dynex currently has recourse credit facilities aggregating in excess of $1 billion. Dynex has not obtained replacement financing for a $100 million credit facility secured by loans serviced by AutoBond Acceptance Corp., that expires in September 1999.

Dynex sought and has received a temporary injunction to compel AutoBond and its affiliates to release to Dynex the related loan files and servicing rights. Nevertheless, Dynex can give no assurance as to when it will actually obtain the related loan files and servicing rights. Dynex believes that, if AutoBond and its affiliates do not release the servicing files, it will be difficult for Dynex to secure replacement financing for its credit facility that expires in

September 1999. Moreover, regardless of the location of the servicing files, it may be difficult for Dynex to secure such replacement financing.

Dynex's credit facilities contain "cross-default" provisions that cause a default on any one credit facility to be a default on each. If Dynex does not secure new sources of credit or obtain an extension of existing facilities, it may default on one or more of its facilities, including the $100 million credit facility that expires in September 1999. If a default occurs, Dynex may not be able to master service the contracts and payments to bondholders may be delayed or challenged.

*Stand-By Master Servicer — Norwest.* Norwest Bank Minnesota, National Association, has agreed to be the Stand-By Master Servicer of the Contracts; if the appointment of Dynex as Master Servicer is not renewed, Norwest will assume some of the master servicing duties (but not certain of the bond administration duties of Dynex). Moreover, Norwest will not assume Dynex's duties to supervise, administer, monitor and oversee the servicing by the Servicer. Instead, if Norwest becomes the master servicer, the Issuer or an affiliate will be responsible for supervising the servicing of the Contracts by the Servicer. The principal executive offices of Norwest are located at Sixth Street and Marquette Avenue, Minneapolis, Minnesota. Norwest performs its master servicing and bond administrator activities principally at 11000 Broken Land Parkway, Columbia, Maryland. Norwest is engaged in the business of master servicing, on behalf of third party investors, residential single family mortgage loans secured by properties located in all 50 states and the District of Columbia. As of June 30, 1999, Norwest was master servicing more than 639,000 mortgage loans representing an aggregate outstanding principal balance of approximately $73 billion.

*Servicer — Dynex Services.* Dynex Services, a division of Dynex Financial, Inc., an affiliate of MERIT, has been retained on a quarterly basis as the Servicer of the Contracts. Dynex Services commenced its servicing operations in November 1996. Dynex Services services all the manufactured housing contracts it originates or purchases from its servicing operation located in Fort Worth, Texas. As of June 30, 1999, Dynex Services serviced a portfolio of approximately 20,638 manufactured housing contracts totaling approximately $893 million.

The following sets forth the delinquency experience related to manufactured housing contracts serviced through Dynex Services for fiscal years ending 1997 and 1998 and the six months ended June 30, 1999:

|  | At December 31, | | At June 30, |
| --- | --- | --- | --- |
|  | 1997 | 1998 | 1999 |
|  | (Dollars in Thousands) | | |
| Outstanding Dollars of Serviced Assets (1) | $286,873 | $708,620 | $893,447 |
| Delinquent Dollars (2): | | | |
| 30 – 59 days | $4,704 | $7,515 | $9,189 |
| 60 – 89 days | $977 | $2,020 | $3,197 |
| 90 days or more | $1,360 | $2,347 | $4,191 |
| Total Dollars Delinquent | $7,041 | $11,882 | $16,577 |
| Delinquency as a Percentage of Serviced Assets (3) | 2.45% | 1.68% | 1.86% |
| Percentage of Serviced Assets Repossessed/Foreclosed | .33% | .73% | .59% |
| Net Loss Percentage (4) | .21% | .54% | .49% |

(1) Excludes contracts already in repossession/foreclosure.
(2) The period of delinquency is based on the number of days payments are contractually past due (assuming 30-day months). Consequently, a contract due on the first day of a month is not 30 days delinquent until the first day of the following month.
(3) By outstanding dollars as of period end.
(4) The calculation of net loss percentage includes unpaid interest accrued through the date of liquidation and all repossession liquidation expenses and is based on the principal balance of contracts being serviced as of period end including contracts already in repossession/foreclosure.

*Proposed Sale of Dynex Services by Dynex —* Dynex announced during the second quarter of 1999 that it had retained Lehman Brothers Inc., one of the underwriters of the Offered Bonds, as an advisor to assist in the sale of Dynex Services. Dynex has not yet identified a purchaser for Dynex Services.

*Stand-By Servicer —* GreenPoint Credit Corp. has been retained as Stand-By Servicer for the Contracts and will become the Servicer if the appointment of Dynex Services as Servicer is not renewed. If GreenPoint becomes the

Servicer, it will service the Contracts under its own servicing agreement and the Servicing Fee will not be subordinate to payments on the Bonds.

*Terms of Servicing and Master Servicing Arrangements* — Dynex's engagement as Master Servicer and Dynex Services' engagement as Servicer are on a quarterly basis with initial terms ending December 31, 1999. These engagements may be renewed for subsequent quarterly terms by the Trustee; provided that the Trustee shall not renew either such engagement unless it receives a letter from Fitch IBCA, Inc., in its capacity as one of the Rating Agencies, prior to any quarterly renewal date, confirming that such renewal will not result in a downgrading of its rating of any of the Bonds. In addition, the servicing agreement includes triggers that may result in termination if Dynex Service's servicing performance does not meet required standards. If either agreement is not renewed or is terminated, there may be disruptions in the administration of the contracts. In particular, it is likely that delinquencies on the contracts will increase temporarily, possibly resulting in increased losses, until the stand-by servicer has completed the logistical processes necessary to render it fully capable of servicing the contracts effectively.

If Fitch IBCA, Inc. confirms that there will be no adverse effect on its then ratings of the Bonds, the requirement of quarterly renewals of the Servicing and Master Servicing Agreements will be removed.

## Advances

On or before each Payment Date, the Servicer will be obligated (subject to the limitations provided in its servicing agreement) to make a cash advance (an "Advance") with respect to any delinquent loan in an amount equal to the sum of (i) the scheduled payment (the interest portion only in the case of Simple Interest Contracts and, in any case, without deduction of the Servicing Fee so long as Dynex Services is the Servicer), (ii) amounts for the payment of assessments, insurance premiums and property protection expenses and (iii) amounts to cover expenses relating to foreclosure and liquidation. Dynex (but not Norwest) as Master Servicer will be obligated to make any required advance if the Servicer fails to make such advance. The Trustee will be obligated to make any required Advance if the Master Servicer fails to do so. Nevertheless, none of them is required to make any Advance if it has determined in its good faith business judgment that such advance would not be recoverable. See "SERVICING OF THE COLLATERAL" in the Prospectus.

## Forbearance and Modification Agreements

To the extent set forth in the Servicing Agreement, the Servicer may, with the approval of the Master Servicer in most cases, enter into a forbearance or modification agreement with the borrower under a defaulted Contract, provided that such Servicer and, if required, the Master Servicer have determined in their good faith business judgment that granting such forbearance or modification will maximize recovery to the Trust Estate on a present value basis. The interests of the Master Servicer in determining whether to enter into a forbearance or modification agreement (or in establishing the terms of any such forbearance or modification agreement) may conflict with the interests of Bondholders.

