Joseph J. Saltarelli
HUNTON & WILLIAMS LLP
200 Park Avenue, 52nd Floor
New York, NY 10166
212-309-1000 (telephone)

   *-and-*

Edward J. Fuhr (admitted *pro hac vice*)
Terence J. Rasmussen (admitted *pro hac vice*)
HUNTON & WILLIAMS LLP
951 E. Byrd Street
Riverfront Plaza, East Tower
Richmond, VA 23219
804-788-8200 (telephone)

*Counsel for Defendants Dynex Capital, Inc., Merit Securities Corporation, Thomas H. Potts and Stephen J. Benedetti*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE DYNEX CAPITAL, INC. SECURITIES LITIGATION | Master File No. 05-CV-1897 (HB) |

**DEFENDANTS' REPLY BRIEF IN FURTHER SUPPORT OF MOTION TO DISMISS
<u>PLAINTIFF'S SECOND AMENDED CLASS ACTION COMPLAINT</u>**

Dated: November 5, 2008
        New York, New York

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................................ ii

PRELIMINARY STATEMENT ..........................................................................................................1

ARGUMENT.........................................................................................................................................2

    I.    Plaintiff Misstates the Legal Standard ................................................................................2

    II.   Plaintiff Fails to Rebut Defendants' Scienter Arguments...................................................3

        A.    Plaintiff Fails to Correct the Scienter Deficiencies Identified by
             the Second Circuit in <u>Teamsters</u> ................................................................................3

            1.    There Is a Hole in the Complaint: Plaintiff Fails to Cite a
                   Single Source That Sheds Light on What Happened at Dynex
                   During the Class Period .................................................................................4

            2.    Documentary Sources: Contrary to Plaintiff's Exaggerations,
                   the Complaint Cites Only a Single Internal Report ......................................5

            3.    Testimonial Sources: The Complaint Cites No Source in a Position
                   to Opine on What Potts and Benedetti Knew During the Class Period .................7

        B.    Plaintiff Is the Party Who Wants to View the Allegations in Isolation;
             Viewed Collectively, They Fail to Give Rise to an Inference of Scienter
             that Is Cogent and at Least as Compelling as Competing Inferences..........................9

    III.  Plaintiff Fails to Rebut Defendants' Argument that the Complaint Fails to
          Plead Falsity......................................................................................................................12

        A.    Statements Regarding Market Conditions ................................................................12

        B.    Statements Regarding Underwriting..........................................................................13

    IV.  On Defendants' Remaining Arguments, Plaintiff Relies Inappropriately on
          the Doctrine of the Law of the Case to Avoid Responding on the Merits........................14

CONCLUSION....................................................................................................................................15

## TABLE OF AUTHORITIES

**Page**

### FEDERAL CASES

In re Am. Express Co. Sec. Litig., No. 02-5533, 2008 WL 4501928
   (S.D.N.Y. Sept. 26, 2008) ................................................................................ 7-8

ATSI Commun., Inc. v. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007) ........................... 6

Coble v. Broadvision, Inc., No. 01-01969, 2002 WL 31093589
   (N.D. Cal. Sept. 11, 2002) ................................................................................. 6

In re Dynex Capital, Inc. Sec. Litig. ("Dynex I"), No. 05-1897, 2006 WL 314524
   (S.D.N.Y. Feb. 10, 2006) .............................................................................. 14, 15

In re Impac Mortgage Holdings, Inc. Sec. Litig., 554 F. Supp. 2d 1083
   (C.D. Cal. 2008) ................................................................................................. 9

In re JP Morgan Chase Sec. Litig., No. 02-1282, 2007 WL 950132
   (S.D.N.Y. Mar. 29, 2007) ................................................................................... 9

Johnson v. Bd. of Educ., 457 U.S. 52 (1982) ................................................................. 14

Kalnit v. Eichler, 264 F.3d 131 (2d Cir. 2001) .............................................................. 11

Klehr v. A.O. Smith Corp., 521 U.S. 179 (1997) ..................................................... 14, 15

Ling Nan Zheng v. Liberty Apparel Co., 556 F. Supp. 2d 284 (S.D.N.Y. 2008) ........... 14

Malin v. XL Capital Ltd., 499 F. Supp. 2d 117 (D. Conn. 2007) .................................... 8

In re NTL Inc. Sec. Litig., 347 F. Supp. 2d 15 (S.D.N.Y. 2004) ..................................... 6

Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000) ............................................................... 8

