**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------x

                                                                   :

                                                                     :

**In re DYNEX CAPITAL, INC.**　　　　　　　　:　　**05 Civ. 1897 (HB)**

**SECURITIES LITIGATION**　　　　　　　　　:　　**OPINION & ORDER**

                                                                    :

                                                                     :

-------------------------------------------------------------------------x

**Hon. HAROLD BAER, JR., United States District Judge:**

       This putative securities class action, filed by lead plaintiffs Teamsters Local 445 Freight Divisions Pension Fund ("Teamsters" or "Plaintiffs") more than four years ago, concerns asset-backed securities. Specifically, bonds collateralized by several thousand mobile home loans originated and initially serviced by Defendant Dynex Capital, Inc. ("Dynex") and its affiliates. Plaintiffs allege that Dynex, its subsidiary Merit Securities Corporation ("Merit"), and two senior executives of the companies, Thomas H. Potts ("Potts") and Stephen J. Benedetti ("Benedetti") made false and misleading statements about the bonds in violation of Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) (the "Act"). Plaintiffs also assert claims for "control person" liability against Potts and Benedetti (collectively, "Individual Defendants") under Section 20(a) of the Act, 15 U.S.C. § 78t(a), which are derivative of their Section 10(b) claims. In 2006, I granted Defendants' motion to dismiss the then-operative First Amended Complaint ("FAC") against the Individual Defendants for a failure to adequately allege scienter, but I denied the motion with respect to Dynex and Merit (collectively, "Corporate Defendants"). *In re Dynex Capital Inc. Sec. Litig.*, No. 05 Civ. 1897, 2006 WL 314524 (S.D.N.Y. Feb. 10, 2006) ("*Dynex I*"). Because at the time there was a difference of opinion in this Circuit as to whether scienter could be adequately alleged against a corporation without concomitant allegations that an employee or officer acted with the requisite state of mind, I certified the matter for interlocutory appeal. *In re Dynex Capital Inc. Sec. Litig.*, No. 05 Civ. 1897, 2006 WL 1517580 (S.D.N.Y. Jun. 12, 2006). In 2008, the Court of Appeals held that in appropriate circumstances allegations of corporate scienter may be sustained "in the absence of successfully pleading scienter as to an expressly named officer," but concluded that Plaintiffs had not done so in this case. *Teamsters Local 445 Freight Division Pension Fund v.*

1

*Dynex Capital, Inc.*, 531 F.3d 190 (2d Cir. 2008) ("*Teamsters*").  The Court of Appeals thus vacated my decision in *Dynex I* and remanded with instructions to dismiss the FAC against the Corporate Defendants and to grant Plaintiffs leave to replead.  Plaintiffs have since filed a Second Amended Complaint ("SAC") and Defendants have again moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  As set forth below, Defendants' motion is GRANTED IN PART and DENIED IN PART.

## I.  BACKGROUND

### A. Factual Background and General Allegations of Securities Fraud

Dynex is a financial services company in the business of packaging mortgage loans into securities (i.e. "securitizing" loans), including the two series of bonds at issue here: the $336 million offering of Series 12 bonds issued on April 2, 1999 and the $303 million offering of Series 13 bonds issued on September 2, 1999 (collectively, "Bonds").  Together with its affiliates, Dynex was responsible for all aspects of the loan securitization process.  Through its subsidiary Dynex Financial, Inc. ("DFI"), between 1996 and 1999 Dynex originated or purchased the 13,000 manufactured housing (*i.e.* mobile home) loans that collateralized the Bonds ("Collateral Loans" or "Bond Collateral").  Dynex subsidiary Merit served as issuer of the bonds, purchasing the Collateral Loans from another Dynex subsidiary, Issuer Holding Corp. ("IHC"), and packaging them into securities.  Merit retained the most junior, or subordinated "tranche" or class of securities within each series of Bonds—*i.e.* the class of Bonds that bore losses first and received payments last—and also committed to provide "overcollateralization" in the form of, *inter alia*, lines of credit, reserve funds, insurance policies, or additional loans to be drawn upon in the event of losses in the Bond Collateral, thereby providing "credit enhancement" to the Bonds themselves.  SAC ¶¶ 36-39; Decl. of Terrence Rasmussen ("Rasmussen Decl."), Ex. 3 ("Series 13 Prospectus Supplement"), at 32.  Finally, until 1999, Dynex's loan servicing affiliate serviced the Collateral Loans, collecting and remitting payments that ultimately found their way to bondholders.[1]  Dynex sold its loan servicing operation in 1999, but retained its role as "Master Servicer" with respect to the Bonds.  In fulfilling that role, Dynex published a monthly report that summarized the performance of the Bond Collateral, listing number and dollar value of delinquent loans ("Monthly Collateral Reports").  SAC ¶ 21.  During the relevant time periods, Potts was president and principal executive officer of Dynex and Benedetti served as president and CEO of Merit and was an officer and director of

---

[1] Payments of interest and principal on the Collateral Loans flowed as follows:  payments were collected by the servicer (originally a Dynex affiliate and subsequently Origin Financial, Inc) and remitted to the "Master Servicer" (Dynex); after retaining its fee, the Master Servicer remitted the payments to the trustee of the Bonds, who then made payment to the bondholders. SAC ¶¶ 21-22.

Dynex.  The Teamsters bring this putative class action on behalf of persons who purchased the Bonds between February 7, 2000 and May 13, 2004 ("Class Period").

It was not long after the Bonds were issued that the Collateral Loans began to perform poorly.  For example, whereas Merit represented in the Series 13 Prospectus Supplement that, as of August 1999, 1.36% of the Collateral Loans were delinquent, by December 2000 the delinquency percentage had jumped to 4.92%.  SAC ¶ 8; Rasmussen Decl. Ex. 4 ("Series 13 Prospectus Supplement"), at S-5.  In October 2003, Dynex's Monthly Collateral Report disclosed that cumulative repossessions in the Series 13 Collateral Loans had been understated by approximately 34% or $15.92 million.  SAC ¶ 134.  Between November 2003 and May 2004, the Bonds were reviewed by rating agencies Moody's Investor Service and Fitch Ratings ("Rating Agencies") and ultimately downgraded.  SAC ¶¶ 10-12.  In announcing its downgrade of the Series 12 Bonds, Fitch noted that "relaxed credit standards, overbuilding by manufacturers, and the difficulties relating to servicing this unique asset have all contributed to poor performance of [manufactured housing] securities."  SAC ¶ 94.  In April 2004, Merit disclosed an "internal control deficiency" with regard to recording losses on the Collateral Loans and restated its earnings for the second and third quarters of 2003.  SAC ¶ 149.  Following the downgrades by the Rating Agencies, the value of the Bonds dropped by as much as 85%.  SAC ¶ 11.

The gravamen of Plaintiffs' claims—the central theme of both the earlier and instant complaints—are allegations that Defendants engaged in a fraudulent scheme to artificially inflate the price of the Bonds by misrepresenting that the poor performance of the Bond Collateral resulted from "market conditions," thereby concealing what Plaintiffs contend was the *true* cause of the poor performance:  namely, that Defendants' aggressive and reckless loan underwriting and origination practices generated a pool of Collateral Loans of poor credit quality and impaired by inherent defects.  FAC ¶¶ 2, 10; SAC ¶¶ 2-8.  More specifically, Plaintiffs' theory is that Dynex was a late entrant to the market for originating and securitizing mobile home loans and as a consequence overtly expressed to mobile home dealers a willingness to "buy bad paper," *i.e.* to originate or purchase uncreditworthy loans in order to gain market share and generate a sufficient volume of new loans to permit the issuance of mortgage-backed securities ("MBS").  FAC ¶ 5; SAC ¶ 58.  Thus, in both their earlier and instant pleadings, Plaintiffs allege that Defendants "systematically disregarded" their own underwriting guidelines relative to borrower creditworthiness and minimum documentation requirements, originated a large volume of so-called "buy-for" loans (*i.e.* loans where the signatory to loan documents was not the mobile home's owner or occupant, which

frustrated repossession),[2] "repeatedly purchas[ed] loans from mobile home dealers known to regularly submit falsified loan applications," and failed to obtain releases from landowners ("no-release loans"), which also frustrated repossession of the mobile home collateral located thereon. FAC ¶ 10; SAC ¶¶ 89, 91.

