UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
                                                                             :

In re DYNEX CAPITAL, INC.                              :         05 Civ. 1897 (HB)
SECURITIES LITIGATION                            :         OPINION & ORDER
                                                                       :
------------------------------------------------------------------------x

**Hon. HAROLD BAER, JR., United States District Judge:**

       Lead Plaintiff Teamsters Local 445 Freight Division Pension Fund ("Teamsters" or "Plaintiff") in this purported class action brings claims under sections 10(b) and 20(a) of the 1934 Securities Exchange Act (the "Act"), 15 U.S.C. §§ 78j(b), 78t(a). Its claims arise from its purchase of Merit Securities Corporation Collateralized Series 12 and Series 13 Bonds (collectively, the "Bonds") between February 7, 2000 and May 13, 2004 (the "Class Period"). The Bonds are mortgage-backed securities collateralized by several thousand mobile home loans (the "Bond Collateral") originated and initially serviced by Defendant Dynex Capital, Inc. and its affiliates.

       Plaintiff alleges that Dynex, its subsidiary Merit Securities Corporation, and two senior executives of the companies, Thomas H. Potts and Stephen J. Benedetti (collectively, "Defendants") made false and misleading statements about the Bond Collateral. Specifically, Plaintiff alleges that Defendants sold the Bonds to investors for over $630 million without revealing that the Bond Collateral was seriously impaired, and continued to conceal material deficiencies in the Bond Collateral through May 13, 2004. Plaintiff's Section 20(a) claims are derivative of its Section 10(b) claims and allege "control person" liability against Potts and Benedetti. The factual and procedural history of this case is detailed in a previous Opinion and Order which granted in part and denied in part Defendants' motion to dismiss. *See In re Dynex Capital, Inc. Secs. Litig.*, No. 05 Civ. 1897 (HB), 2009 WL 3380621 (S.D.N.Y. October 19, 2009).

       The Teamsters now move pursuant to Fed. R. Civ. P. 23(b)(3) for certification of a class consisting of "[a]ll purchasers of Merit Securities Corporation's Collateralized Bonds Series 12 and Series 13 Bonds during the period between February 7, 2000 and May 13, 2004 who were damaged thereby." Pl. Notice of Mot. Class Cert., dated June 4, 2010, at 1. Plaintiff also moves to be appointed as Class Representative and to have Cohen, Milstein, Sellers & Toll, PLLC appointed as Class Counsel. For the reasons that follow, the motions are GRANTED.

## DISCUSSION

       "In order to qualify for class certification under Rule 23(b)(3), class counsel must satisfy four basic requirements [under Rule 23(a)]: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. If these criteria are met, the court must decide whether common questions of law or fact predominate and whether a class action is the superior means of adjudicating the controversy fairly and efficiently." *Seijas v. Republic of Argentina*, 606 F.3d 53,

57 (2d Cir. 2010); Fed. R. Civ. P. 23(b)(3).  These factors must be established by a preponderance of the evidence.  *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).

## I. RULE 23(a) REQUIREMENTS

### A. Numerosity

Numerosity requires that the proposed class be so large that joinder of individual members would be "inconvenient or difficult."  *In re J.P. Morgan Chase Cash Balance Litig.*, 242 F.R.D. 265, 272 (S.D.N.Y. 2007).  The Second Circuit has held that a proposed class of 40 members presumptively satisfies this requirement.  *See, e.g.*, *id.* (*citing Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)).  Trade data shows at least 2,718 trades during the Class Period—a significant amount for bond trading.  *See* Rehns Decl., Ex. C.  Among the firms that provided trade data some also provided the number of institutions who purchased from them, including the Bank of New York which alone identified 56 different institutions that purchased the Bonds during the Class Period.  Pl. Mem. Supp. Class Cert. at 8, n.2.  Defendants have failed to rebut the presumption of numerosity.

### B. Commonality

The "commonality requirement is met if plaintiffs' grievances share a common question of law or of fact."  *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC,* 504 F.3d 229, 245 (2d Cir. 2007). Class certification will not necessarily be precluded by differing individual circumstances of class members; rather, "the critical inquiry is whether the common questions are at the core of the cause of action alleged."  *Vengurlekar v. Silverline Techs., Ltd.*, 220 F.R.D. 222, 227 (S.D.N.Y. 2003).  Even "a single common question may be sufficient."  *Bakalar v. Vavra*, 237 F.R.D. 59, 67 (S.D.N.Y. 2006); *see also Marisol A. v. Giuliani*, 929 F. Supp. 662, 690 (S.D.N.Y. 1996) (citation omitted), *aff'd* 126 F.3d 372, 376 (2d Cir.1997).

