```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   TEAMSTERS LOCAL445 FREIGHT
     DIVISION PENSION FUND,
 4
                    Plaintiff,
 5
                 v.                          05 Civ. 1897 (HB)
 6
     DYNEX CAPITAL INC., et al.,
 7                                           Argument
                 Defendants.
 8
     ------------------------------x
 9
                                             New York, N.Y.
10                                           September 14, 2011
                                             9:40 a.m.
11
     Before:
12
             HON. HAROLD BAER, JR.
13
                                             District Judge
14

15
             APPEARANCES
16

17
     COHEN MILSTEIN SELLERS & TOLL PLLC
18        Attorneys for Plaintiffs
     BY:  JOEL P. LAITMAN
19

20   HUNTON & WILLIAMS LLP
          Attorneys for Defendant Dynex Capital Inc.
21   BY:  JOSEPH SALTARELLI
          EDWARD J. FUHR
22

23

24

25
```

```
 1                (Case called)

 2           THE COURT:  We have a three-year case analysis in this

 3      courthouse, the concept being that you are supposed to be at

 4      zero in terms of your three-year-old cases.  You are my only

 5      candidate.  I just thought I'd let you in on it.  In case

 6      anybody asks you how quickly you get rid of your cases, you can

 7      tell them not quick enough.

 8           This is defendant's motion for summary judgment.  That

 9      does not mean I'm going to get rid of it on summary judgment,

10      however.  Don't feel obliged on that score.  But I will hear

11      from the defendant first, since it is the defendant's motion.

12           MR. SALTARELLI:  Good morning, your Honor.  Joseph

13      Saltarelli of Hunton & Williams on behalf of the defendant in

14      support of the motion.  With me at counsel table is Ed Fuhr.

15           Your Honor, if I may, I'm going to be addressing three

16      of the six elements on the 10b-5 claim.

17           THE COURT:  I'd be glad to do it any way you want, but

18      I'm only interested in the market condition problem and the

19      modification problem and something about underwriting

20      statements.  I really am not interested in the others.  If you

21      want to talk about them, you may, but there isn't really any

22      interest on my part.

23           MR. SALTARELLI:  Certainly, your Honor.  If I may, I

24      have prepared a short handout.  It covers some of the documents

25      that have been submitted to you.  There is nothing new here.  I
```

1    think it would be for the convenience of the Court, a little

2    bit easier.

3             THE COURT:  Fine.

4             MR. SALTARELLI:  If I may hand up some for your law

5    clerk as well.

6             THE COURT:  The emphasis is on there is nothing new

7    here, right?

8             MR. SALTARELLI:  Yes, your Honor.  There are two

9    charts in there that I have drawn on the documents submitted,

10   and the others are just enlarged documents that have been

11   submitted in part of the motion.

12            Your Honor, you asked me to address some of the

13   alleged misrepresentations.  The underwriting statements I

14   believe is the first one you mentioned.

15            THE COURT:  Correct.

16            MR. SALTARELLI:  Your Honor, the underwriting

17   statements in Dynex II, I think your ruling was very clear that

18   the underwriting statements could be actionable.  There are two

19   issues involved here.  One is those statements were made in

20   1999 in the prospectuses.  As we have cited in our brief, and

21   they don't challenge it in their opposition, those statements

22   are not actionable, because they fall outside of the class

23   period.  They were made in 1999 and the class period starts in

24   2000.

25            THE COURT:  Now that we are talking about dates --

1    well, never mind.  Go ahead.  I'm going to try not to interrupt

2    you.

3           MR. SALTARELLI:  The underwriting statements, your

4    Honor, are those statements that plaintiff alleges were made in

5    the offering documents which were issued in 1999 that

6    essentially said creditworthiness is the main characteristic of

7    the borrowers on the loans.

8           In Dynex II you ruled quite clearly that the only way

9    those type of statements could be actionable is if there was

10   evidence of routine, blatant disregard by Dynex Financial of

11   its own underwriting guidelines.  There is no evidence of that,

12   your Honor.  They have presented none.  In fact, when you go

13   through their opposition brief, it is fairly clear that they

14   have pretty much abandoned this claim, because there is no

15   evidence supporting it.

16          THE COURT:  Going back to your first prong, let's

17   assume that the underwriting statements were drafted prior to

18   the start of the class period.  Don't you nonetheless have an

19   ongoing duty to disclose material facts where those facts

20   render the statements misleading?

21          MR. SALTARELLI:  Your Honor, I think that's the ruling

22   in an omissions case.  You have a duty to disclose facts.  If

23   you don't disclose them and it keeps the prior statements

24   misleading, you have a duty to disclose a fact if it is

25   necessary to make a prior statement not misleading.

1          As I understand your ruling in Dynex II, you sustained

2    those allegations from 1999, statements made in 1999, on the

3    premise that continuing statements of a similar nature were

4    made beyond 1999 and into the class period.  But that is not

5    the case.  There is no evidence in the case that statements

6    about the creditworthiness of the borrowers were made during

7    the class period.

8          Those statements appeared in the offering documents

9    which were issued in 1999.  That is the premise for our first

10   prong of that argument, which is the Lattanzio case in the

11   Second Circuit, which says statements that are prior to the

12   class period are not actionable.  And since there is no

13   spillover, for want of a better term, those statements would

14   not be actionable.

15         Secondarily, on a purely evidentiary basis, your

16   Honor, you ruled that those statements would be actionable not

17   on the basis of the C-rated loan evidence, which is on

18   virtually every page of their brief, but only if there was

19   evidence of routine, blatant disregard of our underwriting

20   guidelines and standards.  There is no evidence of that, and

21   they don't argue that there is.

22         So, those statements, your Honor, to the extent you

23   said they were actionable in Dynex II, summary judgment should

24   be granted on those statements.

25         THE COURT:  I'm not sure we are on the same

6

1  wavelength.  Like I said, I'm going to try and control myself.

2  Keep going.

3          MR. SALTARELLI:  Your Honor, that is how you define

4  underwriting savings in Dynex II, so that is how we addressed

5  it.  I believe that responds to your point.

6          THE COURT:  My only concern is that it seems to me

7  there is a continuing obligation which I didn't get the

8  impression you were so clear about.  You have a continuing

9  obligation to let your investors in on what is going on, and

10  that was so even if the underwriting statements, as I said,

11  were drafted before the class period began.

12          MR. SALTARELLI:  Right, your Honor.  But my point is

13  any continuing duty into the class period must be connected to

14  a falsity.  In other words, were the underwriting statements

15  false.

16          THE COURT:  I understand.

17          MR. SALTARELLI:  Therefore, there is a continuing

18  duty, or a duty actually, to correct it.

19          THE COURT:  We may disagree as to that aspect, the

20  falsity concept.

21          MR. SALTARELLI:  All I'm saying, your Honor, is in

22  Dynex II you said that's how you can prove the falsity of those

23  statements.