## Events of Default

Dynex will generally have the right to terminate the Servicer in the event of a breach by such Servicer of any of its obligations thereunder. In the event of such termination, Dynex generally assumes certain of such Servicer's servicing obligations, including the obligation to make Advances (limited as provided herein under "—Advances"), until such time as a successor servicer is appointed. If Dynex is unable to act as servicer, Dynex will generally appoint or petition a court of competent jurisdiction for the appointment of a suitable loan servicing institution to act as successor servicer under such Servicing Agreement. Pending such appointment, Dynex will be obligated to service the Contracts subject to the same limitations as apply to the Master Servicer's obligation to fulfill the servicing responsibility of a terminated servicer. Any successor servicer, including Dynex, will be entitled generally to compensation arrangements similar to, and not in excess of, those provided to the terminated Servicer. If Norwest becomes the Master Servicer, it is anticipated that GreenPoint Credit Corp. will become the Servicer.

## Servicing and Other Compensation and Expenses

The primary compensation payable to the Servicer is the monthly servicing fee (the "Servicing Fee"), which fee is capped at an amount equal to 1/12 of 1% (the "Servicing Fee Rate") multiplied by the Unpaid Principal Balance of each Contract on the first day of the Due Period preceding each Payment Date. So long as Dynex Services is the Servicer of the Contracts, Dynex Services will remit the monthly payments on the Contracts without retaining the Servicing Fee and the Trustee will pay such Servicing Fee to Dynex Services to the extent of the Interest Payment Amount available after having paid interest on the Bonds. In addition to the Servicing Fees, late payment fees, loan assumption fees and conversion fees with respect to the Contracts, and any interest or other income earned on collections with respect to the Contracts pending remittance to the Master Servicer will be paid to or retained by the Servicer as additional servicing compensation. The Servicer is obligated to pay certain insurance premiums and certain ongoing expenses associated with the related Contracts and incurred by the Servicer in connection with its responsibilities under the Servicing Agreement. The Master Servicing Fee will be equal to 0.02% per annum on the aggregate Unpaid Principal Balance of the Contracts.

## Special Servicer

A Special Servicer acceptable to the Rating Agencies may be appointed to undertake some of or all the Servicer's obligations with respect to Contracts that are in default. The Special Servicer, if any, may be entitled to various fees, including, but not limited to, (i) a special servicing fee expressed as a fixed percentage of the remaining Unpaid Principal Balance of each specially serviced Contract, (ii) a performance fee applicable to each liquidated Contract based upon the Liquidation Proceeds of such Contract, or both. See "SERVICING OF THE COLLATERAL — Special Servicing Agreement" in the Prospectus.

## MATURITY AND PREPAYMENT CONSIDERATIONS

The Stated Maturity Date for Class A1, Class A3, Class A4, Class M1, Class M2 and Class B1 Bonds was calculated by adding approximately four years to the last scheduled payment date on the Contracts originally pledged to such Bonds. The Stated Maturity Date for the Class A2 Bonds was calculated by adding approximately twelve months to the last scheduled payment date on the Contracts originally pledged to such Bonds.

Because the rate of payment (including payments attributable to prepayments, defaults, liquidations, and repurchases) of principal on the Contracts may exceed the scheduled rate of payments, and could exceed such scheduled rate by a substantial amount, the actual final payment of principal of the Bonds may be earlier, and could be substantially earlier, than the Stated Maturity Date of such Class.

## Weighted Average Life of the Bonds

Weighted average life refers to the average amount of time that will elapse from the date of delivery of a bond until each dollar of principal of such bond will be repaid to the investor. The weighted average life of the Bonds will be influenced by the rate at which principal of the Contracts is paid, which may be in the form of scheduled amortization or prepayments (for this purpose, the term "prepayment" includes payments resulting from refinancings, liquidations of the Contracts due to defaults, casualties, indemnifications and purchases by or on behalf of MERIT or the Servicer, as the case may be).

Prepayments on loans are commonly measured relative to a prepayment standard or model. The prepayment assumption model used in this Prospectus Supplement, the Manufactured Housing Prepayment Model ("MHP"), is based on an assumed rate of prepayment each month of the then unpaid principal balance of a pool of new manufactured housing installment sales contracts. A prepayment assumption of 100% MHP assumes constant prepayment rates of 3.7% per annum of the then unpaid principal balance of such Contracts in the first month of the life of the contracts and an additional 0.1% per annum in each month thereafter until the 24th month. Beginning in the 24th month and in each month thereafter during the life of all the contracts, 100% MHP assumes a constant prepayment rate of 6.0% per annum each month.

As used in the following tables "200% MHP" assumes the Contracts will prepay at rates equal to twice 100% of the MHP assumed prepayment rates; "300% MHP" assumes the Contracts will prepay at rates equal to three times 100% of the MHP prepayment rates, and so forth.

### Factors Affecting Prepayments on the Contracts

The rate of payments (including prepayments) on a pool of manufactured housing installment sale contracts is influenced by a variety of economic, geographic, social, tax, legal and other factors. If prevailing interest rates fall significantly below the then current interest rates on the Contracts or significantly below the maximum lifetime interest rates on the Adjustable Rate Contracts, the rate of prepayments on such Contracts would be expected to increase. Conversely, if prevailing rates rise significantly above the then current interest rates on the Contracts or significantly above the maximum lifetime interest rates on the Adjustable Rate Contracts, the rate of prepayments would be expected to decrease. Other factors affecting prepayment of Contracts include changes in borrowers' housing needs, job transfers, unemployment, borrowers' net equity in the related properties and servicing decisions, as well as Contract terms and the type of collateral securing a Contract. See "SECURITY FOR THE BONDS — Selected Initial Contract Data" on page S-15. The Contracts may be prepaid, in whole or in part, at any time by the borrowers. **No assurance can be given as to the rate of principal payments or prepayments on the Contracts.**

Of the Contracts, 1.69% were Adjustable Rate Contracts as of August 10, 1999. MERIT is not aware of any publicly available statistics relating to the principal prepayment experience of adjustable rate manufactured housing installment sales contracts loans over an extended period of time, and MERIT's experience with respect to adjustable rate contracts is insufficient to draw any conclusions with respect to the expected prepayment rates on the Adjustable Rate Contracts. Defaults on Adjustable Rate Contracts leading to foreclosure and the ultimate liquidation of the related properties may occur with greater frequency in their early years, although little data is available with respect to the rate of default on Adjustable Rate Contracts. Increases in the required monthly payments on the Adjustable Rate Contracts may result in a default rate higher than that on contracts with fixed interest rates. MERIT, at its option, may purchase, on any Payment Date, any Contract that is delinquent in payment by 90 days or more. Any such purchase must be made at a price equal to the outstanding principal balance of the related Contract plus accrued and unpaid interest thereon at its interest rate through the Payment Date following the date of purchase. See "YIELD CONSIDERATIONS" and "MATURITY AND PREPAYMENT CONSIDERATIONS" in the Prospectus. Furthermore, MERIT will have the option to pledge to the Trustee a Substitute Contract in substitution for a defaulted Contract or REO, as more particularly described in "SECURITY FOR THE BONDS — Substitution of Contracts" on page S-18. The weighted average life of the Bonds may increase to the extent that MERIT exercises its option to pledge Substitute Contracts to the Trustee for defaulted Contracts or Repo Property, because such substitution will be effected in lieu of foreclosure and disposition of the related properties or Repo Property and the payment of Liquidation Proceeds to Holders of the Bonds. See "YIELD CONSIDERATIONS" on page S-26.