In re Optionable Sec. Litig., -- F. Supp. 2d --, 2008 WL 4223662
   (S.D.N.Y. Sept. 15, 2008) ................................................................................ 13

Shields v. Citytrust Bancorp, 25 F.3d 1124 (2d Cir. 1994) ........................................... 11

Teamsters Local Freight Div. Pension Fund v. Dynex Capital, Inc.,
   531 F.3d 190 (2d Cir. 2008) ....................................................................... passim

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499 (2007) ................ 3, 11, 12, 13

Defendants Dynex Capital, Inc. ("Dynex"), Merit Securities Corporation ("Merit"), Thomas H. Potts and Stephen J. Benedetti (collectively, "Defendants") submit this reply brief in support of their motion to dismiss the Second Amended Class Action Complaint ("Complaint").

## PRELIMINARY STATEMENT

In its opposition brief, Plaintiff strives to portray the Complaint as overflowing with details. It cites numerous reports. It describes various policies. It notes different programs.

There is a difference, however, between citing details and citing details that are pertinent to whether specific statements were uttered with fraudulent intent. The latter kind of detail is the kind demanded by the Private Securities Litigation Reform Act. Despite having had the benefit of two practice runs with prior complaints, it is this kind of detail that the Complaint still lacks.

Specifically, Plaintiff fails to rebut Defendants' showing that the Complaint cites not a single source shedding light on what transpired at Dynex <u>during the Class Period</u>, when the challenged statements were made. Even putting this defect aside, the <u>only</u> particular documentary source the Complaint cites is a report on loan production from a single region of a Dynex affiliate covering four months in 1997. This is hardly a basis on which to premise company-wide claims that every loan originated over a four-year time span was worthless, much less that Messrs. Potts and Benedetti had knowledge of this alleged state of affairs. Nor does this report indicate that anyone else "whose intent could be imputed to the corporation" made a statement with "the requisite scienter," as the Second Circuit requires. <u>Teamsters Local Freight Division Pension Fund v. Dynex Capital, Inc.</u>, 531 F.3d 190, 195 (2d Cir. 2008).

In short, the Complaint, like its predecessor, has a scienter problem. Plaintiff's brief strives to overcome these problems with hyperbole and exaggeration, at one point trying to establish the scienter of Mr. Benedetti by referring to "collateral which he [i.e., Mr. Benedetti,] had originated." Pl.'s Br., at 23. But there is no allegation in the Complaint that Mr. Benedetti,

1

one of Dynex's top executives, personally originated manufactured housing loans to potential home buyers. This exaggeration of the allegations is emblematic of Plaintiff's approach.

When all the facts are viewed together, the more compelling inference remains the inference to which the Second Circuit gravitated in Teamsters: that the "primary cause of the bonds' poor performance" was the "general weakness in the mobile homes market." Id. at 197.

In addition to confirming this scienter problem, Plaintiff's opposition brief fails to rebut Defendants' arguments as to the falsity of the challenged statements. Once again, Plaintiff attempts to hold Defendants liable for words they did not utter while simultaneously refusing to credit the disclosures Defendants actually made.

Finally, Plaintiff relies inappropriately on the doctrine of the law of the case to avoid responding to Defendants' arguments on the statute of limitations, standing, materiality and loss causation. Under settled law, that doctrine does not apply to a vacated order. Moreover, as explained in Defendants' opening brief, each of these arguments is fatal to all or part of Plaintiff's claims.

For these reasons, the Complaint must be dismissed. And after three years and three tries, it ought to be dismissed with prejudice.

## ARGUMENT

### I.   Plaintiff Misstates the Legal Standard

Plaintiff begins its legal argument by misstating the standard. Plaintiff claims that "[w]hen considering a motion to dismiss," a court must "draw all reasonable inferences in favor of the non-moving party." Pl.'s Br., at 11; see also id. at 24 n.9 (claiming that on a motion to dismiss, a court must construe allegations "in the light most favorable to the plaintiffs").

Plaintiff is wrong. As the Second Circuit held in this very matter, "[w]hile we normally draw reasonable inferences in the non-movant's favor on a motion to dismiss, section 21D(b)(2)

2

of the PSLRA, which governs scienter pleading in securities fraud actions, establishes a <u>more stringent</u> rule for inferences involving scienter." <u>Teamsters</u>, 531 F.3d at 194 (emphasis added).