As a consequence of Defendants' questionable underwriting and origination practices, Plaintiffs contend that certain of Defendants' statements in the Bonds' prospectuses (collectively, "Offering Documents") were materially false and misleading, as were public statements that purported to attribute losses on the Bond Collateral primarily to market forces instead of Defendants' own practices in originating and underwriting the Bond Collateral. *See*, *e.g.*, FAC ¶ 13, SAC ¶ 93.

**B. First Motion to Dismiss: *Dynex I***

In *Dynex I*, I found Plaintiffs' allegations of scienter lacking with respect to the Individual Defendants. Although I concluded the FAC "aptly described a pattern of reckless corporate behavior," I found that Plaintiffs "failed to link that behavior to any culpable individuals" and did not allege that "Potts or Benedetti saw or had access to specific reports or statements that indicated malfeasance or that contradicted their public statements." *Dynex I*, 2006 WL 314524, *9. With respect to the Corporate Defendants, however, I noted that a plaintiff may allege scienter "on the part of the corporate defendants without pleading scienter against any particular employees of the corporation." *Id.* (citing *In re Worldcom*, 352 F.Supp. 2d 472, 497 (S.D.N.Y. 2005)). Specifically, I found that the FAC adequately alleged that officers and employees of the Corporate Defendants "had the motive and opportunity to commit fraud" and that Plaintiffs' allegations that the Corporate Defendants "systematically originated defective loans . . . constitute[d] 'strong circumstantial evidence of . . . recklessness.'" *Id.* (quoting *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000)).

Defendants moved for reconsideration or, in the alternative, for interlocutory appeal. I concluded that the question of whether scienter could be successfully alleged against a corporation without also alleging that specific corporate officers or employees acted with fraudulent intent was "a controlling question of law as to which there is substantial ground for difference of opinion." 28

---

[2] Plaintiffs allege that the "Dynex collectors were forbidden by the Fair Debt Collection Practices Act [15 U.S.C. § 1692 *et seq.* ("FDCPA")], to even contact the occupant without the permission of the person who signed the loan application." SAC ¶ 76. The Court takes judicial notice of the fact that the FDCPA generally prohibits a "debt collector" from communicating with any party other than the "consumer" (*i.e.* the party liable for the debt), his attorney, or immediate family, except to confirm basic information about the debtor's place of residence and employment. 15 U.S.C.A. §§ 1692b, 1692c(b).

U.S.C. § 1292(b).  I thus certified the matter for interlocutory appeal.  *In re Dynex Capital Inc. Sec. Litig.*, 2006 WL 1517580, *3.

**C.  Second Circuit Opinion: *Teamsters***

On appeal, the Second Circuit confirmed that "there are circumstances in which a plaintiff may plead the requisite scienter against a corporate defendant without successfully pleading scienter against a specifically named individual defendant."  *Teamsters*, 531 F.3d at 192.  However, the Circuit reviewed my denial of Defendants' motion to dismiss *de novo* and concluded that the allegations of the FAC were insufficient to raise the requisite "strong inference" of scienter against Dynex and Merit, rejecting each of Plaintiffs' three arguments as to why the FAC's allegations of scienter were adequate.  *Id.* at 196.  In conclusion, the Court of Appeals stated that Plaintiffs had "fail[ed] to allege the existence of information that would demonstrate that the statements made to investors were misleading, *e.g.*, information showing that the primary cause of the bonds' poor performance was *not* the general weakness in the mobile homes market."  *Id.* at 197.  As a consequence, the panel could not conclude that Plaintiffs' proffered inference—namely, that someone responsible for the statements made them with at least a reckless disregard for their truth—was "'at least as compelling as the competing inference'; i.e. that the statements either were not misleading" or were the result of careless mistakes based on erroneous information."  *Id.* (quoting *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)) (internal citation omitted).  The Circuit vacated the *Dynex I* opinion and remanded with instructions to dismiss the FAC against the Corporate Defendants and to grant Plaintiffs leave to replead.

**D.  Second Amended Complaint**

The SAC attempts to remedy the pleading deficiencies identified by the Court of Appeals by supplementing the allegations in the FAC in two primary ways.  First, the SAC describes nine confidential witnesses whose statements form the basis of many of the substantive allegations.  The confidential witnesses ("CWs") include three district sales managers who were involved in the origination of the Bond Collateral and who generally describe Dynex's loan underwriting practices, a credit underwriter at a Dynex regional office during a portion of the period in which the Bond Collateral was underwritten, four Dynex employees who worked in Dynex's loan servicing and collection departments, and a "senior accountant" at Dynex's Virgina headquarters.

Second, the SAC identifies and describes for the first time the following four categories of reports that Plaintiffs contend put the Defendants on notice that their public statements were materially misleading.[3]

1.      Manufactured Housing Dealer Performance Reports ("MHDP Reports"):  The SAC alleges that during the period of loan origination (*i.e.* 1996 – 1999) data from Dynex's regional and district offices were collected and synthesized into monthly MHDP Reports that inventoried the number and dollar amounts of loans from each manufactured housing dealer and assessed the loans' creditworthiness on a scale of "A" (superior), "B" (good), or "C" (poor), "based on borrower credit scores and other indicia of creditworthiness." SAC ¶¶ 4, 66.  The MHDP Reports were prepared by Dynex management in Virginia and disseminated to the company's regional offices. SAC ¶ 4.

2.      Manufactured Housing Regional Performance Reports ("MHRP Reports"):  During the same period, Dynex also prepared and circulated MHRP Reports that listed the number and dollar amount of mobile home loans by region, and also rated the loans' credit quality on the "A" to "C" scale.  SAC ¶¶ 5, 66.  Plaintiffs allege that the MHRP Report for Dynex's Northeast Region for the first quarter of 1997 revealed that 64% of the $8.3 million in loans funded in that region in that quarter were assigned a "C" rating. SAC ¶ 66.  Plaintiffs allege that both the MHDP and MHRP Reports were reviewed by the Individual Defendants and used to evaluate and compensate regional management in accordance with a corporate culture "completely focused on achieving high loan volume."  SAC ¶¶ 6, 66.

3.      "Basis Reports":  According to the SAC, during the Class Period Benedetti reviewed monthly "Basis Reports" that summarized Dynex's balance sheet and valued its assets, a substantial portion of which were its own debt securities including the Bonds.  SAC ¶ 85.  Benedetti allegedly attended monthly accounting meetings "approximately one hour in duration" at which the Basis Reports were discussed. *Id*.

4.      "Audit Reports":  Finally, Plaintiffs allege that quality-control audits of the Bond Collateral were prepared in Dynex's Fort Worth, Texas servicing headquarters and summarized into "Audit Reports" that "revealed true rates of first payment defaults and dealer fraud" and "uncovered that borrower's creditworthiness was not consistent with underwriting guidelines." SAC ¶ 53(i).  Additionally, the SAC contains allegations that employees in Dynex's Fort Worth servicing center prepared "foreclosure reports" for every loan that went into default.  Such reports, together with all

---

[3] A fifth form of report, the Monthly Collateral Report, is referenced in the FAC.  *See* FAC ¶¶ 9, 25.

of the underlying documentation for the defaulted loan were sent to Dynex's Virginia headquarters by means of a computerized imaging system called "Polaris." SAC ¶¶ 53(g), 84.