The proposed class satisfies commonality because "putative class members have been injured by similar material misrepresentations and omissions."  *Fogarazzo v. Lehman Bros. Inc.*, 232 F.R.D. 176, 180 (S.D.N.Y. 2005).  Indeed the putative class members here are alleged to have been impacted by the *same* misrepresentations and omissions, and all will be required to show that Defendants committed fraud with the requisite mental state. *See* Second Am. Class Action Compl. ("SAC"), ¶¶ 96-151.

### C. Adequacy

"Adequacy entails inquiry as to whether: (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation."  *In re Flag Telecomm. Holdings, Ltd. Secs. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009).  "The focus is on uncovering conflicts of interest between named parties and the class they seek to represent . . .   In order to defeat a motion for certification, however, the conflict

must be fundamental." *Id.* (internal quotations omitted).

Defendants argue first that Plaintiff's interests will conflict with those of other class members because it purchased from only one tranche of the Series 13 Bonds, and purchasers of different tranches, whether superior or subordinate, will have different repayment rights and potential damages. While investors' repayment rights may vary slightly based on the seniority of the tranches they purchased, this does not present a "fundamental" conflict within the class. *Id.* Plaintiff's claims allege damages as a result of fraud on the entire proposed class, and Plaintiff is committed to pursuing a class-wide remedy. *See* Pl. Mem. Supp. Class Cert. at 10. Moreover, differences relating to repayment rights are at base about damages and, on a motion for class certification, differences in damages are not dispositive. *See, e.g.*, *Seijas*, 606 F.3d at 58.

Second, Defendants argue that adequacy is defeated because Plaintiff has only rudimentary knowledge of the facts and the case is driven by counsel. However, this is not a situation where the Plaintiff has simply lent its name to a suit "controlled entirely by the class attorney." *In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 135 (S.D.N.Y. 2008). Lead Plaintiff is a large institutional investor with over $150 million in pension assets and its 30(b)(6) representatives understood, among other things, that the action involves alleged misstatements and omissions related to the Bonds, that the circumstances surrounding the underlying mobile home loans are important to their case, that it seeks to recapture losses in the Bonds at issue, and that it is responsible for reviewing and approving all filed documents. *See* Pl. Reply Mem. Supp. Class Cert. at 10 and accompanying citations. This is sufficient to establish adequacy in this case. *See Wagner v. Barrick Gold Corp*, 251 F.R.D. 112, 118 (S.D.N.Y. 2008) ("in complex actions such as securities actions, a plaintiff need not have expert knowledge of all aspects of the case to qualify as class representative.").

### D. Typicality

To establish typicality, the party seeking certification must show that "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Flag*, 574 F.3d at 35. This requirement "is not demanding." *E.g., In re Prestige Brands Holdings, Inc. Sec. Litig.*, 05 Civ. 6924 (CLB), 2007 WL 2585088, at *3 (S.D.N.Y. Sept. 5, 2007). Here, Lead Plaintiff's proof and legal theories will be identical to those of the proposed class. All of the allegedly false and misleading statements applied to both the Series 12 and Series 13 Bonds because the statements about underwriting and origination guidelines for both offerings were identical. *See* SAC ¶¶ 3, 59-62, 86, 96-141.

Defendants suggest that typicality is defeated because Teamsters will face the "full" defense that it sustained no injury. They assert that this defense is "not typical of the potential claims of other class members", but do not support their assertion (indeed, doing so could be contrary to their interests). There is no reason to believe that such a defense is unique to Teamsters and, even if it

were, "it is well-established that the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification." *Seijas*, 606 F.3d at 58.

Defendants also argue that Teamsters cannot represent all purchasers of the Bonds because it did not purchase any Series 12-1 Bonds.  While a lead plaintiff must without question have standing to sue on "at least some claims," *In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 377 (S.D.N.Y. 2002), it would be premature to defeat class certification on the basis that some Plaintiff did not purchase every single security forming the basis of the claims.  *See Hevesi v. Citigroup, Inc.*, 366 F.3d 70, 82 (2d Cir. 2004) ("[I]t is inevitable that, in some cases, the lead plaintiff will not have standing to sue on every claim."); *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 Civ. 4318 (HB), 2000 WL 1357509, at *3 (S.D.N.Y. Sep. 20, 2000) ("Courts have repeatedly certified classes where the class representatives had not invested in all of the subject securities.").