24          THE COURT:  I got it.

25          MR. SALTARELLI:  It is linked to the next thing that

1    I'm going to discuss, which is the loan rating system that they

2    have talked about, the C-rated loans.  You made two rulings in

3    Dynex II.  One was you can't prove the falsity of the

4    underwriting statements just by referring to the predominance

5    of C-rated loans within the bond collateral, within the loans

6    comprised of the bond collateral.

7              THE COURT:  C and S, right?

8              MR. SALTARELLI:  That's correct, your Honor.  You also

9    as part of that case, your Honor, said again the fact that

10   there were C-rated loans that may have been 60 percent of the

11   bond collateral is not proof, will not prove the falsity of the

12   market condition statements.  Those are the statements, and

13   there are a number of them alleged here, where defendants are

14   alleged to have said and did say market conditions were the

15   cause of the mounting losses and losses were being reported

16   regularly throughout the entire class period in the bonds.

17             You ruled that the fact that they were C-rated loans

18   within the bond collateral cannot and will not prove the

19   falsity of those statements.  There is only one way to prove

20   the falsity of those statements.  You have to find evidence

21   that the bond collateral was comprised of facially defective

22   loans and that you concealed that.  That would make the market

23   condition statements false or misleading because you concealed

24   the fact that facially defective loans were causing the losses.

25             THE COURT:  I think you glossed over the distinction,

1    indeed you don't mention any distinction, between falsity and

2    misleading, which indeed the language is put in the

3    disjunctive.  And that is their new claim to fame here

4    actually, a new sort of approach to this lawsuit.  A little

5    late in the game I might add.  Nonetheless, it seems to me that

6    what they are talking about really is more misleading.

7         Let us assume that you are right, that falsity is a

8    little harder to prove.  Misleading is probably not that hard

9    or not as hard.

10        MR. SALTARELLI:  Your Honor, I have no quarrel with

11   misleading either.  I think the question is very simple:  Is

12   there evidence of facially defective loans comprising the bond

13   collateral?  Facially defective loans, which you define in

14   Dynex II as loans which were clearly fraudulent applications,

15   no-release loans, and buy for loans.  There has to be some

16   evidence that the loans were actually those type of loans so

17   that it would raise an issue of fact as to whether the

18   statements about market conditions were arguably misleading,

19   putting aside falsity, your Honor.  That's where there is no

20   evidence that the loans were those type of loans.

21        We produced all of these files to them, your Honor.

22   In a footnote in their opposition brief, the only thing they

23   raise in response to the facially defective loans -- by the

24   way, I'll note their own expert, Dr. Ferry, admitted in his

25   deposition he has not seen any facially defective loans.  Not

19extcom

1  aware of it, didn't analyze that at all.  So he is not opining

2  on facially defective loans at all.

3        The only evidence they put out in a footnote is a

4  reference to a spreadsheet that was produced that refers to

5  undisclosed buy for loans and a spreadsheet of the loans that

6  went into default, just under 4 percent I believe of the

7  defaulted loans for which a reason is stated.  That is the only

8  evidence that they have put forward.

9        THE COURT:  They seem to say that 60 to 80 percent of

10  the losses during the class period were caused by C and S

11  loans.  Admittedly, I didn't see any proof in their papers, but

12  that is what they allege.

13        MR. SALTARELLI:  Your Honor, that is specifically what

14  you ruled in Dynex II would not prove the falsity of the market

15  condition statements.  The fact is, your Honor, there is no

16  evidence of facially defective loans contributing to 60 or 70

17  percent of the losses or anything.  The only evidence is what I

18  have just referred to.  They point to these buy for loans --

19  undisclosed to Dynex, by the way, that the applications were

20  buy for type loans -- comprising at most 4 percent.

21        If you go back to Dynex II, your Honor, you were very

22  clear.  You sustained the allegation in the second amended

23  complaint that these facially defective loans, inherent defects

24  in these loans, caused 65 to 70 percent of the losses.  That

25  was your ruling in Dynex II, your Honor.  There is no evidence

 1   of that in this record, none.

 2           THE COURT:  That's what I just said.

 3           MR. SALTARELLI:  Your Honor, if there is no evidence

 4   of that --

 5           THE COURT:  We are going to let them tell us what

 6   their evidence is.

 7           MR. SALTARELLI:  I'm glad to hear it, your Honor.

 8           THE COURT:  They may balk, but that's what I said.  So

 9   you don't have to tell me.  I didn't see any support.  I saw a

10   different figure, 60 to 80, but it's close.

11           MR. SALTARELLI:  I'll be glad to hear that, your

12   Honor.  But that is our position, that therefore there is no

13   issue of fact as to the falsity of the market conditions

14   statements.  As I mentioned, Dr. Ferry was asked about this and

15   has no evidence either that he raises about it.

16           THE COURT:  We are still on market conditions, right?

17   I am anyway.

18           MR. SALTARELLI:  Sure.

19           THE COURT:  Even if, as you say, your choice to stop

20   financing was as a result of market conditions, how can you

21   justify not disclosing your change in financing policy when you

22   made statements that market conditions were causing the losses?

23           MR. SALTARELLI:  Your Honor, there is an important

24   distinction here.

25           THE COURT:  We've got several.

1          MR. SALTARELLI:  On the financing issue, your Honor.

2   And this is their third alleged omission, which is also new to

3   the case, it's a new theory.

4          THE COURT:  I'm not arguing that.

5          MR. SALTARELLI:  The financing of repossessed units,

6   which is I believe what you are talking about, which is what

7   they have characterized as an omission that made the market

8   condition statements arguably false or misleading --

9          THE COURT:  I think that's an unfair characterization.

10  But you and I know what you mean, so go right ahead.

11         MR. SALTARELLI:  The financing of these units, your

12  Honor, was conducted by a subsidiary of Dynex.  This was never

13  undisclosed.  It was Dynex Financial which originated these

14  loans and sometimes financed them.  That unit of Dynex was sold

15  in 1999, and that was fully disclosed to the market.  It was

16  fully disclosed that Dynex was no longer in the origination and

17  financing business, because it had sold DFI, Dynex Financial,

18  to another company, which later became known or called Origin.

19         So there was no policy of financing repossessed units

20  in 2001 or 2002 during the class period that was, quote-

21  unquote, abandoned by Dynex.  There is simply no factual basis

22  to say that, your Honor.

23         That's their claim.  They say that you abandoned that

24  policy -- there was no policy -- and you didn't disclose that

25  this lack of financing was causing the losses.

1          If you go to the evidence that they presented to raise

2     an issue of fact about that, your Honor, it's one memorandum

3     from an employee of Dynex named Bob Nielsen, I'm sure you have

4     seen it, where he says quite clearly that he is relaying

5     information that Origin, then an entirely separate company from

6     Dynex, had told Dynex.

7          Origin, if you look at all of the memos that relate to

8     this in their papers, was very clearly not interested in

9     financing these repossessed units.  No one was at the time,

10    your Honor, because of the depressed market condition.  They

11    are saying to Dynex the reason for the losses or the main

12    reason for the losses are the lack of financing.