The interest rates on the Adjustable Rate Contracts will adjust periodically (although not on the same dates), generally based on the current Six-Month LIBOR Index as applicable (which may not rise and fall consistently with prevailing interest rates or other adjustable rate residential loans based on other indices), plus the Gross Margins for the Adjustable Rate Contracts (which may be different from the current margins on other adjustable rate residential loans). As a result, the interest rates on the Adjustable Rate Contracts at any time may not equal the prevailing rates for similar adjustable rate residential loans, and the rate of prepayment may be lower or higher than would otherwise be anticipated. See "RISK FACTORS — Uncertain Timing of Principal" on page S-3.

### Mandatory Prepayment

If not all the Original Pre-Funded Amount is used to acquire Subsequent Contracts, then the Holders of the Bonds then entitled to receive payments of principal will receive a partial prepayment on the Payment Date immediately following the end of the Funding Period.

Although no assurances can be given, MERIT expects that the principal amount of Subsequent Contracts to be purchased will require the application of substantially all the Original Pre-Funded Amount and that there should be no material prepayment as a result of a failure to purchase Subsequent Contracts.

**Modeling Assumptions**

The following assumptions (the "Modeling Assumptions") have been used in preparing the principal decrement tables on the following pages (the "DEC Tables"). It has been assumed that: (1) the Adjustable Rate Contracts consist of one assumed Adjustable Rate Contract, (2) the Level Payment Contracts consist of two assumed Level Payment Contracts and (3) the Pre-Funded Amount is applied to acquire one Level Payment Contract, each with the characteristics set forth in the following tables as of August 10, 1999:

| Contract Type | August 10, 1999 Current Balance | Index | Current Gross WAC Rate | Total Fees | Current Net WAC | Gross Margin | Original WAM | Current WAM | Periodic Cap | Next Reset Date |
|---|---|---|---|---|---|---|---|---|---|---|
| Level Payment | $215,626,512.50 | Fixed | 8.5439% | 0.020% | 8.5239% | N/A | 332 | 330 | N/A | N/A |
| Level Payment | $83,224,555.65 | Fixed | 9.7094% | 0.020% | 9.6894% | N/A | 308 | 284 | N/A | N/A |
| Level Payment * | $104,191,656.96 | Fixed | 8.5439% | 0.020% | 8.5239% | N/A | 332 | 332 | N/A | N/A |
| Adjustable Rate | $5,124,488.25 | Six-Month LIBOR | 9.2926% | 0.020% | 9.2726% | 5.800% | 350 | 330 | 1.00% | 11/1/00 |

* Represents the assumed Subsequent Contracts.

It has been further assumed that:

(i)   all scheduled payments on the assumed Contracts are received timely on the payment date for each Contract, commencing September 1, 1999, and prepayments on such Contracts are received on the last day of each month beginning August 31, 1999, and include 30 days of interest thereon;

(ii)   there are no defaults or shortfalls on the assumed Contracts;

(iii)   the assumed Contracts prepay monthly at the specified constant percentages of MHP;

(iv)   the Closing Date for the Bonds is September 2, 1999;

(v)   payments are made to the Bondholders on the 28th day of each month, commencing in September 1999;

(vi)   the initial principal amount of each Class of Bonds is as set forth on the cover hereof;

(vii)   there is no optional redemption or mandatory purchase of the Bonds (except with respect to the line entitled "Weighted Average Life with Redemption" which assumes an early redemption on the earlier of (1) August 28, 2004, or (2) the Payment Date on which, after taking into account payments of principal to be made on such Payment Date, the aggregate outstanding principal balance of the Bonds is less than 35% of the initial aggregate principal balance of the Bonds) and no increase in the Class Interest Rates of the Bonds as a result of MERIT's failure to redeem the Bonds when it is permitted to do so;

(viii)   there are no prepayment fees or penalties;

(ix)   100% of all principal amounts due with respect to the assets in the Collateralization are received and are invested in Eligible Investments held in Collateralization Fund;

(x)   Six month LIBOR remains constant at 5.885%;

(xi)   all the Original Pre-Funded Amount is applied to the purchase of Subsequent Contracts; and

(xii)   for purposes of calculating the value of the Collateralization Fund, the initial deposit to the Collateralizataion Fund was assumed to be approximately $15,858,828, which was valued at 34.49% to derive a deemed initial principal balance of approximately $5,469,710.

If the Bonds are redeemed when MERIT has the option to do so, the weighted average life of the Bonds will be shorter than the weighted average life set forth on the line entitled "Weighted Average Life Without Redemption", and, using the Modeling Assumptions, the weighted average life of the Bonds would be as set forth on the line

entitled "Weighted Average Life With Redemption." See "DESCRIPTION OF THE BONDS — Optional Redemption" on page S-13.

There will be discrepancies between the Contracts actually included in the Collateral and the Modeling Assumptions. Any discrepancy may have an effect upon the percentages of initial principal amount (and weighted average lives) set forth in the DEC Tables. To the extent that the Contracts actually included in the Collateral have characteristics that differ from the Modeling Assumptions, the Bonds are likely to have weighted average lives that are shorter or longer than indicated by such tables. Other things being equal, to the extent that cash is used to redeem Bonds because Contracts are not delivered together with all the required documentation or Contracts are repurchased, the Bonds will have shorter weighted average lives than indicated by the DEC Tables, which will adversely affect the yield of such Bonds to the extent that they are purchased at a premium.

There is no assurance that prepayment of the Contracts will conform to any of the percentages of MHP described in the DEC Tables. Among other things, the DEC Tables assume that the Contracts prepay at the indicated percentage rates of MHP, notwithstanding the fact that such Contracts may vary substantially as to geographic concentration of properties, interest rate and prepayment terms. Variations in actual prepayment experience for the Contracts will increase or decrease the percentages of initial principal balance (and weighted average lives) shown in the DEC Tables.

The DEC Tables indicate the projected weighted average life of each Class of the Bonds and set forth the percentage of the initial balance of the Bonds that would be outstanding after each of the dates shown at various percentages of MHP as indicated below. See "MATURITY AND PREPAYMENT CONSIDERATIONS" in the Prospectus.

The Weighted Average Life values included in the following DEC Tables have been determined by (a) multiplying the amount of each principal payment by the number of years from the date of delivery of the Bonds to the related Payment Date, (b) summing the results and (c) dividing the sum by the total principal to be paid on the applicable Class of Bonds. Asterisks (*) in the following tables indicate values between 0.0% and 0.5%.