This is an important distinction. The Complaint cannot survive this motion by articulating a theory of fraud that is merely possible. Nor can it survive by articulating a theory that is reasonable or even plausible. See <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 127 S. Ct. 2499, 2504-05 (2007) (an inference of scienter "must be more than merely plausible or reasonable"). Rather, the inference of fraudulent intent must be "cogent and at least as compelling as any opposing inference." <u>Id.</u> As described below, Plaintiff's opposition brief confirms that the Complaint fails this test.

## II.     <u>Plaintiff Fails to Rebut Defendants' Scienter Arguments</u>

### A.     **Plaintiff Fails to Correct the Scienter Deficiencies Identified by the Second Circuit in <u>Teamsters</u>**

In <u>Teamsters</u>, 531 F.3d 190, the Second Circuit held that Plaintiff's previous complaint failed to plead scienter and that a litany of various non-culpable inferences were more compelling. <u>Id.</u> at 197. Plaintiff claims, however, that <u>Teamsters</u> identified only the narrow scienter deficiency of a failure to "identify <u>specific reports</u>." Pl.'s Br., at 13 (emphasis in original). Plaintiff claims further that the current Complaint, with its references to purported reports, cures this deficiency. Pl.'s Br., at 13-18.

Plaintiff is mistaken both as to the Second Circuit's diagnosis and the Complaint's purported cure. The deficiencies identified in <u>Teamsters</u> were broader than the mere failure to name a specific type of report. And the Complaint's purported cure is a mirage. Stripped of hyperbole, the Complaint cites exactly <u>one</u> specific report and no sources — documentary or testimonial — shedding light on what Potts and Benedetti (or anyone else) believed when making the challenged statements during the Class Period.

3

      1.    <u>There Is a Hole in the Complaint: Plaintiff Fails to Cite a Single Source That Sheds Light on What Happened at Dynex During the Class Period</u>

Plaintiff's opposition brief confirms that the Complaint cites not a single source with knowledge of what transpired at Dynex during the Class Period. See Pl.'s Br., at 22-23. Every cited report and virtually all of the confidential witnesses pre-date February 2000, the beginning of the Class Period.[1] This is significant because this case is about statements made <u>during the Class Period</u> at the behest of Potts and Benedetti, and the intent with which those statements were made (Compl. ¶ 2).

Plaintiff claims that these pre-Class Period sources are probative because they allegedly relate to the time "when the mortgage collateral was being underwritten." Pl.'s Br., at 22. But as the Second Circuit recognized implicitly in <u>Teamsters</u>, purported reports from years prior to the start of the Class Period cannot give rise to a strong inference that Messrs. Potts or Benedetti believed five, six or seven years later that disappointing bond performance was attributable, as Plaintiff claims, solely to "aggressive underwriting." Pl.'s Br., at 13; <u>Teamsters</u>, 531 F.3d at 197. Potts and Benedetti could have received other reports in the intervening seven years pointing to other factors. Circumstances could have changed. This explains the Second Circuit's belief that a more plausible explanation of this case is that "no one at Dynex or Merit found the statements misleading because they identified the cause of the bonds' performance as accurately as possible." <u>Teamsters</u>, 531 F.3d at 197.

Neither the Complaint nor Plaintiff's brief offers any insight into what happened at Dynex after 1999. There is no citation to a confidential witness who reported to Potts or

---

[1] Two of the nine confidential witnesses purportedly worked for a relatively brief period after February 2000, see ¶¶ 53(e), (g), but neither of them worked at Dynex. Rather, they both worked at Origen Financial, Inc., the unaffiliated third party to which Dynex sold its manufactured housing operations in 1999 (¶ 21). See Def.'s Br., at 5, 13.

4

Benedetti during the Class Period. There is no citation to a single report that Potts or Benedetti received or a single meeting they attended during the Class Period. There is no citation to a source who was told by Potts, Benedetti, or anyone else to falsify a report or fudge a number during the Class Period. And there is certainly no citation to a report during the Class Period indicating that aggressive underwriting was causing poor bond performance, to the exclusion of all other factors. Put simply, there is a hole in the Complaint the size of the Class Period.

        2.        <u>Documentary Sources: Contrary to Plaintiff's Exaggerations, the Complaint Cites Only a Single Internal Report</u>

Even putting aside the failure to cite sources from the key time period, Plaintiff's opposition brief confirms that the Complaint has another scienter problem. Specifically, Plaintiff's argument is premised on the hope that this Court will not notice that the Complaint's citations to what appear to be a litany of reports all point to the same document, a regional report of a Dynex affiliate prepared three years before the start of the Class Period.