Like the FAC, the SAC depicts Dynex and Merit entering the mobile home loan market in a particularly aggressive fashion by, among other things, consistently agreeing to purchase or fund poor quality loans, often without sufficient documentation, although the instant pleading adds detail to the allegations of the central role played by Dynex's management in Virginia. For example, the SAC alleges that in 1999 Dynex adopted a computer-based underwriting system named "Portal" that centralized loan underwriting decisions and led to approval of loans that would not have been approved under the prior manual underwriting process. SAC ¶¶ 63-65. The SAC alleges that in 1996 Dynex's senior management implemented the "225 Program" which streamlined the process by which Dynex reviewed mobile home dealers in order to expedite growth in the dealer base, SAC ¶ 68, and authorized an underwriting directive to approve loans to senior citizens with repayment terms that exceeded normal life-expectancy statistics. SAC ¶ 74.

## II. LEGAL STANDARD

According to the Supreme Court's most recent pronouncements, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The requirement that the court accept all factual allegations as true does not apply to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* The court's determination of whether a complaint states a "plausible claim for relief" is a "context-specific inquiry" that requires application of "judicial experience and common sense." *Id.*

A securities fraud claim such as this one must also satisfy the heightened pleading requirements of the PSLRA and Rule 9(b) by stating with particularity the circumstances constituting fraud. *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citations omitted). To comply with Rule 9(b), a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004). Under the PSLRA, a complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the

statement is misleading," and must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(1), (2).

In the time since I decided *Dynex I*, but before the Circuit's decision in *Teamsters*, 531 F.3d 190, the Supreme Court has clarified the standard and analytical framework applicable to determination of the central issue in this case:  namely, when a plaintiff's allegations of scienter are adequate to establish the required "strong inference" that the defendant acted with fraudulent intent. *Tellabs*, 129 S.Ct. 2509.  *First*, as with any Rule 12(b)(6) motion to dismiss, the court must accept all factual allegations in the complaint as true.  *Id*.  *Second,* the court must "consider the complaint in its entirety," together with the other sources ordinarily examined when ruling on a Rule 12(b)(6) motion to dismiss, such as documents incorporated into the complaint and upon which Plaintiffs rely. *Id*.  The proper inquiry is whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter."  *Id.* (emphasis in original).  *Third*, the court must "take into account plausible opposing inferences" in an inquiry that is "inherently comparative." *Id.* at 2509-10. Although the "inference that the defendant acted with scienter need not be irrefutable, *i.e., of the* 'smoking-gun' genre," the complaint will only survive "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

### III. DISCUSSION

### A.  Elements of Securities Fraud Claim

Plaintiffs' principal claims are brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5, which implements the statute to prohibit "mak[ing] any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b) (2008).  To state a claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must allege (1) a material misrepresentation or omission; (2) scienter, *i.e.* an intent to deceive or defraud; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

### B.  Actionable Misrepresentations

Only materially misleading statements or omissions give rise to liability under Section 10(b).  A statement or omission is materially misleading if there is a "'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'"  *In re Novagold Res. Inc. Secs.*

*Litig.*, No. 08 Civ. 7041 (DC), 2009 WL 1575220, *16 (S.D.N.Y. Jun. 5, 2009) (quoting *Basic Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988)).  Of course, in addition to being material, to form the basis of liability an affirmative statement must be false and an omitted fact must be true.

## 1. Underwriting Statements

Plaintiffs allege that Defendants' statements that they relied upon their own guidelines to underwrite the Bond Collateral were false and misleading because the underwriting guidelines were in fact "systematically disregarded" ("Underwriting Statements").  SAC ¶ 100.  These allegations derive from the statements of the confidential witnesses who observed, for instance, "Dynex's underwriters and sales managers routinely ignor[ing] the Company's stated [underwriting] guidelines in order to achieve 'volume'" in the origination of mobile home loans and who noted that "regional offices were given wide latitude to waive underwriting standards."  SAC ¶ 53(b), (f).  Plaintiffs also purport to base their allegations upon the MHDP, MHRP, and Audit Reports.

Plaintiffs cannot convincingly argue that the poor credit quality of the Collateral Loans alone rendered the Underwriting Statements false and misleading because Defendants never publicly articulated minimum creditworthiness standards below which they would not lend.  Rather, the Offering Documents merely state that Collateral Loans would be originated pursuant to *either* (a) the generally accepted underwriting standards of Fannie Mae and Freddie Mac ("GSE's"), *or* (b) Defendants' "various credit, appraisal and underwriting standards and guidelines, themselves "less stringent then those applied by [the GSE's]." [4]  Thus, even assuming every MHRP Report revealed a percentage of "C" rated loans as high as the 64% disclosed in the 1997 report cited in the SAC, such information would not establish the falsity of the Underwriting Statements.[5]  *See In re FBR*

---

[4] The Offering Documents warned in bold typeface that as a consequence of the less stringent underwriting standards, the Collateral Loans were "*likely* to experience rates of Delinquency and Foreclosure that are higher and may be substantially higher, than Mortgage Loans originated in accordance with [GSE] underwriting guidelines." Series 13 Prospectus at 7 (emphasis added).  The Offering Documents also disclosed that underwriting guidelines were "intended" to provide for origination of loans to "non-conforming credit[s]," including loans to borrowers who "may have a record of major derogatory credit items, such as default on a prior mortgage loan, credit write-offs, outstanding judgments and prior bankruptcies." Series 13 Prospectus at 7.

[5] As lax as Dynex's underwriting appears to have been, this is not a case of a lender who publicly touted the quality of its loans as it originated loans to unqualified borrowers without regard to its publicly proclaimed underwriting standards.  *Cf. Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142 (S.D. Cal. 2008) (defendants' repeated representations that its underwriting procedures were more conservative than those of other subprime lenders were false and misleading because they were consistently disregarded); *In re Countrywide Fin. Corp. Secs. Litig.*, 588 F. Supp. 2d 1132, 1192-93 (C.D. Cal. 2008) (CEO's statements that loans to borrowers with FICO scores below 550 could not be priced to cover risk were false and misleading when lender in fact made numerous loans to such borrowers); *In re New Century*, 588 F.Supp. 2d 1206 (C.D.

*Inc. Secs. Litig.*, 544 F. Supp. 2d 346, 359-60 (S.D.N.Y. 2008) (statements about mere existence of risk management program without "qualitative assurances" about its effectiveness were not actionable).  Similarly, the Offering Documents disclosed that the Defendants' underwriting standards would be "varied" or documentation requirements "waived" in "appropriate cases where factors such as low loan-to-value ratios or other favorable compensating factors exist."  Series 13 Prospectus at 34.  Thus, revelations that "regional offices were given wide latitude to waive underwriting standards" are insufficient to render the Underwriting Statements false or misleading. SAC ¶ 53(b).

Rather, Plaintiffs' theory of falsity with respect to the Underwriting Statements turns on allegations that Dynex "systematically" or "routinely" disregarded its own underwriting standards, not in the principled manner described in the Offering Documents—*i.e.* in "appropriate cases" where "favorable compensating factors exist"—but recklessly to achieve loan volume. *See, e.g.*, SAC ¶ 73.  According to the SAC, Dynex's "systematic disregard" for its own documentation requirements in the origination process led to a significant number of loans that were "facially defective," such as "buy-for" and "no release" mobile home loans which presented substantial obstacles to successful collection.  SAC ¶¶ 53(f), 75, 79.  Worse yet, according to the SAC, Dynex repeatedly purchased loans from mobile home dealers known to regularly submit falsified loan applications.  SAC ¶¶ 53(b), 90.  Statements in the Offering Documents that underwriting standards are generally applied to evaluate a prospective borrower's "repayment ability" are misleading if the factual predicates of such a determination are deliberately falsified.   SAC ¶ 75; Series 13 Prospectus at 33.  Defendants dispute the sufficiency of the confidential witnesses' observations, arguing that "'several instances' witnessed by one low-level employee do not a 'systematic disregard' make." Defs.' Br. at 29.  But three of the confidential witnesses were district sales managers and each reported that underwriting guidelines were "routinely" sacrificed in the name of loan volume and loans with falsified documentation were "routinely" approved.  SAC ¶ 53(a)-(c).  These observations are corroborated by those of two former employees in Dynex's loan servicing

---

Cal. 2008) (company's statements that the credit quality of its loans was "excellent" and "very high" and that it employed "strict" and "strong" underwriting guidelines were false and misleading because officers were aware of "pervasive company-wide practice of issuing loans of poor quality without complying with any basic set of underwriting standards").

center who "routinely" encountered underwriting and documentation deficiencies and falsified loan documentation in the course of performing their loan-servicing duties.[6] SAC ¶ 53(e)-(f).