## II. RULE 23(b) REQUIREMENTS

Since the Rule 23(a) requirements are satisfied, the Court may consider whether the 23(b)(3) requirements of predominance and superiority compel a decision in favor of class certification.  *See Bombardier Inc.*, 546 F.3d at 202 (*quoting* Fed. R. Civ. P. 23(b)(3)).

### A.  Predominance

"In order to be certified as a Rule 23(b)(3) class action, plaintiffs must show that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).  *In re IMAX Sec. Litig.*, No. 06 Civ. 6128 (NRB), 2010 WL 5185076, at *17 (S.D.N.Y. Dec. 22, 2010).  "Common questions of law and fact predominate when issues subject to generalized proof and applicable to the class as a whole predominate over, and are more substantial than, issues that are subject to individualized proof." *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 98 (S.D.N.Y. 2010).

To support their argument that individual issues predominate, Defendants devote the bulk of their memorandum to showing that the element of reliance, which is required to prevail under section 10(b), *see Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008), is not subject to generalized proof.  "Reliance may be presumed where (1) defendants have made material omissions, as indicated by *Affiliated Ute Citizens of Utah v. United States*, [406 U.S. 128 (1972)] or (2) the fraud-on-the-market doctrine applies." *Berks Cty. Emps. Ret. Fund v. First Am. Corp.*, No. 08 Civ. 5654 (LAK), 2010 WL 3430517, at *2 (S.D.N.Y. Aug. 31, 2010).

#### 1. *The fraud on the market presumption*

To presume reliance under the fraud on the market theory, the certificates at issue must have been traded in an efficient market.  The Second Circuit has approved the use of five so-called "*Cammer*" factors as an analytical tool to determine whether a market is efficient.  *See Bombardier Inc.*, 546 F.3d at 204, n.11, 210-11 (*citing Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989)).  They include "(1) the average weekly trading volume of the Certificates, (2) the number of

securities analysts following and reporting on them, (3) the extent to which market makers traded in the Certificates, (4) the issuer's eligibility to file an SEC registration Form S-3, and (5) the demonstration of a cause and effect relationship between unexpected, material disclosures and changes in the Certificates' prices." *Bombardier Inc.*, 546 F.3d at 200.

### a)  *Average weekly trading volume of the bonds*

Defendants contend that there was insufficient trading volume to satisfy this factor. There is a substantial presumption of market efficiency where 1% of the average outstanding balance is traded, i.e. a 1% weekly turnover rate. *See Cammer*, 711 F. Supp. at 1286. Plaintiff's expert Dr. Ferri concluded that average trading volume across tranches exceeded 1%. Ferri Rep. ¶¶ 77-83. Defendants' expert, Dr. Carron, disputes Dr. Ferri's methodology on the grounds that it (1) used trading data for less than all tranches, (2) considered trades that were cancelled or properly characterized as repurchase financings rather than trades, and (3) double-counted certain trades. Carron Rep. ¶¶ 21-27. Dr. Carron ultimately concluded that average turnover was less than 1%. *See id.*, Ex. 3. This factor is not dispositive. First, even if a presumption based on 1% trading volume is not triggered, Dr. Ferri has shown that trading in the Bonds was active. Moreover, the *Cammer* presumption applied to stock trades, whereas the type of bonds at issue in this case trade "relatively infrequently" in general. *See* Ferri Rep. ¶¶ 73-74. The Second Circuit has not fully addressed this issue, but has suggested that the *Cammer* factors be adjusted in the context of bond markets. *See Bombardier Inc.*, 546 F.3d at 204, n.11, 210-11 (*citing In re Enron Corp. Sec.,* 529 F. Supp. 2d 644, 748 (S.D.Tex. 2006)). A turnover rate below the 1% threshold established in *Cammer* for the stock market does not, without more, defeat a finding of an efficient bond market.