13         So the question is, is there a disclosure obligation

14    or is that something that makes the market condition statements

15    false or misleading because you don't disclose that?

16         That fact, that there was a lack of financing for the

17    repossessed units in this market, is absolutely part of the

18    fact that market conditions in this industry were severe.  One

19    of the reasons why companies did not want to put out more money

20    and finance repossessed units is because they were losing money

21    and these homes were being sold in foreclose and the market was

22    tanking.  That is part and parcel.  There is overwhelming

23    evidence of that in these memoranda, in these reports by

24    Standard & Poor's and Fitch and other analyses, your Honor.  We

25    have put them all forward in our brief.

1    So there was no obligation that did not make the

2    market condition statements false, because those statements

3    simply said the losses are being caused by market conditions.

4    Well, market conditions encompasses a number of things.  One of

5    them was the lack of financing for repossessed units.

6    THE COURT:  You don't think further identification was

7    necessary?

8    MR. SALTARELLI:  No, your Honor, not based on the

9    evidence that that is part and parcel of market conditions.

10   Even when some of the downgrade ratings and reports refer --

11   I'd like to talk about it a little bit briefly later.  One of

12   the documents they put in, as well as all those other

13   independent market analyses, refers to the fact that as part

14   and parcel of market conditions.  So yes, your Honor, we don't

15   believe doesn't raise an issue of fact as to the falsity or

16   misleading nature of those statements.

17   Your Honor, let me talk about the modification data,

18   your Honor.  This is again a new theory.  It's not in the

19   second amended complaint, never addressed by you in Dynex II,

20   and it appeared for the first time in this motion and in their

21   contention interrogatories now.

22   The question there is similar, your Honor.  They are

23   saying, you had detailed modification data relating to loans

24   that were modified and you omitted to put this into the monthly

25   reports and you should have.  The question becomes, as it does

1    in every omissions case:  Is there a duty? does a duty arise?

2    is there a duty to disclose that detailed data of how many

3    loans were modified, the amounts, etc., in order to make some

4    prior statement that was made not misleading?

5         They don't argue that there is such a prior statement

6    that had to be made not misleading by disclosure.  They say you

7    had to put it into the monthly reports just to make them

8    complete.  Your Honor, they don't cite any independent duty to

9    do that.

10        In the handout I have given you, under

11   misrepresentations 2B, your Honor, B and C, these are parts of

12   the prospectuses, and we have highlighted them, which disclose

13   or set forth very specifically what information Dynex agreed to

14   transmit to each bondholder, will transmit.  That includes the

15   things we listed in our brief, your Honor.  It's the amount of

16   the losses, collateral servicing fees, etc.  There is no

17   allegation that any of those reports or disclosures were false

18   or misleading in any way.

19        At the next tab, your Honor, C, is the disclosure

20   where we specifically say loans are subject to modification,

21   they can be modified under certain conditions.  It says that it

22   may have an effect on the life of the class of bonds regarding

23   prepayment, etc., your Honor.

24        The question really is, is there an obligation to

25   disclose this level of detail about the modifications when you

1   have disclosed that the modifications can and will occur at the

2   discretion of the servicer?  Your Honor, we have cited cases --

3   and they haven't cited any cases that suggest there was except

4   to one, which I will address -- we have cited cases that say

5   when you have disclosed a general matter, such as overall

6   liability, you don't have an obligation thereafter to disclose

7   that level of detail.  Those cases fit this.

8          The one case they have cited, your Honor, doesn't fit.

9   That is the Caiola case.  They say that's the case which makes

10  your obligation to disclose your disclosures complete.  But

11  when you go and read that Caiola case, your Honor, it is very

12  clear.

13         That was a case involving affirmative

14  misrepresentations.  Citibank was making disclosures about its

15  hedging strategy that affected this plaintiff customer.  The

16  Second Circuit very specifically said, Citibank is alleged to

17  have made affirmative misstatements about the nature of the

18  hedging strategy, that's sufficient to state a claim.  That is

19  very, very different than what we have here, your Honor, in the

20  modification situation.

21         I'd like to make one other point about it, your Honor.

22  Of course, if you have other questions about these three.  The

23  case is now distilled to these three categories of alleged

24  omissions.

25         THE COURT:  I'd be glad to listen to anything else

19qrt.asm                                                                      16

1    you'd like to say.

2         MR. SALTARELLI:  I'd like to talk a little bit about

3    loss causation because I think it is a very, very significant

4    issue.  It is the first tab of the handout.

5         With respect to modifications and the other allegation

6    about the lack of financing, there is no evidence, and even no

7    attempt by Dr. Ferry, to connect for loss causation purposes

8    those allegations to the downgrade announcement.  I'm going to

9    talk about that more broadly.

10        There has to be evidence or at least an attempt to

11   connect the two things.  They can't just leave hanging out in

12   mid air allegations of falsity or omissions but then not

13   connect them through evidence of loss causation to the

14   downgrades of 2004 and the resulting drop in the price.  That

15   applies to all three of these matters, your Honor.

16        THE COURT:  The problem really is whether, in my

17   humble opinion, and I have to look at it all again, certainly

18   will, my real problem is whether in each of these, which is why

19   I was focusing on them, they don't present questions that are

20   really jury questions and are not something I can decide on

21   summary judgment.  I think that is where we have our problem.

22        You have now done the best I think you could do to

23   tell me there is nothing here that raises a material issue of

24   fact.  I just have to think about whether that is my view.

25        MR. SALTARELLI:  I appreciate that, your Honor.  That

1    is what we believe.  It has to be a certain amount of evidence

2    that makes it an issue of fact.

3         If I may briefly talk about loss causation.  Loss

4    causation is I believe a much more straightforward analysis.  I

5    will try to be brief.  I want to talk for one moment about your

6    loss causation ruling in Dynex II.  Again, it is important

7    because it has set the parameters for the case.

8         In Dynex II you ruled that there were the allegations

9    of loss causation in the case that were adequate for pleading

10   purposes.  You characterized it this way.  You said, well, they

11   have alleged that there was this dramatic restatement of

12   cumulative losses that initiated a downgrade review by Moody's

13   that eventually led to the downgrades which caused the price

14   drop, the price drop of the alleged damages.  But that is

15   factually not the case.  The evidence is very clear now.  That

16   allegation in the SAC was wrong.

17        The review initiated by Moody's of a possible

18   downgrade of series 13 bonds was issued on October 2nd.  The

19   restatement that occurred by Dynex took place on October 28th.

20   Not before.  It took place after.  And a critically important

21   difference, your Honor, it was not a restatement of cumulative

22   losses, which would have been more significant, it was a

23   correction, a restatement of cumulative repossessions.

24        There is no evidence in this case of a restatement or

25   a correction of cumulative losses, and there is no evidence

 1   that the downgrades were at all prompted, initiated, or stated

 2   in response to some restatement by Dynex.  Dr. Ferry has

 3   acknowledged that.  He doesn't argue that any of these

 4   restatements were corrective disclosures for purposes of loss

 5   causation, because he has found no price reaction in response

 6   to it.