## PERCENTAGE OF ORIGINAL PRINCIPAL AMOUNT

| | Class A1 Bonds Scenario | | | | | | Class A2 Bonds Scenario | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 75% | 150% | 200% | 250% | 300% | | 75% | 150% | 200% | 250% | 300% |
| Initial Percent | 100 | 100 | 100 | 100 | 100 | Initial Percent | 100 | 100 | 100 | 100 | 100 |
| August 28, 2000 | 76 | 56 | 44 | 31 | 18 | August 28, 2000 | 100 | 100 | 100 | 100 | 100 |
| August 28, 2001 | 48 | 9 | 0 | 0 | 0 | August 28, 2001 | 100 | 100 | 65 | 13 | 0 |
| August 28, 2002 | 20 | 0 | 0 | 0 | 0 | August 28, 2002 | 100 | 21 | 0 | 0 | 0 |
| August 28, 2003 | 0 | 0 | 0 | 0 | 0 | August 28, 2003 | 86 | 0 | 0 | 0 | 0 |
| August 28, 2004 | 0 | 0 | 0 | 0 | 0 | August 28, 2004 | 31 | 0 | 0 | 0 | 0 |
| August 28, 2005 | 0 | 0 | 0 | 0 | 0 | August 28, 2005 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2006 | 0 | 0 | 0 | 0 | 0 | August 28, 2006 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2007 | 0 | 0 | 0 | 0 | 0 | August 28, 2007 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2008 | 0 | 0 | 0 | 0 | 0 | August 28, 2008 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2009 | 0 | 0 | 0 | 0 | 0 | August 28, 2009 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2010 | 0 | 0 | 0 | 0 | 0 | August 28, 2010 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2011 | 0 | 0 | 0 | 0 | 0 | August 28, 2011 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2012 | 0 | 0 | 0 | 0 | 0 | August 28, 2012 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2013 | 0 | 0 | 0 | 0 | 0 | August 28, 2013 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2014 | 0 | 0 | 0 | 0 | 0 | August 28, 2014 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2015 | 0 | 0 | 0 | 0 | 0 | August 28, 2015 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2016 | 0 | 0 | 0 | 0 | 0 | August 28, 2016 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2017 | 0 | 0 | 0 | 0 | 0 | August 28, 2017 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2018 | 0 | 0 | 0 | 0 | 0 | August 28, 2018 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2019 | 0 | 0 | 0 | 0 | 0 | August 28, 2019 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2020 | 0 | 0 | 0 | 0 | 0 | August 28, 2020 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2021 | 0 | 0 | 0 | 0 | 0 | August 28, 2021 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2022 | 0 | 0 | 0 | 0 | 0 | August 28, 2022 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2023 | 0 | 0 | 0 | 0 | 0 | August 28, 2023 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2024 | 0 | 0 | 0 | 0 | 0 | August 28, 2024 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2025 | 0 | 0 | 0 | 0 | 0 | August 28, 2025 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2026 | 0 | 0 | 0 | 0 | 0 | August 28, 2026 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2027 | 0 | 0 | 0 | 0 | 0 | August 28, 2027 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2028 | 0 | 0 | 0 | 0 | 0 | August 28, 2028 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2029 | 0 | 0 | 0 | 0 | 0 | August 28, 2029 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life Without Redemption[1] | 1.9 | 1.2 | 0.9 | 0.8 | 0.6 | Weighted Average Life Without Redemption[1] | 4.7 | 2.7 | 2.2 | 1.8 | 1.5 |
| With Redemption[2] | 1.9 | 1.2 | 0.9 | 0.8 | 0.6 | With Redemption[2] | 4.6 | 2.7 | 2.2 | 1.8 | 1.5 |

| | Class A3 Bonds Scenario | | | | | | Class A4 Bonds Scenario | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 75% | 150% | 200% | 250% | 300% | | 75% | 150% | 200% | 250% | 300% |
| Initial Percent | 100 | 100 | 100 | 100 | 100 | Initial Percent | 100 | 100 | 100 | 100 | 100 |
| August 28, 2000 | 100 | 100 | 100 | 100 | 100 | August 28, 2000 | 100 | 100 | 100 | 100 | 100 |
| August 28, 2001 | 100 | 100 | 100 | 100 | 72 | August 28, 2001 | 100 | 100 | 100 | 100 | 100 |
| August 28, 2002 | 100 | 100 | 59 | 6 | 0 | August 28, 2002 | 100 | 100 | 100 | 100 | 82 |
| August 28, 2003 | 100 | 50 | 0 | 0 | 0 | August 28, 2003 | 100 | 100 | 92 | 67 | 44 |
| August 28, 2004 | 100 | 0 | 0 | 0 | 0 | August 28, 2004 | 100 | 96 | 65 | 37 | 14 |
| August 28, 2005 | 83 | 0 | 0 | 0 | 0 | August 28, 2005 | 100 | 80 | 56 | 31 | 11 |
| August 28, 2006 | 45 | 0 | 0 | 0 | 0 | August 28, 2006 | 100 | 71 | 48 | 26 | 9 |
| August 28, 2007 | 8 | 0 | 0 | 0 | 0 | August 28, 2007 | 100 | 64 | 42 | 22 | 7 |
| August 28, 2008 | 0 | 0 | 0 | 0 | 0 | August 28, 2008 | 89 | 57 | 36 | 18 | 6 |
| August 28, 2009 | 0 | 0 | 0 | 0 | 0 | August 28, 2009 | 81 | 50 | 31 | 15 | 4 |
| August 28, 2010 | 0 | 0 | 0 | 0 | 0 | August 28, 2010 | 75 | 44 | 26 | 11 | 0 |
| August 28, 2011 | 0 | 0 | 0 | 0 | 0 | August 28, 2011 | 69 | 39 | 22 | 2 | 0 |
| August 28, 2012 | 0 | 0 | 0 | 0 | 0 | August 28, 2012 | 64 | 34 | 14 | 0 | 0 |
| August 28, 2013 | 0 | 0 | 0 | 0 | 0 | August 28, 2013 | 59 | 30 | 5 | 0 | 0 |
| August 28, 2014 | 0 | 0 | 0 | 0 | 0 | August 28, 2014 | 53 | 22 | 0 | 0 | 0 |
| August 28, 2015 | 0 | 0 | 0 | 0 | 0 | August 28, 2015 | 48 | 14 | 0 | 0 | 0 |
| August 28, 2016 | 0 | 0 | 0 | 0 | 0 | August 28, 2016 | 43 | 6 | 0 | 0 | 0 |
| August 28, 2017 | 0 | 0 | 0 | 0 | 0 | August 28, 2017 | 39 | 0 | 0 | 0 | 0 |
| August 28, 2018 | 0 | 0 | 0 | 0 | 0 | August 28, 2018 | 34 | 0 | 0 | 0 | 0 |
| August 28, 2019 | 0 | 0 | 0 | 0 | 0 | August 28, 2019 | 29 | 0 | 0 | 0 | 0 |
| August 28, 2020 | 0 | 0 | 0 | 0 | 0 | August 28, 2020 | 18 | 0 | 0 | 0 | 0 |
| August 28, 2021 | 0 | 0 | 0 | 0 | 0 | August 28, 2021 | 8 | 0 | 0 | 0 | 0 |
| August 28, 2022 | 0 | 0 | 0 | 0 | 0 | August 28, 2022 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2023 | 0 | 0 | 0 | 0 | 0 | August 28, 2023 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2024 | 0 | 0 | 0 | 0 | 0 | August 28, 2024 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2025 | 0 | 0 | 0 | 0 | 0 | August 28, 2025 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2026 | 0 | 0 | 0 | 0 | 0 | August 28, 2026 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2027 | 0 | 0 | 0 | 0 | 0 | August 28, 2027 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2028 | 0 | 0 | 0 | 0 | 0 | August 28, 2028 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2029 | 0 | 0 | 0 | 0 | 0 | August 28, 2029 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life Without Redemption[1] | 6.9 | 4.0 | 3.2 | 2.6 | 2.2 | Weighted Average Life Without Redemption[1] | 15.6 | 10.6 | 7.9 | 5.8 | 4.3 |
| With Redemption[2] | 5.0 | 4.0 | 3.2 | 2.6 | 2.2 | With Redemption[2] | 5.0 | 5.0 | 4.8 | 4.4 | 3.8 |