Plaintiff's brief cites repeatedly to what appear to be various reports establishing that a "substantial" portion of the bond collateral was worthless upon origination, and that Potts and Benedetti knew it. <u>See</u> Pl.'s Br., at 7 ("The MHDP Reports issued by Dynex management in Virginia showed the poor 'C' rating assigned to <u>substantial</u> portions of the bond collateral.") (emphasis added); <u>id.</u> at 9 ("Management was well aware of the <u>substantial</u> percentage of poor credit quality loans . . . since management themselves quantified the amount of such 'C' loans in the MHDP and MHRP Reports.") (emphasis added); <u>id.</u> at 19 ("a <u>substantial</u> portion of the mortgages were designated 'C' or poor credit quality mortgages in the MHDP and MHRP Reports) (emphasis added); <u>id.</u> at 22-23 (the "mortgage collateral" was "determined by management to be <u>substantially</u> of poor credit quality as reflected in, for example, the MHDP

5

and MHRP Reports") (emphasis added); id. at 29 ("Defendants knew [creditworthiness] did not exist for substantial portions of the MBS collateral") (emphasis added).

But these broad, repeated claims about "substantial" portions of the bond collateral share an interesting feature. As factual support, they all cite the same single report; namely, a purported MHRP Report from one region of a Dynex affiliate for a single quarter of 1997. See Pl.'s Br., at 7, 9, 19, 22-23 (all citing ¶ 66, which itself cites the single report). That is all. In fact, there is no other "specific report," Pl.'s Br., at 13, cited in the Complaint or Plaintiff's opposition brief — not a specific "basis report," not a specific "audit report" and not a specific "MHDP" or "MHRP" report. See Def.'s Br., at 18.

Accordingly, Plaintiff's claim that a "substantial" portion of the collateral was worthless is not supported by the alleged facts, which relate only to loan production in a single region of a Dynex affiliate for four months of 1997. See ATSI Commun., Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007) ("[a]llegations that are conclusory or unsupported by factual assertions are insufficient") (emphasis added). As one court put it, "[a]djectives" — such as "substantial" — "are not substitutes for allegations of fact." Coble v. Broadvision, Inc., No. 01-01969, 2002 WL 31093589, at *4 (N.D. Cal. Sept. 11, 2002); see also In re NTL Sec. Litig., 347 F. Supp. 2d 15, 24 (S.D.N.Y. 2004) ("The complaint, apart from largely rhetorical flourishes of indeterminate meaning, contains little or no hard information concerning the extent . . . of the subsidiary 'facts' relied upon. Claims of 'frequent' failures to complete service appointments, for example, are meaningless unless one knows what 'frequent' means.") (emphasis added), Ex. 33.

Dynex is a large, publicly-traded corporation. A single report covering a single quarter of loan production in a single region is simply not probative of the entire corporation's aggregate loan production over a four-year period (i.e., the period over which the bond collateral was

6

originated). That single report does not give rise to any inference of falsity or scienter, as its purported results could have been outweighed by contributions from the Company's myriad other regions, or even by that same region in different quarters.

In sum, Plaintiff's lone report — coupled with Plaintiff's liberal use of the adjective "substantial" — cannot sustain a claim that Potts and Benedetti knew the collateral on an aggregate basis was worthless from the outset but told investors otherwise.[2]

### 3. Testimonial Sources: The Complaint Cites No Source in a Position to Opine on What Potts and Benedetti Knew During the Class Period

Plaintiff's opposition brief also relies heavily on the Complaint's confidential witnesses ("CWs"). Pl.'s Br., at 3, 16-18, 22-24. The CWs, however, are no more probative of fraudulent intent during the Class Period than the single report discussed above.

First, Plaintiff concedes that the CWs were generally low-level, short-term employees who either left an affiliate of Dynex prior to the Class Period or never worked at Dynex at all. See Pl.'s Br., at 22. This concession is fatal to Plaintiff's efforts to plead, as required by the Second Circuit, that "someone whose intent could be imputed to the corporation acted with the requisite scienter" in making an alleged misstatement. Teamsters, 531 F.3d at 195.