At some point, statements by a defendant that it "generally" adheres to a particular policy become misleading when in fact there is no such policy or the policy is something else altogether. *See Novak,* 216 F.3d at 311 (finding statements materially misleading because "disclosed policy no longer reflected actual practice"); *In re Moody's Corp. Secs. Litig.,* 599 F. Supp. 2d 493, 510 (S.D.N.Y. 2009) (statement by credit rating agency that it relied on "originator and servicer quality" in its analysis of MBS was an actionable misrepresentation where defendant did not consider such practices at the time the statements were made). When the allegations in the SAC are accepted as true and reasonable inferences drawn in Plaintiff's favor, the SAC sufficiently alleges that the Underwriting Statements are misleading to the extent that they claim that *some* standards pertaining to borrower documentation or creditworthiness were followed when in fact such requirements were regularly or routinely disregarded or were based upon falsified loan documentation.

2. **Market Conditions Statements**

The allegedly actionable statements most central to Plaintiffs' allegations of fraud are Defendants' public statements during the Class Period that purport to attribute losses and "loss severities" in the Bond Collateral, as well as the need for increased loss reserves, primarily to "market conditions" (the "Market Conditions Statements"), but that omit to state that the poor performance in fact derived from "reckless underwriting and origination practices." *See, e.g.*, SAC ¶¶ 111-122. Representative of the Market Conditions Statements are those found in Merit's Form 10-K for the year 2001, which explained the need to increase provision for losses over the previous year as follows:

> The Company has seen the loss severity on manufactured housing loans increase dramatically since the third quarter of 2000 as a result of the saturation in the market place with both new and used (repossessed) manufactured housing units.

---

[6] Defendants also seek to discredit Plaintiffs' anonymous sources by noting that many of them were employed by a Dynex affiliate prior to the Class Period and that one of their disclosures actually undermines Plaintiffs' allegations. These arguments are unavailing. First, because the Collateral Loans were originated by a Dynex affiliate prior to the Class Period confidential witnesses employed by that affiliate during that time period are "described in the [SAC] with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak,* 216 F.3d at 314. Second, although the statement attributed to CW#4 that the pre-1999 underwriting process at Dynex was "very labor intensive" does not support Plaintiffs' allegation that underwriting guidelines were routinely disregarded, when the balance of the well-pleaded factual allegations of the SAC are taken as true it is clear that Defendants' did not disregard stated underwriting guidelines or purchase loans with falsified documentation on a merely ad hoc basis.

> In addition, the Company has seen some increase in the overall default rates on its manufactured housing loans.  The Company anticipates that market conditions for manufactured housing loans will remain unfavorable through 2002.

SAC ¶ 119 (quoting Merit 2001 Form 10-K); *see also* SAC ¶ 113 (Dynex Form 10-K for 2000); ¶ 115 (Merit Form 10-K for 2000).  In Defendants' public statements, market conditions are blamed for not only high "loss severities," *i.e.* the amount by which the outstanding loan balance exceeds the lender's recovery from a foreclosure sale net of expenses, *see Teamsters*, 531 F.3d at 192-93, but also, in at least one instance, a "high level of credit *losses*." SAC ¶ 117 (quoting Merit 2001 Annual Report) (emphasis added).  In an April 2, 2002 letter to Merit shareholders, Potts wrote that the company was "experiencing a high level of credit losses on the manufactured housing loan portfolio" and that these losses were "primarily related to the depressed market for repossessed manufactured homes, compounded by the exit from that market of several large lenders." *Id.*

Defendants argue that Plaintiffs have not pled the falsity of such statements because the SAC does not allege that Merit had *not* seen loss severities increase or *not* observed a rise in default rates.  But Defendants' argument misses the mark.  Plaintiffs' theory is that Defendants *omitted* material facts about the true causes of the Bond Collateral's poor performance.[7]  *See, e.g.,* SAC ¶116.  Once Merit chose to speak about what caused losses in the Bond Collateral it had an obligation to be "both accurate and complete." *Caiola v. Citibank N.A., New York*, 295 F.3d 312, 331 (2d Cir. 2000).  Put differently, a defendant has a duty to disclose material facts, *i.e.* facts that, if disclosed, would significantly alter the "total mix" of available information. *In re Take-Two Interactive Sec. Litig.*, 551 F.Supp.2d 247, 263 n. 8 (S.D.N.Y. 2008) (citing *In re Time Warner Sec. Litig.,* 9 F.3d 259, 267 (2d Cir. 1993)).

Of course, omitting the *true* causes of the credit losses is only actionable if the omission is both material and true.  *Id.*  Assuming, *arguendo*, their truth, the materiality of the alleged omissions is apparent.  Disclosure of the true cause of the Bond Collateral's poor performance would be viewed by reasonable investors as having altered the "total mix" of information available, *Levinson,* 485 U.S. at 231-32, because while market conditions fluctuate and are easily observed by myriad objective and publicly available indicia, loan underwriting and origination defects are "built-

---

[7] Indeed, faulting Plaintiffs for failing to allege the falsity of statements concerning rising default rates makes no sense when Plaintiffs' allegations are in part *premised* on the rise in default rates over the Class Period.  Similarly, the SAC's allegations are consistent with high loss severities in the Bond Collateral.  *See, e.g.*, SAC ¶ 83 ("[A] mobile home loan that served as the basis for Bond collateral following a repossession/sale and foreclosure generally would be sold for only pennies on the dollar.").

in" to the Collateral Loans such that poor performance is likely to continue notwithstanding improvements in general market conditions.

Determination of whether the allegedly omitted facts are *true*, however, is not as simple, even when all of the SAC's allegations are themselves assumed to be true.  Analysis must start with recognition that the "reckless underwriting and origination practices" alleged by the SAC resulted in loans that fall into two general categories:  loans of poor credit quality (*i.e.* loans to borrowers with low indicia of creditworthiness), and "facially defective" loans (*i.e.* loans originated pursuant to fraudulent or highly deficient loan applications, "buy for" loans, and "no release" loans).  The distinction matters because to argue that poor credit quality is the true cause of losses in the Bond Collateral, Plaintiffs rely on a logical assumption that does not support the weight that Plaintiffs place upon it.  Plaintiffs contend that creditworthiness of the Collateral Loans, must have played a material role in causing the losses because market conditions are only relevant after a default and "borrower default is inextricably tied, first and foremost, to the borrower's ability to pay—or the borrower's creditworthiness."[8]  Pls.' Opp'n. Br. at 29.  *Defaults* are generally a factor of borrower creditworthiness (though macro-economic factors such as rising unemployment rates can certainly affect individual borrowers' ability to repay a loan), but *losses* are a function of *both* creditworthiness and the market conditions that dictate the price recovered at a foreclosure sale.  It is thus theoretically possible for a pool of loans to exhibit both high rates of default and low overall losses if the lender (or servicer) is successful in recovering outstanding loan balances through foreclosure.[9]  Of course, the reverse is also theoretically possible: a pool of loans may exhibit low rates of default and high losses because the lender cannot recover through foreclosure.  In neither hypothetical, are *losses* "inextricably tied" to creditworthiness.  This exercise demonstrates that Plaintiffs' logical inference does not establish the truth of one of the alleged omissions from

---

[8] Creditworthiness can only plausibly be cited as a material cause of *losses* in the Bond Collateral.  It would be illogical to attribute high loss severities to poor credit quality because the likelihood that a loan will become delinquent in the first instance does not affect the *magnitude* of a resulting loss.  Moreover, if creditworthiness is defined as the likelihood of borrower default then attributing an increase in default rates to poor credit quality borders on tautological.