### b)  *Coverage by securities analysts*

Dr. Ferri asserts that "there were enough reports from leading financial services and research firms covering the manufactured housing collateral pool that backed Merit Series 12-1 and 13-1 throughout the Class Period" to fulfill the second factor. Ferri Rep. ¶ 90. These include analyst reports relating to the industry generally, rating agency reports, and reports issued by Merit, the issuer of the Bonds. Moreover, it is undisputed that Moody's and Fitch rated all the Bonds. Pl.'s Reply Mem. at 5. Defendants contend that these are not the types of reports contemplated by *Bombardier* because they do not show that "analysts specifically followed the Certificates [at issue]." *Bombardier*, 546 F.3d at 205. Nonetheless, Defendants' expert is unable to rebut the assertion that, in the context of the market for manufactured home bonds, there were enough reports throughout the Class Period to provide a sufficient amount of information to satisfy this factor.

### c)  *Market makers for the bonds*

Plaintiff contends that "thirteen[] large, sophisticated and prestigious financial institutions acted as market makers for the Series 12 and 13 Bonds, easily meeting the third . . . factor." Pl. Memo. Class Cert. 17-18; Ferri Rep. ¶¶ 91-93. Defendants assert that these institutions do not fit

the SEC definition of market maker,[1] but Plaintiffs argue persuasively that this should not be dispositive because the SEC definition was developed for markets other than the bond market relevant here.  Plaintiff submits documentary and testimonial evidence from Defendants that Mesirow Financial and similar firms actually communicated with Defendants and priced the Bonds for the purpose of trading them in the open market.  *See* Benedetti Dep. 187:10-188:2.  Mesirow Financial has represented itself as a "regular market maker [] in the Merit 12 and Merit 13 transactions."  Rehns Decl. in Further Supp., Ex. B.  Thus, even if the financial institutions referred to in the Ferri Report do not constitute proper market makers, some market makers existed to satisfy the third factor.

### d) Eligibility to file registration statement SEC Form S-3

Defendants concede that an SEC Form S-3 was filed.  *See* Def. Mot. Opp. Class Cert. at 12.

### e) Price reaction to unexpected, material disclosures

"Evidence that unexpected corporate events or financial releases cause an immediate response in the price of a security has been considered the most important [] factor, and the essence of an efficient market and the foundation for the fraud on the market theory."  *Bombardier*, 546 F.3d at 207-08 (internal quotation marks and citations omitted).  An event study that correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price has been considered *prima facie* evidence of the existence of such a causal relationship.  *Id.*

Dr. Ferri conducted eight event studies and concluded that there was a "strong price reaction to material information, specifically to rating agency downgrades" for the Bonds.  Ferri Rep. ¶ 182.  Defendants raise two challenges to Dr. Ferri's conclusions.  First, they contend that his event studies were in error because he used "matrix prices" as a proxy for actual transaction prices.  Matrix prices are modeled prices provided by a pricing service such as, in this case, Bloomberg.  Ferri Rep. ¶¶ 105-06.  The Second Circuit has approved the use of matrix prices "as long as they are shown to be consistent and reliable proxies for transaction prices."  *Bombardier*, 546 F.3d at 209.  Matrix prices are "consistent and reliable" if they and the transaction prices "generally moved in the same direction during the months close to the disclosure dates studied."  *Id.*  Some differences are acceptable.  *See id.*

The main event that Plaintiff cites is Moody's February 24, 2004 downgrade of the M13 Bonds.  It claims this downgrade caused a drop in both actual prices (M1 tranche went from $100.00 on 2/23/2004 to $83.50 on 2/27/2004) and matrix prices (M1 tranche went from $101.81 on 2/23/2004 to $81.09 on 5/11/2004).  Roughly parallel drops occurred in the matrix and actual

---

[1] The SEC defines a "market maker" as "a dealer who, with respect to a particular security, (i) regularly publishes bona fide, competitive bid and offer quotations in a recognized interdealer quotation system; or (ii) furnishes bona fide competitive bid and offer quotations on request; and (iii) is ready, willing and able to effect transactions in reasonable quantities at his quoted prices with other brokers or dealers."  *Bombardier*, 546 F.3d at 206 (*quoting* 17 C.F.R. § 240.15c3-1[c][8] (2006)).

transaction prices for M2 Bonds – another subordinate tranche of the M13 Bonds at issue here. *See* Pl. Reply Mem. Supp. Mot. Class Cert. at 3-4. Finally, Mesirow Financial – an alleged market maker for the M12 and M13 Bonds – apprised Dynex on March 16, 2004 that market prices for the M2 bonds had dropped "significantly," a fact that confirms the generally uniform direction of matrix and actual prices at issue here.