 7          I want to briefly talk about the law of loss

 8   causation.  They have really grossly understated the standard

 9   for that articulated by the Second Circuit.  That standard is

10   when you allege a corrective disclosure which eventually leads

11   to the price drop, it has to reveal a falsity of the

12   misrepresentation, the representation, or the omission.  It has

13   to reveal this specifically with respect to the specific

14   allegations made.  It has to reveal hard facts.  That is the

15   standard set forth by the Second Circuit, your Honor.

16   Actually, the circuit talks about but-for and cause in fact

17   causation.

18          If you go to tabs Roman numeral IA through D, your

19   Honor, these are what is alleged to be the corrective

20   disclosures in this case.  They are the four announcements,

21   three by Moody's and one by Fitch, between February and May

22   2004.

23          If you go to tab 1, your Honor, we have highlighted

24   the language here, the only language, that talks specifically

25   about the Merit bonds other than pure factual information at

the bottom.  You can see here that Moody's is saying the rating

actions are prompted by weaker than anticipated performance.

It does not make any specific reference or reference to any of

the specific allegations of misstatements or omissions that are

actionable.  Facially defective loans, not mentioned.

Modification data not disclosed, not mentioned.  The lack of

financing making the market condition statements false, not

mentioned, your Honor.

        In fact, if it mentions anything, in the second

sentence it says overall performance in the manufactured

housing sector has been weak in the last few years.  That is

entirely consistent with what the market statement said, your

Honor.  So you have both the lack of any connection to the

specific allegations of falsity or misleading or omission and

corroboration of the market condition statements themselves.

        That is the same, your Honor, in A, B, and C.  One of

them doesn't mention the market, the other one does.  Those are

the Moody's statements.

        Now I'd like to talk briefly about the Fitch

statements.  It's interesting.  They have characterized the

Moody's statements as quintessential corrective disclosures

because they specifically reference the subject matter of the

omissions.  As I have just said, your Honor, I don't think that

any reading of the language of actual announcements can

possibly satisfy even that standard, which is not the correct

1    standard in any event.

2            Let's talk about the Fitch statement for a second,

3    your Honor, which is tab D.  This is the one where their

4    argument is, oh, this referred to relaxed credit standards and

5    that's what we are talking about.  But when you read the

6    sentence after it, and if you look at Fitch, actually, one of

7    series, one of the classes, the charges was not downgraded at

8    all by Fitch.  Class A3 was affirmed at AAA.  That suggests

9    quite a bit about the so-called poor credit quality of the

10   collateral.

11           In any event, the sentence that we have highlighted,

12   if you read it, again, any fair reading of this language, your

13   Honor, does not make any reference, any reference at all, to

14   the specific allegations of fraud made by the plaintiff in this

15   case.  The first sentence talks about the industry has

16   experienced worst down-turn.  That's what we said.  Relaxed

17   credit standards, overbuilding, difficulty servicing have all

18   contributed to poor performance of MH securities, your Honor.

19   That is not a reference to the Merit bonds.  It's a reference

20   to this entire industry and all of the securities.

21           The last sentence is again a reference to the industry

22   in general, your Honor.

23           I'd like to make just two other points if I can.

24   There is another document they have tried to now allege is a

25   corrective disclosure.  If you would like me to discuss it, it

1    is not listed in their responses to their contention

2    interrogatories which binds them, it is not listed in the SAC,

3    in the second amended complaint as a corrective disclosure.

4    It's a newswire.  It's in their documents.  There is nothing in

5    there as well.  That document, which is a press release and

6    some interviews, doesn't disclose anything specific.  It

7    suffers from the same exact defects as the others.

8         Let me make two other quick points, your Honor.  In

9    order to make this connection between these documents and the

10   purported loss following the downgrade, Dr. Ferry puts in his

11   expert report.  That's their evidence of this connection.  But

12   Dr. Ferry makes no attempt to link the corrective disclosures

13   or to identify any specific allegations of fraud in the

14   corrective disclosure.

15        In fact, he admitted in his deposition:  I don't even

16   know what they are, I haven't analyzed them, I haven't studied

17   them.  All he said, without even identified the statements, is

18   Dynex must have said something about the quality of these loans

19   because later the magnitude of the downgrade was so severe.

20        What he doesn't say, your Honor, he doesn't make any

21   reference to the facially defective loans.  He says he has no

22   knowledge of them, again doesn't identify any statements about

23   quality that he is referring to.  And he doesn't link or make

24   any reference to the actual specific statements.

25        It gets worse with respect to the last point about the

1    downgrade, your Honor.  Dr. Ferry said one of the main reasons

2    I am sure this is a corrective disclosure is because the

3    magnitude of the downgrades nine, ten notches was so rare and

4    unusual, there must have been something wrong that Moody's and

5    Fitch were reacting to.

6            But now there is undisputed evidence, your Honor, and

7    I believe we have noted that.  If you look at tabs F and G, F

8    is a chart which lays out on the left-hand side the statements

9    by Dr. Ferry, their expert.  This is their evidence of loss

10   causation.  On the right-hand side, your Honor, is evidence

11   which is undisputed by the plaintiff.  That is set forth in tab

12   G in their 56.1 statement of the average magnitude of

13   downgrades for manufactured housing sector bonds during the

14   class period.

15           If you look at the chart, your Honor, the Merit bond

16   securities fall right in the average.  They are not rare or

17   unusual at all.  And there were hundreds of these downgrades.

18   Before Fitch even downgraded the Merit bonds, it had issued

19   1340 downgrades of MH type securities just like the Merit

20   bonds, your Honor.

21           Your Honor, if you have any other questions.  I do

22   believe that those are undisputed facts with respect to the

23   other downgrades.  As a matter of law, your Honor, these

24   corrective disclosures -- it is their allegation of corrective

25   disclosures, your Honor.

1              They don't even attempt or purport to disclose the

2     specific allegations of the falsity that is alleged by the

3     plaintiff.  Those are not my words, your Honor.  Those are the

4     words of the Second Circuit in Omnicom.  That is the

5     requirement.  They don't purport to disclose or correct the

6     specific statements of fraud.  There is no hard facts at all

7     disclosed in these documents as a matter of law.  That's why I

8     said it was a more straightforward issue, your Honor:  As a

9     matter of law they cannot be corrective disclosures.

10             THE COURT:  I think I have your drift.

11             MR. SALTARELLI:  We have cited a number of cases on

12    corrective for the standard.  It is not surprising, they have

13    cited no case that supports their standard about specifically

14    reference the subject matter of.  That is not the standard.  It

15    has to specifically reference and reveal the falsity.  That's

16    the standard.

17             Unless you have any other questions, your Honor.

18             THE COURT:  No.  I think you have done well in terms

19    of my concerns, or most of them.

20             MR. SALTARELLI:  Thank you.

21             THE COURT:  Why don't you start and see what you can

22    tell me about Mr. Saltarelli's argument with respect to loss

23    causation.