[1] In years, assuming no redemption of the Bonds.
[2] In years, assuming the Bonds are redeemed on the earliest possible Payment Date using the Modeling Assumptions.

| | Class M1 Bonds Scenario | | | | | | Class M2 Bonds Scenario | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 75% | 150% | 200% | 250% | 300% | | 75% | 150% | 200% | 250% | 300% |
| Initial Percent | 100 | 100 | 100 | 100 | 100 | Initial Percent | 100 | 100 | 100 | 100 | 100 |
| August 28, 2000 | 100 | 100 | 100 | 100 | 100 | August 28, 2000 | 100 | 100 | 100 | 100 | 100 |
| August 28, 2001 | 100 | 100 | 100 | 100 | 100 | August 28, 2001 | 100 | 100 | 100 | 100 | 100 |
| August 28, 2002 | 100 | 100 | 100 | 100 | 100 | August 28, 2002 | 100 | 100 | 100 | 100 | 100 |
| August 28, 2003 | 100 | 100 | 100 | 100 | 100 | August 28, 2003 | 100 | 100 | 100 | 100 | 100 |
| August 28, 2004 | 100 | 100 | 100 | 100 | 100 | August 28, 2004 | 100 | 100 | 100 | 100 | 100 |
| August 28, 2005 | 100 | 95 | 87 | 84 | 81 | August 28, 2005 | 100 | 95 | 87 | 84 | 81 |
| August 28, 2006 | 100 | 85 | 75 | 70 | 65 | August 28, 2006 | 100 | 85 | 75 | 70 | 55 |
| August 28, 2007 | 100 | 75 | 65 | 58 | 52 | August 28, 2007 | 100 | 75 | 53 | 31 | 10 |
| August 28, 2008 | 100 | 67 | 56 | 46 | 25 | August 28, 2008 | 100 | 62 | 22 | 0 | 0 |
| August 28, 2009 | 95 | 60 | 44 | 19 | 0 | August 28, 2009 | 95 | 36 | 0 | 0 | 0 |
| August 28, 2010 | 88 | 53 | 21 | 0 | 0 | August 28, 2010 | 88 | 12 | 0 | 0 | 0 |
| August 28, 2011 | 81 | 40 | 2 | 0 | 0 | August 28, 2011 | 81 | 0 | 0 | 0 | 0 |
| August 28, 2012 | 75 | 21 | 0 | 0 | 0 | August 28, 2012 | 75 | 0 | 0 | 0 | 0 |
| August 28, 2013 | 69 | 5 | 0 | 0 | 0 | August 28, 2013 | 68 | 0 | 0 | 0 | 0 |
| August 28, 2014 | 63 | 0 | 0 | 0 | 0 | August 28, 2014 | 47 | 0 | 0 | 0 | 0 |
| August 28, 2015 | 57 | 0 | 0 | 0 | 0 | August 28, 2015 | 26 | 0 | 0 | 0 | 0 |
| August 28, 2016 | 51 | 0 | 0 | 0 | 0 | August 28, 2016 | 6 | 0 | 0 | 0 | 0 |
| August 28, 2017 | 36 | 0 | 0 | 0 | 0 | August 28, 2017 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2018 | 18 | 0 | 0 | 0 | 0 | August 28, 2018 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2019 | * | 0 | 0 | 0 | 0 | August 28, 2019 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2020 | 0 | 0 | 0 | 0 | 0 | August 28, 2020 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2021 | 0 | 0 | 0 | 0 | 0 | August 28, 2021 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2022 | 0 | 0 | 0 | 0 | 0 | August 28, 2022 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2023 | 0 | 0 | 0 | 0 | 0 | August 28, 2023 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2024 | 0 | 0 | 0 | 0 | 0 | August 28, 2024 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2025 | 0 | 0 | 0 | 0 | 0 | August 28, 2025 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2026 | 0 | 0 | 0 | 0 | 0 | August 28, 2026 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2027 | 0 | 0 | 0 | 0 | 0 | August 28, 2027 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2028 | 0 | 0 | 0 | 0 | 0 | August 28, 2028 | 0 | 0 | 0 | 0 | 0 |
| August 28, 2029 | 0 | 0 | 0 | 0 | 0 | August 28, 2029 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life Without Redemption[1] | 15.9 | 10.5 | 9.0 | 8.3 | 7.8 | Weighted Average Life Without Redemption[1] | 14.4 | 9.2 | 7.9 | 7.4 | 7.0 |
| With Redemption[2] | 5.0 | 5.0 | 5.0 | 5.0 | 4.4 | With Redemption[2] | 5.0 | 5.0 | 5.0 | 5.0 | 4.4 |

[1] In years, assuming no redemption of the Bonds.

[2] In years, assuming the Bonds are redeemed on the earliest possible Payment Date using the Modeling Assumptions.

The DEC Tables have been prepared based on the Modeling Assumptions (including the assumptions regarding the characteristics and performance of the Contracts which may differ from the actual characteristics and performance thereof) and should be read in conjunction with the Modeling Assumptions.

## YIELD CONSIDERATIONS

### General

The yield to maturity of, and the aggregate amount of payments on, the Bonds will be related to the rate and timing of principal payments on the Contracts, which will be affected by the amortization schedules of the Contracts and the rate of principal prepayments thereon (including for this purpose payments resulting from refinancings, liquidations of the Contracts due to default, casualties and condemnations and repurchases). An optional redemption of a Class of Bonds will have the same effect as a prepayment in full of the Contracts with respect to such Class. No assurance can be given as to the rate of principal payments or prepayments on the Contracts.