Second, Plaintiff fails to explain how these low-level employees who left Dynex prior to the Class Period could have had any insight into what Potts and Benedetti believed when making the challenged statements. See, e.g., In re Am. Express Co. Sec. Litig., No. 02-5533, 2008 WL 4501928, at *8 (S.D.N.Y. Sept. 26, 2008) ("Plaintiffs have also failed to allege any facts showing

---

[2] Defendants note further that the single specific report Plaintiff cites does not establish — and is not alleged to have established — that the loans referenced therein were worthless or underwritten inappropriately. Rather, according to the Complaint that report simply states that 64% of the loans referenced therein received a grade of "C," rather than "A" or "B" (¶ 66). There is nothing improper about originating loans that are rated internally as a "C," whatever that means (Plaintiff does not explain with any particularity). Doing so certainly does not violate the federal securities laws.

7

that the confidential sources . . . had any contact with the Individual Defendants or would have knowledge of what they knew or should have known during the Class Period."), Ex. 34; Malin v. XL Capital Ltd., 499 F. Supp. 2d 117, 141 (D. Conn. 2007) ("none of the CWs present any evidence that they communicated . . . the alleged problems . . . to any of the Individual Defendants or that the Individual Defendants otherwise knew about these issues").

Although one CW claims that he was "aware" that "Potts and Benedetti" personally used certain types of reports to evaluate "regional management," ¶ 53(a), and thus had knowledge of those reports, those claims are simply not credible coming from a "District Sales Manager" who left his job at a branch office of a Dynex affiliate in May 1997 (¶ 53(a)). As Plaintiff concedes, confidential sources must be sufficiently described "to support the probability that a person in the position occupied by the source would possess the information alleged." Pl.'s Br., at 16 (quoting Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000)) (emphasis added). It is not probable that a district employee had personal knowledge of which reports top executives reviewed at corporate headquarters in Virginia. And it is certain that he lacked such knowledge for all times after May 1997, when he was no longer even employed by a Dynex affiliate.

Moreover, Plaintiff's opposition brief confirms that none of the CWs is alleged to have communicated with Mr. Potts. And the purported statement of the only CW alleged to have made personal contact with Mr. Benedetti is conspicuous in its failure to attribute to Benedetti any bad intent or any knowledge contrary to Dynex's public statements (¶ 53). See also Def.'s Br., at 15-16.

Finally, Plaintiff claims that Defendants rely on a "contrived" contradiction between CW#4 and certain of Plaintiff's other CWs. Pl.'s Br., at 24. Plaintiff claims further that to create this contradiction, Defendants have resorted to "improper twisting" of Plaintiff's allegations. Id.

8

Plaintiff is mistaken. To dispel any confusion, here are Plaintiff's own words:

- CW#6: Dynex's "underwriters and sales managers <u>routinely ignored the Company's stated guidelines</u> in order to achieve 'volume' in the organization of manufactured mobile home loans." Compl. ¶ 53(f) (emphasis added).

- CW#4: "[P]rior to 1999," when the bond collateral was originated, "employees responsible for reviewing credit applications and supporting documentation would review the paperwork and render a decision <u>based on guidelines that were set by the Company</u>." Compl. ¶ 53(d) (emphasis added).

CW#4 takes a fundamentally different view from CW#6 (and several of Plaintiff's other so-called witnesses). It does not take any "improper twisting," Pl.s' Br., at 24, to see this. This tension between Plaintiff's own witnesses as to the <u>key</u> allegation in the Complaint — that underwriting standards were "systematically disregarded" prior to the Class Period — is not the stuff of which cogent inferences of scienter are made. See, e.g., <u>In re Impac Mortgage Holdings, Inc. Sec. Litig.</u>, 554 F. Supp. 2d 1083, 1100 (C.D. Cal. 2008) (dismissing securities fraud complaint related to allegedly improper loan underwriting where "Plaintiffs' own assertions contradict[ed] and undermine[d] their allegations of scienter"); <u>In re JP Morgan Chase Sec. Litig.</u>, No. 02-1282, 2007 WL 950132, at *13 (S.D.N.Y. Mar. 29, 2007) (dismissing securities fraud complaint where plaintiff's "conclusory allegation that JPM Chase knew of Enron's 'true financial condition' is contradicted by other allegations in the SAC"), Ex. 35.