[9] The Series 13 Prospectus discloses that the "[w]eighted average loan-to-value ratio" of the loans securing those bonds is 87.27%, which leaves preciously little room for error with respect to either valuation of the collateral or estimation of foreclosure expenses.  When combined with the Prospectuses' disclosures that, in contrast to mortgaged real property, the value of manufactured housing tends to decrease over time, the wisdom of the high loan-to-value ratios suspect.  But the Securities Act imposes liability for false statements made with fraudulent intent, not poor exercise of business judgment. *See Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 479 (1977).

Defendants' public statements, *i.e.* that poor credit quality was a primary cause of losses in the Bond Collateral.  In the scenario of high rates of default and high losses alleged by the SAC, one cannot rely on logic alone to single out credit quality as the principal culprit.

The same cannot be said of loans that, independent of their credit quality, have inherent defects that preclude or materially frustrate collection, whether through foreclosure or otherwise.  In such instances, a default necessarily entails a loss irrespective of market fluctuations.  When collection through foreclosure is thwarted, either because the servicer cannot legally contact the owner of the collateral (in the case of a "buy for" loan) or enter the property (in the case of a "no release" loan) the "loss severity" will inevitably equal 100% of the outstanding principal balance.  Therefore, assuming the truth of the SAC's allegations that Defendants' origination practices resulted in a pool of loans plagued by a substantial number of inherent defects—*i.e.* where 65-70% of delinquencies were "buy for" loans[10]—when defaults rise (as they did here) losses must rise too, irrespective of market conditions.  Consequently, the Defendants' failure to state that origination practices, to the extent they led to "facially defective" loans, were also a contributing cause of high losses was misleading.

### 3.  **Other Allegedly Actionable Statements**

Plaintiffs also allege that Defendants misrepresented the number of delinquencies and repossessions in the Bond Collateral.  *See* SAC ¶ 2.  Plaintiffs' allegation that Defendants directed that reported delinquencies and repossessions be falsified is unsupported by any factual allegations, *see* SAC ¶ 78, albeit if credited it would suffice to state a claim of securities fraud.  Consequently, the allegation is "not entitled to the assumption of truth," *Iqbal*, 129 S.Ct. at 1951, and Plaintiffs' allegation of securities fraud based upon this alleged false or misleading statement falls short.  The Monthly Collateral Report for September 2003 misstated the number of repossessions in the Series 13 Bond Collateral; this figure was restated in the next month's report.  Allegations of "accounting irregularities" must be "coupled with evidence of corresponding fraudulent intent" to be actionable, *Novak*, 216 F.3d at 309, and thus alleged misstatements concerning cumulative repossessions will rise or fall with the SAC's allegations of scienter.  The same goes for the next category of allegedly false or misleading statements, those which claimed that Merit's internal controls for evaluating

---

[10] The allegations in the SAC concerning "buy-for" loans are somewhat inconsistent.  *Compare* SAC ¶ 75 ("By 2000, Dynex knew approximately 65% - 70% of the *delinquent* mobile home loans were "Buy For" loans.") (emphasis added) *with* SAC ¶ 90 (Dynex's origination practices "resulted in 65% - 70% of its mobile home loan portfolios [consisting of] undisclosed "Buy For" loans.")

repossessions were sufficient.  These allegations will support liability if made with fraudulent intent.  Finally, Plaintiffs allege that Merit's statements that it had adequate loss reserves were false and misleading because due to the high number of facially defective and thus largely uncollectable loans Merit should have provided for loss reserves for even current mobile home loans as it ultimately did in 2004.  Defendants' statements concerning the adequacy of Merit's loss reserves during the Class Period are misleading to the extent Plaintiffs allege that they were in fact *in*adequate due to the high percentage of "facially defective" Collateral Loans.  They are thus actionable to the same extent as the Market Conditions Statements and will support liability if made with scienter.

### C.  Scienter

In this Circuit, the requisite "strong inference" of scienter "can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA Local*, 553 F.3d at 198 (citing *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000); *Novak,* 216 F.3d at 307.  With respect to a corporate defendant, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters*, 531 F.3d at 195.  Although not strictly necessary, "[i]n most cases, the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant."  *Id.*  Here, Plaintiffs contend that the allegations of the SAC support a "strong inference" that the Individual Defendants Potts and Benedetti, and thus by imputation the Corporate Defendants, acted with an intent to deceive based upon (i) their motive and opportunity to commit fraud; and (ii) strong circumstantial evidence of conscious recklessness.  I address each manner of pleading scienter in turn and then consider the allegations collectively, taking into account "plausible opposing inferences," in order to determine if Plaintiffs' proffered inference of scienter is "cogent and at least as compelling as any opposing inference one could draw form the facts alleged." *Tellabs*, 129 S.Ct. at 2510.

### 1. Motive and Opportunity

The question of whether the Individual Defendants, and thus by extension the Corporate Defendants, had *opportunity* to commit fraud need not detain us long.  As senior executives, the Individual Defendants had the ability to direct the allegedly false and misleading statements to be made. *See In re PXRE Group, Ltd., Secs. Litig.*, 600 F. Supp. 2d 510, 529 (S.D.N.Y. 2009).  Rather, the question is whether Plaintiffs have adequately pleaded that the Defendants had a *motive* to

commit fraud.  The answer is that they have not.  "In order to raise a strong inference of scienter through 'motive and opportunity' to defraud, Plaintiffs must alleged that [Defendants] 'benefitted in some concrete and personal way from the purported fraud." *ECA Local*, 553 F.3d at 198 (quoting *Novak*, 216 F.3d at 307). " It is not sufficient to allege goals that are 'possessed by virtually all corporate insiders,' such as the desire to maintain a high credit rating for the corporation or otherwise sustain the appearance of corporate profitability or the success of an investment, or the desire to maintain a high stock price in order to increase executive compensation." *South Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (quoting *Novak*, 216 F.3d at 308).

Plaintiffs offer two theories as to why Defendants had motive to conceal the true impaired quality of the Bond Collateral.  First, Plaintiffs allege that towards the end of the period of loan origination through the beginning of the Class period (i.e. 1999-2000), Dynex "was in the midst of a dramatic financial collapse" with its stock price having fallen 99% in less than two years and its access to operating capital rapidly deteriorating. SAC ¶¶ 9, 57, 152.  As a consequence, Plaintiffs allege that Defendants "could not afford to disclose Dynex's aggressive underwriting and the true impaired quality" of the Bond Collateral.  SAC ¶ 9.  Second, Plaintiffs allege that the Individual Defendants were motivated to commit fraud to "preserve and protect their bonus compensation." SAC ¶¶ 9, 26-27.  Each proffered motive has been rejected by the courts of this Circuit.

First, the alleged motivations of a corporation to halt a drop in its stock price, raise money or preserve access to capital or lines of credit are all "far too generalized (and generalizable) to allege the proper 'concrete and personal' benefit required by the Second Circuit." *PXRE Group*, 600 F.Supp. 2d at 532 (citing *Kalnit,* 264 F.3d at 142); *see also In re Astrazeneca Secs. Litig.*, 559 F.Supp. 2d 453 (S.D.N.Y. 2008), aff'd *State Universities Retirement System of Illinois v. Astrazeneca PLC*, No. 08-3185, 2009 WL 1796534, *1 (2d Cir. Jun. 25, 2009).

Second, "'incentive compensation can hardly be the basis on which an allegation of fraud is predicated,'" because if "scienter could be pleaded solely on [that] basis . . . 'virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.'" *ECA, Local*, 553 F.3d at (quoting *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 54 (2d Cir.1995)).  Plaintiffs' allegations that Potts and Benedetti were motivated by a desire to preserve their bonus compensation, then, are unavailing.