Second, Defendants fault Dr. Ferri's analysis for considering prices on dates too far removed from events and claim that a proper event study typically considers prices on the day immediately before and immediately after an event. Indeed, Judge Kaplan recently concluded that a plaintiff failed to show market efficiency based on event studies relying on price impacts as short as one week after the studied events because such data did not measure the "immediate" effect of the events. *See Berks Cty. Emps. Ret. Fund v. First Am. Corp.*, No. 08 Civ. 5654 (LAK), 2010 WL 3430517, at *4-5 (S.D.N.Y. Aug. 31, 2010). However, Judge Kaplan's decision did not rely on the amount of time between the events and the dates on which market prices were measured; rather, that decision was based on his conclusion that the events did not result in the disclosure of previously unavailable or material information. *Id.* Moreover, that case involved a stock market which, as noted above, differs from the bond market relevant here. *See Bombardier*, 546 F.3d at 204, n.11, 210-11

Here, Plaintiff's motion highlights the effect of a single event–not multiple disclosures, as in *Berks*. Dr. Ferri measured the price of the Bonds 57 days after the February 24, 2004 Moody's downgrade because insufficient data existed to measure prices the very next day. The fact, somehow overlooked by the Defendant, is that Bloomberg halted pricing between February 24 and May 11, 2004, so matrix pricing was unavailable for that period. Dr. Ferri also explained that no intervening events were of comparable magnitude to the February 24, 2004 downgrade by Moody's. *See* Ferri Dep. 143-44, Defendant's Ex. B. As a result, the matrix pricing provides the best-possible approximation of the rating downgrade's immediate effect.

Defendants' arguments fail to defeat a finding that the market for the bonds at issue was efficient. Plaintiff has shown that the matrix prices in this case provide a reliable tool for assessing price reactions to downgrade events. Unlike in *Bombardier*, where prices suffered no material reactions following unexpected downgrades, *Bombardier*, 546 F.3d at 210, the Bonds at issue here lost as much as 80% of their value following the ratings downgrades. *See* Pl. Reply Mem. Supp. Mot. Class Cert at 2-4, n.10, and accompanying citations.

### 2. *The Affiliated Ute Presumption*

Reliance by investors on alleged material omissions may be presumed. *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972); *In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 397 (S.D.N.Y. 2010). "Under *Affiliated Ute,* 'positive proof of reliance is not a prerequisite to recovery" in cases "involving primarily a failure to disclose.'" *Merrill*

7

*Lynch*, 704 F. Supp. 2d at 397 (*quoting Affiliated Ute*, 406 U.S. at 153).  A failure to disclose is a material omission for *Affiliated Ute* purposes when "the facts withheld [were] material in the sense that a reasonable investor might have considered them important in the making of this decision." *Id.* at 153-54.

      This case is about alleged "statements regarding underwriting standards, market conditions, loss reserves, and delinquencies." *Dynex*, 2009 WL 3380621, at *8.  However, it is also about omissions.  As noted in the opinion denying in part Defendants' motion to dismiss, the allegedly actionable statements "most central" to Plaintiff's fraud allegations are those that attribute losses to market conditions yet "*omit* to state that the poor performance in fact derived from 'reckless underwriting and origination practices.'" *Id.* (emphasis added).  Thus the heart of the alleged deception is rooted not in statements, but in the fact that specific information about the quality of the collateral was withheld, and that information would have been important to a reasonable investor.  *See id.*  The *Affiliated Ute* presumption applies here because "the alleged omissions played an independent, or at least interdependent, role in the alleged fraud." *In re Parmalat Sec. Litig.*, No. 04 Civ. 30, 2008 WL 3895539, at *8 (S.D.N.Y. Aug. 21, 2008).  This renders the issue of reliance common to all class members.