24             MR. LAITMAN:  Your Honor, may I hand this up, please?

25    This is a handout.

19art.asm

```
 1              THE COURT:  Sure.  Whatever it is, you can hand it up.
 2      Do you want to give us a hint, Mr. Laitman?
 3              MR. LAITMAN:  Yes.  I just wanted to make sure defense
 4      counsel had a copy.
 5              THE COURT:  You could have given it to him before the
 6      argument, then you'd be sure.
 7              MR. LAITMAN:  Your Honor, in terms of loss causation,
 8      Mr. Saltarelli ran on and on about a corrective disclosure.
 9      The reality is under the Second Circuit law there are two ways
10      to demonstrate loss causation.  One is a corrective disclosure
11      and the other is a materialization of the concealed risk.
12              If you wouldn't mind, your Honor, looking at the chart
13      I handed out, on the top in yellow are many of the statements
14      cited in the amended complaint.  Basically, the statements boil
15      down to three categories, as your Honor knows.  The first is
16      that the cause of the bond losses were market conditions.  2 is
17      that there were ever-expanding loan loss reserves required.
18      The third is about internal controls, the adequacy of internal
19      controls.
20              On the bottom, below the red, are the three concealed
21      schemes.  One is at every point in the class period.  At every
22      point when defendants made their statements that the losses
23      were due to generalized market conditions, they had specific
24      knowledge that 60 to 80 percent of the defaulted loans were
25      those C and S loans that were known from the outset to be of
```

1    the worst credit quality.

2            THE COURT:  I mentioned that earlier.  I wonder if you

3    could tell me how you reached the 60 to 80 percent of the

4    losses during the class period having been caused by C and S

5    loans.

6            MR. LAITMAN:  They rated every loan.

7            THE COURT:  "They" being Dynex?

8            MR. LAITMAN:  Dynex.  When they originated it, they

9    rated every loan according to this standard.  If you look at

10   Exhibit B, that is the key to what A, B, C, and S means.

11           THE COURT:  I'm looking at B.  Of course, it's upside

12   down.  Maybe it's me that's upside down.  Here we are.

13           MR. LAITMAN:  That's A, B, C.  Most of the loans that

14   were defaulted in the C and S category were C.  There is no

15   dispute those loans had the highest debt-to-income ratio,

16   required the least borrower employment, and tolerated the most

17   problems or deficiencies on the credit history.

18           All you had to do -- and this was no secret.  We make

19   this point in our memorandum of law.  In many presentations --

20   and it is not just related to pricing.  Defendants tried to say

21   this was a pricing.  It wasn't just a pricing.  They were

22   constantly looking at the quality of their loans.  Everyone

23   knew, including Mr. Potts in his deposition, that at least 60

24   percent of the loans were C loans.  It's never mentioned in the

25   offering documents.

 1           When they say during the class period the losses are

 2    due to the market conditions, they know that the C and S loans

 3    are driving the losses.  Now, at the pleading stage, your

 4    Honor, we couldn't present that evidence.  We didn't know that

 5    they tracked every loan.  But it's obvious in their documents

 6    and it is not disputed.  At every point in the class period,

 7    they knew that, a predominant fact, 60 to 80 percent of the

 8    defaulting loans were these poor quality loans that were known

 9    from the outset.

10           As your Honor said at the beginning, this is a motion

11    for summary judgment.  Defendants argue there is no issue of

12    fact that a reasonable investor in the class period would have

13    wanted to know before he bought the bonds in the class period

14    that it wasn't just market conditions but 60 to 80 percent of

15    the defaults were due to poor quality loans from the get-go?

16           THE COURT:  I think the defendant is saying that it

17    was all part and parcel of market conditions and that's what

18    Fitch -- well, I don't know.  All of these in his handout sort

19    of indicate, as do all the briefs, Moody's and Fitch, about how

20    terrible this market was.  He is saying this was part of the

21    landscape.

22           MR. LAITMAN:  Let's go to Exhibit F.  Exhibit F --

23           THE COURT:  I assume you mean your Exhibit F.

24           MR. LAITMAN:  My Exhibit F, yes.  This is an article

25    where Moody's was interviewed specifically --

1          THE COURT:  Where does it come from?

2          MR. LAITMAN:  This comes from the Dow Jones newswire.

3          THE COURT:  It's not part of what you provided, at

4     least I don't remember seeing it.

5          MR. LAITMAN:  It's in the summary judgment papers,

6     your Honor.  We quote from it extensively in the summary

7     judgment papers.

8          THE COURT:  I guess I take that back.  OK.

9          MR. LAITMAN:  What do they say here?  Mr. Saltarelli

10    said this article proves their point that it is just market

11    conditions.  Nothing could be further from the truth.  Take a

12    look at the second page of the document.  At the middle page it

13    says, "But in the Merit case Moody's cited weaker than

14    anticipated performance for ratings cuts."

15          Before we go on, let's be very clear.  This whole

16    issue of loss causation was already dealt with by Dr. Ferry.

17    He did event studies which looked at the drop in the price of

18    these bonds on the rating downgrade dates and factored out what

19    was happening to the index, the manufactured housing index.

20          The reason these were material events and the reason

21    your Honor found that there was a causation sufficient to

22    certify the class was because we factored out market

23    conditions.  Whatever Fitch and Moody's said, and we are going

24    to come to this article in a second, but whatever Fitch said

25    about generalized market conditions, they were now applying it

 1    to these bonds.

 2            THE COURT:  He says Dr. Ferry said essentially there

 3    must have been something wrong but that he was unable to put

 4    his finger on anything.

 5            MR. LAITMAN:  He is not the liability expert.

 6            THE COURT:  But he reviewed all these pieces of paper,

 7    I presume.

 8            MR. LAITMAN:  Right.  But what he did do as part of

 9    his events study is he said, let me look at the manufactured

10    housing index.  If it's true that it's market conditions, there

11    shouldn't be a reaction on the day that Moody's downgrades

12    these bonds.  There shouldn't.  The entire market should go

13    down.  That's what market conditions means.  Lo and behold,

14    that didn't happen.  You had a dramatic collapse just on the

15    Merit bonds.

16            Let's look at exactly what is said in the middle of

17    the page.  In the Merit case Moody's cited weaker than

18    anticipated performance for ratings cuts.  How does something

19    that is monitored monthly deteriorate that fast?  Here we go.

20    "Denise Pearson, a senior credit officer in Moody's

21    manufactured housing group, said Merit's situation is unusual.

22    Not only has the quality of the pool of assets backing the deal

23    deteriorated more than anyone had anticipated, but the monthly

24    reporting on the transaction has been difficult to interpret at

25    least partially because the company was coping with issues in

1    its reporting system.  'The data might show a zero percent

2    annualized repossession in one month and a 70 percent rate in

3    the next month.'"