The timing of changes in the rate of prepayments on the Contracts may significantly affect an investor's actual yield to maturity, even if the average rate of principal payments experienced over time is consistent with an investor's expectation. In general, the earlier a prepayment of principal of a Contract, the greater will be the effect on the investor's yield to maturity. As a result, the effect on an investor's yield of principal prepayments occurring at a rate higher (or lower) than the rate anticipated by the investor during the period immediately following the issuance of the Bonds would not be fully offset by a subsequent like reduction (or increase) in the rate of principal prepayments.

If the purchaser of a Bond offered at a discount from its Parity Price calculates the anticipated yield to maturity of such Bond based on an assumed rate of payment of principal that is faster than that actually received on the Contracts, the actual yield to maturity will be lower than that so calculated. Conversely, if the purchaser of a Bond offered at a premium over its Parity Price calculates the anticipated yield to maturity of such Bond based on an

assumed rate of payment of principal that is slower than that actually received on the Contracts, the actual yield to maturity will be lower than that so calculated.

Because the rate of principal payments (including prepayments) on the Contracts may significantly affect the weighted average life and other characteristics of the Bonds, prospective investors are urged to consider their own estimates as to the anticipated rate of future prepayments on the Contracts and the suitability of the Bonds to their investment objectives. For factors affecting principal prepayments on the Contracts, see "MATURITY AND PREPAYMENT CONSIDERATIONS" on page S-21.

In certain circumstances a Substitute Contract may be pledged to the Trustee in substitution for a defaulted Contract or Repo Property, as more particularly described in "SECURITY FOR THE BONDS — Substitution of Contracts" on page S-18. The amount, if any, by which the Unpaid Principal Balance of the defaulted Contract or Repo Property exceeds the Unpaid Principal Balance of the Substitute Contract would constitute a Loss on such Contract or Repo Property. Furthermore, to the extent that any Substitute Contract has payment terms that differ from the original Contract such difference in payment terms will affect the yield to maturity of investors in the Bonds. MERIT's ability to pledge Substitute Contracts may result in an increase in the weighted average life of the Bonds, because such substitution would be effected in lieu of a foreclosure and disposition of the related properties or REO and the resulting payment of Liquidation Proceeds to Holders of the Bonds.

A higher than expected rate of default could produce payment delays and could lead to foreclosures. A foreclosure may produce proceeds upon sale that are less than the Unpaid Principal Balance of such Contract plus interest accrued thereon and the expenses of sale. Such a shortfall upon foreclosure would result in a Loss on such Contract.

## Subordination

On each Payment Date, the holders of any higher ranking Class of Bonds will have a preferential right to receive amounts of interest and, generally, principal before any payments are made on any Class of Bonds subordinate to such Class. As a result, the Class M2 and Class M1 Bonds will be more sensitive to the rate of delinquencies and defaults on the Contracts than the Senior Bonds.

Losses with respect to the Contracts will be borne, by virtue of the payment priorities described herein, first, by the cash and cash equivalents on deposit in the Collateralization Fund attributable to principal, second, by any interest received on the Contracts in excess of interest required to be paid on the Bonds on any Payment Date, third, by any interest earnings on assets on deposit in the Collateralization Fund, fourth, by the limited overcollateralization of the Bonds and, fifth, by the Class B1, Class M2 and Class M1 Bonds (in that order) before any losses will be borne by the Class A1, Class A2, Class A3 and Class A4 Bonds. Losses will be borne by the Class A1, Class A2, Class A3 and Class A4 Bonds *pro rata* based on their outstanding principal balance.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

MERIT will cause an election to be made to treat the Contracts and the Collateral Proceeds Account (the "REMIC Estate") as a REMIC for federal income tax purposes; the Capitalized Interest Account, the Pre-Funding Account and the Collateralization Fund will not be part of the REMIC Estate. The Bonds will be designated as the regular interests in the REMIC; MERIT will retain the residual interest in the REMIC.

In the opinion of Arter & Hadden LLP, counsel to MERIT, for federal income tax purposes, assuming (i) the REMIC election is made, (ii) the Indenture is fully executed, delivered and enforceable against the parties thereto in accordance with its terms, (iii) the transactions described herein are completed on substantially the terms and conditions set forth herein and (iv) compliance with the Indenture, the REMIC Estate will be treated as a REMIC and each Class of Bonds will be treated as a "regular interest" in the REMIC and generally will be treated as debt instruments issued by the REMIC. Holders of Bonds that otherwise report income under a cash method of accounting will be required to report income with respect to the Bonds under an accrual method.

As a result of the qualification of the REMIC Estate as a REMIC, the REMIC will not be subject to federal income tax except with respect to (i) income from prohibited transactions, (ii) "net income from foreclosure property" and (iii) certain contributions to the REMIC after the Closing Date. The total income of the REMIC (exclusive of any

S-27

income that is taxed at the REMIC level) will be taxable to the beneficial owners of the Bonds and the residual interest. See "CERTAIN FEDERAL INCOME TAX CONSEQUENCES" in the Prospectus. Income with respect to the Pre-Funding Account, the Capitalized Interest Account and the Collateralization Fund will be taxed to MERIT.

The Class A1 Bonds earn interest at a fixed rate and will be issued with original issue discount only if their stated principal amount exceeds their issue price. The Class A2, Class A3, Class A4, Class M1 and Class M2 Bonds will be treated as contingent payment obligations and will be treated as issued with original issue discount regardless of their issue prices. See "CERTAIN FEDERAL INCOME TAX CONSEQUENCES — Original Issue Discount" in the Prospectus. In determining the rate of accrual of original issue discount, amortization of bond premium or market discount, if any, on the Bonds, Bondholders should use a prepayment assumption of 200% MHP (as described under "MATURITY AND PREPAYMENT CONSIDERATIONS — Modeling Assumptions" on page S-23). No representation, however, is made herein as to the rate at which prepayments on the Contracts actually will occur.

The OID Regulations contain provisions (the "Contingent Payment Regulations") that address the federal income tax treatment of debt obligations that provide for one or more contingent payments. Although the Contingent Payment Regulations, by their terms, do not apply to REMIC regular interests and other instruments that are subject to section 1272(a)(6) of the Code, in the absence of further guidance, MERIT intends to account for income on the Class A2, Class A3, Class A4, Class M1 and Class M2 Bonds in the manner described in this paragraph. Income will be accrued on those Bonds based on a constant yield that is derived from a projected payment schedule as of the Closing Date. The projected payment schedule will take into account the Pricing Prepayment Assumptions and the interest payments that are expected to be made, based on the assumption that the principal balances of the Contracts pay down pro rata. To the extent that actual payments differ from projected payments for a particular taxable year, appropriate adjustments to interest income and expense accruals will be made for that year.

The method described in the foregoing paragraph for accounting for interest on the Class A2, Class A3, Class A4, Class M1 and Class M2 Bonds is consistent with Code section 1272(a)(6) and the legislative history to that section. However, considerable uncertainty exists with respect to the treatment of bonds such as the Class A2, Class A3, Class A4, Class M1 and Class M2 Bonds under the OID Regulations. Accordingly, there can be no assurance that the Internal Revenue Service will not assert successfully that a method less favorable to Bondholders should apply. In view of the complexities and the current uncertainties as to income inclusions with respect to securities such as the Class A2, Class A3, Class A4, Class M1 and Class M2 Bonds, each purchaser should consult his own tax advisor to determine the appropriate amount and method of income inclusion on such certificates for federal income tax purposes.