    **B.    Plaintiff Is the Party Who Wants to View the Allegations in Isolation; Viewed Collectively, They Fail to Give Rise to an Inference of Scienter that Is Cogent and at Least as Compelling as Competing Inferences**

Plaintiff accuses Defendants of wanting to view the allegations in the Complaint in isolation, contrary to the mandate of <u>Tellabs</u>. Pl.'s Br., at 20. Plaintiff claims that when viewed in their totality, its allegations give rise to a cogent inference of scienter. <u>Id.</u>

Plaintiff is mistaken on both counts. First, it is Plaintiff that refuses to examine the allegations in their totality. Plaintiff asks this Court to ignore the contrary statements of its own

9

CW#4 concerning adherence to underwriting standards.  Pl.'s Br., at 24.  Plaintiff asks this Court to ignore Dynex's accurate reporting over the entire Class Period of every measure of bond performance — including total losses — other than cumulative repossessions.  Pl.'s Br., at 28. Plaintiff asks this Court to ignore public disclosures that the underwriting standards used by the Dynex affiliate that originated the loans were "more lenient" than those used for standard mortgages.  Pl.'s Br., at 30 (accusing Defendants of "cherry-picking allegations" by referring to this disclosure); see also Def.'s Br., at 30.  Finally, Plaintiff asks this Court to ignore Defendants' own financial interest in ensuring that the homeowners made monthly payments.  Pl.'s Br., at 28-29; see also Def.'s Br., at 23-25.  So much for totality.

Second, viewing the allegations in the Complaint in their totality does <u>not</u> favor Plaintiff. Rather, doing so confirms that Plaintiff's theory of fraud is not even plausible, much less cogent and compelling.  Taking all the facts together, Plaintiff's theory amounts to this:

- Step One:  Defendants decided to originate loans and issue bonds backed by those loans in the hope of making a "profit" like a bank; that is, "from the differential between . . . the typical yield (7% to 9%) paid [by Defendants] to the bondholders and <u>the interest (10% to 14%) received [by Defendants] from the mortgages</u>."  ¶ 56 (emphasis added). Dynex also invested in the bonds; indeed, it was "saddled with the most junior tranche" of the bonds.  Pl.'s Br., at 28.

- Step Two:  Defendants knew, however, that the homeowners would not make interest payments on the mortgages.  ¶ 5 (Dynex "management" had "actual knowledge of the substantially impaired quality of the bond collateral").  Accordingly, Defendants knew — from the outset of their "scheme" — that they would not in fact make the "profit" to which the Complaint itself refers (¶ 56);

- Step Three:  Defendants sought to induce the public to invest in the bonds.  Defendants sought to accomplish this goal by reporting accurately, before the class period even began, that delinquency and repossession rates had "increased dramatically by 170% and 200%."  ¶ 8.  In Plaintiff's words, this disclosure was an "unavoidable red flag" of the "poor quality of the collateral" (¶ 8) — hardly the sort of disclosure one makes to induce investor interest.

- Step Four:  For the next four years, Defendants sought to continue inducing the unsuspecting public to invest in the securities.  They somehow accomplished this by disclosing accurately on a monthly basis 30, 60 and 90 day delinquencies, ending

10

    collateral balance, and <u>cumulative (i.e., total) losses</u>.  <u>See</u> Pl.'s Br., at 28 (conceding that the Complaint attacks only the reporting of cumulative repossessions, which was one of more than twenty measures of bond performance reported monthly); Ex. 16; and finally,

- <u>Step Five</u>:  In the final year of the Class Period, Defendants sought to convince the public yet again that the bonds were a good investment by causing Merit to <u>over</u>state the losses it expected to incur personally on the bonds (¶ 149) — again, hardly the sort of misstatement one makes to induce investor interest in the bonds.

At every step of Plaintiff's narrative, Defendants made not only an odd choice with respect to furthering a fraudulent scheme, but an utterly irrational choice.  <u>Cf.</u> <u>Kalnit v. Eichler</u>, 264 F.3d 131, 140-41 (2d Cir. 2001) ("where plaintiff's view of the facts defies economic reason, . . . [it] does not yield a reasonable inference of fraudulent intent").  The Complaint offers no viable allegation that Potts or Benedetti had a motive to pursue such an irrational scheme.  Defendants submit that this Court would have a difficult time noting all of these facts — each of which is alleged in the Complaint — and conducting the requisite "comparative evaluation," <u>Tellabs</u>, 127 S.Ct. at 2504, but still finding a cogent inference of scienter.

    Rather, the more plausible inference is that an affiliate of Dynex originated loans between 1996 and 1999 and that Defendants believed the loans (and the securities backed by those loans) would perform well.  That is why they invested in and hoped to "profit" (¶ 56) from them.  <u>See</u> <u>Shields v. Citytrust Bancorp</u>, 25 F.3d 1124, 1130 (2d Cir. 1994) (holding in securities suit that "we assume that the defendant is acting in his . . . informed economic self-interest").  When certain loans began performing poorly, Defendants disclosed it.  Indeed, on the eve of their alleged scheme to dupe investors into believing the bonds were a good investment, Defendants disclosed that delinquency and repossession rates had "increased dramatically by 170% and 200%."  ¶ 8.