2. **Scienter and Strong Circumstantial Evidence of Recklessness**

In the context of scienter, the Second Circuit has said that "[b]y reckless disregard for the truth, we mean 'conscious recklessness—*i.e.*, a state of mind *approximating actual intent,* and *not merely a heightened form of negligence*.'" *South Cherry Street*, 573 F.3d at 109 (quoting *Novak,* 216 F.3d at 312(emphases in original).  Where, as here, the plaintiff does not adequately allege motive, "the strength of the circumstantial allegations of conscious misbehavior or recklessness must be correspondingly greater." *PXRE Group*, 600 F.Supp.2d at 535 (citing *Kalnit,* 264 F.3d at 142).

Strong circumstantial evidence of recklessness may be alleged in two ways.  First, "[w]here the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business."  *In re Scholastic Corp. Secs. Litig.*  252 F.3d 63, 76 (2d. Cir. 2001) (citing *Novak,* 216 F.3d at 308). Second, "a strong inference of the requisite state of mind 'may arise where the complaint sufficiently alleges that the defendants . . . failed to check information they had a duty to monitor.'" *South Cherry Street*, 573 F.3d at 110 (quoting *Novak,* 216 F.3d at 311).  That is, "[a]n egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of ... recklessness."  *Chill,* 101 F.3d at 269 (internal quotation marks omitted)

i. Underwriting Statements

"There is considerable authority for the proposition that a company's failure to follow an internal policy can form the basis of an inference of recklessness." *In re Sadia, S.A. Secs. Litig.*, No. 08 Civ. 9528 (SAS), 2009 WL 2356181, *11 (S.D.N.Y. Jul. 29, 2009) (citing *In re Scholastic Corp. Secs. Litig.,* 252 F.3d 63, 77 (2d Cir.2001) ("[D]efendants' asserted actions contrary to expressed policy and prior practice can form the basis for proof of recklessness."); *Novak,* 216 F.3d at 311 (defendants "knowingly sanctioned procedures that violated the Company's own markdown policy").  As previously discussed, the SAC adequately alleges that the Defendants' routine disregard for their publicly stated underwriting guidelines not only resulted in a large percentage of "facially defective" and thus uncollectable loans, but also rendered certain of the Defendants' Underwriting Statements false and misleading.  When taken as true, the allegations of the SAC make clear that the disregard for underwriting standards was a top-down directive from Dynex management in Virginia and that Benedetti and other top executives knew that dealer fraud was rampant. *See*, *e.g.*, SAC ¶¶ 4, 53(c).  These are the facts that make Defendants' statements that underwriting guidelines were "generally followed" misleading.

The SAC's well-pleaded factual allegations describe management policies to promote loan volume at the expense of borrower creditworthiness and loan documentation requirements that resulted in a substantial portion of Collateral Loans being fraudulently procured or "facially defective" and therefore largely uncollectible.  For example, the management-imposed "225 Program" eliminated most of the audit and review procedures used to approve mobile home dealers from whom Defendants purchased loans and, as confirmed by the CWs, Dynex purchased loans from dealers who routinely submitted falsified loan documentation.  SAC ¶¶ 68, 53.  Dynex set monthly quotas for loan volume and the CWs reported that both salary and bonuses at the regional offices were based on loan volume, creating incentives to approve loans with no documentation of borrower income or with facially defective documentation, *e.g.* applications for borrowers who were minors, deceased, or not the occupant of the home (*i.e.* a "buy for" loan).  SAC ¶¶ 53, 72.  The SAC further details a specific management directive to approve loans to senior citizens that would far exceed normal life-expectancy statistics—a top down directive that is inconsistent with application of underwriting standards meant to judge "repayment ability."  SAC ¶ 74; Series 13 Prospectus at 33.  These practices "represent[] an extreme departure from the standards of ordinary care to the extent that the danger [of having uncollectable loans] was either known to the defendant[s] or so obvious that the defendant[s] must have been aware of it."  *South Cherry Street*, 573 F.3d at 110.

Furthermore, while the information disclosed to the Individual Defendants in the MHDP and MHRP Reports does not *directly* contradict the misleading Underwriting Statements,[11]  the existence of such reports provides support for an inference of recklessness.  These reports corroborate the allegation that the Individual Defendants had personal knowledge of the overall composition of the pool of Collateral Loans; Potts and Benedetti reviewed these reports to compensate regional managers with an emphasis on loan volume.  SAC ¶ 6.  An inordinate percentage of low-quality loans in the pool of Collateral Loans following an express emphasis by management on loan volume is arguably a red flag that, in the ordinary course of business, the company's decisions to originate or purchase a particular loan were driven by a desire to maximize loan volume instead of adherence to the company's stated underwriting guidelines.

Finally, the SAC contains well-pleaded factual allegations that Defendants monitored the performance of the Collateral Loans when servicing the loans in the period between their

---

[11] Even assuming that a majority of the reports revealed that more than 50% of the Collateral Loans were of "C" quality, the Defendants never claimed the loans would meet minimum creditworthiness standards.  But they did claim that underwriting standards would be applied to evaluate a prospective borrower's ability to repay a loan.

origination and the issuance of the Bonds in 1999 and that clear warnings about the falsity of the Underwriting Statements were reported to Dynex management, including the Individual Defendants.  For example, CW#7 worked as a supervisor in Dynex's loan servicing center between 1998 and 2000 and reported to Cynthia Wasser, a Vice President for Collections in the Fort Worth servicing center who prepared the Audit Reports of a percentage of the Collateral Loans.  SAC ¶53(g).  CW#7 prepared foreclosure reports, which, together with all of the underlying documentation for a defaulted loan, were sent to Daryl Ake, a Vice President for Collections in Defendant's Virginia headquarters, via Dynex's computerized documentation system called Polaris. SAC ¶¶ 53(g), 61, 84.  Loan application documentation that was facially deficient, fraudulent, or missing altogether was thus revealed to Dynex management at this point.  Furthermore, CW#9 performed quality control audits of sample sets of the Collateral Loans that revealed the rates of dealer fraud and provided reports of such audits to Cynthia Wasser who reported to Senior Vice President Doug Burdette.  The Individual Defendants and others responsible for the false and misleading Underwriting Statements necessarily reviewed collections data and the foregoing reports to provide the then-current rates of delinquency in the Offering Documents.  Consequently, when taken as true, the foregoing allegations also establish that Defendants either "'failed to check information that they had a duty to monitor, or ignored obvious signs of fraud,' and hence 'should have known that they were misrepresenting material facts.'" *South Cherry*, 573 F.3d at 110 (quoting *Novak,* 216 F.3d at 308).

ii. Market Conditions Statements

The SAC also sets forth factual allegations from which a strong inference may be drawn that the Market Conditions Statements were made with an intent to deceive, manipulate, or defraud the investing public.  In contrast to the FAC, the instant pleading contains factual allegations about several forms of reports that collectively provided to Dynex's senior management, including the Individual Defendants, information that contradicted their misleading statements.  First, the Audit Reports and the foreclosure reports generated prior to and throughout the Class Period revealed the existence of numerous facially defective or fraudulently procured loans.  CW #9 avers that he or she "routinely performed" quality control audits on "sample sets of the mobile home loan portfolio" at Dynex's Fort Worth servicing center.  SAC ¶ 53(i).  The SAC also alleges that during the Class Period Vice President Cynthia Wasser regularly conducted audits of a percentage of the Collateral Loans to determine their "bona fide value" and that "[t]hese audits, as well as the experience of [Dynex's] collectors, confirmed that a large percentage of the underlying loans were substantially

19

defective," including "buy for" and "no release" loans and loans for which not even the first payment was made. SAC ¶ 7. Dynex management also reviewed the foreclosure reports and loan documentation uploaded to the Polaris system and Benedetti relied upon these various sources of information "while he conducted intense examinations of losses" in the Bond Collateral. SAC ¶¶ 26-27. Second, the SAC alleges that Benedetti and others met monthly to discuss the Basis Reports "a summary of Dynex's value as [a] sum of the value of its assets," which included a large number of the Bonds themselves. Although standing alone the allegations about the Basis Reports are insufficient to put Defendants on notice of the falsity of the Market Conditions Statements—the summary of assets did not itself disclose the *cause* of the decrease in the value of the Bonds that Dynex retained in its own portfolio—they do reveal that Benedetti was well aware that losses were accumulating faster than expected. Benedetti himself prepared the Monthly Collateral Reports that documented the number and dollar amount of delinquencies in the pool of Bond Collateral as well as "cumulative losses" and reviewed information stored on the Polaris system in order to do so. SAC ¶ 82. Again, although this form of report did not specify the *reasons* for the losses they clearly indicated that the Bond Collateral was performing poorly and in preparing the reports Benedetti must have encountered clear red flags—such as falsified loan documents or buy-for loans that could not be collected—while reviewing information stored on Polaris to prepare the monthly reports.