                              3.   <u>Other elements are subject to generalized proof</u>

      Defendants reserved virtually no space to argue that the remaining elements of Plaintiff's 10(b) claims are not subject to generalized proof.  They argue that the investors who bought at different times during the Class Period made decisions based on different universes of information.  This suggests that unique defenses may be available against different class members based on the element of loss causation.  As this Court recently held, typicality is defeated where Lead Plaintiff cannot show loss causation as a result of purchasing stock at different times. *In re IMAX Secs. Litig.*, 2010 WL 5185076, at *13-14.  That opinion suggested in dicta that differences in purchase dates may work against a finding of typicality, but declined to address the connection to the predominance prong.  *Id.* at *18.  Moreover, *In re IMAX* is distinguishable because it addressed a situation where the Lead Plaintiff itself—as opposed to some potential but unidentified class member—could not show loss causation, and was susceptible to unique defenses that threatened to become the focus of the litigation. *Id.* at *13-14.  Because *In re IMAX* did not address the effect of different purchase dates on the predominance prong, and was factually distinguishable.  I conclude that Plaintiff has shown by a preponderance of the evidence that class-wide issues predominate.

      **B.  Superiority**

      "[A] class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to this inquiry include: (A) class members' interest in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the

desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

Defendants do not refute the assertions that no litigation concerning this controversy has begun elsewhere and that it is desirable to concentrate the all the claims in this forum, nor do they argue that management of the class action would be difficult. Def. Mot. Opp. Class Cert. at 18; *see* Fed. R. Civ. P. 23(b)(3)(B-D). Rather, they point out that Plaintiff has cited no evidence in support of superiority and rely on mere assertions that class treatment is superior because the amounts at stake are small enough such that individual actions would be impractical.

The foregoing discussion of Plaintiff's typicality and commonality is premised on submitted evidence that shows that the proposed class is cohesive in terms of the types of claims and evidence that will be presented. Individual control of separate actions would not serve the class members' interests and class treatment in this case is the fairest and most efficient way to proceed. *See Seijas*, 606 F.3d at 57; *Barrick*, 251 F.R.D. at 120 ("In general, securities suits such as this easily satisfy the superiority requirement of Rule 23.").

### III. RULE 23(g) REQUIREMENTS

To appoint class counsel, a court must consider, among other things, counsel's knowledge, experience, and commitment in connection with the claims asserted in the action. *See* Fed. R. Civ. P. 23(g)(1)(A). The court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." *Id.* 23(g)(1)(B). The scope of consideration is broad, *see* Advisory Committee Notes Rule 23(g), 2003 Amendments, Subsection (C); Federal Judicial Center, 4 Manual for Complex Litigation § 21.27 at 278-301 (2004) (same); WRIGHT & MILLER § 1802.3, and carries significance because fair and adequate representation is a requirement for class counsel. *See* Fed. R. Civ. P. 23(g)(4). *See also Schwab v. Philip Morris USA, Inc.,* 449 F.Supp.2d 992, 1106-1107 (E.D.N.Y. 2006) (comparing class counsel to "a judicially appointed fiduciary. . ."). Indeed, before Rule 23(g) existed, courts employed Rule 23(a)'s adequacy prong to evaluate the "competency and conflicts of class counsel." *See Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). The addition of Rule 23(g) underscores the importance of a considered and independent analysis for the appointment of class counsel.

Cohen, Milstein, Sellers & Toll, PLLC has the experience, knowledge, commitment and record of work on this case to merit appointment as Class Counsel. *See* Rehns Decl. Ex. B; *Lehman Bros.*, 232 F.R.D. at 182. Defendants have not argued otherwise. In considering other matter pertinent to counsel's ability to fairly and adequately represent the class, as I have noted in previous opinions, diversity is a factor of central importance. *See In re J.P. Morgan Chase Cash Balance Litig.*, 242 F.R.D. 265, 277 (S.D.N.Y. 2007). Cohen Milstein has helped to satisfy the Court's concerns by its note that it was recognized as one of the top law offices in Washington D.C. for diversity efforts. While I recognize that many or all of the proposed class members may be

9

institutional investors, it should be clear to all that their investments were made on behalf of people of diverse gender, racial, and socio-economic backgrounds. That said, Cohen Milstein is encouraged to staff the case accordingly. *See J.P. Morgan Cash Balance Litig.*, 242 F.R.D. at 277.

## CONCLUSION

For the foregoing reasons, the motion for class certification is GRANTED.[2] Cohen, Milstein, Sellers & Toll, PLLC is appointed Class Counsel and Lead Plaintiff Teamsters is appointed Class Representative. The Clerk of the Court is instructed to close this motion.

SO ORDERED
March 7, 2011
New York, New York

Hon. Harold Baer, Jr.
U.S.D.J.

---

[2] The Court may *sua sponte* reconsider this decision should the outcome of the motion for sanctions or to dismiss currently *sub judice* make reconsideration appropriate.

10