4            Before Mr. Saltarelli sat down, one of the last things

5    he said, your Honor, is that there is no evidence that the

6    improper reporting of repossessions was the reason Moody's

7    downgraded the Merit bonds.  Here you have a specific quote

8    from the senior person at Moody's saying, you know what, Merit

9    isn't like the rest, we didn't downgrade this for the same

10   reason we downgraded all the other bonds, we downgraded it

11   because Merit was unusual, their financial reporting of the

12   transaction can no longer be relied upon.

13           That brings us directly to the nondisclosure of the

14   previously defaulted loans or modified loans that is the second

15   scheme in this case.  Let me be very, very clear about this,

16   your Honor.  If you go back to the front chart, the yellow

17   statements, every one of these yellow statements, we already

18   said that one was the problems are only market condition.  The

19   second statement in that yellow at virtually every point in the

20   class period is a statement about the loan loss provision.

21           One of the things Mr. Saltarelli said was plaintiffs,

22   they said in the papers, abandoned the loan loss provision

23   allegations as false, that we don't allege that there was

24   anything false stated and that only an affirmative duty to

25   disclose.  Again, nothing could be further from the truth.

1          Let's understand exactly what happened in discovery.

2     If you go back to the complaint, on paragraph 81 of the

3     complaint we have a heading.  The heading is very clear.  The

4     heading says, "Dynex and Merit officers Potts and Benedetti

5     repeatedly assessed and learned the impaired quality of the

6     bond collateral as a result of the monthly reports and the

7     Merit quarterly and annual filings."

8          What did we do?  We subpoenaed Mr. Benedetti's loan

9     loss analysis to see what did Mr. Benedetti know at each point

10    that he did the loan loss provision.  What we learned was

11    astounding.  That's why we now have modifications in this case.

12    If you turn to Exhibit D, this is what Mr. Benedetti knew when

13    he did his loan loss calculations.  This is why the loan loss

14    calculations are rendered blatantly false by the nondisclosure

15    of the modification.

16          In the black column, in the black column, every month

17    Dynex put on its website current loans, 30, 60, 90, foreclosure

18    repo loans.  Bondholders only saw what was in black; Mr.

19    Benedetti knew what was in red.

20          Just consider the first line.  That's all you have to

21    do.  The very first line says, current loans.  This is for

22    June.  We are taking June 2003, but he did this for many other

23    quarters.  The current loans are 228 million.  So the average

24    investor goes to the Dynex website, how many current loans are

25    there, what is the dollar amount, 228.  What doesn't he know?

1  He doesn't know that 31 million of that amount are loans that

2  have already defaulted once.

3         More than that, Mr. Benedetti did another calculation.

4  He said, how much more likely are those 31 million likely to

5  default than a regular current loan?  What does he come up

6  with?  387 percent more likely.

7         Let's go back to what is the standard on summary

8  judgment.  Would an investor want to know, when he read the

9  monthly report, when he looked at the loan loss reserve

10 calculation, that the reason Mr. Benedetti keeps hiking the

11 loan loss reserve is that there is undisclosed previously

12 defaulted loans that have a 300 percent greater likelihood of

13 defaulting again.

14        This is the most important, this is the most important

15 fact that an investor could possibly want to know.  He wants to

16 know are the current loans really current or are they filled

17 with a material portion of loans that have already defaulted

18 once?

19        It gets even worse when you go through the other

20 categories.  60 percent of what bondholders were told as

21 30-plus, 60 percent of those loans had previously defaulted.

22 80 percent of 60-plus had previously defaulted.  Now let's go

23 back to the loss causation.  What is the materialization of the

24 risk?  The materialization of the risk is another prong.

25        By the way, the standard is not to resolve the chain

32

1   of loss causation on summary judgment, but what did the

2   concealed risk materialize in the rating downgrades.  The

3   rating downgrades, it is undisputed, were due to greater than

4   anticipated defaults and losses.  Well, if you're not telling

5   the bondholders that in every category of loans there is a

6   fifth column of previously defaulted loans, what is the

7   materialization of that nondisclosure?  The materialization is

8   more than anticipated defaults.

9        THE COURT:  Didn't Dynex already disclose the loan

10  prices which provided information essentially regarding the

11  quality of the loans?

12       MR. LAITMAN:  No, nothing.  That is an excellent

13  point, your Honor.  Go back to the very first page, the chart.

14  Before the beginning of the class period, we have the

15  statements in the prospectus.  If you go to Exhibit A, I copied

16  all of the data, the detailed data, that investors are told

17  about these loans.  Very interesting.

18       They are told about unpaid principal balance.  They

19  are told about loan-to-value ratio.  They are told about

20  current interest.  They are told about the state where the loan

21  was generated.  It is pretty much identical in both the M12 and

22  M13, very, very detailed information.

23       What is not there?  Any information about borrower

24  creditworthiness.  No debt-to-income ratio.  No employment

25  history requirement.  No credit history requirement.  Why?

1      Because had they disclosed that information, had they disclosed

2      that information, it would be readily apparent that 60 percent,

3      50 to 60 percent of the collateral had the worst quality of

4      debt-to-income, the worst employment history requirement, the

5      worst credit history requirement.

6          That's why in the chart, if you look, I list all of

7      the information they did put in the prospectus, and look what

8      they happened to omit.  They happened to omit anything that

9      would give the investor any inkling about the true extent of

10     the poor creditworthiness.

11         Again, your Honor, when you wrote your decision on

12     Dynex II on the motion to dismiss, we didn't have the data of

13     what A, B, and C meant.  We didn't know that A, B, and C meant

14     something specific about debt-to-income, credit history,

15     employment history.  Now we do.  Just like now we know

16     precisely at each point when they said the loss was due to

17     market conditions, in fact now we know that the driver of the

18     losses were the loans that were known from day one to be the

19     worst credit quality.

20         THE COURT:  It's interesting to me, and maybe you can

21     help me.  Since you didn't have some of this information at the

22     time that I wrote Dynex II, and the theory was really falsity,

23     and you're just telling me why it was even better afterwards,

24     why are we now talking in your new theory about misleading

25     rather than false?  You don't really have to answer that, but

1    it certainly is interesting.

2          MR. LAITMAN:  It's very straightforward, your Honor.

3    The green fraud --

4          THE COURT:  The green fraud?

5          MR. LAITMAN:  The green fraud in the chart is that at

6    each point in the class period defendants knew that the driving

7    cause of losses wasn't generalized market conditions but the

8    poor quality loans.  That's directly from the complaint.  That

9    hasn't changed.

10         The only thing that's changed, that has become more

11   detailed, your Honor, is that now we know it wasn't just

12   generally they knew during the class period that they had these

13   bad loans.  They knew precisely at each moment in the class

14   period.  That's what we know now.

15         THE COURT:  Doesn't that go more to falsity than to

16   misleading?  Again, that's a frolic and a detour.

17         MR. LAITMAN:  Let me explain what happened.  The

18   modification, when we say modification, it's concealing

19   previously defaulted loans.  We did not have Mr. Benedetti's

20   work papers, obviously, prior to discovery.  Those

21   modifications proved the falsity of every loan loss provision.