### Credit Enhancement Provided by Collateralization Fund and Sale of Call Right

The Bonds will be entitled to the benefit provided by the Collateralization Fund, which is not part of the REMIC, and will be purchased subject to the right of an affiliate of MERIT to effect a mandatory purchase of a Class or Classes of the Bonds on any Payment Date on and after the earlier of (i) the Payment Date in August 2004 or (ii) the Payment Date on which, after taking into account payments of principal to be made on such Payment Date, the aggregate outstanding principal balance of the Bonds is less than 35% of the initial aggregate outstanding principal balance of the Bonds (the "Call Right").

If the benefit provided by the Collateralization Fund is treated as separate from the Bonds, the purchasers of the Bonds may be treated for federal income tax purposes as having purchased simultaneously (i) the Bonds without the credit enhancement provided by the Collateralization Fund and (ii) the credit enhancement provided by the Collateralization Fund. The purchasers of the Bonds would have to allocate for federal income tax purposes the amount paid by them between the Bonds without the credit enhancement and the credit enhancement provided by the Collateralization Fund.

If the Call Right is treated as separate from the Bonds, the purchasers of the Bonds may be treated for federal income tax purposes as having purchased such Bonds without any obligation to sell such Bonds and as having simultaneously sold a separate option to effect a mandatory purchase of the Bonds. The purchasers of the Bonds would be considered to have received an option premium and to have purchased the Bonds for a purchase price equal to the amount paid plus the option premium. Certain rules (such as the straddle rules) governing the treatment

of a debt instrument and a related option could apply in this situation and, in certain circumstances, could affect a Bondholder's holding period and cost-of-carry in respect of its Bonds.

MERIT, however, believes that the credit enhancement provided by the Collateralization Fund and the Call Right retained by MERIT should be treated as part of a single debt instrument for federal income tax purposes. Even if the credit enhancement provided by the Collateralization Fund and/or the Call Right and the Bonds are not treated as a single debt instrument, MERIT believes that the fair market value of each of the credit enhancement provided by the Collateralization Fund and the Call Right retained by MERIT is *de minimis* and, therefore, the purchase price of the Bonds would not be affected in any event. If nevertheless, the Internal Revenue Service determined that the credit enhancement provided by the Collateralization Fund had more than *de minimis* value, the result of that determination would be that a Bondholder would have to allocate its purchase price for the Bond between the individual interest in the Collateralization Fund and its regular interest in the REMIC in accordance with the relative fair market value of those two property rights. The amount allocated to the credit enhancement provided by the Collateralization Fund would likely be treated as a notional principal contract subject to special accounting rules under applicable Treasury Regulations. Similarly, if the Service determined that the Call Right had more than *de minimis* value, the result of that determination would be that a Bondholder had sold a call right with more than *de minimis* value, which, if not exercised by MERIT, would result in a gain to the Bondholder. In that event, the issue price of such a Bond would be greater, by the value of the Call Right, than the aggregate price paid. If the issue price is greater than the stated redemption price at maturity, the Bond would have acquisition premium.

**DUE TO THE COMPLEXITY OF THE FEDERAL INCOME TAX RULES APPLICABLE TO BONDHOLDERS AND THE CONSIDERABLE UNCERTAINTY THAT EXISTS WITH RESPECT TO MANY ASPECTS OF THOSE RULES, POTENTIAL INVESTORS SHOULD CONSULT THEIR OWN TAX ADVISORS REGARDING THE TAX TREATMENT OF THE ACQUISITION, OWNERSHIP, AND DISPOSITION OF THE BONDS.**

## USE OF PROCEEDS

MERIT will retain from the proceeds from the sale of the Bonds an issuance fee that will be used to cover its expenses and to compensate it for facilitating the issuance of the Bonds. The proceeds from the sale of the Bonds net of the issuance fee will be used by MERIT to purchase the Collateral from Issuer Holding Corp. A portion of such net proceeds will be used to repay Lehman Brothers Inc. and Greenwich Capital Markets, Inc., in respect of certain extensions of credit made to one or more affiliates of MERIT.

## UNDERWRITING

Subject to the terms and conditions set forth in the underwriting agreement dated as of the date hereof (the "Underwriting Agreement") between Lehman Brothers Inc. and Greenwich Capital Markets, Inc. (the "Underwriters"), Issuer Holding Corp. and MERIT, MERIT has agreed to sell to the Underwriters, and the Underwriters have agreed to purchase from MERIT, the Class A1, Class A2, Class A3, Class A4, Class M1 and Class M2 Bonds other than $11,000,000 principal amount of the Class M2 Bonds (the "Offered Bonds"). An affiliate of MERIT will purchase the Class M2 Bonds not purchased by the Underwriters and may offer such Class M2 Bonds from time to time in negotiated transactions or otherwise at varying prices to be determined at the time of sale.

The distribution of the Offered Bonds will be effected from time to time in one or more negotiated transactions, or otherwise, at varying prices to be determined, in each case, at the time of sale. The Underwriters may effect such transactions by selling Offered Bonds to or through dealers, and such dealers may receive from the Underwriters, for whom they act as agent, compensation in the form of underwriting discounts, concessions or commissions. The Underwriters and any dealers that participate with the Underwriters in the distribution of the Offered Bonds may be deemed to be underwriters, and any discounts, commissions or concessions received by them, and any profit on the resale of the Offered Bonds purchased by them, may be deemed to be underwriting discounts and commissions under the Securities Act of 1933, as amended (the "Act"). In addition, Lehman Brothers Inc. will be entitled to receive a structuring fee of $366,500 from MERIT.

The Underwriting Agreement provides that MERIT and Issuer Holding Corp. will indemnify the Underwriters against certain civil liabilities, including liabilities under the Act to the extent and under the circumstances set forth therein.

MERIT expects to receive proceeds of approximately $325,333,000, plus accrued interest, before deducting expenses estimated to be $625,000.

The Underwriters may engage in over-allotment, stabilizing transactions, syndicate covering transactions and penalty bids in accordance with Regulation M under the Securities Exchange Act of 1934 (the "Exchange Act"). Over-allotment involves syndicate sales in excess of the offering size, which creates a syndicate short position. Stabilizing transactions permit bids to purchase the underlying security so long as the stabilizing bids do not exceed a specified maximum. Syndicate covering transactions involve purchases of the offered certificates in the open market after the distribution has been completed in order to cover syndicate short positions. Penalty bids permit the Underwriters to reclaim a selling concession from a syndicate member when the offered certificates originally sold by syndicate members are purchased in a syndicate covering transaction to cover syndicate short positions. Stabilizing transactions, syndicate covering transactions and penalty bids may cause the price of the offered certificates to be higher than it would otherwise be in the absence of these transactions. These transactions, if commenced, may be discontinued at any time.