    As the loans continued to perform poorly, Defendants told the public, disclosing accurately not only 30, 60 and 90 day delinquencies but also total bond losses.  <u>See</u> Pl.'s Br., at

11

28; Ex. 16. Finally, after four years of increasingly disappointing performance — performance that disappointed Defendants as much as Plaintiffs — ratings agencies downgraded the bonds. Cf. Teamsters, 531 F.3d at 197 (more plausible that disappointing bond performance was caused by "the general weakness in the mobile homes market").

When all the facts are viewed together, Plaintiff's proffered inference of a five-year fraudulent scheme is simply not as compelling as an inference that normal market factors were at work. Cf. Teamsters, 531 F.3d at 197 ("We cannot say, based on the allegations in the complaint, that this inference is 'at least as compelling' as the competing inference . . . . Accordingly, the PSLRA requires dismissal of the complaint.") (quoting Tellabs, 127 S.Ct. at 2505).

### III. Plaintiff Fails to Rebut Defendants' Argument that the Complaint Fails to Plead Falsity

#### A. Statements Regarding Market Conditions

In their opening brief, Defendants explained that contrary to the Complaint, Dynex never told investors that poor collateral performance was due solely to market factors. Def.'s Br., at 26. As a result, the Complaint sought to pin liability on Dynex for something it never said.

In its opposition brief, Plaintiff misses the point entirely. Pl.'s Br., at 26. Plaintiff claims that Dynex told investors that "poor bond collateral performance [was due] to only market conditions," id. at 22, that the "poor performance of the collateral [was] due to 'market factors,'" id. at 22 n.8, and that the "mortgage collateral poor performance during the Class Period was due to 'market conditions' alone." Id. at 22.

Plaintiff fails, however, to point to the paragraph of the Complaint containing such a statement. This is because there is no such paragraph. See Def.'s Br., at 26 (reprinting what Merit actually said and explaining why Plaintiff fails to allege that that statement was false). For

12

this reason, Plaintiff fails to plead a false statement.  See In re Optionable Sec. Litig., -- F. Supp. 2d --, 2008 WL 4223662, at *5 (S.D.N.Y. Sept. 15, 2008) ("Plaintiffs rely on a BMO press release to support the claim that 'BMO informed investors . . . that it had between $350 million and $450 million . . . in trading losses . . . .' In fact, however, the BMO press release did not say that. . . .  Thus, plaintiffs' first allegation is contradicted by its alleged source.") (emphasis added), Ex. 36; see also Teamsters, 531 F.3d at 197 ("Teamsters fails to allege the existence of information that would demonstrate that the statements made to investors were misleading").

      **B.**    **Statements Regarding Underwriting**

In their opening brief, Defendants noted that Dynex never claimed to adhere to the underwriting standards that Plaintiff says it did.  Def.'s Br., at 29-30.  Defendants pointed to public disclosures concerning the "lenien[cy]" of the standards, the use of a "limited documentation program," and the possibility that underwriting standards would be waived, see id., the precise disclosures Plaintiff claims were omitted.

In response, Plaintiff accuses Defendants of "cherry-picking allegations which purportedly advance their position while ignoring the totality of the allegations."  Pl.'s Br., at 30.

Plaintiff is mistaken.  Indeed, this is another example of Plaintiff ignoring facts that it finds inconvenient.  See above, at pp. 9-10.  Under Tellabs, this Court has to consider all of Defendants' disclosures.  Tellabs, 127 S.Ct. at 2509 ("courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss").  To find that Defendants made a misstatement about underwriting standards, this Court would have to ignore the disclosures cited above, disclosures that Plaintiff simply fails to address in its opposition brief.  See Pl.'s Br., at 30.

13

## IV. On Defendants' Remaining Arguments, Plaintiff Relies Inappropriately on the Doctrine of the Law of the Case to Avoid Responding on the Merits

In their opening brief, Defendants raised arguments based on the statute of limitations, loss causation, standing and materiality. Def.'s Br., at 30-34. Plaintiff asserts that these defenses "do nothing more than waste judicial resources" because they are barred by the doctrine of the "law of the case," Pl.'s Br., at 31-32, having been rejected by this Court in In re Dynex Capital, Inc. Sec. Litig. ("Dynex I"), No. 05-1897, 2006 WL 314524 (S.D.N.Y. Feb. 10, 2006).