   Consequently, although none of the reports *individually* analyzed the servicing data in a way that would "demonstrate[] that loan origination practices were undermining the collateral's performance" as opposed to market conditions or some other cause, *Teamsters*, 531 F.3d at 196, the SAC alleges Dynex's senior management, including the Individual Defendants, relied upon the several forms of report that collectively *must have* disclosed that origination practices were a material cause of the poor performance of the Bond Collateral. The Individual Defendants were on notice of (i) the credit quality of Bond Collateral by way of the MHDP and MHRP Reports; (ii) the number of facially or inherently defective loans and loans with fraudulent or deficient documentation by virtue of the Audit Reports, the foreclosure reports, and use of the Polaris system; and (iii) the rapid increases in the overall levels of delinquencies and cumulative losses as a consequence of the Basis Reports and the Monthly Collateral Reports. The Circuit was clear that in order to allege a strong inference of scienter on the basis of known facts the Plaintiffs must "specifically identify the reports or statements containing this information." *Teamsters*, 531 F.3d at 196 (citing Novak, 216 F.3d at 309), but neither the Circuit's decision in *Teamsters* nor any other binding precedent requires that the contradictory facts must be summarized in a single report that

explicitly states the direct opposite of the misleading statement.  To the contrary, a strong inference
of scienter is alleged by "'specific allegations of various reasonably available facts . . . that should
have put the officers on notice' that their public statements were false."  *Police and Fire Retirement
System of the City of Detroit v. Safenet, Inc.*, --- F.Supp. 2d ---, 2009 WL 2391849 (S.D.N.Y. Aug.
5, 2009) (*quoting In re Refco, Inc. Secs. Litig.*, 503 F.Supp. 2d 611, 649 (S.D.N.Y. 2007)).  The
SAC adequately alleges specific facts that were available to and reviewed by the senior
management responsible for the public statements at issue that either put them on notice of the
falsity of those statements or clearly should have done so.  Collectively, these reports establish that
the Defendants either "had access to non-public information contradicting their public statements,
*Scholastic,* 252 F.3d at 76, or acted with an "egregious refusal to see the obvious." *Chill,* 101 F.3d
at 269.  Consequently, the SAC supports a strong inference of scienter with respect to the Market
Conditions Statements.

   iii. **Other Misstatements**

   Based upon the foregoing conclusions that the Individual Defendants both knew about the
"inherently defective" Collateral Loans and that such defects were a material cause of the Bonds'
poor performance, the allegations of the SAC support a strong inference of scienter with respect to
the balance of Defendants' allegedly misleading statements during the Class Period: namely, that
Merit had adequate loan loss reserves and internal controls and that the delinquencies and
repossessions in the Bond Collateral were adequately reported.  *See* SAC ¶¶ 123-24, 127-34, 137-
41.  In the same way that the Individual Defendants either must have known or consciously refused
to recognize that the substantial number of "inherently defective" Collateral Loans would lead to
losses, they either must have known or refused to acknowledge that their loss reserves and internal
controls were insufficient, as ultimately became manifest when Merit restated its loan loss reserves
and cited internal control deficiencies as the cause.  Although the fact of a restatement is not
enough, alone, to support an inference of scienter, *see, e.g.,City of Brockton Retirement System v.
Shaw Group Inc.*, 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008), when paired with allegations of
knowledge or recklessness the fact of the restatement, as well as its size and relation to a
defendant's "core operations" are all some evidence of scienter.  *See In re IMAX Secs. Litig.*, 587 F.
Supp. 2d 471, 482 (S.D.N.Y. 2008); *In re Atlas Air Worldwide Holdings, Inc. Secs. Litig.*, 324 F.
Supp. 2d 474, 488 (S.D.N.Y. 2004).  Here, the SAC supports a strong inference that the Defendants
acted recklessly with respect to their public statements concerning the affects of the inherently
defective Collateral Loans and, when coupled with the restatements, the same conclusion applies to

statements about sufficiency of Merit's loss reserves and internal controls.  Similarly, the Defendants failed to accurately check information they had a duty to monitor—namely the number of reported delinquencies and cumulative repossessions—and when combined with the foregoing conclusions about what the Individual Defendants knew or recklessly disregarded the allegations of the SAC support a strong inference the misstatements of these figures were made with scienter.

**3. Comparison to Plausible Opposing Inferences**

In light of the foregoing, let us turn to the considerations spelled out in *Tellabs* and consider the "whether *all* of the allegations, taken collectively, give rise to a strong inference of scienter" and whether, in comparison to "plausible opposing inferences," the inference that Defendants acted with scienter is "at least as compelling as any opposing inference."  *Tellabs*, 129 S.Ct. at 2509-10.   In *Teamsters*, the Second Circuit concluded that a "number of competing inferences regarding scienter" could be drawn from the allegations of the Plaintiffs' earlier pleading, namely:

> One might infer that no one at Dynex or Merit found the statements misleading because they identified the cause of the bonds' performance as accurately as possible, or that no one responsible for the statements made to investors had reason to believe that Dynex employees were systematically flouting its underwriting guidelines or giving them false information about the cause of the bonds' poor performance . . . [or that the statements] were the result of merely careless mistakes at the management level based on false information fed it from below.

*Teamsters*, 531 F.3d at 197 (internal quotation omitted).  The difference between the FAC and the SAC with respect to allegations of scienter, however, is that the SAC does not require one to speculate that "*someone* whose scienter is imputable to the corporate defendants and who was responsible for the statements made was at least reckless toward the alleged falsity of those statements."  *Id.*  Rather, the internal reports known to and reviewed by the Individual Defendants disclosed to them that the Underwriting Statements and the Market Conditions statements were misleading.  Therefore, while it remains *conceivable* that the misleading statements were the result of "merely careless mistakes"; that explanation is no longer as compelling as the one urged by Plaintiffs.  *Id.*  Similarly, when the allegations of the SAC are taken as true, they foreclose the possibility that "no one responsible for the statements made to investors had reason to believe that Dynex employees were systematically flouting its underwriting guidelines."  The several forms of report quite clearly gave the Individual Defendants and other senior management "reason to believe" the underwriting guidelines and documentation requirements were systematically disregarded.  *Id*.  As a consequence, when the well-pleaded allegations of the SAC are taken as true and reasonable inferences drawn in Plaintiff's favor, the inference of scienter is at least as cogent

and compelling as the competing inferences that the misleading statements were merely the result of careless mistakes or false information fed from below.