22         Why?  What did Mr. Benedetti say to investors?  He

23   goes, we are having to increase the loan loss provision because

24   of market factors and increase in defaults.  He is not telling

25   them that they are having to increase because of the fact that

1   there are all these previously undisclosed defaults that

2   investors aren't told about.

3           The amazing thing to me is the way that Mr. Saltarelli

4   tries to get around this huge nondisclosure of such a

5   critically important thing is to say, well, we didn't have to

6   put it in the monthly report.  The prospectus says -- this is

7   one of the most blatant --

8           THE COURT:  This is not a summation.

9           MR. LAITMAN:  No, no.  The prospectus says Dynex had

10  to provide on an ongoing basis all current information

11  regarding modifications.  It says it, black and white.  We

12  quote it in our opposition brief.  Why didn't they provide it?

13  Unbelievable:  Nobody asked for it.  Nobody asked for it.

14          If somebody would have called, this is what Mr.

15  Benedetti said --

16          THE COURT:  I read it.

17          MR. LAITMAN:  If somebody would have called me and

18  asked me, I would have told them, by the way, 60 percent of the

19  30-day delinquent are previously defaulted loans.  It just

20  can't be.  The federal securities laws aren't designed so that

21  the investor has to call up and ask questions.

22          You asked why did we have the modifications in the

23  initial complaint.  Because we didn't have Mr. Benedetti's work

24  papers on the loan loss provisions.  As soon as we got them and

25  analyzed them and deposed him, we now have it in the documents.

1    Every one of the loan loss provisions statements are now

2    fortified by the nondisclosure of the previously defaulted

3    loans that they were obligated to disclose by any fair reading.

4    At the very least, it's an issue of fact.

5              THE COURT:  You make another point with respect to

6    what contributed to the losses.  You indicate that that is that

7    they stopped providing financing on the repossessed units.  Do

8    you have any evidence that I must have missed to support that

9    that policy caused any or contributed to the losses?

10             MR. LAITMAN:  Yes.  Mr. Nielsen is one of the people

11   that reported to Mr. Benedetti, and he states, and this is

12   Exhibit F, his memo -- I'm sorry -- Exhibit E.

13             THE COURT:  This is his hearsay statement?

14             MR. LAITMAN:  For purposes of summary judgment.

15             THE COURT:  It's not a fault, counsel.  I just want to

16   be sure we are talking about the same thing.

17             MR. LAITMAN:  What I wanted to add is we deposed Mr.

18   Nielsen and we have his testimony.  I'd like to read it to you.

19   One of the defenses that Mr. Saltarelli said is this wasn't my

20   policy, Dynex, this was a policy after we sold the company.

21             First of all, we are playing games with semantics

22   here.  DSI was Dynex Servicing, Inc.  This memo says, "Largest

23   issue affecting losses per DSI," Dynex Servicing, Inc., "is

24   that we" -- Mr. Nielsen is writing this, he is a representative

25   of Dynex -- "that we are no longer financing our

repossessions."

          Mr. Saltarelli's point is that had to do with somebody
else, we already sold the company.  Throughout the entire class
period, Dynex was the master servicer.

          THE COURT:  When did they sell to Origin or whoever?

          MR. LAITMAN:  They did sell to them.  But the reality
was the policy before the class period was mobile home was
repossessed, manufactured home was repossessed.  Servicer said
we'd take it.  Somebody would come and say, I'm interested in
buying it, what kind of financing could you provide me?  The
servicer or the master servicer, whether it was Dynex, whether
it was Origin, would say we'll provide you financing, these are
the terms.

          What happened in the class period that was
dramatically different is they repossessed the mobile home.

          THE COURT:  I know what happened.  What he is saying
is that Dynex had nothing to do with this.  You're telling me
that that's smoke and mirrors.

          MR. LAITMAN:  Because they are the master servicer and
origin is the servicer.  What always had been the prior
practice, the way they resold these things was to provide
financing.  All they are saying in the public statements is the
losses are due to market conditions and the big lenders have
left.  They are not saying the much more powerful critical
point, that the servicer is no longer providing financing.

1   That is, the entity that actually takes possession and tries to

2   resell isn't providing any financing to allow the resale.

3        They say, well, we disclosed that when we said major

4   lenders have left the industry.  You're missing the forest for

5   the trees.  The major lenders leaving is not the critical piece

6   to the Merit or Dynex mobile homes that are repossessed.  It's

7   whether or not the servicer that takes possession of those has

8   a means to resell them.

9        THE COURT:  I don't see where you're telling me how it

10  contributed to the losses.

11       MR. LAITMAN:  What does Mr. Nielsen say?  He says,

12  "Largest issue affecting losses per DSI," Dynex Servicing, Inc.

13  By the way, this email is 2001, in the class period.  We are no

14  longer financing.  That's it.  This alone creates an issue of

15  fact.  They are saying it's due to some generalized departure

16  of lenders.  Their own internal email by the guy who is closest

17  says the losses are due to our policy changing, not the general

18  policy.

19       But what does Mr. Nielsen say in his deposition?

20  Their defense is Mr. Nielsen wasn't saying what he thinks, he

21  was saying the policy of Dynex Services, Inc., and that's not

22  ours.  This is his testimony.  We asked him what that phrase

23  meant.  He says, "Because Dynex Capital is not providing

24  financing, dealers were more reluctant to sell units for Dynex

25  Capital."  We asked, "Was that your opinion?"  "Yeah, that was

1     my opinion."  This is page 88 of the Nielsen deposition.

2           Their defense in their reply brief is this wasn't Mr.

3     Nielsen's opinion, it was somebody else's.  The deposition

4     testimony specifically says, this was my opinion.

5           "What do you mean when you say largest issue, largest

6     issue affecting losses per DSI?  Is that we are no longer

7     financing?"

8           "That means we are having to wholesale more units than

9     we are able to retail, and in the context a wholesale generally

10    recovers less than retail.  So this generally would increase

11    losses."

12          Again, Mr. Nielsen isn't saying this is somebody else.

13    As master servicer, he is saying this is us, and he is directly

14    tying it to the losses.  This is page 136 to 137.

15          THE COURT:  Let me ask you another question.  I guess

16    it goes to most, or some at least, of these concerns.  Where is

17    the line between the obligation to spell out or disclose versus

18    an invitation to ask and be told?  Do you understand the

19    question?

20          MR. LAITMAN:  Yes.  I think, your Honor, the line is

21    when Dynex started to say things affirmatively.  I agree had

22    Dynex been silent about the causes for their losses, had Dynex

23    said nothing about their loan loss reserve increasing due to

24    these manufactured homes, we wouldn't be here today.

25          But the reality is they affirmatively said to the

 1   market repeatedly, we're having increased losses due to these

 2   manufactured homes, never disclosed the previously defaulted

 3   loans that are driving the loan losses.  They said the losses

 4   are due to market conditions affirmatively, never disclosing

 5   that in fact it was the change in their own policy and the

 6   servicer policy that was driving, that was in fact the largest

 7   issue according to their guy.  And they said it was due to

 8   market factors even though they knew it was the worst quality

 9   loans to begin with.