Some of the Contracts have been the subject of financing provided by affiliates of the Underwriters. The Underwriters and their affiliates have lending relationships with affiliates of MERIT.

## LEGAL MATTERS

Certain legal matters relating to the Bonds will be passed upon for MERIT by Arter & Hadden LLP, Washington, D.C., and certain legal matters relating to the Bonds will be passed upon for the Underwriters by Hunton & Williams, Richmond, Virginia, which also performs certain legal services for MERIT and its affiliates on other matters.

## RATINGS

It is a condition to the issuance of the Bonds that the Offered Bonds be rated as set forth on the cover page.

The ratings assigned to asset-backed bonds take into consideration the credit quality of the related pool of assets, including any credit enhancement, structural and legal aspects associated with such bonds and the extent to which the payment stream on the related assets is adequate to make payments required on such bonds. Ratings on such bonds do not, however, constitute a statement regarding frequency of prepayments on the related loans. As a result, the ratings do not address the possibility that the holders of the Offered Bonds might suffer a lower than anticipated yield.

A security rating is not a recommendation to buy, sell or hold Offered Bonds and may be subject to revision or withdrawal at any time by the assigning Rating Agency. In the event that a rating initially assigned to the Offered Bonds is subsequently lowered for any reason, no person or entity is obligated to provide any additional support or credit enhancement with respect to the Offered Bonds. Each security rating should be evaluated independently of any other security rating.

MERIT has not requested a rating on the Offered Bonds by any rating agency other than Moody's Investors Services, Inc., and Fitch IBCA, Inc. (collectively, the "Rating Agencies"). Nevertheless, there can be no assurance as to whether any other rating agency will nonetheless issue a rating and, if it does, what such rating would be. A rating assigned to the Offered Bonds by a rating agency that has not been requested by MERIT to do so may be lower than the rating assigned by the Rating Agencies pursuant to MERIT's request.

## ERISA CONSIDERATIONS

Fiduciaries of employee benefit plans and certain other retirement plans and arrangements, including individual retirement accounts and annuities, Keogh plans, and collective investment funds in which such plans, accounts, annuities or arrangements are invested, that are subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or corresponding provisions of the Code (any of the foregoing a "Plan"), persons acting on behalf of a Plan, or persons using the assets of a Plan ("Plan Investors"), should carefully review with their legal advisors whether the purchase or holding of the Bonds could give rise to a transaction that is prohibited under ERISA or the Code or cause the Collateral securing the Bonds to be treated as "plan assets" for purposes of regulations of the Department of Labor set forth in 29 C.F.R. 2510.3-101 (the "Plan Asset Regulations"). Prospective investors should be aware that, although certain exceptions from the application of the prohibited transaction rules and the Plan Asset Regulations exist, there can be no assurance that any such exception will apply with respect to the acquisition of a Bond. See "ERISA CONSIDERATIONS" in the Prospectus.

If the Offered Bonds are treated as equity for purposes of ERISA, the purchaser of an Offered Bond could be treated as having acquired a direct interest in the Collateral securing the Offered Bonds. In that event, the purchase, holding, or resale of the Offered Bonds could result in a transaction that is prohibited under ERISA or the Code. Furthermore, regardless of whether the Offered Bonds are treated as equity for purposes of ERISA, the acquisition or holding of the Offered Bonds by or on behalf of a Plan could still be considered to give rise to a prohibited transaction if MERIT, the Trustee, any Master Servicer, any Servicer or any of their respective affiliates is or becomes a party in interest or a disqualified person with respect to such Plan. Nevertheless, one or more alternative exemptions may be available with respect to certain prohibited transaction rules of ERISA that might apply in connection with the initial purchase, holding and resale of the Offered Bonds, depending in part upon the type of Plan fiduciary making the decision to acquire Offered Bonds and the circumstances under which such decision is made. Those exemptions include, but are not limited to: (i) Prohibited Transaction Class Exemption ("PTCE") 95-60, regarding investments by insurance company general accounts; (ii) PTCE 91-38, regarding investments by bank collective investment funds; (iii) PTCE 90-1, regarding investments by insurance company pooled separate accounts; (iv) PTCE 84-14, regarding transactions negotiated by qualified professional asset managers; or (v) PTCE 96-23, regarding transactions negotiated by in-house asset managers. Before purchasing Bonds, a Plan subject to the fiduciary responsibility provisions of ERISA or described in Section 4975(e)(1) (and not exempt under Section 4975(g)) of the Code should consult with its counsel to determine whether the conditions of any exemption would be met. A purchaser of a Offered Bond should be aware, however, that even if the conditions specified in one or more exemptions are met, the scope of the relief provided by an exemption might not cover all acts that might be construed as prohibited transactions. See "ERISA CONSIDERATIONS" in the Prospectus.

MERIT believes that the Offered Bonds will be treated as debt obligations without significant equity features for purposes of the Plan Asset Regulations. Accordingly, a Plan that acquires such Bond should not be treated as having acquired a direct interest in the assets of MERIT. Nevertheless, there can be no complete assurance that such Bonds will be treated as debt obligations without significant equity features for purposes of the Plan Asset Regulations.

## LEGAL INVESTMENT CONSIDERATIONS

At the end of the Funding Period the Senior Bonds and the Class M1 Bonds will constitute "mortgage related securities" for purposes of the Secondary Mortgage Market Enhancement Act of 1984 for so long as they are rated in one of the two highest rating categories by one or more nationally recognized statistical rating organizations. As mortgage related securities, the Senior Bonds and the Class M1 Bonds will be legal investments for entities to the extent provided in SMMEA, unless there are state laws overriding SMMEA. A number of states have enacted legislation overriding the legal investment provisions of SMMEA. See "LEGAL INVESTMENT" in the Prospectus.

**The Class M2 Bonds will not constitute mortgage related securities for purposes of SMMEA because they are not rated in one of the two highest rating categories by a nationally recognized statistical rating organization.** There are significant interpretive uncertainties in determining the appropriate characterization of the Class M2 Bonds under various legal investment restrictions, and thus the ability of investors that face legal restrictions to purchase the Class M2 Bonds. Any financial institution regulated by the Comptroller of the Currency, the Board of

Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, the National Credit Union Administration, any state insurance commission or any other federal or state agency with similar authority should review any applicable rules, guidelines and regulations prior to purchasing any certificates. Financial institutions should review and consider the applicability of the Federal Financial Institutions Examination Counsel Supervisory Policy Statement on the Selection of Securities Dealers and Unsuitable Investment Practices, to the extent adopted by their respective federal regulators, which, among other things, sets forth guidelines for investing in certain types of mortgage related securities and prohibits investment in high risk mortgage securities.

MERIT does not make any representations as to the proper characterization of any class of the Offered Bonds for legal investment or other purposes, or as to the legality of investment by particular investors in any class of the offered certificates under applicable legal investment restrictions. Accordingly, all institutions that must observe legal investment laws and regulatory capital requirements or review by regulatory authorities should consult with their own legal advisors to determine whether and to what extent the offered certificates constitute legal investments under SMMEA or must follow investment, capital or other restrictions. See "LEGAL INVESTMENT" in the Prospectus.