Plaintiffs are mistaken. The Second Circuit vacated the decision in Dynex I, see Teamsters, 531 F.3d 190, and "where a court has vacated an earlier order, the doctrine of the law of the case no longer applies." Ling Nan Zheng v. Liberty Apparel Co., 556 F. Supp. 2d 284, 296 (S.D.N.Y. 2008) (internal quotation omitted); see Johnson v. Bd. of Educ., 457 U.S. 52, 53-54 (1982) ("Because we have vacated the Court of Appeals' judgments in this case, the doctrine of the law of the case does not constrain . . . the District Court").

Other than misplaced reliance on the doctrine of the law of the case, Plaintiff offers no response to Defendants' arguments on standing and materiality. Pl.'s Br., at 31-34.

Plaintiff offers a limited response to Defendants' argument on limitations, see Pl.'s Br., at 32-34, but the response is inadequate. The Supreme Court has held that statutes of repose cannot be extended indefinitely to accommodate continuing misrepresentations. Def.'s Br., at 31-32 (citing Klehr v. A.O. Smith Corp., 521 U.S. 179 (1997)). Such an extension would "create[] a limitations period that is longer than Congress could have contemplated." Klehr, 521 U.S. at 187. Accordingly, Plaintiff's claims based on statements made more than five years prior to the filing of this suit in February 2005 must be dismissed as time-barred. Def.'s Br., at 31-32.

14

In response, Plaintiff offers two sentences at the end of a footnote. Pl.'s Br., at 33 n.15. These sentences attempt to distinguish <u>Klehr</u> on the grounds that it was a RICO case involving misrepresentations that occurred many years before suit was filed. Pl.'s Br., at 33 n.15.

But <u>Klehr</u> is not so easily distinguished. The principle on which it is based is that a "last predicate act" rule — a variant of which was adopted by this Court in <u>Dynex I</u> — cannot be reconciled with a "basic objective — repose — that underlies limitations periods." <u>Klehr</u>, 521 U.S. at 187.[3] Moreover, Plaintiff is mistaken in asserting that the Court's evaluation in <u>Klehr</u> was restricted to statements uttered "<u>more than twenty years</u> before plaintiff brought suit." Pl.'s Br., at 33 n.15 (emphasis in original). Rather, the Court "assume[d] that [plaintiffs] c[ould] show at least one such late-committed act" within "the limitations period." <u>Klehr</u>, 521 U.S. at 187.

Accordingly, under <u>Klehr</u>, Plaintiff's claims based on statements made more than five years prior to the filing of this suit in February 2005 must be dismissed as time-barred.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that this Court dismiss the Complaint in its entirety without leave to amend yet again. Indeed, because Plaintiff failed to notify this Court and Defendants within ten days of its receipt of Defendants' motion that it intended to amend its complaint, it is barred from doing so. <u>See</u> Individual Practices of Judge Harold Baer, Jr. 4(A)(i) ("If the non-moving party elects not to amend its complaint [in response to the filing of a motion to dismiss], no further opportunities to amend will be granted.").

Dated: November 5, 2008
      New York, New York                     HUNTON & WILLIAMS LLP

---

[3] Notably, even Plaintiff's brief in <u>Dynex I</u> did not urge the rule adopted by this Court in <u>Dynex I</u>.

By:    /s/ Terence J. Rasmussen

Edward J. Fuhr
(admitted *pro hac vice*)
Terence J. Rasmussen
(admitted *pro hac vice*)
951 E. Byrd Street
Riverfront Plaza, East Tower
Richmond, VA 23219
804-788-8200

Joseph J. Saltarelli
200 Park Avenue
New York, NY 10166
212-309-1000

*Counsel for Defendants Dynex
Capital, Inc., Merit Securities
Corporation Thomas H. Potts
and Stephen J. Benedetti*

## **CERTIFICATE OF SERVICE**

I certify that on the 5th day of November, 2008, a true and accurate copy of the foregoing was sent via first-class mail to:

>Joel P. Laitman, Esq.
>Frank R. Schirripa, Esq.
>SCHOENGOLD SPORN
>  LAITMAN & LOMETTI, P.C.
>19 Fulton Street, Suite 406
>New York, NY 10038
>(212) 964-0046
>
>*Counsel for Lead Plaintiff Teamsters Local 445*
>*Freight Division Pension Fund*

                                                /s/ Terence J. Rasmussen