In arguing against the cogency of Plaintiff's inference of scienter, Defendants offer several substantive arguments about why Plaintiffs' theory of securities fraud does not add up. For example, Defendants point to the fact that Dynex accurately disclosed the total losses in the Bond Collateral each month, and argues that this course of conduct is inconsistent with a fraudulent scheme to conceal from investors the poor performance of the Bonds. To be sure, a record of honest disclosure cuts against an inference of fraudulent intent, but *Tellabs* does not require that the inference of scienter be premised on "smoking gun" evidence or evidence wholly free from doubt: it simply requires that the inference of fraudulent intent be at *least as* cogent and compelling as other inferences. Accurate disclosure of delinquency rates, moreover, is not necessarily inconsistent with the misleading statements made during the Class Period. Dynex produced the Monthly Collateral Reports pursuant to its duties as Master Servicer and in that role had incentive to accurately disclose delinquencies and losses because the Trustee of the Bonds had authority not to renew Dynex's Master Servicer Agreement. *See* Series 13 Prospectus Supplement at S-20. Moreover, public statements that attributed the Bonds' poor performance to circumstances extrinsic to the loans are plausibly viewed as misleading attempts to minimize investor concern: if the poor performance is due to extrinsic factors, like market conditions, then presumably when the market rebounds so too will the Bonds. Defendants also point to the fact that Dynex and Merit were "investors" in the bonds who hoped to profit from the "spread" between the higher interest rates paid by borrowers and the lower rates paid to bond holders and in fact believed the Collateral Loans would perform well. *See* SAC ¶ 56. As a consequence it is certainly plausible that Defendants had disincentives to disregard underwriting criteria, but once it was clear to them that the Bond Collateral was comprised of numerous facially defective or fraudulently procured loans, they certainly had an incentive to withhold information about the disregard of the underwriting guidelines in the Offering Documents. Similarly, the Defendants' ownership of the securities at issue does not immunize them from liability and the misstatements that attributed the Bonds' poor performance to market conditions could have easily been motivated by an intent to prop up the flagging value of the Bonds themselves.

In sum, when the allegations of the SAC are assessed "holistically" a cogent story of securities fraud is revealed: the Defendants originated or purchased a large number of mobile home loans of generally low credit quality, a substantial number of which were "inherently

23

defective," and packaged them into the Bonds failing to disclose that the stated underwriting guidelines were "systematically disregarded"; then, when adverse market conditions coincided with rising defaults and many loans were uncollectible as a consequence of inherent defects, Defendants publicly stated that market conditions were to blame in an attempt to forestall deeper drops in the value of the Bonds, many of which they held for their own account.  For the foregoing reasons the SAC adequately alleges facts that give rise to a strong inference that the statements I have found to be false and misleading were made with scienter.

### D.  Loss Causation

Defendants contend that the SAC fails to allege loss causation, another required element of securities fraud under Section 10(b).  To plead loss causation, Plaintiff must allege that the price of the Bonds dropped as a result of the "truth" regarding the alleged misrepresentations being revealed to the market. *Dura Pharms.*, 544 U.S. at 346-47.  Defendants argue that the Rating Agency downgrades that mark the end of the Class Period and that are alleged to be the proximate cause of the drop in the market price of the Bonds did not disclose the falsity of Defendants' misleading statements.  That is, according to Defendants, the SAC fails to allege a "corrective disclosure"—*i.e.* a disclosure that demonstrates to the market not only that the securities were overvalued but also that the Defendants' prior statements were false.  *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 175 (2d Cir. 2005).

In *Dynex I*, I rejected the same argument that the Defendants re-assert here.  However, because my decision in *Dynex I* was vacated by the Circuit, it is no longer the law of the case. Nevertheless, Defendants point to no intervening change in the law or other compelling reason for me to reverse my earlier decision on the issue of loss causation.  Both the earlier and instant pleadings allege that it was Dynex's dramatic restatement of cumulative losses in Series 13 Bond Collateral in October 2003 that caused the Rating Agencies to initiate a credit review of that series of Bonds which in turn led to downgrades that cited "relaxed credit standards" as a cause of the Bonds' poor performance.  SAC ¶ 94.  Subsequently, in early 2004, the Rating Agencies reviewed and downgraded the Series 12 Bonds. *Id.*  Immediately after the downgrades, the market price of the Bonds dropped precipitously.  *Id.*  The Bonds' price dropped further after disclosures in April and May 2004 that Merit had to restate its prior financial results due to internal control deficiencies. SAC ¶ 95.  This chain of events is sufficient to allege loss causation at the pleading stage.

### E.  Timeliness of Plaintiff's Claims Pertaining to the Underwriting Statements

Defendants also recycle their argument that certain of Plaintiffs' allegations are time-barred—namely, those contained in the Offering Documents in 1999.  The Circuit declined to address this argument in *Teamsters*.  531 F.3d at 197.  Actions for securities fraud must be brought within five years after the violation, which in this context occurs when the misleading statement or omission was made. *See* 28 U.S.C. § 1658(b).  Here, the FAC was filed on February 7, 2005, nearly six years after the Offering Documents were issued.  However, as noted in *Dynex I*, in a case such as this one in which a series of fraudulent misrepresentations is alleged, the "'period of repose begins when the last alleged misrepresentation was made.'" *Dynex I*, 2006 WL 314254 at \*5 (quoting *Teamsters Local 445 Freight Division Pension Fund v. Bombardier, Inc.*, 05 Civ. 1898 (SAS), 2005 WL 2148919, \*5 (S.D.N.Y. Sep. 6, 2005)); *see also Plymouth County Ret. Ass'n v. Schroeder*. 576 F. Supp. 2d 360, 378 (E.D.N.Y. 2008).

In reasserting their timeliness argument here, Defendants rely upon the Supreme Court's decision in *Klehr v. A.O. Smith Corp*, 521 U.S. 179 (1997), which held in the context of a civil RICO action that the last predicate act rule is at odds with the basic objective of limitations periods because a series of predicate acts can continue indefinitely.  However, Defendants point to no authority applying *Klehr* to the securities fraud context and I find none.  Consequently, Defendants have failed to persuade me that reversal of my earlier decision with respect to the timeliness of Plaintiff's claims based on statements that preceded the Class Period is warranted.

## F.  Standing to Assert Claims as to Series 12 Bonds

Next, Defendants again contend that Plaintiffs lack standing to pursue claims based on the Series 12 Bonds because the SAC contains no allegation that Plaintiffs purchased those securities. The Second Circuit similarly declined to consider this argument in *Teamsters*.  531 F.3d at 197.  As I held in *Dynex I*, at this stage of the litigation Plaintiffs have adequately alleged their standing to proceed on behalf of purchasers of both the Series 12 and Series 13 Bonds because they allege that Defendants made the exact same misrepresentations with respect to both series of bonds and that the bond collateral suffered from the same defects.  *Dynex I*, 2006 WL 314254 at \*12 (citing *Bombadier*, 2005 WL 2148919 at \*5).

## G.  Section 20(a) Control Person Claims

Finally, because I have concluded that Plaintiff's SAC has adequately alleged a violation of Section 10(b), premised in large measure on what the Individual Defendants Potts and Benedetti knew at the time the statements at issue were made, the SAC's derivative claims for "control

person" liability under Section 20(a) may proceed. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion is GRANTED in part and DENIED in part. The SAC adequately alleges violations of Section 10(b) with respect to (i) the Defendants' statements in the Offering Documents that *some* standards pertaining to borrower documentation or creditworthiness were followed; (ii) that market conditions were to blame for *losses* in the Bond Collateral and, (iii) that during the Class Period and prior to the restatements Merit had adequate loss reserves and internal controls; and (iv) that during the Class Period and prior to October 2003 cumulative repossession and delinquency figures for the Bond Collateral were accurately reported. With respect to such claims and the corresponding Section 20(a) claims, Defendants' motion to dismiss is DENIED.  With respect to claims of securities fraud based upon other allegedly false and misleading statements, Defendants' motion to dismiss is GRANTED.  The parties are directed to meet and confer with respect to the timeline for the balance of this litigation and to jointly submit a proposed pretrial scheduling order within twenty (20) days of the date hereof.  The Clerk of the Court is instructed to close this motion.

SO ORDERED October 19, 2009
~~September~~ , 2009

**New York, New York**

**U.S.D.J.**