10          When a company goes out of its way, opens the door, as

11   your Honor said in Dynex II, once they went down the road of

12   giving affirmative reasons for losses, once they went down the

13   road of talking about increases in their loan loss provision,

14   they've got to be fully truthful about what those causes are.

15   The reality is the causes that they concealed, there is a

16   reason why they concealed it:  Because it was what they did

17   from the outset.  They didn't want to tell investors we have

18   all of these defaulting loans that we have had to modify.

19          If your Honor would take a look at Exhibit C.  When

20   was this offering?  M13 was in September 1999.  By the way, the

21   extension information is incomplete.  But here you have

22   extensions on the M13 and the M12 loans virtually every single

23   month in 2000.

24          For the first eight months you have you've got almost

25   25 million in previously defaulted loans that were never

1    disclosed in the first seven or eight months of this deal.  We

2    know now from Mr. Benedetti's own notes that by the time you

3    get to June 2003, you've got 80 million, slightly more than

4    80 million, in previously defaulted loans that they are putting

5    in as current.

6         The argument on scienter is we didn't have to disclose

7    the loan rating system, we didn't have to disclose

8    modifications.  Well, here again it's the same line.  When you

9    come out and are affirmatively providing investors either loan

10   loss information or monthly delinquency information and current

11   loan information, you can't hold back such critical

12   information.  Certainly these raise issues of fact.

13        Again, we are not finding the previously defaulted

14   loans in the files of some minor employee in some district

15   office somewhere.  We're finding them in Mr. Benedetti's own

16   files.

17        THE COURT:  All right.  I think I got it.

18        MR. SALTARELLI:  Your Honor, if I may have just a

19   moment?

20        THE COURT:  You may have two moments.

21        MR. SALTARELLI:  Thank you.  I won't beat a dead

22   horse, your Honor, but I find it very telling that Mr. Laitman

23   made no attempt whatsoever to talk about the four corrective

24   disclosures in the case, the Moody's announcement, no effort

25   whatsoever, your Honor.  He shifted immediately to what he

1   calls the materialization of the risk theory, which is an

2   alternative theory.

3        Your Honor, their argument on this theory is contained

4   in one paragraph of their brief.  They say the loss is

5   materialized in February and March of 2004, led to the

6   downgrades.  That is completely false.  The losses were

7   recorded from 1999 to 2004, every month the mounting losses.

8   They did not materialize in February and March 2004.

9        The risk of these losses due to increasing

10  delinquencies, your Honor, was expressly disclosed in the

11  prospectus.  We have cited this in our reply memorandum.  Under

12  the Second Circuit case in Lentell and others, your Honor, that

13  means you can't prove loss causation if you have disclosed the

14  actual risk of loss that you claim is materialized.  That same

15  case says even though have a corrective disclosures, you still

16  have to draw a line between the misrepresentation and the loss.

17       Your Honor, I'd like to talk for a minute about the

18  modification issue.  He shows you the chart, which we have seen

19  before.  I'd like to refer you to tab 2C, your Honor, if I may.

20  There are two pages to this.  These disclosures in the

21  prospectuses, your Honor, specifically disclose that loans that

22  are defaulting or have defaulted or are in default without

23  being foreclosed are subject to modification.

24       THE COURT:  I heard that from you and I read it

25  myself, believe it or not.

1          MR. SALTARELLI:  The point is simply that it is

2   disclosed, your Honor.  The question is, do you have to

3   disclose the nitty-gritty when you are disclosing 30, 60, 90

4   days?

5          THE COURT:  That's a big issue.

6          MR. SALTARELLI:  I didn't hear any evidence.  You

7   asked the appropriate question, what is the evidence that these

8   C-rated loans were the cause of the losses?  If you look at tab

9   A of part 2 on the handout, that shows you this whole point

10  about the poor credit quality is a sham, your Honor.

11         The loans that were approved and underwritten were in

12  the top 31 percent of all the loan applications that were made.

13  This argument amounts to nothing more than whenever you rank

14  something, if you're ranking colleges, law schools, whatever,

15  you're going to say there are some in the bottom half of the

16  rank.  That's really all this amounts to, your Honor.

17         The key point of it is there is no evidence, and this

18  is the allegation you sustained, as to facially defective loans

19  causing the delinquencies.  You said it in Dynex II.  Is there

20  proof that 65 to 70 percent of the delinquencies was caused by

21  facially defective loans?  No evidence of that.  Didn't hear

22  that from Mr. Laitman.

23         Your Honor, the Dow Jones newswire, they have alleged

24  or tried to say that is corrective disclosure.  It's a bit late

25  in the game for that, as I've talked about before.  I'm not

 1   afraid of that document.  I have actually included that as part
 2   of our package.  It's Exhibit E tab 1.  Obviously, as you
 3   noted, this is a news article which is quoting people.  It's
 4   rank hearsay.  But if you read this, there is nothing in here
 5   that talks about fraud from Dynex.
 6        The first page, the bottom of it I have highlighted,
 7   says investors say the Merit downgrade is severe but they have
 8   become used to such dramatic moves when it comes to
 9   manufactured housing.  The top of the next page says the same
10   thing, your Honor.
11        THE COURT:  It goes on to say that the Merit case is a
12   little different.
13        MR. SALTARELLI:  Yes.  But let's look at that
14   language, your Honor.  What they actually say, if you read
15   this, it quotes an analyst, not from Moody's, who says
16   sometimes these performances are due to fraud and servicing
17   problems.  But that's not what Moody's said with respect to the
18   Merit bonds.  It actually says fraud wasn't an issue with the
19   Merit bonds, it was the data.
20        What did they say about the data, your Honor?  The
21   only reference in this document to a data issue with respect to
22   Merit has to do with the repossession correction.  It
23   specifically talks about repossession.  This document cannot be
24   a corrective disclosure, because Merit corrected the
25   repossession issue in October and there was no price reaction

1    to it

2            So this document is not a revelation of any mysterious

3    concealment about repossession data.  It refers to something

4    that was disclosed six months, seven months earlier.

5            THE COURT:  I don't really need to belabor this any

6    further.  It has become a career already.

7            MR. SALTARELLI:  I do want to point out, your Honor,

8    you made a reference, and it is true.  We have cited in our

9    reply brief the breakdown of interest rates applicable to the

10   loan which was a proxy for those categories is set forth in the

11   prospectuses.  You're correct about that, your Honor.

12           Unless you have any other questions, your Honor, I

13   appreciate the time.  Thank you.

14           THE COURT:  I will reserve decision.  I thank you all

15   for being able to jockey around my questions throughout your

16   argument.  We will be in touch.

17           When do we try this case if summary judgment is for

18   some reason denied?  November?

19           MR. LAITMAN:  November 16th, your Honor.

20           THE COURT:  We'll get to this quickly one way or

21   another.

22           (Adjourned)

23

24

25